00001

1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3   JON MUSE,              )
                           )
4        Plaintiff,    )
                           )
5        vs.              ) Civil No. CV04-00154 DAE/BMK
                           )
6   HOME DEPOT USA, INC.,       )
                           )
7        Defendants.    )
                           )
8

9

10

11

12

13

14

15

16

17

18           DEPOSITION OF DEBRA PETERSON

19        Taken on behalf of the Plaintiff at the offices of

20   Davis Levin Livingston Grande, 851 Fort Street, 500 Davis

21   Levin Livingston Grande Place, Honolulu, Hawaii, commencing

22   at 9:01 a.m. on January 7, 2006, pursuant to Notice.

23

24   BEFORE:     JESSICA R. PERRY, CSR NO. 404

25           Certified Shorthand Reporter



                    **PETERSON.V1**                    **Page 1**

                    EXHIBIT "A"

00002
1  APPEARANCES:

2  For the Plaintiff:  STANLEY E. LEVIN, ESQ.

3              Davis Levin Livingston Grande

4              851 Fort Street

5              400 Davis Levin Livingston Grande Place

6              Honolulu, Hawaii 96813

7

8              BRUCE F. SHERMAN, ESQ.

9              1164 Bishop Street

10             Suite 124

11             Honolulu, Hawaii 96813

12

13

14  For the Defendant:  JEFFREY S. HARRIS, ESQ.

15             JAN MURANAKA BOIVIN, ESQ.

16             Torkildson, Katz, Fonseca,

17             Moore & Hetherington

18             700 Bishop Street, 15th Floor

19             Honolulu, Hawaii 96813

20

21

22

23

24

25

**PETERSON.V1**                              **Page 2**

00003

1              I N D E X

2

3  EXAMINATION BY:                    Page

4        Mr. Sherman              4

5

6            EXHIBITS FOR IDENTIFICATION

7

8  1.  Employee Statement              24

9  2.  Associate Statement            60

10 2A. Associate Statement            72

11 3.  Declaration of Debra Peterson        89

12

13

14

15

16

17

18

19

20

21

22

23

24

25

00004

1              PROCEEDINGS

2         VIDEOGRAPHER:  This is the deposition of Debra

3  Peterson in the matter of Jon Muse versus Home Depot U.S.A.,

4  Incorporated.  We are located at Davis Levin Livingston

5  Grande, 851 Fort Street, Suite 500, Honolulu, Hawaii 96813.

6  My name is Derrick Bryant, certified legal video specialist

7  for Certified Legal Video Services.

8         Will counsel please state your names.

9         MR. SHERMAN:  I'm Bruce Sherman, on behalf of

10  the Plaintiff, Jon Muse.  I'm here with Stan Levin, who is

11  also co-counsel on behalf of Jon Muse.

12         MR. HARRIS:  Good morning.  Jeff Harris and

13  Jan Boivin, appearing on behalf of Home Depot, Inc., the

14  Defendant, and also representing the deponent in this

15  deposition.

16         VIDEOGRAPHER:  Today's date is January 7th,

17  2006.  We're now on the record at 9:02 a.m.

18         Will the court reporter please swear in the

19  deponent.

20         DEBRA PETERSON,

21  having first been duly sworn, testified upon her oath as

22  follows:

23              EXAMINATION

24  BY MR. SHERMAN:

25    Q.  Good morning, Ms. --

00005

1     A.  Good morning.

2     Q.  Is it Ms. or Mrs.?

3     A.  Mrs.

4     Q.  Mrs., okay.  I'm Bruce Sherman, here on behalf of

5  Plaintiff Jon Muse.  If we -- if I could ask you to state

6  your name for the record again and spell it so that we're

7  clear.

8     A.  Okay.  Debra Ann Peterson, D-E-B-R-A, A-N-N,

9  P-E-T-E-R-S-O-N.

10     Q.  And where do you currently reside?

11     A.  45-1133 Makaleha Street, Kaneohe, Hawaii 96744.

12     Q.  Are you familiar with the nature of this lawsuit or

13  what it's about?

14     A.  Yes.

15     Q.  And have you ever had your deposition taken before?

16     A.  No.

17     Q.  Do you know what a deposition is?

18     A.  Yes.

19     Q.  You understand that you'll be asking -- you'll be

20  asked questions and you'll be asked to answer the questions

21  while under oath?

22     A.  Yes.

23     Q.  You understand that at this point in time, from the

24  time that you were sworn in, that you're under oath?

25     A.  Yes.

00006

1    Q.   Is there anything -- is there any medication you've

2   taken in the last 24 hours or have you consumed any alcohol

3   that would impede --

4    A.   No.

5    Q.   -- your ability to testify?

6    A.   No.

7    Q.   When I ask you questions during this deposition --

8   I'll ask in a minute whether you've spoken with Mr. Harris

9   about formatting of it, but it's important --

10        MR. LEVIN:  Wait.

11    Q.   It's important that you listen to each question as

12   it's asked and answer it to the best of your ability as it's

13   asked.  Do you understand that?

14    A.   Yes.

15    Q.   You should also wait until I've actually asked the

16   whole question.  The reason for that is sometimes, after a

17   line of questioning, you'll start to think that you know what

18   the next question -- or what it's going to be and you'll

19   answer beforehand, and that prevents the court reporter from

20   getting the exact question and testimony down.  Do you

21   understand that?

22    A.   Yes.

23    Q.   So it's important to wait until the question is

24   asked.  There will be times when your attorney, Mr. Harris,

25   will object to a question.  At that point in time you should

00007

1  stop answering the question.  Let him state his objection for

2  the record.  And virtually -- in most cases then you'll be

3  asked to answer the question.  There are only a few rare

4  exceptions where you may be instructed not to answer the

5  question.  I'm not sure we'll encounter those here, but

6  Mr. Harris, I'm certain, will make that very clear on the

7  record.  Do you understand that?

8      A.  Yes.

9      Q.  It's also very important -- while we are

10  videotaping this, we are having it transcribed as well.  It's

11  very important that you answer verbally each question.  Do

12  you understand that?

13      A.  Yes.

14      Q.  Oftentimes we will start to have a non-verbal

15  answer to a question, and unfortunately the court reporter

16  can't pick that up.  Do you understand that?

17      A.  Yes.

18      Q.  So if you don't understand a question that I've

19  asked, you know, feel free to say so and ask that I clarify.

20  We're not asking you necessarily to guess, so there may come

21  a time when we do, but that would be very explicit, okay, so

22  just to the best of your recollection answer the questions.

23  Do you understand that?

24      A.  Yes.

25      Q.  And are there any health barriers or issues that

00008

1  would prevent you from testifying truthfully today?

2      A.  No.

3      Q.  The other thing is if at any point you become tired

4  and need to take a break, just let us know, and if we can,

5  we'll certainly accommodate you.  Do you have any -- can you

6  read and write?

7      A.  Yes.

8      Q.  And, again, you've never testified in a deposition

9  before?

10     A.  No.

11     Q.  Have you ever testified in court before?

12     A.  No.

13     Q.  Have you ever been party to a lawsuit before?

14     A.  No.

15     Q.  Not as a defendant or a plaintiff?

16     A.  No.

17     Q.  Now, prior to this meeting today, have you -- prior

18  to the deposition today, have you looked at any documents in

19  preparation for today's testimony?

20     A.  Yes.

21     Q.  And what documents were those?

22     A.  My declaration and my written statement.

23     Q.  Are there two written statements you looked at?

24     A.  Yes.

25     Q.  And one of those would be regarding a November 3rd

00009

1  incident; is that correct?

2      A.  Yes.

3      Q.  And one would be --

4          MR. SHERMAN:  I'm sorry.

5          MR. HARRIS:  Objection, best evidence.

6      Q.  And one would be regarding the April 25th --

7      A.  Yes.

8      Q.  -- incident?

9          Did you meet with Mr. Harris today before this

10  deposition to prepare?

11         MR. HARRIS:  Objection, attorney-client

12  privilege.  Instruct the witness not to answer with respect

13  to communications between her and I.

14         MR. SHERMAN:  I understand, but we can

15  certainly ask the question did she meet with you.

16         MR. HARRIS:  Sure, sure.

17     Q.  Did you meet with Mr. Harris to prepare?

18     A.  Yes.

19     Q.  And that was this morning?

20     A.  Yes.

21     Q.  At his office?

22     A.  Yes.

23     Q.  And who was present then?

24     A.  Mr. Harris and Ms. Jan and myself.

25     Q.  When you say Ms. Jan, you mean Jan Boivin?

00010

1    A.  Yes.

2    Q.  Is that the attorney sitting next to Mr. Harris?

3    A.  Yes.

4    Q.  How long did you meet with them?

5          MR. HARRIS:  Objection.  Instruct the witness

6  not to answer.  Attorney-client privilege.

7          MR. SHERMAN:  Okay, I don't think the time --

8          MR. HARRIS:  I'm sorry, I'm not going to argue

9  with you.  I'm instructing the witness not to answer.  Please

10  ask your next question.

11         MR. SHERMAN:  Okay, can we -- let's mark this

12  on the transcript.

13    Q.  Okay, one thing you should understand is -- and it

14  may be difficult today, but in the instance where there is a

15  dispute as to whether your attorney properly instructs you

16  not to answer a question, we may have to go to court, okay.

17  I'm not sure we're going to do that right now, but I want you

18  to understand it.  Now, is it your understanding today that

19  Mr. Harris represents you?

20    A.  Yes.

21    Q.  And is that in your capacity as an employee of Home

22  Depot?

23    A.  Yes.

24    Q.  Are you in fact today an employee of Home Depot?

25    A.  No.

00011

1    Q.   Where do you work now?

2    A.   Young Laundry & Dry Cleaning.

3    Q.   What do you do there?

4    A.   Clerk.

5    Q.   How long have you worked there?

6    A.   Ten months.

7    Q.   Immediately prior to there where did you work?

8    A.   Home Depot.

9    Q.   Do you know the time period you worked at Home

10   Depot?

11   A.   November 2002 to August 2004.

12   Q.   And why did you leave Home Depot?

13   A.   Termination.

14   Q.   What was the basis of that termination?

15   A.   I was told by supervisor -- supervisor, higher-ups

16   to do -- to make returns and -- from upstairs, the LPS people

17   didn't see me doing the -- with the products at my counter,

18   so they took me in for questioning for that.  They would just

19   give me a list of UPC codes to do returns.

20   Q.   Was there a specific designation or reason for the

21   termination that you can recall?

22   A.   Repeat the question.

23   Q.   Was there a specific term they used for the

24   termination?

25   A.   They said fraudulent returns.

**PETERSON.V1**                    **Page 11**

00012

1    Q.  Was there a -- any kind of investigation?

2    A.  Yes.

3    Q.  Okay, and what was the result of that

4 investigation?

5        MR. HARRIS:  Objection, speculation,

6 foundation.

7    Q.  What was the result of that investigation?

8    A.  Case was dropped.  No evidence.

9    Q.  When you say the case was dropped, was there an

10 investigation by the police in that regard?

11   A.  Yes.

12   Q.  Okay, and that would be the Honolulu Police

13 Department?

14   A.  Yes.

15   Q.  Do you happen to remember the name of the officer

16 investigating that?

17   A.  Susan Medeiros.

18   Q.  And would this have been in August of 2004?

19   A.  Yes.

20   Q.  And it's your testimony that the police department

21 decided to prosecute this case?

22       MR. HARRIS:  Objection, foundation,

23 speculation.

24   Q.  You can answer that.

25   A.  It was LPS at Home Depot, loss preventions at Home

00013

1  Depot.

2     Q.  They declined to prosecute?

3     A.  Yes.

4     Q.  Could you say that again, loss prevention?

5     A.  LPS, loss prevention.  I don't know if it's service

6  or...

7     Q.  Are they located in that particular store?

8     A.  Yes.

9     Q.  Is there a statewide loss prevention system or

10  service?

11        MR. HARRIS:  Objection, foundation,

12  speculation.

13        THE WITNESS:  I don't know.

14    Q.  Okay.

15    A.  I don't recall.

16    Q.  Who was the -- who was in charge of that

17  investigation at Home Depot?

18    A.  Harold Han.

19    Q.  Do you know how to spell his last name?

20    A.  H-A-N.

21    Q.  Do you know if he's still working at Home Depot?

22    A.  Yes.

23    Q.  Is he still working at Home Depot?

24    A.  Yes.

25    Q.  When did this investigation begin?



00014

1    MR. HARRIS:  Objection, speculation.

2    THE WITNESS:  I don't know.  I don't recall.

3    Q.  When were you first contacted about it by Home

4  Depot?

5    A.  I don't recall.

6    Q.  Would it have been July of 2004?

7    A.  No.  It was in 2005 sometime.

8    Q.  Was it after you left Home Depot?

9    A.  Yes.

10    Q.  So let me get this straight, were you terminated

11  before they finished the investigation by Home Depot?

12    A.  Yes.

13    Q.  So let me get this straight, before they

14  investigated you, they fired you; is that correct?

15    A.  Yes.

16    Q.  Had they taken your statement before they fired

17  you?

18    A.  Yes.

19    Q.  Had they taken anyone else's statement?

20    MR. HARRIS:  Objection, speculation.

21    Q.  To your knowledge, had they taken anyone else's

22  statement?

23    A.  I don't recall.  I don't know.

24    Q.  Do you have any -- did they give you a letter

25  regarding the termination?

00015

1     A.  Yes.

2     Q.  And would that have been in August of 2004?

3     A.  Yes.

4     Q.  Do you think you should have been fired?

5         MR. HARRIS:  Objection, speculation, lay

6 opinion.

7     Q.  Do you think you should have been fired?

8     A.  No.

9     Q.  Why do you think they fired you?

10        MR. HARRIS:  Objection, speculation, lay

11 opinion, irrelevant, harassing.

12    Q.  Go ahead.

13    A.  I don't know.

14    Q.  Okay.  When did they first bring to your attention

15 the problem about the returns?

16    A.  The day I was terminated.

17    Q.  So is it your testimony, then, that they just

18 terminated you and then they did an investigation?

19    A.  Yes.

20    Q.  And you had no idea that this was coming when they

21 terminated you in August of 2004?

22    A.  No.

23    Q.  That must have been very upsetting.

24        MR. HARRIS:  Objection, speculation,

25 harassing.

00016

1          THE WITNESS:  Yes.

2      Q.  Doesn't seem very fair, does it?

3      A.  No.

4      Q.  Were you ever put on any kind of paid leave --

5      A.  No.

6      Q.  -- pending this?

7      A.  No.

8      Q.  Did you apply for unemployment insurance?

9      A.  No.

10     Q.  Did you just not want to or did you know you

11  couldn't?

12     A.  Just didn't want to.

13     Q.  Has this affected you -- your ability to get any

14  other work?

15     A.  Yes.

16     Q.  How so?

17     A.  I was devastated.  I couldn't get out of bed,

18  couldn't eat.  I was -- I didn't know what was going on.  I

19  was just following procedures.  Just following procedures.

20     Q.  You don't think there was any justification for

21  them terminating you, do you?

22          MR. HARRIS:  Objection, foundation,

23  speculation, lay opinion.

24     Q.  You can answer.

25     A.  Repeat.

00017

1    Q.  You don't think there's any good reason for them

2  terminating you, then?

3    A.  No.

4    Q.  After -- when did you find out the police were not

5  going to take their case?

6    A.  In 2005 sometime.  I don't recall the exact.

7    Q.  At that time -- have you had any contact with Home

8  Depot since you were terminated in August of 2004?

9    A.  I go shopping in there.

10    Q.  They haven't banned you from the store or anything?

11    A.  No.

12    Q.  I guess you -- is it comfortable for you to go to

13  that store?

14    A.  I go shopping.  It's okay.

15    Q.  Do you still have friends there, who work --

16    A.  A lot of friends.

17    Q.  Do you talk to them when you go to the store?

18    A.  Yes.

19    Q.  Is Darlyn Kuhia a friend of yours?

20    A.  She was a co-worker of mine.

21    Q.  You wouldn't classify her as a friend?

22    A.  Personal friend, no.  Just a co-worker.

23    Q.  What about Michael Dolan, was he a friend of yours

24  there?

25    A.  A co-worker.  He was my manager.

00018

1    Q.  Did either of these people have anything to do with

2  your termination, to your knowledge?

3    A.  No.

4    Q.  Besides Mr. Han, do you know if anyone in

5  particular complained about your situation at Home Depot that

6  led to your termination?

7    A.  No.

8    Q.  Have you ever seen any documents or reports

9  regarding the investigation and the findings?

10    A.  No.

11    Q.  Has anyone ever offered you -- anyone ever offered

12  to show you these?

13    A.  No.

14    Q.  Have you received any kind of an offer of

15  settlement from Home Depot for your termination?

16    A.  No.

17    Q.  No one has ever talked to you about it?

18    A.  I just go on with my life.

19    Q.  Have -- you've never talked to an attorney --

20  another attorney besides Mr. Harris about this?

21    A.  No.

22    Q.  And let me get this straight, I guess, one last

23  time.  You were never placed on any kind of paid leave

24  pending the investigation; is that correct?

25    A.  No.

00019

1    Q.  They just fired you outright?

2    A.  Yes.

3    Q.  And you showed up for work one day and they just

4  said, here's a termination letter?

5         MR. HARRIS:  Objection, argumentative.

6         MR. SHERMAN:  Leading too, probably.

7         MR. HARRIS:  Yeah, but the argumentative will

8  get sustained.

9         MR. SHERMAN:  I know.

10   Q.  And I don't want to dwell on this, but I do need to

11  be clear.  What exactly did Home Depot claim you were doing?

12        MR. HARRIS:  Objection, foundation,

13  speculation.

14   Q.  You can answer the question.

15   A.  I was following procedures, doing what I was told

16  to do, and they told me I was doing fraudulent returns.

17   Q.  And what -- what basis did they have to claim that

18  you were doing a fraudulent return?

19        MR. HARRIS:  Objection --

20        THE WITNESS:  Video.

21        MR. HARRIS:  Hold on.  Objection, foundation,

22  speculation.

23   Q.  Okay, go ahead.

24   A.  Video.

25   Q.  Do they have -- and were these doing -- were these

**PETERSON.V1**                          **Page 19**

00020

1  fraudulent returns at your checkpoint?

2      A.  Yes.

3      Q.  Do they have a video on each checkpoint, to your

4  knowledge?

5      A.  No, no.

6      Q.  Let me ask you this, to your knowledge -- and I

7  want to refer to the two incidents with Mr. Muse -- do you

8  know if there was a video on those checkpoints at the time?

9      A.  Videos are on the ceiling of the store and can see

10  everything clearly.

11      Q.  Are they on, to your knowledge, all the time?

12      A.  Yes.

13      Q.  So is it possible, then, that there is a video

14  recording of the November 2003 encounter with Mr. Muse?

15          MR. HARRIS:  Objection, foundation,

16  speculation.

17      Q.  Go ahead.

18      A.  I'm sure there is.

19      Q.  Have you ever seen such a video?

20      A.  No.

21      Q.  Do you know if one has -- a copy has been made of

22  one?

23      A.  Don't recall.

24      Q.  Since you began working at Home Depot in -- is it

25  November or December of 2002?

**PETERSON.V1**                               **Page 20**

00021

1    A.  November.

2    Q.  Where did you work prior to that?

3    A.  I stayed home for a little while.

4    Q.  When you say -- was that a few years?

5    A.  Yes.

6    Q.  Where did you -- when was your -- what was your

7  last job before you began working at Home Depot?

8    A.  Hardware Hawaii.

9    Q.  I'm sorry, what?

10    A.  Hardware Hawaii.

11    Q.  And what did you do there?

12    A.  I was an assistant manager.

13    Q.  And why did you leave that job?

14    A.  They had a new GM that came in and we didn't get

15  along.  We didn't see eye to eye there, and he was -- a lot

16  of people quit when he got there.  I wasn't the only one.

17    Q.  Where is Hardware Hawaii located?

18    A.  Kahuhipa Street.

19    Q.  It still exists?

20    A.  Yes.

21    Q.  Have you had any other kind of allegations about

22  fraudulent returns or anything of that nature in your work

23  history?

24    A.  No.

25    Q.  This is the only time at all --



00022

1    A.  Yes.

2    Q.  -- that this has ever occurred?

3    A.  Yes.  Can I say something?

4         MR. LEVIN:  No.

5         MR. HARRIS:  Why don't you wait until he asks

6    a question, and then if you want to tell him something later,

7    I'll ask you to talk to me.

8    Q.  Let me get this straight one last time.  You've

9    never had a problem -- an accusation of theft or dishonesty

10   in your work -- in your work history?

11   A.  No.

12   Q.  You've never been charged with a crime at all?

13   A.  No.

14   Q.  You've never been convicted of such a crime?

15   A.  No.

16   Q.  Do you know who maintains the videos at Home Depot?

17   A.  Harold Han.

18   Q.  Is Harold Han security at Home Depot, to your

19   knowledge?

20   A.  LPS.

21   Q.  Is that a fancy name for security?

22   A.  Security is -- I think it's different, security.

23   LPS is loss preventions.

24   Q.  Do you know how long the videos are maintained?

25         MR. HARRIS:  Objection, speculation,

**PETERSON.V1**                              **Page 22**

00023

1  foundation.

2      THE WITNESS:  No.

3    Q.  Do you know if Harold Han is still working at Home

4  Depot?

5    A.  Yes.

6    Q.  You think he is?

7    A.  Yes.

8    Q.  Have you ever seen one of these videos from a

9  checkpoint?

10    A.  No.

11    Q.  But to the best of your knowledge, every

12  transaction is videoed?

13      MR. HARRIS:  Objection, foundation,

14  speculation.

15    Q.  You can answer.

16    A.  Yes.

17    Q.  Is that general knowledge among all the clerks

18  there?

19      MR. HARRIS:  Objection, foundation,

20  speculation, hearsay.

21    Q.  Go ahead.  You can answer.

22    A.  The video cameras are above the ceiling.  It's

23  focusing on everybody in the store, not just the cashiers.

24    Q.  How many -- do you know how many video cameras are

25  on the ceiling?

00024

1    A.  Approximately about 30.

2        MR. HARRIS:  Did you want to ask me something?

3    Q.  I'm going to hand you what's been marked as Exhibit

4  1.

5        (Exhibit No. 1 marked.)

6        MR. HARRIS:  There's no question pending now,

7  is there?

8        MR. SHERMAN:  No.

9        MR. HARRIS:  The witness wants to tell me

10  something.

11      Okay, I'll follow up on that when I talk to you.

12    Q.  To the best of your knowledge, does loss prevention

13  maintain the videos?

14    A.  Yes.

15    Q.  Why don't you take a look at what's been marked as

16  Exhibit 1.  Can you identify that document?

17    A.  Yes.

18    Q.  What is it?

19    A.  My statement the day Jon Muse came in to return a

20  wheelbarrow.

21    Q.  Is this your handwriting?

22    A.  Yes.

23        MR. HARRIS:  Excuse me, Counsel, what exhibit

24  is this marked?  I have an unmarked copy.  It's 1, right?

25  Okay.  I don't need a sticker.

**PETERSON.V1**                    **Page 24**

00025

1       MR. SHERMAN:  Well, I want to make sure it's

2   clear, Jeff.  I don't want any confusion here.

3       Q.  Now, let me ask you to take a look at the top of

4   the employee statement.  Is that your residence, 45-113

5   Makaleha Street?

6       A.  Yes.

7       Q.  Is that still your residence?

8       A.  Yes.

9       Q.  And you earlier testified that you thought you had

10   been employed at Home Depot since November of 2002?

11      A.  Yes.

12      Q.  Does this refresh your recollection?

13      A.  Yes.

14      Q.  Since when have you been employed at Home Depot, to

15   your --

16      A.  November 4th, 2002.

17      Q.  November 4th, 2002?

18      A.  Yeah.

19      Q.  So on this statement here, though, you said you had

20   been employed since December of 2002; is that correct?

21      A.  I don't recall, because my daughter was hired at

22   her job in November and I was December, the same time, so I

23   might have that two dates mixed with hers.

24      Q.  So you're not really sure --

25      A.  Yes.