00026

1    Q.    -- at this point whether it was November or

2  December 2002?

3    A.  Yes.

4    Q.  Let me ask you to take -- we can take a moment here

5  just to read through this statement, if you would, or are you

6  familiar enough with it?

7    A.  (Witness nods).

8    Q.  You're familiar enough with it just to testify now?

9    A.  Yes.

10    Q.  Now, is this statement accurate?

11    A.  Just the date, a date -- I think the date on the

12  top.

13    Q.  What date would that be?

14    A.  That would be on November 3rd, 2003.

15    Q.  You're sure?

16    A.  Yes.

17    Q.  So you made a mistake there; is that correct?

18    A.  Just on the 2, should be changed to a 3.  That's

19  the only --

20    Q.  That --

21    A.  -- year.

22        MR. HARRIS:  Please don't interrupt.

23    Q.  So that part of the statement is not correct; is

24  that true?

25    A.  Just the date.





00027

1    Q.  Okay.  So is it your testimony, then, that the

2  occurrence about which you're writing took place on November

3  3rd, 2003?

4    A.  No, 2004.

5    Q.  Okay.  Then when you encountered Mr. Muse, that was

6  on November 3rd, 2004?

7    A.  Yes.

8    Q.  Okay.  Now, remembering the day of the incident,

9  did you write up a report that day?

10    A.  Yes, I wrote my -- a note sheet, stuck it in my

11  locker.

12    Q.  Do you know who has that note sheet now?

13    A.  I threw it away after I wrote my statement.

14    Q.  Okay.

15    A.  It's the same.

16    Q.  Okay, so you actually had an earlier statement that

17  you destroyed; is that correct?

18    A.  Yes.

19    Q.  And what format was that in?  What does that look

20  like?

21    A.  Exactly the same.

22    Q.  Did you copy this statement word for word from

23  there?

24    A.  Yes.

25    Q.  Was it -- at the time, to your knowledge, was it

**PETERSON.V1**                    **Page 27**

00028

1  company policy that when you had an incident like you did

2  with Mr. Muse that you would make a statement immediately

3  thereafter?

4      A.  Yes.

5      Q.  And when did you make that statement that day?

6      A.  I wrote up my statement, my -- and I stuck it in my

7  locker until I was told to give it to them.  Then I rewrote

8  it.

9      Q.  Let me ask you, do you remember what time the

10  incident with Mr. Muse occurred, what time of the day?

11      A.  I don't recall.

12      Q.  It's not in your statement, though, is it, the time

13  it occurred?

14      A.  No.

15      Q.  Do you know if it was early morning?

16      A.  It was approximately between -- early afternoon.

17      Q.  After 1:00 o'clock?

18      A.  Yes.

19      Q.  Now -- so what was your shift that day?  What were

20  your hours that day, November?

21      A.  I don't recall.

22      Q.  Do you know when you got off that day?

23      A.  No.

24      Q.  Would you have written up the statement after you

25  got off?

**PETERSON.V1**                              **Page 28**

00029

1    A.  Yes.

2    Q.  Okay, would you have made a copy of it?

3    A.  I had -- the statement that I wrote was in my

4  locker.  That's the only one I --

5    Q.  Is it company policy that you would keep that

6  statement and not give it to anyone else?

7        MR. HARRIS:  Objection, foundation,

8  speculation.

9    Q.  To the best of your knowledge, at that time, was it

10  company policy that you would keep that statement for

11  yourself?

12    A.  Repeat the question.

13    Q.  To the best of your knowledge, at that time, was it

14  Home Depot's policy that you would not give that statement to

15  anyone else but keep it in your locker?

16    A.  No.

17        MR. HARRIS:  Objection, foundation,

18  speculation.  Did I interrupt you?

19        THE WITNESS:  No.

20        MR. HARRIS:  Did you say something?  Okay.

21    Q.  You can answer the question.

22    A.  No.

23    Q.  What was the policy as you understood it at that

24  time?

25        MR. HARRIS:  Objection, foundation,

00030

1 speculation.

2    Q. You can answer.

3    A. To write a statement right when it happened, the

4 day that it happened.

5    Q. But what were you supposed to do with this

6 statement after you wrote it?

7       MR. HARRIS: Objection, foundation,

8 speculation.

9    Q. You can answer.

10    A. I kept it in my locker.

11    Q. You weren't aware of any policy at the time that

12 would require you to give it to a manager or someone higher

13 up in the company?

14    A. Yeah.

15    Q. What was that policy that you were aware of at the

16 time?

17    A. To give it to the manager or -- I wasn't told to

18 give it to them until February.

19    Q. There was no policy, to your knowledge, that you

20 would give it to them immediately?

21       MR. HARRIS: Objection, foundation,

22 speculation, asked and answered.

23       THE WITNESS: I don't recall.

24    Q. How did you know that you were supposed to give it

25 to the manager?

**PETERSON.V1**                                              **Page 30**

00031

1           MR. HARRIS:  Objection, foundation,

2   speculation, assumes facts, asked and answered.

3       Q.   You can answer.

4       A.   It's the right thing to do.

5       Q.   When you began work at Home Depot, were you given a

6   manual of company policy?

7       A.   Yes.

8       Q.   And did that manual tell you what to do in certain

9   circumstances?

10      A.   Yes.

11      Q.   Okay, did that manuel address a situation like you

12  had with Mr. Muse?

13      A.   Yes.

14      Q.   And to your recollection, what did the manual say?

15      A.   Treat every individual, every customer with

16  dignity, respect.

17      Q.   Did the manual tell you to make a written report

18  after an incident with a customer?

19      A.   I don't recall.

20      Q.   Do you still have a copy of that manual?

21      A.   No.

22      Q.   Did they take it back from you when you were

23  terminated?

24      A.   No.

25      Q.   Did you -- what happened to the manual you were

**PETERSON.V1**                              **Page 31**

00032

1  given?

2     A.  It was probably in the junk at home and it got

3  tossed out with the junk, you know.

4     Q.  But the manual they gave you told you what you had

5  to do as an employee at Home Depot; is that correct?

6     A.  Yes.

7        MR. HARRIS:  Objection, best evidence and

8  foundation.

9     Q.  You can answer.

10    A.  Yes.

11    Q.  And did you -- would you refer to that manual when

12  you had a question about what you were supposed to do at Home

13  Depot?

14    A.  Yes.

15    Q.  At the time this incident occurred, did you still

16  have that manual?

17    A.  Yes.

18    Q.  Did you refer to it at the time of this incident to

19  see what you should do?

20    A.  Yes.

21    Q.  And what did the manual state, to the best of your

22  recollection?

23    A.  Treat the person -- each person as a regular

24  customer.

25    Q.  What did the manual state about taking a -- making

00033

1  a report about an incident?

2          MR. HARRIS:  Objection, assumes facts, best

3  evidence, hearsay.

4          THE WITNESS:  I don't recall.

5      Q.  Do you think the manual may have said something

6  about making a report?

7          MR. HARRIS:  Same objection, asked and

8  answered.

9          THE WITNESS:  I don't recall.

10     Q.   So let me direct your attention to the bottom of

11  the report.  Is that your signature?

12     A.  Yes.

13     Q.  Could you read the time for us into the record?

14     A.  4:55 p.m.

15     Q.  Okay.  And the date?

16     A.  February 20th, 2004.

17     Q.  You were still an employee of Home Depot at that

18  time?

19     A.  Yes.

20     Q.  Do you know where you wrote this statement out?

21     A.  In the lunch room.

22     Q.  At Home Depot?

23     A.  Yes.

24     Q.  And who asked -- did someone ask you to write this

25  statement out?

00034

1    A.  Yes.

2    Q.  Who was that?

3    A.  I don't recall.

4    Q.  Would it have been Mike Dolan?

5    A.  I don't recall.

6    Q.  How many times -- how many times have you met with

7  Mr. Harris?

8        MR. HARRIS:  Objection, attorney-client

9  privilege.  Instruct the witness -- instruct the witness not

10  to answer.

11        MR. SHERMAN:  Actually, what communication is

12  being violated there?

13        MR. HARRIS:  I'm not arguing with you.  You

14  can take that question and go talk to the magistrate.  I'm

15  objecting.  I'm instructing the witness not to answer.

16    Q.  Are you going to follow Mr. Harris's instruction in

17  this regard, knowing that we may have to go to court on this?

18    A.  Yes.

19    Q.  How many times have you been to Mr. Harris's

20  office?

21        MR. HARRIS:  Same objection, same instruction.

22    Q.  Has Mr. Harris ever come out to Home Depot to talk

23  to you?

24        MR. HARRIS:  Same objection, same instruction.

25    Q.  Have you met with employees at Mr. Harris's law

00035

1 firm regarding this matter?

2          MR. HARRIS:  Same objection, same instruction.

3     Q.  Have they helped you prepare for this deposition in

4 any form or fashion?

5          MR. HARRIS:  Same objection, same instruction.

6     Q.  Did you -- let me ask you one more time. what

7 documents did you review for this deposition?

8          MR. HARRIS:  Asked and answered.

9     Q.  You can answer that question.

10     A.  My declaration and my written statements.

11     Q.  Now, your declaration, did you prepare that

12 yourself?

13     A.  No.

14     Q.  Was it prepared for you?

15     A.  Yes.

16     Q.  And you went somewhere to sign it; is that correct?

17     A.  No.

18     Q.  Was it sent to you in the mail?

19     A.  No.

20     Q.  How did you get it physically to sign it?

21     A.  It was dropped off at my work of employment.

22     Q.  Was it picked up from your work of employment as

23 well?

24     A.  Yes.

25     Q.  Do you know who picked it up?

**PETERSON.V1**                    **Page 35**

00036

1   A.  Yes.

2   Q.  Okay, who was that?

3   A.  Ms. Jan.

4   Q.  That was Jan Boivin?

5   A.  Yes.

6   Q.  Did she drop it off as well?

7   A.  Yes.

8   Q.  Without getting into your -- exactly what was said,

9 she spoke to you when she dropped it off; is that correct?

10      MR. HARRIS:  Objection, attorney-client

11 privilege.  Instruct the witness not to answer.

12      MR. SHERMAN:  Again, I don't understand that,

13 because I'm not asking the content.

14      MR. HARRIS:  Just stop arguing.  Just keep

15 going.

16      MR. SHERMAN:  Jeff, for the record, I don't

17 have to take instruction from you.  We can certainly make our

18 points for the record, all right?  There's no reason for

19 either me to be condescending to you or you to be

20 condescending to me.  We're not going to spend a lot of time

21 on this.  I want to make sure it's very clear, you know, if

22 and when we take this to Judge Kurren.  All right?

23      MR. HARRIS:  Sure.

24      MR. SHERMAN:  And it will just go faster if we

25 just stop going along this route.  Obviously, you know, you

00037

1 have an idea that -- a much more expansive view of the

2 attorney-client privilege than we do, and I think we all

3 understand that at this point, but I do have to make the

4 record.

5      MR. HARRIS:  Ask a question and keep going.

6  Q.  Have you spoken with anyone at Home Depot about

7 this incident?

8  A.  No.

9  Q.  You never spoke to Mr. Dolan about it?

10  A.  No.

11  Q.  At any time?

12  A.  No.

13  Q.  Okay.  What about Darlyn Kuhia, never spoken to her

14 about this?

15  A.  I misunderstood the question.  I thought you

16 meant -- the incident that happened that day?

17  Q.  That's correct.

18  A.  Yes, yeah, I spoke to them.

19  Q.  Okay.  Is it easier for you to remember things

20 right after they've happened than it is to wait, let's say,

21 five months to write it down?

22  A.  I'm pretty sharp.  I can remember a lot of things.

23  Q.  So for you, there's no reason to write anything

24 down immediately?  You can just remember it five or six

25 months later; is that correct?

**PETERSON.V1**                **Page 37**

00038

1          MR. HARRIS:  Objection, argumentative.

2      Q.  You can answer.

3      A.  I usually write it down right away.

4      Q.  But the statement you wrote down right away has

5  been destroyed; is that correct?

6      A.  It's the same statement that I have here.  It's

7  just a re-handwritten one of it.

8      Q.  Are you saying it's exactly the same statement?

9      A.  Yes.

10     Q.  Then why don't we have it?

11         MR. HARRIS:  Objection, foundation,

12  speculation, argumentative.

13     Q.  Go ahead.

14     A.  It's the same thing.  It was just jotted down fast

15  in my -- on paper and I rewrote it.

16     Q.  Why would you rewrite it?

17     A.  On a different sheet of paper, on the employment

18  statement paper.

19     Q.  But you stated that the earlier statement was on

20  exactly the same form?

21     A.  It was on paper.  It was on plain paper, then I

22  rewrote it on the Home Depot statement, exactly wording the

23  same.

24     Q.  Okay, with exactly the same dates?

25     A.  I might have just made a mistake on the top, the

**PETERSON.V1**                              **Page 38**

00039

1 year, 2002. Instead of 2004 I wrote 2002.

2   Q. Now, have you -- did you ever -- have you ever met

3 Mr. Muse since this incident in November?

4   A. No.

5   Q. Did you ever meet him prior to the incident in

6 November of 2004?

7   A. No.

8   Q. Didn't you meet him in April 25th, 2004?

9       MR. HARRIS: Objection, vague as to the term

10 meet.

11   Q. You can answer the question, if you can.

12   A. Yes.

13   Q. So you have met him after the November incident?

14   A. Yes.

15   Q. And would that have been April 25th, 2004?

16   A. Yes.

17   Q. Now, since your termination from Home Depot, have

18 you spoken to anyone other than Mr. Harris about this

19 incident?

20       MR. HARRIS: Objection as to communications

21 with anyone in my office covered by the attorney-client

22 privilege and with respect to -- such as Jan Boivin, and

23 instruct the witness not to answer with respect to

24 communications with anyone in my office.

25   Q. Have you spoken with anyone about this incident?

**PETERSON.V1**                **Page 39**

00040

1   A.  No.

2   Q.  You haven't spoken with anyone at Home Depot?

3   A.  During the time it happened, yes.

4   Q.  Now, going back to the November incident, when

5  Mr. Muse spoke to you, did he speak to you in an even voice,

6  a low voice?

7   A.  No.

8   Q.  How would you describe his voice?

9   A.  The tone was normal, but every time the C word

10  would come out it was a higher tone, higher.

11   Q.  Did you at that time think he was calling you a

12  cunt himself?

13   A.  Yes.

14   Q.  And how long -- did you think that the whole time?

15   A.  Yes.

16   Q.  And did you continue to think that after he told

17  you he had Tourette's?

18       MR. HARRIS:  Objection, assumes facts.

19   Q.  You can answer that.

20   A.  He told me he had Tourette's, but I didn't know if

21  he had Tourette's, so I still thought he was calling me the C

22  word.

23   Q.  At that time did you know what Tourette's was?

24   A.  Yes.

25   Q.  What do you think -- what did you think it was at

00041

1 that time?

2   A.  The Tourette's I knew about was the motion, the

3 movements with the arms and the legs, the ticking.  That's

4 the only Tourette's that I ever knew about.

5   Q.  At that time you weren't aware that there was a

6 verbal Tourette's?

7   A.  No.

8   Q.  You weren't aware that there were verbal tics?

9   A.  No.

10   Q.   Have you since become aware that there are verbal

11 tics?

12       MR. HARRIS:  Objection, foundation,

13 speculation, lay opinion.

14   Q.  You can go ahead and answer.

15   A.  I don't know.  I don't know.  I don't know if

16 that's what he has.  I don't know.

17   Q.  Well, if you had known at the time, would that have

18 made a difference as to how you felt about Mr. Muse?

19       MR. HARRIS:  Objection, foundation,

20 speculation, lay opinion, vague.

21   Q.  Go ahead and answer.

22   A.  No.

23   Q.  You mean if you knew he had a disease like

24 Tourette's with verbal tics, you would have still been

25 offended --

00042

1              MR. HARRIS:  Objection.

2    Q.   -- at that time; is that correct?

3              MR. HARRIS:  Objection, foundation,

4   speculation, lay opinion, vague, argumentative.

5    Q.   Go ahead.

6    A.   Repeat the question.

7              MR. SHERMAN:  Could you read the question

8   back, please.

9                   (Record read.)

10             MR. HARRIS:  Same objection.

11             THE WITNESS:  No.

12    Q.   Looking back at the incident, are you still

13   offended --

14    A.   Yes.

15    Q.   -- knowing what you know now?

16    A.   Yes.

17    Q.   Even though --

18             MR. HARRIS:  Objection, vague -- are you done?

19   You stopped.

20             MR. SHERMAN:  No, I paused for a second.  I

21   know you want to get these objections on the record, but give

22   me a second.

23             MR. HARRIS:  It's just you had paused and you

24   were looking at her like you were asking for an answer.

25             MR. SHERMAN:  I was trying to make a

**PETERSON.V1**                          **Page 42**

00043

1 grammatical question, that's all.

2       MR. HARRIS: It's hard for both of us

3 sometimes.

4       MR. SHERMAN: I understand. We're getting to

5 that age.

6    Q. So assuming that Mr. Muse has a verbal tic that

7 forces him to use the word cunt and fucking and he has no

8 control over that, you were still offended by the fact that

9 he uses that language in that context?

10       MR. HARRIS: Objection, foundation,

11 speculation, lay opinion, argumentative.

12    Q. Okay, go ahead. You can answer.

13    A. Yes.

14    Q. So are there any other disabilities that offend

15 you?

16       MR. HARRIS: Objection, argumentative.

17 Instruct the witness not to answer. Harassing. Don't

18 answer.

19    Q. Are there some disabilities that offend you?

20       MR. HARRIS: Same objection, same instruction.

21 Irrelevant, harassing.

22    Q. Why were you offended at that time in November?

23    A. As a woman, any woman would be offended being

24 called a C word.

25    Q. But did he actually say, you're a cunt, at that

**PETERSON.V1**                              **Page 43**

00044

1  time in November?

2      A.  He addressed me as, eh, C.  Can you help me return,

3  C, this wheelbarrow, C?

4      Q.  Let me ask you that question again.

5          MR. HARRIS:  Objection, asked and answered,

6  argumentative.  Instruct the witness not to answer.

7      Q.  What made you think that he was directing that to

8  you personally at that time?

9      A.  He was asking -- directing to me, asking me for

10  help and looking at me straight in the eyes and saying the C

11  word.  He addressed me as, eh, C.

12      Q.  He actually said a --

13      A.  Eh, as in E-H, eh.

14      Q.  Isn't it possible he was simply asking you for help

15  in this transaction?

16          MR. HARRIS:  Objection, foundation,

17  speculation.

18      Q.  You can answer that.

19      A.  He was asking me for help, but he still addressed

20  me as, eh, C.

21      Q.  So that's -- that was your feeling at that time,

22  that he was calling you a cunt; is that correct?

23      A.  Yes.

24      Q.  And is that still your feeling?

25      A.  Yes.

**PETERSON.V1**                              **Page 44**

00045

1    Q.  So did Mr. Muse at that time ask you for any kind

2  of accommodation with respect to his condition?

3        MR. HARRIS:  Objection, foundation,

4  speculation, lay opinion, inadmissable.

5    Q.  You can answer.

6    A.  No.

7    Q.  Do you know what an accommodation is?

8        MR. HARRIS:  Objection, foundation,

9  speculation, lay opinion.

10    Q.  You can answer.

11        MR. HARRIS:  Vague.  And vague.

12    Q.  You can answer that.

13    A.  I don't know.  I don't recall.

14    Q.  Okay, did you -- if Mr. Muse had asked you for an

15  accommodation at that time, what would you have done?

16        MR. HARRIS:  Objection, foundation,

17  speculation, vague, and lay opinion, assumes facts not in

18  evidence.

19    Q.  Go ahead.

20    A.  Whether he asked me for an accommodation or not, I

21  served him as I would a regular customer while he was still

22  saying the C word.  I was taught to do my job good and I did

23  it as I was trained to.

24    Q.  Can you describe where your -- the checkout stand

25  was in Home Depot at the time of the November incident?

**PETERSON.V1**                        **Page 45**

00046

1     A.   My checkout stand, as you enter Home Depot, Ewa

2  end, the Ewa end, it's right as you enter the door.  My

3  checkout stand was number 23.

4     Q.   Could you have taken Mr. Muse to a separate

5  checkout stand and done the transaction there?

6          MR. HARRIS:  Objection, foundation,

7  speculation, assumes facts --

8     Q.   At the time of the incident.

9          MR. HARRIS:  -- assumes facts not in evidence.

10          THE WITNESS:  No.

11     Q.   Why not?

12     A.   There's three registers.

13          MR. HARRIS:  Go ahead and answer.

14          THE WITNESS:  I was helping Mr. Muse.  The

15  other girl, register 25, helping another customer, and we had

16  a long line, so the available cashier take the next customer.

17     Q.   Do you have any -- we talked about the manual for

18  employees at Home Depot.  You recall that?

19     A.   Yes.

20     Q.   Did the manual say anything about what you do if

21  you have a difficult customer?

22          MR. HARRIS:  Objection, foundation,

23  speculation, best evidence, hearsay.

24          THE WITNESS:  Yes.

25     Q.   What does the manual say to do?

**PETERSON.V1**                    **Page 46**

00047

1     A.  We treat customers all the same, whether they're

2  disgruntled, have a problem with us, or we call the manager

3  over or the head cashiers, which I did.

4     Q.  To your knowledge, do they have personal shoppers

5  at Home Depot?

6        MR. HARRIS:  Objection, foundation,

7  speculation.

8        THE WITNESS:  I don't -- yes, they do.

9     Q.  Would that -- and how do you know this?

10    A.  What do you mean by personal shoppers?

11    Q.  Do you have employees there who would go with

12  someone who had a difficulty shopping there --

13        MR. HARRIS:  Objection --

14    Q.  -- at Home Depot?

15        MR. HARRIS:  -- foundation, speculation,

16  vague.

17    Q.  Do you have employees who were assigned to do that?

18    A.  If a customer asks you for help, it's -- we don't

19  have employees assigned, but anybody -- any employee can help

20  a customer, and we do when they ask us for help.  We did it

21  on several occasions.

22    Q.  And this includes customers with disabilities?

23    A.  Yes.

24    Q.  If someone in a wheelchair came into Home Depot and

25  asked for a personal shopper when they first came in, would

**PETERSON.V1**                              **Page 47**



00048

1  someone go around the store with them?

2        MR. HARRIS:  Objection, foundation, vague,

3  speculation, assumes facts.

4        THE WITNESS:  Yes.

5    Q.   And that's part of the -- your training that you

6  know this?

7        MR. HARRIS:  Same objection.

8        THE WITNESS:  Yes.

9    Q.   Okay, and is that in the manual as well?

10        MR. SHERMAN:  Same objection, and best

11  evidence, hearsay.

12        THE WITNESS:  Yes.

13    Q.   There's actually a portion of the manual that deals

14  with people with disabilities?

15    A.   Yes.

16    Q.   Really?  What does it say?

17        MR. HARRIS:  Same -- objection, foundation,

18  speculation, best evidence, hearsay.

19        THE WITNESS:  Help customers with disabilities

20  that need our help, returns, cashiers, or anybody who is on

21  the floor.  When a disabled -- disabled customer asks us for

22  our help, we give them our full attention.

23    Q.   And this is for every disability?

24    A.   Every disability, yes.

25    Q.   Even Tourette's?

**PETERSON.V1**                                        **Page 48**

00049

1        MR. HARRIS:  Same objection, foundation,

2  speculation, vague.

3    Q.  You can answer.

4    A.  Yes.

5    Q.  Even Tourette's like Mr. Muse has?

6        MR. HARRIS:  Same objection, foundation,

7  speculation.

8    Q.  You can answer.

9    A.  I didn't know at the time Mr. Muse had Tourette's.

10    Q.  But you know now; is that correct?

11    A.  I don't know if he had Tourette's.

12        MR. HARRIS:  Counsel, is this a good time for

13  a bathroom break?  I don't need to talk to the witness or

14  anything.

15        MR. SHERMAN:  Sure, we can take a break now.

16  Let's go off the record.

17        VIDEOGRAPHER:  Go off the record at 10:03 a.m.

18        (Recess taken.)

19        VIDEOGRAPHER:  We're now back on the record at

20  10:13 a.m.

21    Q.  Mrs. Peterson, you understand you're still under

22  oath?

23    A.  Yes.

24    Q.  Now, in November, at the November incident, after

25  Mr. Muse had left, did you speak with Mr. Dolan about it?

**PETERSON.V1**              **Page 49**

00050

1    A.  Yes.

2    Q.  And what was the -- what did you say to him?

3    A.  I had told him what had happened, when I saw

4  Mr. Muse from when he was standing in line.  There was about

5  seven people in line and he kept saying the C word, and the

6  people in line kept turning behind to see who was saying

7  that, and when he finally came to my register, what had

8  happened, and until I called Mr. Dolan over.

9    Q.  Do you remember exactly what you said to Mr. Dolan?

10    A.  Yes.

11    Q.  And what was that?

12    A.  He came towards the register and he asked me,

13  what's going on?  I said this guy just called me the C word.

14  He said, what is the C word?  And then I told him.

15    Q.  Okay.  Well, at the time did you actually help

16  Mr. Muse when this was going on?

17    A.  Yes.

18    Q.  And what did you do for him?

19    A.  I helped him exchange a broken wheelbarrow that he

20  had.

21    Q.  And you completed the transaction?

22    A.  Yes.

23    Q.  When you spoke to Mr. Dolan, did you ask him what

24  you would do when Mr. Muse came back?

25    A.  When I spoke to Mr. Dolan and I told him what had

**PETERSON.V1**                    **Page 50**