00051

1   happened, Mr. Dolan turned red, so red that he couldn't, you

2   know, believe what was said.  His face was flushed.  Then he

3   went and talked to Jon Muse himself.

4       Q.   So Mr. Dolan was very angry?

5       A.   He wasn't very angry.  He was upset, you know, from

6   what was said to his cashier.  He wasn't angry at all.

7       Q.   You mean his face turned red and he wasn't angry?

8       A.   He was embarrassed, more embarrassed for us.

9       Q.   Is that your interpretation of Mr. Dolan's state at

10  that time?

11      A.   Yes.

12      Q.   He could have been angry, though; isn't that true?

13          MR. HARRIS:  Objection, foundation,

14  speculation.

15          THE WITNESS:  He wasn't angry.  He was upset,

16  not angry.

17      Q.   How do you know he wasn't angry?

18          MR. HARRIS:  Same objection.

19          THE WITNESS:  Mr. Dolan is a professional.

20  He's a professional.  He knows how to deal with people and

21  the tone of voice to use, and he wasn't shouting or anything

22  to Mr. Muse.

23      Q.   And to your knowledge, Mr. Dolan has been trained

24  by Home Depot to act that way?

25          MR. HARRIS:  Objection, foundation,

**PETERSON.V1**                                    **Page 51**

00052

1  speculation.

2       THE WITNESS:  Yes.

3    Q.  And you've been trained by Home Depot to act that

4  way?

5    A.  As a professional, yes.

6    Q.  How long was your training?

7    A.  Two weeks.  You have cashier college for two weeks.

8    Q.  And where is cashier college?

9    A.  Upstairs in the building, upstairs in the back.

10   Q.  What -- and tell me what you do at cashier college.

11    A.  Cashier college, we have what was being hired,

12  about five to six people at the time, and we have an

13  instructor going over the rules, going over the policies,

14  going over our job, our duties.  We learn with the computers

15  upstairs how to check in, check out people.

16   Q.  What's the average time for a checkout at Home

17  Depot?

18    A.  Depending on how many items they have at the

19  register.

20   Q.  Is there a paradigm you follow, though, as to what

21  the best checkout time is?

22       MR. HARRIS:  Objection, foundation,

23  speculation.

24       THE WITNESS:  No.

25   Q.  You mean at Home -- at cashier college they never

**PETERSON.V1**                    **Page 52**

00053

1 said you should be able to check someone out with five items

2 within one minute?

3    A.  No.  You just do your job thoroughly, make sure you

4 do it thoroughly and correct and get the customer on his way.

5 There's no racing the clock here.

6    Q.  Is there any policy for when a checkout stand gets

7 backed up with a number of customers waiting, what would be

8 done?

9        MR. HARRIS:  Objection, foundation,

10 speculation.

11        THE WITNESS:  Sometimes the head cashiers will

12 jump on, if they're not busy or, you know, some people on

13 lunch, so you can't help it.

14    Q.  What do you mean jump on?

15    A.  Jump on the cashier register to check out people.

16    Q.  You mean they'll go to an empty register and start

17 checking people out?

18    A.  Yes.

19    Q.  And that will alleviate the backup; is that

20 correct?

21    A.  Yes.

22    Q.  And they went over this with you at cashier

23 college, did they?

24    A.  Yes.

25    Q.  At cashier college do they also give you the

**PETERSON.V1**                    **Page 53**

 

00054

1  employee manual?

2    A.  Yes.

3    Q.  Did they give you scenarios about what to do in

4  certain situations at cashier college?

5    A.  Act out scenarios?

6    Q.  Yes.

7    A.  We read out of the book and acted with each other.

8    Q.  Is there any particular scenario where the customer

9  uses swear words?

10    A.  No.

11    Q.  Okay.  Is there any particular scenario about

12  dealing with a customer who is disabled or is difficult to

13  understand?

14    A.  Yes.

15    Q.  They actually acted that scenario out for you?

16    A.  It's more just reading and talking to each other.

17  It's not actually physical act out.

18    Q.  Okay.  Who -- did you have a main instructor at

19  cashier college?

20    A.  Yes.

21    Q.  Who was that?

22    A.  Sonia.

23    Q.  Do you know what Sonia's last name is?

24    A.  No, I don't.

25    Q.  Would she be familiar with the policies at Home

**PETERSON.V1**                    **Page 54**

00055

1  Depot?

2      A.  Yes.

3          MR. HARRIS:  Objection, speculation.

4      Q.  She certainly told you what the policies were; is

5  that correct?

6      A.  It was a whole class.  We go over it.  Everybody

7  learns at the same time.

8      Q.  Okay, but she was the person who taught you what

9  the policies were; is that correct?

10     A.  Yes.

11     Q.  Did you have any other instructors as to what the

12  policies were?

13     A.  There was another girl there.  She's no longer

14  working at Home Depot.

15     Q.  And this would have been in November or December of

16  2002; is that correct?

17     A.  2002.

18     Q.  That's when you began --

19     A.  Yes.

20     Q.  -- at Home Depot; is that correct?

21     A.  Yes.

22     Q.  In your statement, did you -- it doesn't say -- did

23  you ever ask Mr. Muse not to use the word cunt?

24     A.  Don't recall.

25     Q.  Well, if it's not written here, then you wouldn't

**PETERSON.V1**                    **Page 55**

00056

1   have asked him not to use the word; is that correct?

2      A.  I don't recall.

3      Q.  Didn't you write down exactly what happened in this

4   account --

5      A.  Yes.

6      Q.  -- in November?

7      A.  Yes.

8      Q.  So if something's not there, then that most likely

9   didn't happen; is that correct?

10     A.  Yes.

11     Q.  So you never asked Mr. Muse not to use the word

12  cunt, did you?

13     A.  Yes.

14         MR. SHERMAN:  I'm sorry, can you read that

15  question back to her again.

16             (Record read.)

17         THE WITNESS:  Yes.

18     Q.  Okay, let me rephrase it so we get this clear.  Did

19  you ever use -- did you ever ask Mr. Muse not to use the word

20  cunt?

21     A.  No.

22     Q.  Did you ever ask Mr. Muse why are you using the

23  word cunt?

24     A.  No.

25     Q.  Did you ever say to Mr. Muse, please don't use that

00057

1   word in front of me?

2       A.  No.

3       Q.  Did Mr. Muse use that word in a loud fashion?

4       A.  Yes.

5       Q.  He screamed it out, did he?

6       A.  No.

7       Q.  He shouted it out, did he?

8       A.  No.

9           MR. HARRIS:  Objection, argumentative.

10      Q.  Okay, that's fine.  Here, can you look at the

11  statement and see if there's any place here that you say that

12  he said it in a loud voice, the word cunt, to you?

13      A.  No.

14      Q.  So it's probable that he didn't say the word in a

15  loud voice to you, isn't it?

16      A.  He did.

17      Q.  Wouldn't you have written that down in this

18  statement if he had said it in a loud voice?

19      A.  I don't know.

20      Q.  Well, you have stated on the record that you wrote

21  down exactly what happened to you that day; is that correct?

22      A.  Yes.

23      Q.  And you didn't say in your statement that he

24  shouted or said the word cunt to you in a loud voice, did

25  you?

**PETERSON.V1**                                          **Page 57**

00058

1    A.  It wasn't a shout.  It was, can you help me?  Can

2    you help me return this, C.  Little higher than normal, when

3    the C word would come out.  It wasn't a shout.

4    Q.  But it wasn't louder.  You said higher.

5    A.  Yeah, higher and louder.

6    Q.  Is it a higher pitch?

7    A.  No.

8    Q.  Could it be like he was trying not to say it?

9         MR. HARRIS:  Objection, speculation.

10    Q.  You can answer the question.

11    A.  I don't know.

12    Q.  You don't know.  Isn't it possible he was trying

13    not to say that word?

14         MR. HARRIS:  Objection, asked and answered.

15         THE WITNESS:  He said it several times.

16    Q.  Isn't it possible that he was trying not to say

17    that word?

18    A.  No.

19         MR. HARRIS:  Objection, asked and answered.

20    Q.  So you believe that he was saying that word to you

21    intentionally the whole time?

22    A.  Yes.

23    Q.  But you didn't put in -- and you believe he said it

24    loudly to you; is that correct?

25    A.  Yes.

00059

1    Q.   But you didn't write that in your statement at the

2  time, did you?

3    A.   No.

4    Q.   Okay.  And the statement you destroyed, that you

5  copied, didn't say that either, did it?

6    A.   No, it was the same as this one.

7    Q.   But you destroyed it; is that correct?

8    A.   Well, yes.

9    Q.   How did you destroy it?

10   A.   Tear it up.

11   Q.   Where were you when you tore it up?

12   A.   In the lunchroom at Home Depot.

13   Q.   Did Mr. -- I'm sorry, you tore up the statement

14  when you were at the lunchroom in Home Depot; is that

15  correct?

16   A.   Yes.

17   Q.   What date was that?

18   A.   It was -- you know, I'm so nervous that this

19  date probably -- I know this top date is November 3rd, 2003.

20  Okay.  That should be 2003, because I wasn't even hired on

21  November 3rd, 2000 -- I'm confused with my date on the top,

22  but this was November 2003.  Because the second time I saw

23  Mr. Muse in April 2004 it was -- he came around to my

24  register.  I was helping a Samoan lady with her little

25  daughter.  They were all dressed in white.  Samoans have this

**PETERSON.V1**                                    **Page 59**

00060

1 white Sunday. They're either going to church or -- they're

2 going to church or they're going home from church. It's

3 white Sunday. I have a Samoan nephew. I know about white

4 Sundays. It's a family day. The kids -- put out plays and

5 stuff for the kids and they have baptisms.

6      I was helping the Samoan lady with her little

7 daughter and Mr. Muse came around and started saying, C, can

8 you help me return this, C, sprayer? And the Samoan lady, in

9 embarrassment, put her head down and shaked her head. So I

10 had to talk to her louder to not let the little girl hear

11 what was going on. So I said, okay, Mr. Muse. Go to the

12 garden center, look for the same sprayer, and come back. So

13 during that time I rushed with the lady and got her and the

14 little girl out of there.

15      (Exhibit No. 2 marked.)

16    Q.  Now, I've given you what's been marked as Exhibit

17 2.

18      Yeah, write it on there.

19      But before we get to that, I just wanted to ask

20 you, so you have been -- which date did this occur, to the

21 best of your recollection, 2004, 2003?

22    A.  The first one? The first time was 2003, Sunday --

23 no, excuse me, November 3rd, 2003.

24    Q.  Okay, so you're changing your testimony from

25 earlier today; is that correct?

**PETERSON.V1**                              **Page 60**

00061

1    A.  No, it's just the date.

2    Q.  Okay.  You testified earlier --

3        MR. HARRIS:  I object.  Instruct the witness

4    not to answer.  You're harassing.

5        MR. SHERMAN:  I'm not harassing her.  I'm

6    pinning down as to her ability to recollect, and apparently

7    it's not so good.

8        MR. HARRIS:  I'm not going to argue.

9        MR. SHERMAN:  Are you instructing her not to

10   answer?

11       MR. HARRIS:  Go ahead and ask the question.

12       MR. SHERMAN:  Okay.

13   Q.  Earlier today you testified that this occurred in

14   2004; is that correct?

15       MR. HARRIS:  Objection, vague, argumentative,

16   asked and answered.

17   Q.  You can answer the question.

18   A.  Yes.

19   Q.  And what's written here in Exhibit 1 is 2002; is

20   that correct?

21   A.  Yes.

22   Q.  And that's your handwriting?

23   A.  Yes.

24   Q.  And that's what you copied verbatim from the

25   earlier written declaration that you destroyed; is that

**PETERSON.V1**                          **Page 61**

00062

1  correct?

2     A.  Yes, but you have to know during this -- well, he

3  called -- saying the C word and me doing this, I was still

4  shaking, so, you know, the date just got me confused, you

5  know, writing that date down.  I just went...

6     Q.  But when you copied this again about five months

7  later, were you still upset and shaking?

8     A.  No.

9     Q.  So you made the same mistake again?

10    A.  It wasn't a mistake.  It was I was just copying it,

11  not realizing it was the wrong date.

12    Q.  And I just want to get this straight so that

13  there's no confusion.  You crumpled up the original written

14  statement; is that correct?

15    A.  No.

16       MR. HARRIS:  Objection.

17    Q.  No, you didn't?  What did you do with it?

18    A.  Tear it up.

19    Q.  Into how many pieces?

20    A.  Lots.

21    Q.  Okay, did you use a paper shredder?

22    A.  I tore it up into tiny bits of pieces.

23    Q.  And then what did you do with it?

24    A.  Threw it away.

25    Q.  In a wastebasket?



00063

1    A.  Yes.

2    Q.  So that original written statement that was written

3  at or about the time of the incident is gone forever; is that

4  correct?

5    A.  Yes.

6    Q.  Did you ever tell anyone else you had done this,

7  torn this up -- this statement up?

8    A.  No.

9    Q.  Did anyone instruct you to tear it up?

10    A.  No.

11    Q.  Do you know if that's a policy of Home Depot, for

12  you to destroy evidence like that?

13        MR. HARRIS:  Objection, speculation,

14  argumentative.

15        THE WITNESS:  I already had the same thing

16  written on another paper, so it was exact, the same wording.

17    Q.  What do you mean another paper?

18    A.  On this paper.  I'd already rewritten it on the

19  employee statement.

20    Q.  Okay.  So you can understand that we're a little

21  confused about the dates, based on your testimony earlier

22  today.

23        MR. HARRIS:  Objection, argumentative.

24  Instruct the witness not to answer.

25    Q.  Which date --

**PETERSON.V1**                                   **Page 63**

00064

1        MR. HARRIS:  And hearsay.

2    Q.  -- did this occur on?

3    A.  November 3rd, 2003.

4    Q.  So this statement is wrong; is that correct?

5    A.  The statement is not wrong.  It's the date is

6  wrong, the year is wrong.  I wasn't employed at Home Depot on

7  November 3rd, 2002 yet.  It was just a human error with the

8  year.

9    Q.  But it was an incorrect statement on your part; is

10  that correct?

11        MR. HARRIS:  Objection, harassment, instruct

12  the witness not to answer.

13        MR. SHERMAN:  If your witness wants to

14  persist, and all you have to do is say I made a mistake, and

15  it's obvious.

16        MR. HARRIS:  It's asked and answered.  I'm not

17  going to argue.

18        MR. SHERMAN:  But her --

19        MR. HARRIS:  I'm not going to argue with you,

20  Counsel.  Don't address me.  You state something for the

21  record and then keep going.

22        MR. SHERMAN:  Her ability to recollect is

23  always at issue, any witness's is, and it's apparent here

24  that her dates are all over the place.  It also brings into

25  question what else might have occurred and whether her

**PETERSON.V1**                                   **Page 64**

00065

1 recollection is accurate.

2        MR. HARRIS:  Objection, attorney testifying.

3 Move to strike.

4        MR. SHERMAN:  I'm just stating my basis for

5 the reason.

6    Q.  You understand that we may have to take your

7 deposition again if we go to the judge and Mr. Harris is

8 found not to be correct in the basis for some of his

9 objections?  You appreciate that?

10        MR. HARRIS:  Objection.  Objection,

11 argumentative.  Attorney testifying.  Move to strike.

12 Instruct the witness not to answer.

13    Q.  Okay, are you going to follow Mr. Harris's

14 instructions with regard to that particular question?

15    A.  Yes.

16    Q.  Okay, now, going down to Exhibit 1 at the bottom, I

17 want you to read the last two sentences, starting with, I

18 told Mike.

19    A.  I told Mike C.  Mike asked the young man, please

20 stop saying that or I need you to leave.  He told Mike Dolan,

21 C, I have Tourette's, C.

22    Q.  So Mike Dolan asked Jon Muse to leave; is that

23 correct?

24    A.  He asked him to leave if you're going to be -- from

25 my recollection, would you please leave, if you're going to

**PETERSON.V1**                    **Page 65**

00066

1 be saying that word, leave.

2    Q.  Okay, and Mr. Muse told Mike Dolan that he had

3 Tourette's; is that correct?

4    A.  Yes.

5    Q.  You heard that?

6    A.  Yes.

7    Q.  And what did Mr. Dolan say to that?

8    A.  I don't remember that.

9    Q.  You don't have any recollection if he spoke to him

10 after that?

11    A.  No.

12    Q.  Did Mr. Muse leave then?

13    A.  He walked out backwards swearing the F and C and

14 kept walking backwards out -- till he got out of the front

15 door.

16    Q.  Was he shouting?

17    A.  Yes.

18    Q.  Okay.  And he walked out backwards out the front

19 door?

20    A.  Yes.

21    Q.  Can you take a look at Exhibit 1 and tell me where

22 you wrote that down on this exhibit, that Mr. Muse walked out

23 backwards swearing in a loud voice --

24    A.  I didn't --

25    Q.  -- using the work fucking and cunt on November --

**PETERSON.V1**                                    **Page 66**

00067

1  can you tell me where it is?

2    A.  I didn't write that down, but I remember clearly

3  what happened that day, on the two occasions that Mr. Muse

4  came in because it was out of the ordinary what happened.

5    Q.  Why wouldn't you write that down?

6    A.  I probably could have wrote a lot down.  You know,

7  this was just simply basically what happened that day.

8    Q.  But you're telling us today that more happened than

9  you wrote down; is that correct?

10    A.  When he was walking out backwards and talking to

11  Mr. Dolan.

12    Q.  Was Mr. Dolan right in front of him when Mr. Muse

13  was walking out backwards?

14    A.  He was at a distance from me to the camera.

15    Q.  I'm sorry, he was --

16    A.  From a distance to me to the camera.

17    Q.  Was Mr. Dolan speaking in a loud voice to Mr. Muse?

18    A.  No.

19    Q.  Was Mr. Dolan's face still red?

20    A.  No.

21    Q.  When did his face stop being red?

22    A.  I don't know.

23    Q.  But your testimony earlier is that he wasn't angry

24  at all; is that correct?

25    A.  He wasn't angry.  Mr. Dolan is a low-key guy.  He's

**PETERSON.V1**                    **Page 67**

00068

1  a very nice person.  He doesn't take -- get angry.

2     Q.   When you wrote this statement out originally, on

3  the piece of paper you destroyed, did you try and write

4  everything that happened that day?

5     A.   Yes.

6     Q.   But you didn't put down everything that happened

7  that day, did you?

8     A.   No.

9     Q.   But you remember it now; is that correct?

10     A.   I remembered it all along.

11     Q.   Why wouldn't you write it down?

12     A.   I don't know.

13     Q.   So this statement's not a complete statement, is

14  it?

15     A.   This is an important statement to me because this

16  is what -- the most important thing that happened.

17     Q.   You don't think --

18     A.   To me, with me, this is what -- Mr. Dolan should

19  write, you know, what happened to him.  I thought he'd write

20  that part and I'd write what happened to me.

21     Q.   Let me ask you to take a look at Exhibit 2, if you

22  could, please.  Okay, let me look at the top of this, okay.

23  Here you say you've been an associates since November of

24  2002; is that correct?

25     A.   Yes.

**PETERSON.V1**                                **Page 68**



00069

1    Q.   Okay.  Let me refer you back to Exhibit 1.  Okay,

2   look at the top of that, where it says, I have been an

3   employee since.  Can you read that?

4    A.   Yes.

5    Q.   What does that say?

6    A.   December.

7    Q.   Do you have a problem with dates?

8    A.   No, it was just a confusing time because, like I

9   said, my daughter got hired for the airlines and we were

10   bragging to each other what dates and I got confused with my

11   November 4th and her December 7th.

12    Q.   Do you know where this statement was taken?

13    A.   In the lunchroom at Home Depot.

14    Q.   And did you write this statement immediately after

15   the incident with Mr. Muse?

16    A.   No.

17    Q.   Why not?

18    A.   I don't know.

19    Q.   Isn't it the company policy that you write up an

20   incident right after it occurs?

21       MR. HARRIS:  Objection, foundation,

22   speculation.

23       THE WITNESS:  I didn't think at that time, you

24   know, to write it, and then they called me in the office to

25   write a statement later.

00070

1     Q.   Who called you into the office?

2     A.   It was one of the girls in the -- I don't know her

3   name.  I forget.  It's two years.  Her name is Jan, but I

4   don't know her last name.

5     Q.   What section was she in?

6     A.   She's in accounting.  In accounting they have --

7   they do all kinds of stuff there, office work.

8     Q.   Well, did you tell anyone about this incident on

9   April 25th?

10     A.   Yes.

11     Q.   Who did you tell?

12     A.   I think -- I'm not sure who I told that day.  Who

13   was standing -- that came to me and I told -- it might have

14   been Dar again, Darlyn.

15     Q.   Is that Darlyn Kuhia?

16     A.   Yes.

17     Q.   And when would you have told her that?

18     A.   I don't know if it was the same day or maybe a day

19   after when it happened.

20     Q.   Well, immediately -- you don't remember what time

21   of the day you encountered Mr. Muse on April 25th, 2004?

22     A.   It was in the morning.

23     Q.   Do you know what time?

24     A.   Approximately -- no, but it might have been around

25   10:00, maybe 10:00 o'clock.

**PETERSON.V1**                              **Page 70**

00071

1    Q.  Do you know what your hours were that day?

2    A.  I might have started -- I'm trying to think,

3  because on the register that I was on, if we start early -- I

4  might have started 7:30 that day, and I know it was in the

5  morning, because that's when that little girl and the mother

6  came in going to church.

7    Q.  Can we turn to the second page.  On our Xerox copy

8  it doesn't come up.  Can you read the top line on the second

9  page to us?

10    A.  The top line, I can't see.

11    Q.  Well, this is all we've got.  We were sort of

12  wondering --

13    A.  I can probably make it out.

14    Q.  If you could, that would be --

15    A.  I needed to ask him anything -- extra loud to

16  prevent the young girl who was with her mother and I'm sure

17  she was listening to the bad words.  She was hearing the bad

18  words, the bad word, the C word.

19    Q.  Okay, let's see if we can just maybe write this

20  whole thing out.  Okay, let's start from the --

21        MR. SHERMAN:  Do you happen to have a good

22  copy?

23        MR. HARRIS:  Yeah, the copy that we have --

24  looks like this exhibit has been cut off a little bit.  The

25  copy of 6 and 7 that we have has a little bit more.  It's

**PETERSON.V1**                                    **Page 71**

00072

1  still cut off, but you may want to use this one, because --

2  it looks like there was a copying difficulty.

3          MR. HARRIS:  You want to mark that or just --

4          MR. SHERMAN:  You know what I'd like her to do

5  is maybe we can get her just to read it into the record.

6          MR. HARRIS:  Why don't we just mark that.

7  Well, it's your deposition.  Why don't you --

8          MR. SHERMAN:  You've got other copies of that?

9          MR. HARRIS:  No.

10          MR. SHERMAN:  Okay.  That seems to be the -- I

11  don't know if we want to lose it at this point.  If we can --

12          THE WITNESS:  Give me the other one.  I'll try

13  to make this out.

14          MR. HARRIS:  Why don't you make a copy.

15          MR. SHERMAN:  Let's mark it as Exhibit 2A.

16              (Exhibit No. 2A marked.)

17          MR. HARRIS:  Fine.  We're all getting copies

18  of the depo exhibits, right?  No, don't write on it.

19          THE WITNESS:  Oh, okay.  Hearing, yeah.  I

20  would talk extra loud to prevent a young girl who was with

21  her mother at my register from hearing -- I can't make out

22  this word -- from hearing the bad words too.  From hearing --

23  okay, with her mother at my register too from hearing the bad

24  words.

25          MR. HARRIS:  Go back and read the whole thing

**PETERSON.V1**                          **Page 72**

00073

1  again.

2       THE WITNESS: Okay. I was listening with my

3  side, turned to him, and when I needed to ask him anything

4  about the return, I would talk extra loud to prevent the

5  girl, who was with her mother at my register too, from

6  hearing the bad words. I know she heard because she kept

7  looking at Jon. The girl, about eight years old. I finished

8  this transaction. He said thanks, C, and left.

9       MR. HARRIS: You're marking this one as 2A?

10    Q. I can't read that -- the third line, where you

11  say -- it starts on the second line. She heard -- I know she

12  heard because she kept, and it looks like zing Jon up?

13    A. Sizing Jon up.

14    Q. Oh, sizing Jon up. How long did that transaction

15  take?

16    A. Mr. Muse's transaction?

17    Q. On April 25th, 2004.

18    A. I did it really fast just to get him out, because

19  there was a lot of people in the returns line again. I

20  actually gave him a better deal than what he was -- what he,

21  you know, ordinarily had because there wasn't -- there wasn't

22  a same one. There wasn't no UPC code for him or anything, so

23  it was okay to give him a better one.

24    Q. Now, what did the mother look like, again, on April

25  25th?

**PETERSON.V1**               **Page 73**

00074

1   A.   She was a big Samoan woman dressed in white.

2   Q.   How tall?

3       MR. HARRIS:  Off the record.  Counsel, you

4  want to go off the record?

5       MR. SHERMAN:  Yes.

6       VIDEOGRAPHER:  Off the record at 10:45 a.m.

7           (Off the record.)

8       VIDEOGRAPHER:  We're back on the record at

9  10:46 a.m.

10   Q.   How tall was this woman?

11   A.   She was about five-seven, five-six, five-seven.

12   Q.   And you're sure she was Samoan?

13   A.   Yes, yes.

14   Q.   Do you know how old she was?

15   A.   In her late 40s.

16   Q.   And how do you know that?

17   A.   Because I'm in my late 40s, and looking at her I

18  think she's in her late 40s.

19   Q.   You don't have any proof other than your

20  observation?

21   A.   No, no.

22   Q.   That's just your guess; is that correct?

23   A.   Yes.

24   Q.   And was she immediately behind Mr. Muse in line?

25   A.   I was helping her when he came and interrupted us.

**PETERSON.V1**                          **Page 74**

00075

1    Q.  So you were doing her transaction at that time; is

2  that correct?

3    A.  Yes.

4    Q.  Have you had a chance to read both Exhibit 2 and

5  Exhibit 2A?

6    A.  Yes.

7    Q.  And that's accurate?

8    A.  Yes.

9    Q.  Can you show me where on this exhibit you wrote --

10  you've stated that you were helping a Samoan woman in a white

11  dress when Mr. Muse interrupted that transaction?

12    A.  It's not on there, but that's -- I'm honest.  This

13  is my honest statement.  I know what happened.

14    Q.  But you didn't write that down in the statement?

15    A.  No, I didn't.

16    Q.  Isn't it the policy of Home Depot that you write

17  down exactly what happens when an incident occurrs?

18      MR. HARRIS:  Objection, foundation,

19  speculation.

20      THE WITNESS:  Yes, it is, but the important

21  thing to me was that he came -- he came, you know, asked me

22  for help, I helped him, helped the lady, and I got him out of

23  there as soon as I could.

24    Q.  But in your testimony today you're saying he

25  interrupted.