00076

1    A.  Yes.

2    Q.  Was he rude when he did that?

3    A.  No.  He said --

4    Q.  But you didn't write that down.

5        MR. HARRIS:  Wait a minute.  You're

6  interrupting her.

7        MR. SHERMAN:  Okay, okay.  That's fine.

8        MR. HARRIS:  You're interrupting her, okay.

9        MR. SHERMAN:  That's fine.

10       THE WITNESS:  He interrupted me and the Samoan

11  lady and saying the C words.  C, I have to return this, C,

12  sprayer.  It's broken, C.  So I asked Mr. Muse, can you go on

13  the shelf and go look if there's another one there, and he

14  did.

15   Q.  But you don't put that in here, do you?

16   A.  No.

17   Q.  You put in what you say he said to you; is that

18  correct?

19   A.  Yes.

20   Q.  But you don't even put in that the Samoan woman was

21  right at your counter?

22       MR. HARRIS:  Objection, asked and answered,

23  argumentative.

24       THE WITNESS:  It is here that I was -- she was

25  at my register and I was trying to overshout him.


**PETERSON.V1**                              **Page 76**



00077

1     Q.   You were --

2     A.   Overtalk him rather loud so the little girl and the

3   lady wouldn't hear.

4     Q.   Which is it, you were shouting or --

5     A.   I wasn't shouting.  I was talking loud, loudly.

6     Q.   Was Mr. Muse shouting?

7     A.   No.

8     Q.   Was he -- did he appear angry?

9     A.   No.

10     Q.   Did he appear that -- has he ever appeared to you

11   when he was using the word cunt that he was enjoying doing

12   that?

13     A.   Yes.

14     Q.   All right, how do you know that?

15     A.   He knows when to use it.  It's like he knows when

16   to use it.  When he's addressing me, he knows when to use it.

17     Q.   And how do you -- why do you say that?

18     A.   You know, I'm the opposite sex of you, and if you

19   were a woman, you probably would understand that more.  When

20   he addressed me, can you help me, C?  Thank you very much, C.

21   That's addressing a person.

22     Q.   That's your opinion; is that correct?

23     A.   Yes.

24     Q.   Is it possible that he has no control over the use

25   of that word?

00078

1        MR. HARRIS:  Objection, foundation,

2  speculation, inadmissable lay opinion.

3      Q.  Go ahead and answer.

4      A.  No.

5      Q.  You think he has absolute control over the use of

6  that word?

7        MR. HARRIS:  Same objection.

8      Q.  Go ahead.

9      A.  Yes.

10      Q.  You don't think he then has a disease, do you?

11      A.  No.

12        MR. HARRIS:  Objection, foundation,

13  speculation.

14      Q.  And what do you base that opinion on?

15      A.  He looked like a normal person in line asking for

16  help, until the bad words started coming out.  I noticed that

17  when he was in line on the first -- on November 3rd, when he

18  was standing in line, that's the first time I noticed that

19  this guy is swearing.  I thought maybe this person was on

20  drugs or something.

21      Q.  And when he got up to you did you think he was on

22  drugs still?

23      A.  No.  He just went on, can you help me, C?  Then I

24  ran into -- I was afraid -- I was really afraid.  I ran into

25  the phone booth and I talked to Chris, who is our phone

00079

1  operator, and I said, Chris, this guy is calling me a C.

2  Because that's what it had appeared to be, he was calling me

3  the C word.  That's why I ran into the operator's room and

4  told Chris, can you call somebody?  He's calling me a C, and

5  I thought it would get bigger.

6      Q.  But it didn't get bigger, did it?

7         MR. HARRIS:  Objection, foundation,

8  speculation.

9         THE WITNESS:  At one point --

10         MR. HARRIS:  Hold on.  Hold on.  Objection

11  foundation, speculation, argumentative.

12      Q.  Go ahead and answer.

13      A.  At one point I walked with him to the aisle -- in

14  front of the aisle to -- I walked by myself, excuse me, to

15  see if anybody in garden was there.  Mr. Muse was still at

16  the register with Dar Kuhia, and as I was walking back, he

17  was walking to me with a mad strut, you know.  I thought he

18  was going to hurt me.  I really thought he was going to hurt

19  me.  I didn't understand what was going on.  And he came up

20  to me and he said, I'm sorry, but that F-in C Dar and that

21  ignorant manager, they're ignorant.  That's what he told me.

22      Q.  Let me ask you to take a look at Exhibit 1.  Did

23  you write that anywhere on Exhibit 1, what you just stated?

24      A.  Uh-huh.

25         MR. HARRIS:  You have to answer verbally.

**PETERSON.V1**                    **Page 79**

00080

1          THE WITNESS:  Yes.

2      Q.  Why don't you read where you wrote that he

3  approached you in an angry fashion.

4      A.  I didn't write that down.

5      Q.  So you didn't think that was important to write

6  down at that time, did you?

7      A.  No, this is -- this was important enough for me to

8  be scared.

9      Q.  But now you're testifying you've remembered

10  something you didn't even write down at the time; is that

11  correct?

12     A.  Yes.

13     Q.  Do you do that often?

14     A.  No.

15     Q.  Isn't it possible that that didn't occur and you're

16  just saying it today?

17     A.  Like I said, this was more important to me, and --

18  you know, instead of him walking to me, and after -- after we

19  talked and, you know, he said, you're nice to me.  Thank you,

20  but I don't -- that manager guy is ignorant, so --

21     Q.  Is this on November 3rd we're talking about?

22     A.  Yes.

23     Q.  But you didn't write anything in here about him

24  saying the manager guy was ignorant, did you?

25     A.  Yes, I did.

**PETERSON.V1**                              **Page 80**

00081

1    Q.   Oh, okay.  But you didn't write anything in here

2  about he followed you in an angry fashion, did you?

3    A.   No, I didn't.

4    Q.   And you didn't say anything ever before today that

5  you were afraid of that, did you?

6    A.   No.

7    Q.   And yet you've had a number of occasions to explain

8  what happened that day, haven't you?

9        MR. HARRIS:  Objection, foundation,

10  argumentative, and attorney-client privilege.

11    Q.   You didn't tell anyone else at Home Depot the same

12  thing that you are testifying today, did you?

13        MR. HARRIS:  Objection, assumes facts --

14        MR. SHERMAN:  Why don't you just do a standing

15  objection, okay, and it will go faster?

16        MR. HARRIS:  Why don't you just do a standing

17  question, okay?  You ask a question, I object, and then she

18  gives you answers or I instruct her not to answer.  You have

19  a question pending.

20        MR. SHERMAN:  I don't know that you've

21  instructed her.  I didn't hear you instruct her.

22        MR. HARRIS:  I'm not done with my objection.

23  You interrupted my objection, okay?

24        MR. SHERMAN:  Okay.

25        MR. HARRIS:  Objection, foundation,

**PETERSON.V1**                                    **Page 81**

00082

1  speculation, argumentative.

2       Remember the question?

3       THE WITNESS:  Yes.

4       MR. HARRIS:  Okay, go ahead.

5       THE WITNESS:  Well, when this first happened,

6  when this happened at that time, I remember -- I don't know

7  who I talked to, but I told them what had happened.  It was a

8  weird experience for me, so I did say what happened.

9    Q.  Who did you tell that to?

10   A.  Several people.

11   Q.  Who were they?

12   A.  Co-workers.

13   Q.  What were their names?

14   A.  Dar Kuhia, Jazzlyn -- I'm pretty sure Jazzlyn.

15  Lynn.

16   Q.  How do you spell Jazzlyn?

17   A.  J-A-Z-Z-L-Y-N.

18   Q.  And what's her last name?

19   A.  I don't know her last name.  M-A-R-I-N, Marin.

20   Q.  M-A-R?

21   A.  Yeah, that might be her name.

22   Q.  Mar?

23   A.  It might be -- one of my supervisors and her name

24  is similar, so it might be the same, might be a little --

25  spelt wrong.

**PETERSON.V1**                                    **Page 82**

00083

1    Q.  You told Jazzlyn Mar at that time?

2    A.  Marin.

3    Q.  Marin?

4    A.  Yeah.

5    Q.  Okay.

6    A.  Lynn Bendexin in.

7    Q.  I'm sorry, who else?

8    A.  Lynn.

9    Q.  How do you spell her name?

10   A.  L-Y-N-N, B-E-N-D-E-X-I-N.

11   Q.  And who else did you tell?

12   A.  I don't recall.

13   Q.  Did you tell other people?

14   A.  I'm not sure.

15   Q.  But you're sure you told these two people?

16   A.  Yes, they're returns cashiers.

17   Q.  And that would have been on November 3rd, 2003?

18   A.  Yes.

19   Q.  Was this before or after you wrote down your

20 statement?

21   A.  Before.

22   Q.  What did they say to you?

23   A.  They were surprised.  They were shocked.

24   Q.  Do you remember any of their comments?

25   A.  They asked me who this guy was, if he comes in here

**PETERSON.V1**                    **Page 83**

00084

1  all the time, questions like that.

2      Q.  Now, on November 3rd did anyone tell you go write

3  down this down, exactly what happened?

4      A.  I can't recall that, but I did write it down.

5      Q.  You don't recall if Mike Dolan told you to?

6      A.  No, I don't recall.

7      Q.  Did you talk to any other supervisors that day

8  about what happened?

9      A.  Dar Kuhia.

10     Q.  Do you recall if she told you to go write down

11  exactly what happened?

12     A.  It could have been.

13     Q.  Now, getting back to Exhibit 2 and 2A, what did the

14  Samoan woman buy or return?

15     A.  I don't remember.

16     Q.  Well, this was a pretty important situation for

17  you, witness this again, wasn't it?

18     A.  Yes.

19     Q.  What did she return?

20         MR. HARRIS:  Objection, asked and answered,

21  harassment.  Instruct the witness not to answer.

22     Q.  Okay, you understand that we may take your

23  deposition again with respect to these questions that he's

24  instructing you not to answer?

25         MR. HARRIS:  Objection, harassment.  Move to

**PETERSON.V1**                                    **Page 84**

00085

1 strike. Instruct the witness not to answer.

2    Q.  So you have no recollection of what she returned

3 that day?

4    A.  We take in all day long a lot of broken stuff,

5 junk, returns.  I don't remember.  I couldn't tell you what

6 somebody brought in last week, a person, to return.  We

7 have -- it's all day long.  It's constant returns.  You

8 don't -- you know.  I remember Jon Muse's one.

9    Q.  Did you receive any instructions after April 25th,

10 2004 regarding Jon Muse if he were to return to Home Depot?

11    A.  No.

12    Q.  No one ever said anything to you?

13    A.  No.

14    Q.  Did you ever receive a memo?

15    A.  No.

16    Q.  What if he had returned, what would you have done?

17       MR. HARRIS:  Objection, foundation,

18 speculation, assumes facts not in evidence.

19    Q.  You can answer.

20    A.  I would have helped him.  I would have helped

21 Mr. Muse, but I would also have a supervisor, probably call a

22 supervisor over.

23    Q.  So no one ever told you that Mr. Muse couldn't come

24 to the store anymore?

25    A.  No.

**PETERSON.V1**                                    **Page 85**

00086

1    Q.  But you do recall in November of 2003 Mr. Dolan

2  telling him to leave if he didn't stop using the word cunt?

3    A.  Yes.

4    Q.  And Mr. Dolan didn't say that in a friendly way,

5  did he?

6        MR. HARRIS:  Objection, foundation,

7  speculation.

8        THE WITNESS:  He didn't shout it or anything.

9  He just said, can you leave.  If you're going to use that

10  word, you're going to have to leave the store, and then

11  walking backwards Mr. Muse kept shouting F and C to him.

12        MR. HARRIS:  Counsel, we're on an hour break.

13  Do you have much more?  Do you want to take another break at

14  an appropriate time?

15        MR. SHERMAN:  Yeah, let me ask a few more.

16    Q.  How tall was the little girl on April 25th, 2004,

17  the little girl you said you thought heard Mr. Muse?

18    A.  The little girl did hear Mr. Muse.

19    Q.  How tall was she?

20    A.  She was about this.  What is this, three feet, four

21  feet.

22    Q.  What color were her eyes?

23    A.  Light brown.

24    Q.  Okay, what color was her hair?

25    A.  Dark brown.

**PETERSON.V1**                    **Page 86**

00087

1   Q.  Was it long or short?

2   A.  Long.

3   Q.  What color was the dress she was wearing?

4   A.  White.

5   Q.  How do you know she heard Mr. Muse that day?

6   A.  Because she looked at her -- she just looked at her

7 mom and the mom shaked her head and then they -- the mom grab

8 her hand and walked.  She kept looking at Mr. Muse too, the

9 little girl.

10   Q.  But did she say she heard him?

11   A.  No.

12   Q.  So you don't know, other than your opinion, that

13 she actually heard Mr. Muse that day, do you?

14      MR. HARRIS:  Objection, foundation,

15 argumentative.

16      THE WITNESS:  No, but we were this close, face

17 to face, about two feet apart, and Mr. Muse, with the little

18 girl, was about two feet apart too, so I'm sure she heard.

19   Q.  Now, you just testified that she took her daughter,

20 the Samoan woman?

21   A.  Yes.

22   Q.  And led her away; is that correct?

23   A.  Yes.

24   Q.  So she didn't finish her transaction, did she?

25   A.  We finished her transaction.  We finished her

00088

1 transaction.

2    Q.  You're sure about that?

3    A.  Yes.  We have to finish the transaction right

4 there.  She signed the paper and she left.

5    Q.  Would this transaction have been on videotape as

6 well?

7    A.  Yes.

8    Q.  It would have been videotaped?

9    A.  Yes.

10    Q.  Have you ever reviewed a copy of this?

11    A.  No.

12    Q.  You've never seen it?

13    A.  No.

14    Q.  Do you know if anyone else ever has?

15    A.  I'm not sure.

16    Q.  Okay.  Did anyone ever tell you that these

17 incidents were on video somewhere?

18    A.  No.  I just assumed it was because the videos are

19 running 24/7.

20      MR. SHERMAN:  Okay, I think now's a good time.

21 If we could go off the record.

22      VIDEOGRAPHER:  End of tape 1 at 11:03 a.m.

23      (Recess taken.)

24      VIDEOGRAPHER:  Start of tape number 2, and

25 we're on the record at 11:16 a.m.

**PETERSON.V1**　　　　　　　　　**Page 88**

00089

1             (Exhibit No. 3 marked.)

2    Q.  Okay, I'm going to --

3    A.  This our copies?

4    Q.  Actually, yeah, I need one.  This is your copy.

5    A.  Okay.

6    Q.  Okay, we're back on the record.  I've just handed

7 you what's been marked as Exhibit 3.  Could you take a look

8 at that, Mrs. Peterson?

9    A.  Yes.

10   Q.  Have you seen this before, this document?

11   A.  Yes.

12   Q.  Can you identify it for us?

13   A.  This is my -- one of my statements.

14   Q.  Is that a statement?

15   A.  No.  It's a declaration.

16   Q.  Let's go to the last page.  Is that your signature?

17   A.  Yes.

18   Q.  And do you recall executing this on November 22nd,

19 2005?

20   A.  Yes.

21   Q.  And this is a document that Jan Boivin brought to

22 you at work?

23   A.  Yes.

24   Q.  Before we get into this, just let me ask you a few

25 questions agai about the November and April incidents.  After

**PETERSON.V1**                    **Page 89**

00090

1  the November 3rd incident, did you receive any training at

2  all with respect to how to handle difficult customers or

3  persons with disabilities?

4      A.  No.

5      Q.  Did anyone send you a memo or a company-wide memo

6  on how to deal with situations like this?

7      A.  We already the handbook that was given to us

8  earlier.

9      Q.  But you received no other training after the

10  November 3rd incident?

11      A.  No.

12      Q.  After the April 25th, 2004 incident, did you

13  receive any training or instruction about how to handle a

14  similar type of situation?

15      A.  No.

16      Q.  Did anyone tell you to go look at the manual to see

17  how to do that at that time?

18      A.  No, because I treated him in a kindly manner.

19      Q.  But the question was did you receive any other

20  instruction or admonition about how to deal with this kind of

21  situation --

22      A.  No.

23      Q.  -- after the April 25th --

24      A.  No.

25      Q.  Let me direct your attention to Exhibit Number 3.

**PETERSON.V1**                                    **Page 90**

00091

1    Let me go -- let's go down to paragraph 17 on page 2. Can

2    you read that?

3        A.   The customer did not make any other requests,

4    including a request for personal shopper or a sign explaining

5    he had Tourette's syndrome.

6        Q.   So on November 3rd of 2003, if Mr. Muse had

7    requested a personal shopper, you would have given him one at

8    that time?

9            MR. HARRIS:  Objection, foundation,

10   speculation, vague.

11           THE WITNESS:  I understand I was his personal

12   shopper, because I was the one who helped him do his

13   transaction.

14       Q.   You were his personal shopper on November 3rd?

15       A.   He didn't ask for one, but I was his personal

16   shopper.  I walked to look for a wheelbarrow to help him.

17       Q.   So why did you write in here that he didn't make a

18   request for a personal shopper that day?

19       A.   You don't make a request.  You just automatically,

20   being a cashier, you're trained to help a person.

21       Q.   Okay.  Now, if he had given you a sign explaining

22   he had Tourette's syndrome, would that have made any

23   difference to you on that day?

24           MR. HARRIS:  Objection, foundation,

25   speculation.

**PETERSON.V1**                                    **Page 91**

00092

1          THE WITNESS:  I don't know.  I would call a

2  manager over.

3      Q.  But you testified earlier that you don't think he

4  has a disease about the use of the word cunt; is that

5  correct?

6      A.  Yes.

7      Q.  You think he just says it because he wants to say

8  it; is that correct?

9      A.  Yes, because he knows when to use it.

10     Q.  And that's based on -- how many minutes have you

11  spent with Mr. Muse?

12     A.  About 15 minutes.

13     Q.  All together?

14     A.  15, 20 minutes.

15     Q.  Based on 20 minutes' experience with Mr. Muse, it's

16  your opinion that he intentionally uses the word cunt and

17  fucking; is that correct?

18     A.  Yes.

19     Q.  And you don't believe he has any kind of disease

20  where he has a lack of control?

21     A.  I'm not a doctor, so I don't know if he has.

22     Q.  But I'm asking what you believe.

23     A.  No.

24     Q.  So you think he's faking it?

25     A.  I don't know if it's faking it, but he's saying it.

**PETERSON.V1**                              **Page 92**

00093

1    Q.   Do you think he's faking it, the condition?

2         MR. HARRIS:  Objection, foundation, vague as

3    to faking.

4    Q.   Do you understand what I mean by the word faking?

5    A.   Yes.

6    Q.   Okay, please answer the question, then.

7    A.   Yes.

8         MR. HARRIS:  Objection, foundation, vague as

9    to the use of the word faking as not connected to anything.

10   Q.   So you think Mr. Muse is faking his condition; is

11   that correct?

12   A.   At that time, yes.  I don't know that he has

13   Tourette's, and to this day I don't know if he has

14   Tourette's.  I didn't see any medical statement that he has

15   Tourette's.

16   Q.   Well, if he had a medical statement and gave it to

17   you, would that make a difference?

18        MR. HARRIS:  Objection, foundation,

19   speculation, assumes facts not in evidence, irrelevant.

20   Q.   You can answer.

21   A.   I don't know.  I felt offended when he addressed me

22   as a C.

23   Q.   But if he had a statement saying that he has no

24   control over this, he doesn't intend to use the word, he

25   can't help it, it's a disease --

**PETERSON.V1**                                    **Page 93**

00094
1          MR. HARRIS:  Objection.

2     Q.  -- would you --

3          MR. SHERMAN:  I've got to finish the question.

4          MR. HARRIS:  Okay, you stopped.

5          MR. SHERMAN:  I just paused for a second.  I

6  know you want to get it out.

7     Q.  -- would you still not believe that?

8          MR. HARRIS:  Objection, argumentative, asked

9  and answered.  Instruct the witness not to answer.  And

10  compound.

11    Q.  So let me get this straight.  It wouldn't have made

12  any difference what Mr. Muse told you about his condition

13  that day for you, would it?

14          MR. HARRIS:  Objection, foundation,

15  speculation, irrelevant lay opinion.

16    Q.  You can answer.

17    A.  I don't know.

18    Q.  Well, if he had given you a sign or a medical

19  statement, would that have made a difference to you?

20          MR. HARRIS:  Objection, foundation,

21  speculation, asked and answered, harassment.

22          THE WITNESS:  I understand that I did my job.

23  I helped Mr. Muse no matter what name he was saying, and I

24  would have helped him anyway, like I would have helped any

25  other person that needed help.  And I think he had control,

**PETERSON.V1**                              **Page 94**

00095

1  to my knowledge, of saying the words because he would say it

2  when he addressed me or thanked me.

3     Q.  Have you ever encountered anyone with this form of

4  Tourette's before in your life?

5        MR. HARRIS:  Objection, assumes facts not in

6  evidence.

7        THE WITNESS:  No.

8     Q.  Now, let me ask you, did you -- did you ever file a

9  complaint with Home Depot about having to conduct a

10  transaction with Mr. Muse?

11     A.  No.

12     Q.  Did you ever consider doing that?

13     A.  No.

14     Q.  Did you ever feel that you could accuse them of

15  sexually discriminating against you because they made you

16  work a transaction with Mr. Muse?

17        MR. HARRIS:  Objection, foundation,

18  speculation, inadmissible lay opinion.

19        THE WITNESS:  No.  I'm just a cashier there.

20  I took it upon the higher-ups to take care of that sort of

21  business.

22     Q.  So you never thought that you were sexually

23  discriminated because Mr. Muse was there?

24        MR. HARRIS:  Objection, foundation,

25  speculation, inadmissible lay opinion.

00096

1    MR. SHERMAN:  Can we go off the record for a

2  second.

3    VIDEOGRAPHER:  Off the record at 11:28 a.m.

4    (Off the record.)

5    VIDEOGRAPHER:  Now we're back on the record,

6  11:30 a.m.

7    MR. SHERMAN:  I think it's probably best if we

8  terminate the deposition at this point, due to the fact that

9  opposing counsel is instructing the witness invalidly, I

10  believe, not to answer a number of questions based on a claim

11  of harassment.

12    At this point we've reached -- we're going to

13  adjourn -- not terminate.  We're going to adjourn so we can

14  get a ruling -- so we can adjourn the deposition so we can

15  get a ruling.  We just don't think that claim of harassment

16  is valid.  It's one of the very few reasons you could

17  possibly instruct a witness not to answer.  None of these

18  have -- very few of these have involved any kind of privilege

19  that has been invaded by the question.  So, you know, we'll

20  get a ruling.  I'm sure we can find, you know, a mutually

21  convenient time to do the deposition again after we get a

22  ruling.

23    MR. HARRIS:  I'm assuming you'll be filing a

24  motion.  We'll be filing a cross motion to preclude the

25  plaintiff's attorney from continuing to suggest that the

**PETERSON.V1**                              **Page 96**

00097

1 witness take legal action against Home Depot both on and off

2 the record, and to bar the plaintiff's attorney from further

3 harassment, and to limit the plaintiff's attorney to the

4 answers to the questions that the plaintiff's attorney has

5 already asked and had objections to.

6      With that being said, if you -- if you wish to

7 recess the deposition, that's fine with us.

8      MR. SHERMAN:  Fine.

9      MR. HARRIS:  Thanks.  Bye, bye.

10      VIDEOGRAPHER:  End of tape 2, and we're off

11 the record at 11:32 a.m.

12      (The deposition concluded at 11:32 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**PETERSON.V1**             **Page 97**

00098

1       I, DEBRA PETERSON, hereby certify that I have

2  read the foregoing typewritten pages 1 through 97, inclusive,

3  and corrections, if any, were noted by me and the same is a

4  true and correct transcript of my testimony.

5

6

7

8

9  DEBRA PETERSON

10

11  Signed before me this      day of

12

13        , 20   .

14

15

16

17

18

19

20

21

22  Muse vs. Home Depot, U.S. District Court, Civil No.

23  CV04-00154 DAE/BMK, taken on January 7, 2006, by Jessica R.

24  Perry, CSR.

25

**PETERSON.V1**           **Page 98**

00099

1  STATE OF HAWAII                )

2                                ) ss:

3  CITY & COUNTY OF HONOLULU   )

4

5        I, JESSICA R. PERRY, do hereby certify:

6        That on January 7, 2006, at 9:01 a.m. appeared

7  before me DEBRA PETERSON, the witness whose deposition is

8  contained herein; that prior to being examined she was by me

9  duly sworn;

10        That the deposition was taken down by me in

11  machine shorthand and was thereafter reduced to typewritten

12  form by computer-aided transcription; that the foregoing

13  represents, to the best of my ability, a full, true and

14  correct transcript of said deposition.

15        I further certify that I am not attorney for

16  any of the parties hereto, nor in any way concerned with the

17  cause.

18

19        DATED this 17th day of January 2006, in

20  Honolulu, Hawaii.

21

22

23  Jessica R. Perry, CSR 404
    Notary Public, State of Hawaii
24  My commission expires: 5/11/06

25

**PETERSON.V1**                    **Page 99**