1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF HAWAII

3      JON MUSE,                    )

4                                   )

5           Plaintiffs,             )

6                                   )

7      vs.                          )   NO. CV04-00154 DAE/BMK

8                                   )

9      HOME DEPOT USA, INC.,        )

10          Defendant.              )

11      _____)

12

13

14

15

16

17           DEPOSITION OF WILLIAM P. SHEEHAN, M.D.

18        Taken on behalf of the Defendant at the offices of

19     Torkildson Katz Fonseca, 700 Bishop Street, 15th Floor,

20     Honolulu, Hawaii, commencing at 12:04 a.m. on August 3, 2006,

21     pursuant to Notice.

22

23

24     BEFORE:    JESSICA R. PERRY, CSR NO. 404

25                Certified Shorthand Reporter        EXHIBIT A

1   wronged in the way he was treated at Home Depot, and he's

2   asking for restitution or remediation or compensation.  I

3   don't know what the exact reconciliation would be, trying to

4   make it right, basically.

5          Q.   Do you remember anything else generally about the

6   case that Mr. Sherman told you?

7                    MR. HARRIS:  Let's go off the record.

8                    (Off the record.)

9                    MR. HARRIS:  Back on, please.  Go ahead.

10                   THE WITNESS:  I knew there was a case filed

11  because I was at Kaiser, when I was at Kaiser, Jon told me,

12  actually, that a case was filed.  I left there in October of

13  2005.  It was probably sometime, I can't tell you when he

14  told me, sometime before that.  I remember the day the

15  incident happened, and I remember he got attorneys.  I don't

16  remember who it was originally.  Maybe it was a different

17  firm or something.

18                   And then I left Kaiser in October of 2005 and

19  really hadn't thought much about it.  And then I got

20  information about coming to the deposition, there was a

21  lawsuit filed, it was looked like it was headed towards a

22  trial.  So Mr. Sherman contacted me and came over and visited

23  with me just to tell me that there was, in fact, a proceeding

24  occurring, and I didn't have records.  I think the subpoena I

25  got was for records as well as me, and since I was working at

1   Kaiser, I didn't have any records.  I remember Jon very well,

2   but I don't remember the specifics his case.

3                    So he got me the records and sent me a copy

4   of the other material, Dr. Marvit's report and Dr. Zinner's

5   report just so I knew.  But in items of sort of beyond that,

6   I mean, I didn't -- we talked a long time.  I didn't make a

7   lot of notes.  I got the gist of it; I hope I got the gist of

8   it anyway.

9   BY MR. HARRIS:

10       Q.   You talked a long time with Mr. Sherman?

11       A.   Well, it turns out we have other -- I work for the

12   State of Hawaii, and Mr. Sherman has been involved with some

13   cases that I'm familiar with with the State, so we had other

14   things that we were...

15       Q.   And Mr. Sherman also provided you reports from

16   other doctors?

17       A.   Yes.

18       Q.   And he asked you to read them?

19       A.   He didn't ask me to, I just got them so I read

20   them on my own.

21       Q.   And did you do that as part of your treatment of

22   Jon Muse?

23       A.   No.

24       Q.   Because you're not treating Jon Muse anymore?

25       A.   That's right.

1      Q.   So you read the materials that Mr. Sherman gave

2  you in order to prepare for the deposition today?

3      A.   Yes.

4      Q.   Okay.  What materials that Mr. Sherman gave you

5  did you read to prepare for the deposition?

6      A.   My note -- well, all the notes from Kaiser.  It

7  looks to me like all the notes.  My own notes.  And then

8  Mr. Muse had a primary care physician, Dr. Tsuzaki, and he

9  sent his medical records along as well, and looks to me like

10  an evaluation by Dr. Zinner, and an evaluation by Dr. Marvit.

11  I have the packet here.

12      Q.   So you've reviewed all those since yesterday?

13      A.   Yes.

14      Q.   In order to get ready for the testimony today?

15      A.   (Nodding head.)

16      Q.   Correct?

17      A.   Yes.

18      Q.   And so would your testimony be based on all that

19  material that Mr. Sherman gave you in addition to any

20  treatment that you provided to Mr. Muse?

21      A.   I suppose it depends on what you ask me.  I mean,

22  I remember what I remember from working with Mr. Muse, but

23  then I saw the other -- I did see the other stuff.

24      Q.   Wouldn't it be difficult to separate what you

25  remember about treating Mr. Muse some two or three years ago

1    four things:  Dr. Zinner's report, a letter from Dr. Zinner,

2    dated 10/9/05; Dr. Marvit' report dated 9/14/05; and my

3    medical records; and then please be there.  So -- and then

4    what came was this thing, this is Dr. Marvit' complex medical

5    evaluation; Dr. Zinner's --

6    BY MR. HARRIS:

7        Q.    October 9th letter?

8        A.    -- to Mr. Sherman; October 9th, looks like a

9    site -- pediatrics eval -- neurological -- physical

10   evaluation and assessment, I guess is what this was.

11   Dr. Zinner is a pediatrician, so I guess you call it a

12   evaluation.  Then my notes.  And in the very back I have

13   several pages just of state of Hawaii stuff in case I had a

14   few minutes.  So that's just my own personal sort of

15   tomorrow's business.  And so then Dr. -- looks like Dr.

16   Tsuzaki's notes as well.

17       Q.    And you reviewed all those in preparation for the

18   deposition today?

19       A.    Yes.

20       Q.    Did you have access to Dr. -- did you ever have

21   any communications with Dr. Zinner when you were treating Jon

22   Muse?

23       A.    No.

24       Q.    Did you ever have any communications with

25   Dr. Marvit --

1    A.    No.

2    Q.    -- when you were treating Jon Muse?

3    A.    (Shakes head.)

4    Q.    Please wait until I get done with my question.

5    A.    Oh, sorry.

6    Q.    Did you ever have any communications with

7  Dr. Marvit when you were treating Jon Muse?

8    A.    No.

9    Q.    Did you feel that it was necessary to contact

10  Dr. Zinner before treating Jon Muse?

11        MR. SHERMAN:  Objection.  That question makes

12  no sense, and there's a lack of any foundation, assumes facts

13  in evidence.  We don't even know whether he knew Dr. Zinner

14  existed at the time he was treating Jon Muse.  I don't see

15  how he can answer.

16  BY MR. HARRIS:

17    Q.    Please go ahead and answer.

18    A.    No.

19    Q.    Did you feel it was necessary to contact

20  Dr. Marvit before you treated Jon Muse?

21        MR. SHERMAN:  Same objection.

22        THE WITNESS:  No.

23  BY MR. HARRIS:

24    Q.    Now, based on your -- all the information that you

25  have today, have you formed any opinions about the claims

1  that Mr. Muse has against Home Depot?

2              MR. LEVIN:  Objection.

3              MR. SHERMAN:  Objection.  Calls for a legal

4  conclusion.

5              THE WITNESS:  Go ahead?

6  BY MR. HARRIS:

7      Q.  Yeah, have you formed any opinions about the case?

8      A.  No, that's difficult.  I don't know all the

9  particulars of the case truthfully.

10     Q.  Have you formed any opinion about Mr. Muse's

11  condition?

12             MR. LEVIN:  Medical opinion or not?

13             MR. SHERMAN:  Objection.  Lack of foundation.

14             THE WITNESS:  Yes, generally.

15  BY MR. HARRIS:

16     Q.  Yes?

17     A.  Yes.

18     Q.  What is your opinion about Mr. Muse's condition?

19     A.  I believe that Mr. Muse has Tourette's disorder,

20  severe, I would say pretty severe, and that was primarily why

21  I saw him.  He may have some related, if not conditions, then

22  traits, certainly, of some other phenomenon, if you will,

23  short attention span, hyperactivity.  You know, it's that

24  compulsive behavior, obsessive thinking.  He had used

25  substances in the past, not while I was working with him, but

1    prior to that he had, in the past he had substance use.

2            So the DSM-IV, that's a diagnostic criteria book

3    that psychiatry uses, and if you went by criteria he probably

4    had -- I treated him for, and I believe I considered it

5    Tourette's disorder.  And I don't think I gave a formal --

6    maybe nicotine dependence, but I don't think formally I

7    label -- you know, put a bill in for another type of

8    condition, although he had some traits of depression --

9    episodes of depression, anxiety, and those other things.  So

10   that was my sort of my opinion, just in a nutshell, in

11   working with him.

12           Q.   Do you have any other opinion about Mr. Muse's

13   condition?

14           A.   Just in general, I mean, I -- kind of, yes, I

15   have -- I know Jon pretty well.  I worked with him off and on

16   for the better part of five or six years, I guess, five

17   years, while I was at Kaiser, and I knew him, you know, as --

18   not many people have this condition, so when you meet

19   somebody that has this condition, they kind of usually stick

20   out.  I've had, you know, two handsful, maybe, in my 22

21   years.  I'm a child psychiatrist as well, so over the course

22   of the time I've been here I've had a couple of handsful of

23   folks that have it and kind of remember them pretty well.

24   So -- but in terms of opinion, just in general, because I

25   realize it's part of a lawsuit, so I kind of know of that,

1    think I would call it interruptive, you know, just because it

2    didn't have a normal flow of conversation, but other than

3    that.  As a professional, I kind of understood, you know, his

4    situation, so it didn't really stop me.

5         Q.  Did those tics in any way prevent you from

6    communicating with him enough to make treatment decisions?

7                   MR. SHERMAN:  Objection.  Vague, ambiguous,

8    asked and answered.

9                   THE WITNESS:  Could you say that again.

10   BY MR. HARRIS:

11        Q.  Did the tics, the interruptive tics, did they

12   prevent you in any way from communicating enough with him to

13   treat him?

14        A.  No.

15        Q.  Have you -- well, let me ask this.  There were

16   times when you didn't see Mr. Muse for six months or more

17   during the time you were treating him, right?

18        A.  Yes.

19        Q.  Were you able to determine, based on the visits

20   that were sometimes six months apart, whether or not his

21   obscene gestures or statements waxed or waned over time?

22                   MR. SHERMAN:  Objection.  Relevancy, vague.

23                   THE WITNESS:  Only from his report, but not

24   from direct observation.  I guess what I saw in the office

25   when he would come see me, but based on how he would tell me

1    would necessarily work for everybody.  But I think Jon does

2    that kind of thing generally, but it's not a formal thing

3    that he was taught, like a cognitive-behavioral, like,

4    intervention, you teach him a certain thing to do that.

5         Q.   Did you determine during your treatment with Jon

6    Muse whether or not he could use these premonitions to

7    suppress his obscene --

8                    MR. SHERMAN:  Objection.

9                    MR. HARRIS:  Can I get done with the

10   question, please?

11                   MR. SHERMAN:  Sure, go ahead.

12   BY MR. HARRIS:

13        Q.   Let me start again.

14             Did you determine, during your treatment with

15   Mr. Muse, whether or not he could use these premonitions, as

16   you call them, to suppress his obscene gestures or obscene

17   statements for a particular period of time?

18        A.   No.

19        Q.   Can you think of something you could have done

20   when you were treating him to make such a determination?

21        A.   Actually, we discussed it, actually.  At Kaiser,

22   psychiatrists were generally used for medication kind of

23   management, to help folks with their medication.  We did have

24   a team of psychotherapists and counselors and folks such as

25   that.

1    The challenge for Mr. Muse, by his report, was

2    finances, and to embark on a course like that, there was a

3    co-payment and there was some fees attached, and he elected

4    to try it his way.  He is kind of a try-it-his-way kind of

5    guy, but we did have those conversations.  Because not just

6    this, but there are other things that he could have benefited

7    from, talk therapy or counseling therapy over -- and there

8    were two things, one was the financial, and he was on and off

9    Kaiser, I think, two times, maybe three times in the course

10    of time I knew him.  So we didn't really get a -- that's a

11    six months thing, and we didn't really get this continuity

12    going that I would have liked.

13        But specifically to get to what you're asking

14    about, which is the Tourette's, the identification and

15    targeted referral for such a thing, no, I didn't do.

16    Q.    Did you do anything else to determine whether or

17    not he could use the premonitions to suppress his obscene

18    statements or gestures for a particular period of time?

19    A.    Like a formal kind of thing or as part of the --

20    Q.    Anything.

21    A.    As part of our conversations, yeah, but not like

22    a -- there are formal, sort of, packaged, if you will,

23    protocols that can be obtained and used, and I didn't have

24    any and don't have any of those.  I'm not that familiar with

25    them.  I mean, in general I am.

1      Q.  In other words, Home Depot could say if you don't

2  like those offensive statements or gestures, you just

3  shouldn't come shop here, something like that?

4      A.  Not at the -- it doesn't say he can't come in

5  forever, just be aware that right now, sort of a head's up,

6  hey, there's something in here, we don't want to point

7  fingers and tell you who this person is, but give you -- you

8  know, let you know, so people don't get that shock.  I know,

9  maybe people wouldn't see it, people can't read English, I

10  know all the possibilities.

11      But so you asked about accommodations.  But the

12  accommodations Jon made usually is avoiding stuff like that,

13  and I guess you take it for granted, we just kind of -- I

14  just go everywhere where I need and want to go, and he and

15  folks like him can't do that.  Or they can, but at some risk,

16  I guess.  And so I don't know what the right answer is to

17  that.  I used to give people a little, maybe a half dozen

18  times over the years, a letter or a card for their wallet,

19  and I saw Dr. Zinner's opinion, but...

20      What else?  Maybe you could ask for a private

21  shopping early or late or something, but what we used to try

22  to do at Kaiser was to set him up with the first appointment

23  of the day.  We couldn't guarantee nobody else would be

24  there, but it was minimizing the chance of other folks being

25  around, kind of work around it, because we knew -- bur we

1    A.   Yes.

2    Q.   S?

3    A.   Yes, took his blood pressure, 148 over 94.  His

4  pulse was 88.  A little bit up and a little bit quick.

5        "Subjective:  Now on Kaiser insurance.  Still has

6  severe Tourette's.  Coprolalia, tics, motor and vocal.  Has

7  severe impairment as a result.  Has own business, foliage

8  supply.

9        "O stands for objective.  Serious mood.  Multiple

10  motor tics:  tongue thrust, chin jut, head movements, raises

11  hand, one finger.  Multiple vocal tics:  Coprolalia, barks,

12  grunts.

13        "Assessment:  Severe Tourette's disorder.

14        "Plan:  Try Tenex (guanfacine), 1 milligram, twice

15  daily.  Number 2, Haldol, 5 milligrams HS, stands for

16  bedtime.  And Benadryl, 150 milligrams HS, also means

17  bedtime.  Get old records release in future appointments."

18        I didn't have his old records.  This paper here

19  was a separate sheet, so you -- we have a pile of them in the

20  office, and so when he came in, I pulled one of those.  I

21  didn't have his chart that day.  And then that was that.

22    Q.   The last time before this that you had seen him

23  was July 26th, 2002, correct?

24    A.   Right.

25    Q.   And so -- so 12, 16 months had elapsed?

```
 1        Q.    At Kaiser?

 2        A.    Yes.

 3        Q.    And keep it in a progress note or other -- other

 4   written record of a meeting, correct?

 5        A.    Yes.

 6        Q.    And would you try and keep those progress notes

 7   accurate?

 8        A.    I would -- yes, yeah.  I mean, I would not

 9   consider myself the most thorough.  I mean, but you can read

10   my notes.

11        Q.    Sure.

12        A.    They're somewhat sketchy, but as best I could,

13   given the time I had, yes.

14        Q.    If you considered something important in

15   connection with the treatment of Mr. Muse or any other

16   patient, would you try and keep it in a record?

17        A.    Yes.

18        Q.    During your meetings with Jon, were any other

19   psychiatric patients -- please tell me, was there any method

20   you followed in treating him?

21        A.    Remembering that my contact with Jon Muse was

22   medication management, so the way those kind of appointments

23   are set up is to evaluate the effective medication that might

24   be prescribed for a condition, benefits, problems, side

25   effects, dosages, effectiveness, modification -- other
```

1    symptoms that might have come up, looking for other

2    conditions, medical problems, check his blood pressure in

3    there, check his blood pressure, those kind of things. And

4    it was generally around a 15- to 20-minute, like an office

5    visit.

6            So my method would be sort of as you can see in

7    the SOAP sort of section, the subjective, Jon, tell me how

8    it's going. We'd spend a couple of minutes reviewing how

9    things have been, sort of hitting, you know, kind of

10   highlights on -- I would mostly be looking for symptoms is

11   what I'd be looking for.

12           Objectively, sort of what I observed in the

13   office, you know, kind of in our conversation. Checking his

14   mental state, you know, depression. The biggest risk would

15   be depression.

16           The A stands for assessment, sort of a couple of

17   lines on how we're doing overall.

18           And then the P, the plan, would be sort of where

19   we're going to go going forward. So, yeah, that would be the

20   general gist of it, the flow.

21           I, myself, was trained as a psychotherapist, but

22   just under the system at Kaiser that I chose to work in, I

23   didn't really have the opportunity to conduct sort of more

24   prolonged -- as we talked about earlier -- the psychotherapy

25   or any kind of thing like that, so.

1      Q.  So basically you'd have a conversation with Jon to

2  identify his symptoms, and then you would determine what was

3  the most appropriate treatment based on the symptoms you'd

4  identify; would that be an accurate summary?

5      A.  Yes.

6      Q.  And the treatment that you focused on was

7  medication?

8      A.  Yes.

9      Q.  And if there was going to be any counseling --

10  behavioral counseling or other coaching, your job would be to

11  refer Jon to someone else in Kaiser, right?

12      A.  Yes.

13      Q.  And so it wasn't your job to coach or counsel?

14      A.  Not specifically, although -- right, not

15  specifically, but I would always have conversation about

16  broader, but, no, it would -- I would not characterize it,

17  and I never sent in a -- there's billing codes for what you

18  would do, I never would put in a billing code for any kind

19  of -- I would never call it psychotherapy or counseling.  It

20  was always a straight -- what's called a medication

21  management visit, a 90862 code for billing purposes.  That

22  really is all it's meant to be.

23      Q.  And that was your job at Kaiser?

24      A.  Yes.

25      Q.  To assess symptoms and decide what medicine to

1    prescribe, correct?

2        A.   Yes.

3        Q.   Is there -- is there -- during those meetings,

4    remember I asked you about whether or not he was able to

5    suppress his symptoms, his gestures or his statements.  Was

6    there any need for you to determine whether or not he could

7.   suppress his gestures or his statements during those

8    meetings?

9        A.   No.

10       Q.   Is the way that you identify the symptoms and then

11   prescribe medicine, is that the typical way you're familiar

12   with Tourette's being treated?

13       A.   Within the Kaiser system I would -- I don't know

14   nationally, I haven't gone to a national conference, but

15   within the Kaiser system, that -- and that's the bulk of the

16   eight years.  Prior to that, at Kahi Mohala, it was hospital

17   work, so it was an inpatient came in and then left.  So it is

18   consistent with what was the standard at the time I was

19   there.

20       Q.   At Kaiser?

21       A.   Yes, I would say.  Now, how that matches up in the

22   community, I can't say.

23       Q.   If I -- if I told you and asked you to assume that

24   regardless of whether or not Jon Muse had a card or explained

25   to customers and employees that he had Tourette's, allowing

BY MR. HARRIS:

    Q.   You're being offered as someone that can talk about --

    A.   Sure.

    Q.   -- some accommodations.

    A.   I think what I would do if that happened, I would talk to Jon and say, Jon, did you hear what -- you know, given that this happened, what do you think we ought to do? I would try and work with the person to say what do you think we ought to do here, is it that important to you, you know, is there another way around this? I guess that's what I would do.

    I don't know if that makes sense. I would sort of say, well, given this, Jon, you know, what's -- I don't know the law that well, that's true. But I do acknowledge that I would think it's -- I guess the reason I said what I just said is I think at some point I would ask a consumer or a patient to say, even if it's within your rights, I mean, at what point does that butt up against someone else's rights? You know, I don't really know -- that's sort of your point. I don't really know the answer to that. You know, like his rights versus the next person's rights not to have that happen.

    Q.   Good. That's all I wanted -- you don't really know how to answer that --

1      A.   No.

2      Q.   -- question --

3      A.   No, I don't.

4      Q.   -- is that correct?

5      A.   Yeah, don't know.

6      Q.   Is there any work -- any more reading or work

7  about this case that you intend to do in the future after

8  this deposition?

9      A.   Specifically his case you mean?

10     Q.   Yes.

11     A.   I do intend at some point to go back to clinical

12  work as well.  I'll keep my position, but I am able to have a

13  private practice or see patients on some capacity.  And once

14  I kind have gone past the year mark where I think I

15  understand my new job, I'll do something.  I don't exactly

16  know what it would be.  But in order to stay current, you

17  know, with children and adults, I would like to do something

18  where I could still see people.  But it's likely that I would

19  see somebody again with this condition or many others, and I

20  would continue to read, but specifically to his case --

21     Q.   Yeah, let me limit it.  In between now and the end

22  of October, do you intend to do any further study or analysis

23  concerning Mr. Muse's condition or any accommodations that

24  could be made with respect to it?

25     A.   I had not, no.

1    A.    Yes.

2        Q.    So on November 3rd, 2003, you saw Jon Muse for the

3    first time in 14 months, correct?

4        A.    Yes.

5        Q.    On that day, is there any way you can tell from

6    these documents at what time of the day you saw him?

7        A.    Only if I had written it down.  No, you can't.

8    The only way you can probably find out is at Kaiser, if they

9    have a log of appointments.

10       Q.    But here you cannot tell?

11       A.    No.

12       Q.    And how many patients would you see during a day?

13       A.    12, roughly.  I mean usually 12.

14       Q.    In the SOAP, was it your ordinary practice --

15    what's A stand for?

16       A.    Assessment.

17       Q.    Is it your ordinary practice to write down all of

18    the significant aspects of your assessment of a person's

19    psychiatric condition?

20       A.    Well, as you can see from my notes, I adapted it

21    to fit the box.  And so truthfully there were times when I

22    didn't capture every -- you know, everything in that box.

23    And I guess I could have gotten a sheet, but it was my

24    practice to do the best I could to have it fit the template

25    that Kaiser used.  Because this was actually a triplicate

1    you any other specifics.

2        Q.    With respect to him not coming back, did you ever

3    learn that his former attorney, Lunsford Phillips, had

4    actually agreed that he would not shop until this lawsuit was

5    over?  Had you ever heard that?

6        A.    No.

7        Q.    How did -- how did Mr. Muse get treated between

8    July 26th, 2002 and November 3rd, 2003?

9        A.    He -- the reason he had left -- stopped coming to

10   see me in the first place was he had stopped being a Kaiser

11   member.  As you see that note on page 11, 32013300011, he --

12   on 8/23/01 he had lost his insurance.  It says "no insurance"

13   there.  "No money for medicine.  Debilitated by tics."

14           So I had -- haloperidol is not very expensive.  I

15   mean, it was reasonably affordable.  So -- and he wasn't a

16   Kaiser member either, so I tried to find a way to see him,

17   but I just couldn't do it in the business standpoint at

18   Kaiser.  So I said "meet as able," and he had -- didn't have

19   any insurance period.

20           Well, about a year later he called me, and that

21   "call with patient.  Reports doing well but not having a

22   doctor due to not finding" -- and he got on Medicaid, which

23   would -- any willing provider, but Kaiser is not a Medicaid

24   provider, so he couldn't come back to -- they couldn't

25   take -- they didn't take Medicaid in the office at Kaiser, so

1    wasn't a Kaiser member.

2         So he was continuing to look -- and I actually

3    refilled his Haldol and his Benadryl for a year.  I did a

4    prescription.  I called it into -- I could probably tell you

5    what pharmacy based on that -- this paper here.  Pali Longs,

6    and I put refills, and then on 7/26/02, I did it -- so I did

7    it for a year.  And then I didn't refill it again until I saw

8    him.  So I don't know if you -- see, if you see --

9         Q.   That was a charitable act.

10        A.   Well, yes.  The but is -- the but of it is I

11   didn't see him for a year, so I was a little bit on the hook

12   because I did do the prescription, but I did think it was the

13   right thing to do and hoped he would find somebody.

14        Q.   Now, let's turn to April 10th, then.  That's

15   number -- I see it as number 15.

16        A.   Yes.

17        Q.   Can you please read the S there?

18        A.   Right.  "April 10th, 2004, med review --

19   medication review.  Subjective.  Does not believe guanfacine

20   helps.  Peers and family tell him he's the same.  No drug

21   insurance coverage.  Money tight.  Abstinent from gambling

22   one year.  Uses only coffee, no caffeine pills.

23        "Objective:  Mood clearly better than last visit.

24   He reviewed how he used support groups to help get through

25   it.  Review medication options for Tourette's.  Motor, vocal

1    the guy would say, hey, doctor so and so says have you

2    thought about something else, that kind of thing, and I don't

3    remember if I had that conversation with Jon or not.

4        Q.   If you had that conversation about Dr. Zinner at

5    that time, was there any other period of time during your

6    treatment of Jon Muse when you had a conversation with him

7    about Dr. Zinner, other than that possible time?

8        A.   I don't have any specifics.  I kind of remember

9    him indicating he was going to go to see -- he never

10   traveled, Jon never traveled, so it was kind of a big deal.

11   I'm not even sure he had ever been on a jet, actually.  But I

12   remember him sort of telling me I'm going to go see this guy,

13   but this is at the end of my time at Kaiser.  I kind of was

14   finishing up and all, so I don't remember any better than

15   that.

16       Q.   Would you have referred Jon to Dr. Zinner?

17       A.   Did I?  Did I do it?

18       Q.   Yeah.

19       A.   I don't -- no, I didn't know Dr. Zinner.

20            MR. HARRIS:  Let's take another short break.

21   I think I'm pretty much done with my part of the examination,

22   but I want to be sure.

23                 (Off the record.)

24   BY MR. HARRIS:

25       Q.   Have you ever heard of a woman named Debra

1  describe it, his tics?

2        A.   Yes.

3        Q.   Do you give other patients letters, in the

4  instances where you've had other patients with similar

5  conditions as Jon, you give them letters explaining their

6  condition?

7        A.   I have.  I have.

8        Q.   And has that worked out well for them?

9        A.   No.

10        Q.   No?

11        A.   It's kind of a similar situation.  Society

12  generally struggles, I guess, to understand.  There's one in

13  particular I'm thinking about, probably the most recent one.

14        Q.   Well, let me ask you, does Jon actually pose a

15  physical threat to anyone when he goes to a store?

16        A.   No.

17        Q.   Does he physically lunge at anybody as a result of

18  his Tourette's?

19        A.   No.

20        Q.   To your knowledge, I mean, does the use of the

21  word "cunt" by Jon cause a physical threat to anyone around

22  him?

23        A.   No.

24        Q.   Does the use of the word "fucking" by Jon cause a

25  physical threat or danger to anyone around him?

1  STATE OF HAWAII                    )

2                                     )  ss:

3  CITY & COUNTY OF HONOLULU          )

4

5          I, JESSICA R. PERRY, do herby certify:

6          That on August 3, 2006, at 12:04 a.m.

7  appeared before me WILLIAM P. SHEEHAN, M.D., the witness

8  whose deposition is contained herein; that prior to being

9  examined he was by me duly sworn;

10         That the deposition was taken down by me in

11  machine shorthand and was thereafter reduced to typewritten

12  form by computer-aided transcription; that the foregoing

13  represents, to the best of my ability, a full, true and

14  correct transcript of said deposition.

15         I further certify that I am not attorney for

16  any of the parties hereto, nor in any way concerned with the

17  cause.

18         DATED this 19th day of August of 2006,

19  in Honolulu, Hawaii.

20

21

22

23  Jessica R. Perry, CSR 404
    Notary Public, State of Hawaii

24  My commission expires:  5/11/09

25