# EXHIBIT "5"

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF HAWAII
 3     JON MUSE,                    )
 4                                  )
 5          Plaintiffs,              )
 6                                  )
 7     vs.                           )  NO. CV04-00154 DAE/BMK
 8                                  )
 9     HOME DEPOT USA, INC.,        )
10          Defendant.              )
11     _____)
12
13
14
15
16
17          DEPOSITION OF WILLIAM P. SHEEHAN, M.D.
18       Taken on behalf of the Defendant at the offices of
19     Torkildson Katz Fonseca, 700 Bishop Street, 15th Floor,
20     Honolulu, Hawaii, commencing at 12:04 a.m. on August 3, 2006,
21     pursuant to Notice.
22
23
24     BEFORE:    JESSICA R. PERRY, CSR NO. 404
25                Certified Shorthand Reporter
```

EXHIBIT 5

1    Q.   Let me clarify.  During the time that you treated
2 Jon Muse, the plaintiff in this case, did you become aware of
3 any activities that he could not perform?
4         MR. SHERMAN:  Objection.  Vague and
5 ambiguous, relevancy.
6         THE WITNESS:  The only thing he couldn't do
7 is keep the tics under control, I remember that.  He tried,
8 he tried to do that.  I think he was unable to do that.  Let
9 me think if there was anything else.  That's a good question.
10        He didn't fall asleep normally.  So he
11 couldn't control the tics, he couldn't fall asleep -- he had
12 insomnia, so he couldn't fall asleep, but in terms of like
13 activities of daily life, that sort of thing?
14 BY MR. HARRIS:
15   Q.   Yeah.
16   A.   No, I think he could do that, activities of daily
17 life all right.  Those two things would come to my mind.
18   Q.   He had a business, correct?
19   A.   He did.
20   Q.   He had female friends?
21   A.   Yes.
22   Q.   He had relationships -- did you have any problem
23 communicating with him?
24   A.   A little, but, I mean, you could do it, just
25 because the tics would interject.  But other than the -- I

1  think I would call it interruptive, you know, just because it
2  didn't have a normal flow of conversation, but other than
3  that. As a professional, I kind of understood, you know, his
4  situation, so it didn't really stop me.
5      Q.  Did those tics in any way prevent you from
6  communicating with him enough to make treatment decisions?
7          MR. SHERMAN: Objection. Vague, ambiguous,
8  asked and answered.
9          THE WITNESS: Could you say that again.
10 BY MR. HARRIS:
11     Q.  Did the tics, the interruptive tics, did they
12 prevent you in any way from communicating enough with him to
13 treat him?
14     A.  No.
15     Q.  Have you -- well, let me ask this. There were
16 times when you didn't see Mr. Muse for six months or more
17 during the time you were treating him, right?
18     A.  Yes.
19     Q.  Were you able to determine, based on the visits
20 that were sometimes six months apart, whether or not his
21 obscene gestures or statements waxed or waned over time?
22          MR. SHERMAN: Objection. Relevancy, vague.
23          THE WITNESS: Only from his report, but not
24 from direct observation. I guess what I saw in the office
25 when he would come see me, but based on how he would tell me

1  thing, frankly, unless somebody tells you, I have to admit, I
2  wouldn't have necessarily thought it through.  And maybe it's
3  my lack of sort of consideration for society, but I have done
4  that for people.  Kids, too, I've done that.  That's one.
5  That's the one that sort of intuitively comes to me.  I saw
6  what Dr. Zinner wrote in his, which I have to admit, I hadn't
7  thought of anything like that, frankly, it's not a bad idea,
8  but I don't know what --
9      Q.   What did he write in his?
10     A.   If I -- I wouldn't say I studied it, but it
11 sounded to me like he was advocating that you could actually
12 sort of give the equivalent of informed consent to people.
13 Like if Jon was in a store, any store, there was a little
14 sign that could be put out there saying, look, there's
15 somebody in here who has this condition.  You don't have to
16 name his name or say what shirt he has on.  That gives the
17 other folks a choice whether they go in or not, right?  So I
18 thought that was not a bad -- because my way wouldn't have
19 done that.
20          My way would have been after the fact:  I'm sorry,
21 I apologize, here's a letter from my doctor.  That approach
22 is sort of that preemptive sort of thing, before it becomes
23 too much of a problem.  Not the exact -- I don't want to say
24 the exact things that he proposed, I don't know about the
25 logistics of that, but the concept was not bad, I thought.

```
 1   STATE OF HAWAII                    )
 2                                      ) ss:
 3   CITY & COUNTY OF HONOLULU          )
 4
 5              I, JESSICA R. PERRY, do herby certify:
 6              That on August 3, 2006, at 12:04 a.m.
 7   appeared before me WILLIAM P. SHEEHAN, M.D., the witness
 8   whose deposition is contained herein; that prior to being
 9   examined he was by me duly sworn;
10              That the deposition was taken down by me in
11   machine shorthand and was thereafter reduced to typewritten
12   form by computer-aided transcription; that the foregoing
13   represents, to the best of my ability, a full, true and
14   correct transcript of said deposition.
15              I further certify that I am not attorney for
16   any of the parties hereto, nor in any way concerned with the
17   cause.
18              DATED this 19th day of August of 2006,
19   in Honolulu, Hawaii.
20
21
22   _____
23   Jessica R. Perry, CSR 404
     Notary Public, State of Hawaii
24   My commission expires: 5/11/09
25
```