1    IN THE UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF HAWAII

3 - - - - - - - - - - - - - - - - - - - - - - - - - - -

4 JON MUSE,

5     Plaintiff,

6   vs.     Case No. CV04-00154 DAE/BMK

7 HOME DEPOT USA, INC.,

8     Defendants.

9 - - - - - - - - - - - - - - - - - - - - - - - - - - -

10

11

12     <u>DEPOSITION OF JON MUSE</u>

13

14 Taken on behalf of the Defendant at Torkildson Katz

15 Fonseca Moore & Hetherington, 700 Bishop St., 15th

16 Floor, Honolulu, Hawaii 96813, commencing at 10:04 a.m.,

17 Wednesday, October 12, 2005, pursuant to Notice.

18

19

20 BEFORE:  BARBARA ACOBA, CSR No. 412, RPR

21     Notary Public, State of Hawaii

22

23

24

25

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii (808) 524-2090


EXHIBIT___1___

1    wanted to say before we started questioning.

2            MR. SHERMAN:  Thank you, Mr. Harris.  We

3    discussed this previously before we went on the record.

4    I would like to note our objection to the videotaping of

5    this deposition.  While it was noted in the actual

6    notice, my understanding of the local rules is that in

7    order to videotape you have to get the agreement,

8    expressed agreement, of opposing counsel.  We were never

9    solicited in that regard.  So we will proceed with the

10   deposition as it is, but we don't waive our objecting to

11   the videotaping of it.

12           MR. HARRIS:  Thank you, Mr. Sherman.

13   BY MR. HARRIS:

14       Q.   Mr. Muse, is there any reason why you can't

15   give your complete, accurate, and honest testimony

16   today?

17       A.   Simple, my testimony, it is accurate and it is

18   simple.

19       Q.   Okay.  And it will be honest?

20       A.   It will be honest.

21       Q.   Good.  Thank you.  Let's go back to the initial

22   date in question in this case, which I understand is

23   November 3, 2003, right?

24       A.   Yes.

25       Q.   Okay.  What happened to you in Home Depot's

1  store on that day?

2      A.   I feel I was embarrassed, humiliated, and I

3  wasn't treated fairly as far as being treated as a human

4  being as far as my rights were concerned.

5      Q.   Can you please take me through step by step

6  what happened when you arrived at the store until you

7  left the store.

8          MR. SHERMAN:  I'm gonna object at this point.

9  I think we need to break it down.  That calls for a

10  narrative response.  I think it will be better -- we'd

11  all be better served if we -- if you took it question by

12  question as to what transpired when he entered the

13  store, what happened then, where did he go, et cetera.

14  Otherwise, I think there's a chance of the narrative

15  will ramble.

16  BY MR. HARRIS:

17      Q.   Thank you.  Can you please answer my question.

18      A.   I got to the store with a broken spray canister

19  and I approached the clerk at the return counter and

20  then she proceeded to help me to do what I needed to do,

21  and my Tourette's were evident that day and she looked

22  at me strange, you know, like why am I saying that.  And

23  anyway, a few seconds went by and she picked up the

24  phone and a -- one of her supervisors by the name of

25  Dar, that's all I know of her name was D-a-r, Dar, she

1    came by and she angrily told me, don't be talking to my

2    clerk that way, you know.  She was -- I tried to explain

3    that I suffered from Tourette's syndrome and then she

4    showed absolutely no compassion and she told me, you

5    know, you don't be talking to my clerk that way or else

6    you're gonna have to leave the store.  I think she said

7    you're gonna have to leave the store.

8         Then Dar -- I mean, the clerk later on

9    completed my transaction and I moved over to another

10   counter when this, the other manager, by the name of

11   Mike Dolan came by and he also -- I tried to explain to

12   him that I'm not trying to disrespect anyone or cause

13   any harm by my verbal language, but I suffer from

14   something that I cannot control.  And he says that you

15   can't be using that language around here.  You know, I

16   said, but I can't help it, and it got kind of tense, but

17   I did not -- did not disrespect him and swear at him or

18   yell at him or anything, but it got tense and he says,

19   you're gonna have to leave our store and not come back

20   if you're gonna use this language in my store.

21        I would have appreciated it if he could have

22   pulled me on the side and talked to me one-on-one to

23   settle this matter and had -- but he chose to humiliate

24   me in front of like there were probably about eight or

25   nine other customers in that -- in that area where we

1      Q.    Is there any other reason why you think this

2  incident happened?

3      A.    Because of the words, the context of my

4  language.  Very offensive, I admit.

5      Q.    Now, do you believe you have any sort of

6  impairment?

7      A.    Well, I believe that I -- I suffer from

8  Tourette's syndrome, which is incurable, and I've had to

9  live with this all my life.

10     Q.    Okay.  Do you have any other impairments that

11 you --

12     A.    None at all.

13     Q.    Does -- does this Tourette's syndrome limit in

14 any way the way you are able to care for yourself?

15     A.    Physically?  Are you talking about physically?

16     Q.    Yes.

17     A.    Yes.  No.  No.  No.  I'm able to care for

18 myself normally, like a normal human being.

19     Q.    Does -- does your Tourette's limit in any way

20 the way you can perform manual tasks?

21     A.    Manual?

22     Q.    Yes.

23     A.    No.

24     Q.    Does your Tourette's limit in any way your

25 ability to walk?

1     A.   No.

2     Q.   Okay.  Does your Tourette's limit in any way

3  your ability to see?

4     A.   No.

5     Q.   Does your Tourette's limit in any way your

6  ability to hear?

7     A.   No.

8     Q.   Okay.  Does your Tourette's limit in any way

9  your ability to speak?

10     A.   Yes.

11     Q.   How does your Tourette's limit your ability to

12  speak?

13     A.   Well, I -- I -- I do use -- I do have

14  involuntarily tics, vocal tics, which is called

15  coprolalia, and I -- sometimes it comes out and I try to

16  catch myself, you know, and it comes out.  I can't -- it

17  does have an effect on ability, the way I speak, yes.

18     Q.   Does -- does your Tourette's have any other

19  limitation on your ability to speak, than you've just

20  described?

21     A.   Other than -- can you rephrase that question,

22  sir.

23     Q.   You've told me one way that your Tourette's

24  limits your ability to speak.  Does it limit your

25  ability to speak in any other manner?

1     Q.   Yes.

2     A.   No.

3     Q.   Okay.  Does your Tourette's limit --

4     A.   Cunt.

5     Q.   Did you have something?

6     A.   No.  Go ahead, sir.

7     Q.   Okay.  Does your Tourette's --

8     A.   Excuse me.

9     Q.   -- limit your ability to work?

10    A.   Yes.

11    Q.   How does your Tourette's limit your ability to

12  work?

13    A.   Well, um, I can work, but at the present time I

14  can only work as a self-employed person, 'cause I cannot

15  work for anybody -- any other company because of the --

16  my language that I use, and especially when you work

17  with customers or if you're in social situations, it's

18  just not appropriate.

19    Q.   Okay.

20    A.   Because... so I am employed, but I do work for

21  myself.

22    Q.   Okay.  When's the last time you applied for

23  work at another employer?

24    A.   Gee, that -- that was in April of 2000 -- no,

25  excuse me.  April of 1990 was the last job I had working

1    for someone --

2        Q.    Okay.

3        A.    -- until I went into self employment.

4        Q.    Okay.  And was that the Waikiki Park Hotel?

5        A.    Yes, that was.

6        Q.    Okay.  Since you were employed at the Waikiki

7    Park Hotel, after that job was over, have you ever

8    applied for another job?

9        A.    No.

10        Q.    Okay.  Are your relations with other people

11    characterized on a regular basis by severe problems?

12        A.    Severe problems, um.

13            MR. SHERMAN:  I'm gonna object.  That's vague

14    and ambiguous.  If you could be more specific.

15            THE WITNESS:  Yeah, more specific.  Could you

16    break it down. Cunt.

17    BY MR. HARRIS:

18        Q.    Do you understand the word severe?

19        A.    Yes.

20        Q.    Do you understand the word problems?

21        A.    Yes.

22        Q.    Okay.  Use your understanding and answer that

23    question.

24        A.    Could you repeat the question, sir.

25        Q.    Are your relations with others characterized on

19

1   a regular basis by severe problems?

2       A.   Yes.

3       Q.   Okay.  Please tell me how.

4       A.   Well, I may go to a grocery store and I may pay

5   for something that I buy at the grocery store, and they

6   may communicate with me verbally, and my Tourette's will

7   come out and they'll take offense to it.

8       Q.   Okay.

9       A.   Excuse me?  Or maybe a -- maybe like a

10  situation would be, excuse me, what did you just call

11  me?  And, you know, with the body language and a gesture

12  like that (indicating), and right away I have to defend

13  myself.  And I say, excuse me, I didn't mean to say

14  that.  I have a -- I have to explain myself constantly

15  wherever I go.  So I try to avoid social situations --

16      Q.   Okay.

17      A.   -- at all costs.

18      Q.   Are --

19      A.   It is severe, though.  It could be severe.

20  I've been threatened to be beaten, killed or, you know,

21  stuff like that.

22      Q.   Because of the --

23      A.   The words.

24      Q.   -- words you say to people?

25      A.   Yeah.  Yeah.  Which is totally not to harm

1    them, not to attack them or not to disrespect them, but

2    it's just -- it's just the words that come out of my

3    mouth.  I do not choose the words, sir.

4        Q.    Are there -- are there any other severe

5    problems that -- that you can think of?

6        A.    Yes.  I have a physical tic, which is flipping

7    my birdie.  Like when I'm driving in my car, I'll be

8    having a cigarette, I'll hold it out the window and my

9    finger will go like that (demonstrating) and some people

10   may pass by and start swearing and yelling at me and

11   threatening to run me over and whatever, you know, and

12   it is severe.  I've encountered severe situations

13   before.

14       Q.    Okay.

15       A.    With the physical tic.

16       Q.    How often do you go to the grocery store?

17       A.    I can't give you a very definite answer on

18   that.  When things come up, I need personal hygiene or I

19   may need something -- something, you know, I'll go maybe

20   once a week or, but I try to just do my business and try

21   to avoid people and just try my best to control myself.

22       Q.    Okay.  So you've told me about two sorts of

23   severe problems, going to the grocery store and having a

24   conversation with the clerk, and driving down the road

25   and using a hand signal, okay.  How often do you have

1      A.    It hasn't happened today.   It hasn't happened

2  today so far.

3      Q.    How about yesterday?

4      A.    Yes, it happened.

5      Q.    Okay.   Tell me what happened yesterday.

6      A.    I -- I had an appointment with my -- my

7  attorney, Bruce Sherman, yesterday and I got there

8  early.   And I was down on the mall, outside of Stan

9  Levin's office, sitting on the bench and smoking a

10  cigarette and there was this black lady that was using

11  the phone about 20 feet, is that okay, Bruce?

12          MR. SHERMAN:   That's fine.

13          THE WITNESS:   About 20 feet away from me, and I

14  started using the N word just out of the blue.   I mean,

15  I didn't -- I wasn't trying to disrespect this woman.

16  She was a black woman and the N word came out.   And I

17  think she heard me one time.   I said it a few times.   I

18  don't know exactly how many times, maybe about five

19  times, and I was -- I was very nervous by her being

20  there.   And she -- she -- she -- I think she heard me

21  and she turned over her shoulder and looked at me and

22  glared at me that way.

23  BY MR. HARRIS:

24      Q.    What N word are you referring to?

25      A.    Nigger.

```
 1    of your mouth on Saturday?

 2         A.    It comes out of my mouth every day.

 3         Q.    Okay.  On Saturday, can you tell me --

 4               MR. SHERMAN:  I'm gonna object.  Can you --

 5    please.  I'm gonna object.  Can you state the dates so

 6    we're specific.  We have no reference at this point.

 7    For each day you ask, can you state the date, please,

 8    and a time reference.

 9    BY MR. HARRIS:

10         Q.    Last Saturday, we've gone over Monday, we've

11    gone over Sunday, and now we're on Saturday.  On

12    Saturday did you say any words involuntarily, as a

13    result of your Tourette's, that caused an adverse

14    interaction with any person?

15         A.    On Saturday I cannot recall any situation

16    because I spent most of the day indoors watching

17    football.

18         Q.    Okay.  How about the day before, Friday?

19         A.    I don't remember.

20         Q.    Okay.  How about --

21         A.    No, I don't remember before that.  I do know --

22    I'm not lying -- I'm gonna sit here and lie to you and

23    tell you that it happens 10 times a day every day, but

24    it does happen just about every other day, I get some

25    adverse reaction from somebody I've never met.  Almost
```

1    every day.  Like I said, there are times where I take

2    the day off.  I may stay indoors.  I may not go to the

3    store or I may not go out to the book -- or to the

4    movies or whatever, and I'm not in contact with people,

5    with the social public.  You know what I'm saying?

6        Q.   Okay.  So are you saying before Thursday you

7    don't remember any incidents?

8            MR. SHERMAN:  I'm gonna object.  He didn't say

9    that.  You're mischaracterizing his testimony.

10   BY MR. HARRIS:

11       Q.   Can you answer my question?

12           MR. SHERMAN:  If you can't answer it, you can't

13   answer it, Jon.

14           THE WITNESS:  I don't remember what happened on

15   Thursday.

16           MR. SHERMAN:  If we can -- I'm also gonna

17   object.  I want some specific dates, okay.  We have no

18   reference.  When this deposition is transcribed, it's

19   gonna be a blank page and we're not gonna know the

20   dates.  We don't even know what month we're talking

21   about or what year.  If you could at least be more

22   specific that way, Jeff.

23   BY MR. HARRIS:

24       Q.   Do you -- do you remember what happened last

25   Thursday, any incident in which you uttered a word that

1      A.    Well, depends on what you mean by friends.

2  Close friends?  Acquaintances?  What do you mean?

3      Q.    Let's start with close friends.  How many close

4  friends do you have?

5      A.    Not many,

6      Q.    How many?

7      A.    Maybe not even 10 that I can trust with

8  everything.

9      Q.    Okay.  Do you have 10 friends that you can

10 trust with everything?

11     A.    Not quite.  I don't exactly know if it's 10,

12 but I can't -- it'll take me time to think of the names

13 of these people, I mean, who they are, but I do have one

14 man that I can trust with my life.

15     Q.    Okay.  Why don't you go through the names of

16 the people that you consider your close friends.

17         MR. SHERMAN:  I'm gonna object.  Jeff, what is

18 the possible relevance of this?

19         THE WITNESS:  Yes.

20         MR. SHERMAN:  What is the possible relevance?

21         MR. HARRIS:  Your objection's noted.

22         MR. SHERMAN:  Well, I understand it's noted,

23 but this isn't even designed to lead to the discovery of

24 relevant material.  Listen, at this point, why don't we

25 take a break, okay.  We want to consider whether we

```
1    you see a couple times a week?

2         A.    Not other than what I told you.

3         Q.    Okay.  How long have you had -- had the

4    impairment that we're discussing?

5         A.    What do you mean impairment?  Tourette's?

6         Q.    Yeah.

7         A.    I've lived with this -- I've been diagnosed

8    with this since I was about eight or nine years old.

9         Q.    Okay.  How about the -- can you say the word

10   that starts C-o-p, can you say that again and spell it

11   for the court reporter.

12        A.    C-o-p?

13        Q.    Yeah, copralia.

14        A.    Coprolalia.

15        Q.    Okay.  Can you say that and spell it for the

16   court reporter.

17        A.    I'm not sure if I can spell it exactly, but

18   I've -- I've read about it.  Coprolalia,

19   C-o-p-r-a-l-a-l-i-a (sic).

20        Q.    And how long have you had that condition?

21        A.    Since I was 12.

22        Q.    And do you consider that an a impairment?

23        A.    Oh, yeah.  If -- if -- if you can't control it

24   and it come, you know, and then...

25        Q.    Has it gotten --
```

44

```
 1        A.    It's not normal.  It's not normal, put it that
 2   way.
 3        Q.    Has it gotten better or worse over time?
 4        A.    I would say the words have gotten worse over
 5   time.  The words that I use has gotten worse over time.
 6        Q.    Okay.  Has your use of the words gotten more
 7   frequent or less frequent over time?
 8        A.    More frequent or less frequent?  I can't answer
 9   that accurately.
10        Q.    Why not?
11        A.    I can't answer that accurately.  It all depends
12   on my state of mind.  My being.  If I'm under a lot of
13   stress or if I'm relaxed or if I'm around people or if
14   I'm in a tense situation, all depends.  I can't give you
15   an accurate answer on that.
16        Q.    Okay.  Are there -- are there any times when
17   you may go a day or so without the condition manifesting
18   itself?
19        A.    No.  Not a day in my life.
20        Q.    Now, going back to the -- oh, excuse me.
21   Before we do that.  You've told us that you go to the
22   grocery and go to Longs.  I understand that you surf.
23   You surf once in a while?
24        A.    I haven't surfed in quite awhile.  I do -- I do
25   know how to surf, though, yes.
```

49

```
 1    leave your home or your nursery?

 2         A.    No.

 3         Q.    Okay.  Do you ever go to parties?

 4         A.    Rarely.

 5         Q.    When's the last party you went?

 6         A.    Oh, I'll take that back.  We had a birthday

 7    party this past Saturday evening at my neighbor, Jon

 8    Porlas', house.

 9         Q.    Did you go to that?

10         A.    Yes, I went.

11         Q.    How many people were at the party?

12         A.    Maybe eight, nine.

13         Q.    Okay.  You have any adverse interactions with

14    anybody at the party?

15         A.    Yeah, with the birthday person.  Because she's

16    ignorant.  She's ignorant.

17         Q.    Tell me about that.

18         A.    No.  The word come out and she'll go -- I'll

19    say the C word and she'll go, yeah, balls.  She'll react

20    towards me.  I don't know if she's doing that to joke

21    around or hurt my feelings, but, yeah, she -- she -- I

22    had adverse reactions.

23         Q.    Okay.  Any other adverse interactions, other

24    than what you've just described -- strike that.

25               Did any other adverse interactions, as a result
```

71

1    the court reporter you need to say yes or no.

2        A.    Yes.  Yes.  Excuse me.  I'm sorry.

3        Q.    Now, have you subsequently learned that the

4    clerk's name was Debra?

5        A.    Her name was Debbie, I think.  Yeah, Debra.  It

6    might have been Debra.  It was Debbie.

7        Q.    Okay.

8        A.    Yeah.

9        Q.    Do you -- do you have any idea -- well, how did

10   they find out about your impairment?

11       A.    Well, obviously, Debbie must have gotten

12   offended and called her supervisor, hey, come down here,

13   there's a guy swearing at me and calling me a cunt, and

14   so Dar came over and Dar lashed out at me.

15       Q.    Okay.  How did -- how did they find out that

16   that was something that you couldn't control?

17       A.    I tried to explain it to them --

18       Q.    Okay.

19       A.    -- on the spot.  I tried to settle the matter

20   in a civil manner, civilized manner, without any yelling

21   or swearing at each other or -- but I tried to do that.

22       Q.    Did any of them yell at you?

23       A.    Oh, Dar -- Dar's tone of voice was very

24   hostile.  You know, she didn't -- her attitude was like

25   I don't give a damn.  I don't give a shit what you say.

72

```
1    You just don't be talking to my clerk that way.  That

2    was her -- her demeanor, I should say.

3         Q.   Okay.  Did she yell?

4         A.   She was -- not yell.  Not yell.

5         Q.   Firm voice?

6         A.   She used a firm, very firm, mean kind of voice.

7         Q.   Okay.  How about Mike, did Mike yell at you?

8         A.   Mike kind of raised his voice, but not yell out

9    loud, real loud, but he was a quite loud voice where I

10   could get the vibe, you know.

11        Q.   He was firm.

12        A.   He was -- yeah.  Yeah.

13        Q.   Okay.  And what did you tell Mike about your

14   Tourette's?

15        A.   I told him that I'm just here to do my

16   business.  I'm not here to offend anyone or attack

17   anyone by -- by my gestures.  And I explained to him

18   that I had something that I couldn't control, and he

19   didn't seem to care.  He just didn't want me using that

20   language in his store and that I would have to leave and

21   not come back.

22        Q.   Okay.  What else did you tell Mike about your

23   condition?

24        A.   What else?  I can't recall exactly what I told

25   him, sir.
```

```
 1       Q.   Okay.  What did you tell Dar about your

 2   condition?

 3       A.   I explained to her that -- the same thing I

 4   tried to tell Mike, that I didn't mean to disrespect

 5   your clerk or you folks, you know, by my gestures.  I

 6   don't mean -- you know, I don't mean to cause any

 7   trouble.  I'm just here to return my canister, my spray

 8   canister, and -- and leave.  Cunt.  Cunt.  And I tried

 9   to explain to her, but she showed no compassion for my

10   condition.  She didn't -- in other words, she didn't

11   accept it, and she used a lot of sarcasm towards me.

12       Q.   How about Debra?

13       A.   Debra seemed very pleasant.  I think the

14   managers took it harder than she did.

15       Q.   How did -- how did the managers find out about

16   the situation in the first place?

17       A.   Because --

18            MR. SHERMAN:  Objection.  Asked and answered.

19            THE WITNESS:  Cunt.  Cunt.  Cunt.

20   BY MR. HARRIS:

21       Q.   Unless your attorney tells you not to answer,

22   please answer my question.

23       A.   Should I answer that question, Bruce?

24            MR. SHERMAN:  Yeah, you can answer.

25            THE WITNESS:  I read in their statement,
```

1    because I had a copy of their statements, that Debra had

2    called Dar and said, eh, this guy calling me a fucking

3    cunt, you know, local -- local -- talking like a local

4    language, and that's how Dar came down right away and

5    tried to fix the situation, but she didn't do a good job

6    as a manager.

7    BY MR. HARRIS:

8        Q.    So Debra called her manager about --

9        A.    I would think so, that's what it said in the --

10   in the -- in the, what do you call it, statement that I

11   read.  'Cause I didn't know -- I didn't see her pick up

12   the phone or anything.  I didn't recall seeing her --

13           MR. SHERMAN:    I'm gonna object.  The witness

14   obviously doesn't have personal knowledge and he's just

15   guessing at this.

16           THE WITNESS:  Yes, I'm just guessing.  I'm not

17   certain how the managers found out, sir.  Cunt.

18   BY MR. HARRIS:

19       Q.    Who did Home Depot treat better than you?

20       A.    I don't know.  I can't answer that.

21       Q.    Did Home Depot treat anybody any better than

22   you?

23           MR. SHERMAN:  Objection.  Asked and answered.

24           THE WITNESS:  I can't recall that.

25           MR. SHERMAN:  Also it's vague and ambiguous.

79

```
1          MR. SHERMAN:  I'm gonna object.  It calls for

2   speculation.  There's no foundation laid for that.  He

3   couldn't, you know, he couldn't possibly tell you that.

4   BY MR. HARRIS:

5       Q.    Please answer the question.

6       A.    Do I answer the question, Bruce?

7          MR. SHERMAN:  As best you can.  If you can

8   answer it.  If you can't answer it, if you don't, you

9   know.

10          THE WITNESS:  Could you repeat the question,

11  sir.

12  BY MR. HARRIS:

13      Q.    What should Home Depot have done differently

14  during the incident on November 3rd, 2003?

15      A.    What should they have done differently?

16  Treated me with more compassion.

17      Q.    Okay.  Is there anything else Home Depot should

18  have done differently?

19      A.    Cunt.  Yes.  The manager could have pulled me,

20  on the side, one on one, outside the store instead of

21  embarrassing -- instead of embarrassing me in front of

22  everybody there.

23      Q.    What else could Home Depot have done

24  differently?

25      A.    Accommodate me.
```

1      Q.   How?

2      A.   Instead of telling me not to come back.

3      Q.   How?

4      A.   Probably -- I -- I -- I can't answer -- I don't

5   know how.  I really wouldn't know how, but I know how I

6   would treat somebody in this case.

7      Q.   Did you ask them to do anything?

8      A.   No.  I just -- I returned my canister and my

9   wheelbarrow and I left.

10     Q.   Okay.

11     A.   I didn't -- I didn't -- go ahead.

12     Q.   Did you say any of these words, that Tourette's

13   forces you to say, in front of any customers?

14     A.   I don't know if the customers heard it.  I

15   can't tell you that.

16     Q.   How about the second time you came back, did

17   the little eight-year-old girl standing directly --

18          MR. SHERMAN:  I'm gonna object.  There's a lack

19   of foundation.  We don't know anything about an

20   eight-year-old girl.  If he doesn't recall seeing one.

21          MR. HARRIS:  Counsel, are you gonna testify or

22   are you gonna let your --

23          MR. SHERMAN:  No.  No.  I'm gonna state my

24   objection for the record, Mr. Harrison.

25          MR. HARRIS:  Okay.  State an objection.

1          MR. SHERMAN:  The objection is, he -- there's

2     been no foundation laid for any eight-year-old girl

3     being present or anything as such.  If you want to lay a

4     foundation, do it.  If he doesn't know about an

5     eight-year-old girl being there, he doesn't.

6     BY MR. HARRIS:

7          Q.   Did you see the eight-year-old girl standing

8     directly behind you during the second incident?

9          A.   Do I answer the question?

10         MR. SHERMAN:  If you can.  If you know.

11         THE WITNESS:  I -- I -- I don't recall seeing

12    an eight-year-old girl or any children for that matter.

13    BY MR. HARRIS:

14         Q.   Are you denying that an eight-year-old girl was

15    standing directly --

16         A.   No, I'm not.

17         MR. SHERMAN:  Objection.  Asked and answered.

18         THE WITNESS:  No, I'm not denying.  I -- I -- I

19    don't have eyes behind my head.  I don't know exactly

20    who was behind me.

21    BY MR. HARRIS:

22         Q.   What do you think the Home Depot should have

23    done to accommodate you when other customers were

24    around?

25         MR. SHERMAN:  Objection.  Calls for

82

1    speculation.

2                THE WITNESS:  Do I answer that question?

3                MR. SHERMAN:  If you can.

4                THE WITNESS:  What should they have done to

5    accommodate me you're asking me?

6                MR. HARRIS:  Mm-hmm.

7                THE WITNESS:  Cunt.  Maybe have someone, an

8    employee that's maybe understanding, who can tolerate

9    me, and take me through the store to -- to help me get

10   whatever I need to get, buy or return or whatever,

11   whatever business I need to get done over there at the

12   store.

13   BY MR. HARRIS:

14        Q.   How should Home Depot have dealt with the

15   customers that were around you?

16               MR. SHERMAN:  I'm gonna object.  That's pure

17   speculation as to how Home Depot would deal with anyone

18   or how they should.  That's their business and he

19   couldn't possibly know this.  If you can answer that, if

20   you know how they would.

21               THE WITNESS:  I don't know how.  I have no

22   control over that.

23               MR. HARRIS:  Okay.

24               THE WITNESS:  I have no control over that.

25   Cunt.