# EXHIBIT "B"

Page 1

UNITED STATES DISTRICT COURT

STATE OF HAWAII


JON MUSE,

                Plaintiff,

vs                                    Case No. CV04-00154 DAE/BMK

HOME DEPOT USA, INC.,

                Defendant.


_____



            VIDEOTAPE DEPOSITION OF SAMUEL ZINNER, M.D.

                Taken on behalf of the Defendant


                    AUGUST 9, 2006


                        - - -


    BE IT REMEMBERED THAT, pursuant to the Federal Rules of

Civil Procedures, the deposition of Samuel Zinner, M.D.

was taken before Syndie Hagardt, a Certified Shorthand

Reporter, #2312, on August 9, 2006, commencing at the hour of

9:01 a.m., the proceedings being reported at 1420 Fifth Avenue,

Suite 4100, Seattle, Washington.


EXHIBIT B

Samuel Zinner, M.D.                              August 9, 2006

Page 14

1       Q.   Let me tell you what I understand.

2       A.   Okay.

3       Q.   Okay.  For the purposes of the next question.  A

4   current diagnosis is somebody comes in, you do an objective

5   examination, a subjective evaluation, you determine what their

6   symptoms are and you design a treatment plan.

7       A.   Do you mean subjective or objective?

8       Q.   Both.  Subjective and objective.  But you look

9   forward, it's looking towards future treatment.  I'm putting

10  that aside.

11          Have you been asked to give any opinions about the way

12  Mr. Muse was or what should or should not have been done with

13  respect to him two years before you saw him?

14          MR. SHERMAN:  Objection.  Compound question, vague

15  ambiguous.

16      A.   Could you clarify?

17      Q.   (By Mr. Harris) Yes.  Were you asked to give any -- I

18  will break it up.  Were you asked to give -- I am not asking if

19  you did, I am asking if you understand part of your

20  assignment --

21      A.   I understand that part.

22      Q.   Was to give an opinion about the way Mr. Muse was two

23  years before you saw him?

24      A.   What I don't understand is what you mean by the way he

25  was.

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                          August 9, 2006

1        Q.   His condition, his condition two years before you saw

2    him?

3             MR. SHERMAN:  Objection, question is confusing, it's

4    vague, it's ambiguous.

5        A.   To the extent that I understand what you are asking,

6    no.

7        Q.   (By Mr. Harris)  Were you asked to give an opinion as

8    to what modifications would have been reasonable for Mr. Muse

9    two years before you saw him?

10       A.   Okay.

11            MR. SHERMAN:  Objection, it assumes facts not in

12   evidence.  It's confusing, it's vague.

13       A.   I'm sorry to do this, but can you ask the question one

14   more time.  I want to make sure I am answering your question

15   correctly.

16       Q.   (By Mr. Harris)  Yes.  Since your report that you

17   subsequently issued only deals with the future, I am trying to

18   find out were you asked to give an opinion about what

19   modifications would have been reasonable two years before you

20   issued your report?

21            MR. SHERMAN:  Objection.

22       A.   No.

23            MR. SHERMAN:  If you just wait.

24            THE WITNESS:  Okay.

25            MR. SHERMAN:  Objection.  Vague and confusing, assumes

1    facts not in evidence.

2        A.    No.

3        Q.    (By Mr. Harris) And you gave no such opinion, correct?

4        A.    I gave the opinion you have in my report.

5        Q.    Good.  Are there any other times in your clinical

6    practice when you're asked to give what I am calling

7    retrospective opinions?

8        A.    When I'm asked, yes.

9        Q.    Please explain how you were supposed to go about

10   performing your assignment.

11       A.    I was given license to approach it any way I felt

12   reasonable or professionally appropriate.

13       Q.    Were you given any other instructions by Mr. Sherman?

14       A.    Not specifically, as I recall.

15       Q.    Other than your conversations with Mr. Sherman, how

16   else did you learn about Mr. Muse or the situation involving

17   him?

18       A.    Records were made available to me prior to my

19   evaluation.

20       Q.    Prior to your evaluation did you do anything else to

21   obtain information about Mr. Muse and his situation, other than

22   reviewing the records that Mr. Sherman or his co-counsel sent to

23   you and talking to Mr. Sherman?

24       A.    No.

25       Q.    Can you generally describe the documents that you

Samuel Zinner, M.D.                                    August 9, 2006

1        Q.    I would like to turn to --

2              MR. HARRIS:  Let's go off the record for a minute.

3              VIDEOGRAPHER:  We're going off the record in the

4    continuing deposition of Dr. Samuel Zinner.  The time is now

5    10:16 a.m.

6              (Off the record.)

7              VIDEOGRAPHER:  Everybody ready to go back on?

8              MR. HARRIS:  Yes.

9              VIDEOGRAPHER:  We are now back on the record in the

10   continuing deposition of Dr. Samuel Zinner.  The time is now

11   10:17 a.m.

12       Q.    (By Mr. Harris) I would like to turn to the third test

13   that you have described, the Yale Global Tic Severity Scale.

14   Now, I've read a couple of your articles to get ready for today

15   and one of the articles I read is called Tourette Disorder in

16   Pediatrics in Review, Volume 21, Number 11, in November of 2000;

17   do you remember that article?

18       A.    I do.

19       Q.    And -- well, first of all, is Tourette's a disorder or

20   a syndrome?

21       A.    The distinction is artificial.  Historically, as I

22   understand it, syndrome refers to a collection of symptoms,

23   phenotypic as well as endophenotypic, without necessarily a --

24   that customarily go together, and have variable expression.

25   Disorder is more convention used today particularly when talking

Samuel Zinner, M.D.                                    August 9, 2006

Page 40

1        A.    Does it have the specific questions?  Um, I am not

2   sure I understand what you mean.

3        Q.    Well, I don't have it.  Is it in the materials that

4   you are producing today?

5        A.    It is.

6        Q.    Okay.  If it -- you say represents their expression

7   over the previous week in your report.  If the test -- if you

8   use the test in that one sitting, how did it extrapolate to

9   represent tic expression over the previous week?

10       A.    Based on recollection and contemporary observation.

11       Q.    So essentially you looked at what he was doing and you

12  asked him if he had been doing it for a week?

13       A.    Right.

14       Q.    Did you ask him if he had been doing it for two years?

15       A.    While administering the YGTSS?

16       Q.    Yes.

17       A.    No, not to my knowledge.

18       Q.    Because -- why does the gold standard only go back a

19  week?

20       A.    Tourette's Syndrome is a very, from an academic point

21  of view, very interesting neurological model of

22  neurodevelopmental disability.  There are tremendous

23  vicissitudes in range of expression both in terms of frequency

24  and severity and even to some degree suppressability, which is

25  not reflected, incidentally, in the YGTSS.  Tourette's Syndrome

Samuel Zinner, M.D.                                    August 9, 2006

1   has what we are describing now and is being reported by the

2   Leckman group at Yale who actually put together this report, a

3   fractal quality to tics.  This describes fractal as a physical

4   property that is being observed that describes the temporal

5   waxing and waning course of tic expression.  And this temporal

6   quality decreases and increases in severity over segments of

7   time referred to as bouts of perhaps milliseconds, seconds,

8   minutes, hours, weeks, even years.

9       Q.   I thought you were going to follow those instructions

10  that Mr. Sherman sent you that said, if possible, avoid long

11  narrative answers.

12      A.   You're right, okay.  Then let me be more --

13      Q.   Let me clarify my question.

14      A.   All right.

15      Q.   The gold standard has you evaluate or use your

16  objective observations and your subjective impressions to

17  extrapolate back one week, correct?

18      A.   Right.

19      Q.   And the gold standard is, you call it the gold

20  standard because it's one of the most well respected tests?

21      A.   I call it the gold standard for two reasons:  Because

22  of that, and because in research trials it is virtually always

23  the tool or instrument that is used.

24      Q.   Okay.  And it has the experienced clinician use his or

25  her subjective impressions to go back, to extrapolate back and

Samuel Zinner, M.D.                          August 9, 2006

Page 42

1    objective observations to go back one week, correct?

2         A.   It is used contextually.

3         Q.   To represent their expression over the previous week,

4    as you say in your report, correct?

5         A.   That's true.

6         Q.   Do any of these standardized testing instruments,

7    standardized screening and testing instruments involve the

8    extrapolation to represent tic expression over previous years?

9         A.   I used five tools and none of them, with the exception

10   of the YGTSS, addresses tics.  Let me review my tests.  I did

11   the KBIT, the KTEA, YGTSS, the CY-BOCS and the STAI.  Only the

12   YGTSS specifically addresses tics.

13        Q.   Do any of the standardized screening and testing

14   instruments that you used allow you to extrapolate back more

15   than a week?

16        A.   I also used a number of other approaches to qualify

17   that including medical records and a standard history template

18   that I use as well as a research template that I use.

19        Q.   Are you really following the instruction that Mr.

20   Sherman gave you to answer the question asked?

21        A.   I'm sorry.

22        MR. SHERMAN:  I'm going to object.

23        MR. HARRIS:  Let me ask --

24        MR. SHERMAN:  I mean, let me state the objection,

25   please.

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                          August 9, 2006

Page 43

1           MR. HARRIS:  Please go ahead.

2           MR. SHERMAN:  Argumentative, harassing, either ask the

3    questions or don't.  But there is no reason to harass the

4    witness at this point, Mr. Harris.

5       Q.   (By Mr. Harris) Could you please now answer the

6    question that I asked?  Do you want it repeated?

7       A.   Please.

8       Q.   Okay.  Do any of the five standardized screening and

9    testing instruments that you used involve the extrapolation to

10   represent tic expression over the previous two years as opposed

11   to the previous week?

12      A.   No.

13      Q.   And none of the standardized screening and testing

14   instruments that you used involve the extrapolation back two

15   years, correct?

16      A.   That's correct.

17           MR. SHERMAN:  Objection, leading question.

18      Q.   (By Mr. Harris) In that same Tourette's disorder

19   article you've given the opinion that stressful situations

20   increase tics, right?

21      A.   They can.

22      Q.   Okay.  Is this meeting in a Seattle hotel that you had

23   with Mr. Muse the first time you had ever met him?

24      A.   Yes.

25      Q.   Was it the first time you ever talked to him?

Samuel Zinner, M.D.                              August 9, 2006

Page 55

1    involuntary?

2        A.    Unvoluntary is a neologism for -- that has, to my

3    knowledge, specifically been coined with regard to Tourette's

4    Syndrome.

5        Q.    What's that big word you just used, neologism?

6        A.    Neologism.

7        Q.    How do you spell that?

8        A.    N-e-o, which is new, logism, l-o-g-i-s-m.

9        Q.    So what's that, what's neologism?

10       A.    Neologism.  A neologism is a new word.

11       Q.    And so what's the difference between involuntary and

12   unvoluntary?

13       A.    Involuntary is without volition.  Unvoluntary is with

14   undesired volition, something that would be undesired volition.

15       Q.    Does unvoluntary then have to do with the idea of

16   premonitory urges?

17       A.    Premonitory, yes.

18       Q.    Do you have any opinion as to whether or not Mr.

19   Muse's condition waxes or wanes over time?

20       A.    I'm sorry, please --

21       Q.    Do you have any opinion on whether or not Mr. Muse's

22   condition waxes or wanes over time?

23       A.    I have an opinion.

24       Q.    Please state your opinion.

25       A.    My opinion is that it does.

Samuel Zinner, M.D.                                    August 9, 2006

Page 56

1        Q.    Okay.  Did you -- during your examination of Mr. Muse

2   during either your objective or subjective part, did you

3   consider whether or not he had, say that again?

4        A.    Premonitory.

5        Q.    Premonitory urges, did you consider that?

6        A.    Yes.

7        Q.    How did you consider that?

8        A.    It is a sine qua non Tourette's.

9        Q.    Sine qua non means everybody has it?

10       A.    Well, sne qua non, that means that without which.  So

11  in order to have Tourette's Syndrome you have -- with rare

12  exception there are premonitory urges in adults.

13       Q.    And did you consider whether or not Mr. Muse had

14  those?

15       A.    I did.  I don't recall whether I reported that.  I

16  certainly would have considered it.

17       Q.    How would you have considered it?

18       A.    That's what Tourette's Syndrome is.  So how would I --

19  I am not sure how to answer the question, please be more

20  specific.

21       Q.    What method did you use to determine whether or not

22  Mr. Muse had such urges?

23       A.    I would have asked.

24       Q.    What did you ask Mr. Muse?

25       A.    I would have to look at my report to see if I

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                                    August 9, 2006

Page 57

1    documented it.  I'm sorry, I don't remember.

2        Q.   If it was -- well, look at your report on that matter.

3    Other than looking at your report, is there anything else that

4    would refresh your recollection about what you would have asked

5    Mr. Muse about those such urges?

6        A.   Offhand I can't think of one.

7        Q.   But is your opinion that Mr. Muse would have had at

8    least some premonitory urges?

9        A.   There are some people who are not able to identify

10   those.  The majority of adults with Tourette's Syndrome identify

11   them.

12       Q.   Was Mr. Muse able to identify them?

13       A.   I would have to look at my report.

14       Q.   Okay.  Did you reach any opinion as to whether or not

15   he was able to suppress the tics based on his understanding of

16   those urges?

17       A.   Again, without looking at the report -- I would have

18   to look at my report.

19       Q.   Did you reach an opinion on whether or not it would be

20   reasonable for Home Depot to provide a store chaperone?

21       A.   Please come again?

22       Q.   Did you reach an opinion on whether or not it would be

23   reasonable for Home Depot to supply a store chaperone?

24       A.   I don't remember if I made a comment on that or not.

25       Q.   Did you reach any opinion on whether or not Mr. Muse

Samuel Zinner, M.D.                          August 9, 2006

                                                    Page 59

1   Tourette's Syndrome Association.  With that exception, this

2   would have been mine.

3        Q.   Okay.  In your report you say, "Given the longevity of

4   tics from Mr. Muse it is very likely that his tics will endure

5   lifelong, however tics wax and wane in severity over time."  Is

6   that an accurate statement?

7        A.   Yeah.

8        Q.   What does the longevity of tics have to do with your

9   conclusion that they will be lifelong?

10       A.   I don't want to talk too much, I know that's not the

11   approach.  So let me make this pithy, which is hard for me to

12   do.  The outcome of Tourette's Syndrome in adults over the

13   course of time has not been well studied, only retrospectively.

14   Tourette's Syndrome was very poorly understood until about 40

15   years ago.  So its continuity over the course of life has been

16   -- there have not been longitudinal, meaning prospective,

17   studies to understand this other than short term.  I think the

18   longest is seven years.

19            That having been said, retrospective information

20   strongly supports that people who have Tourette's Syndrome that

21   endures into adulthood will always have Tourette's Syndrome.

22       Q.   Okay.  In your Tourette's disorder article --

23       A.   Which article?

24       Q.   Tourette's Disorder Pediatrics in Review, Volume 21,

25   No. 11, November 2000, you say -- let's back up a little bit.

Samuel Zinner, M.D.                                    August 9, 2006

Page 60

1   How did you determine whether or not Mr. Muse's tics would wax

2   and wane?

3       A.    Through my, I suppose -- again, I would have to look

4   at the report, but Tourette's Syndrome tics do wax and wane.

5   That's just what they do.

6       Q.    So in your Tourette's Disorder Pediatrics in Review,

7   Volume 21, No. 11, published in November 2000, you say tics

8   typically wax and wane over time with periods of exacerbation

9   and remission ranging from moments to weeks or more.  Newer tics

10  may replace older ones or they simply may be added to a growing

11  repertoire.  What's the process by which new tics replace old

12  ones?

13      A.    Can you be more specific?

14      Q.    Yes.  You say in your article, newer tics may replace

15  older ones or they simply may be added to a growing repertoire.

16  How do -- you say newer tics may replace older ones, how does

17  that happen?

18          MR. SHERMAN:  Objection, the question is confusing.

19  Maybe you can rephrase it.

20      Q.    (By Mr. Harris) Do you understand the question?

21      A.    I'm not sure you do.

22      Q.    What do you mean when you say newer tics may replace

23  older ones?

24      A.    Tics are observable movement or motor phenomena and/or

25  phonic or noise making phenomena.  They are observable, that's

Samuel Zinner, M.D.                        August 9, 2006

Page 63

1    paragraph 1, 2, 3, 4, 5, starting "for Mr. Muse."

2         A.   Outloud.

3         Q.   No, go ahead and read it to yourself.

4         A.   Okay.  I have read that.

5         Q.   When did you come to the conclusion stated in that

6    paragraph?

7         A.   After the -- over the course and after the completion

8    of my assessment of Mr. Muse.

9         Q.   What basis do you have for saying that the ability to

10   suppress, Mr. Muse, his tics voluntarily is extremely limited?

11        A.   Again, based on the longevity of his symptoms and what

12   it is that we understand epidemiologically about Tourette's

13   Syndrome.

14        Q.   Do you have any other basis for your opinion that Mr.

15   Muse is able to suppress his tics voluntarily is extremely

16   limited?

17        A.   My observations.  But I certainly can't, I can't tell

18   you his internal experience, that's -- I can only put it in the

19   context.

20        Q.   Does the paragraph that you just read accurately

21   summarize all of the bases you have for you opinion that he

22   can't suppress his tics?

23        A.   No.

24        Q.   Can you please give me the other bases that you

25   haven't already given me for your opinion that he can't

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                          August 9, 2006

Page 66

1              VIDEOGRAPHER:  I need to change the tape.

2              MR. HARRIS:  Let's take a ten minute break.

3              VIDEOGRAPHER:  We are now going off the record in the

4      continuing deposition of Samuel Zinner, M.D.  This is the end of

5      tape 1.  The time is now 11:14 a.m.

6              (Off the record.)

7              VIDEOGRAPHER:  We are now back on the record in the

8      continuing deposition of Dr. Samuel Zinner.  The time is now

9      11:20.  This is the beginning of tape 2.

10         Q.   (By Mr. Harris) Looking back at the paragraph

11      starting, "As discussed below," on page 11 did somebody --

12             MR. SHERMAN:  I'm sorry, which exhibit are we talking

13      about?

14             MR. HARRIS:  Exhibit-3.

15         Q.   (By Mr. Harris) Did somebody ask you to answer the

16      questions that are answered in that paragraph?

17         A.   To the best of my recollection, no.

18         Q.   Okay.  Did you decide all by yourself to answer that

19      additional question?

20         A.   To the best of my recollection, yes.

21         Q.   How did you decide to add that additional explanation

22      to your report?

23         A.   I knew the purpose of my having been retained, and I

24      wanted to make sure that my report reflected as compelling a

25      statement as possible.

Samuel Zinner, M.D.                         August 9, 2006

Page 67

1      Q.   As compelling a statement for whom?

2      A.   As compelling a statement that reflected my medical

3  opinion that Mr. Muse has a neurological disorder that is beyond

4  his willful ability to suppress.  You had -- I'm sorry, I'm not

5  supposed to mention any more.

6      Q.   Well let's just go back and make sure.  Now that you

7  have had a chance to look at that part of your report, do you

8  remember whether you assessed whether Mr. Muse had any

9  premonitory urges?

10     A.   I would have to look at my report to determine that.

11     Q.   Okay.  Well, you have both your draft report and your

12  final report in front of you.  Go ahead and look at them.

13     A.   Okay.

14          MR. SHERMAN:  Do you want to go off the record?

15     Q.   (By Mr. Harris) First of all, let me ask you, did you

16  prepare for this deposition?

17     A.   I got -- yes and no, I mean, I prepared.  I have been

18  on call for the past 115 hours this past week doing inpatient

19  pediatrics, so last night at 11:00 o'clock I reviewed the

20  standardized information that had been sent to me.  I also spoke

21  by telephone last week briefly with Mr. Sherman which went over

22  the same materials that were sent to me.

23     Q.   So about how long did you spend preparing for this

24  deposition today?

25     A.   An hour.

Samuel Zinner, M.D.                          August 9, 2006

Page 69

1       A.   I have.

2       Q.   And have you had an opportunity to review any other

3   records that you wish to review?

4       A.   I did, yes.

5       Q.   And have you determined whether or not you assessed

6   whether Mr. Muse had premonitory urges?

7       A.   Premonitory urges.  I was able to look in the report

8   to see if I documented it.

9       Q.   Okay.  Have you been able to determine whether or not

10  you assessed whether he had such urges?

11      A.   Sorry, could you repeat the question?

12      Q.   Did you assess whether he had such urges?

13      A.   I did.

14      Q.   What method did you use?

15      A.   I would have asked him.

16      Q.   Okay.  What would you have asked him?

17      A.   If he experiences a sensation of pressure or tension

18  or discomfort where he has tics that is alleviated after having

19  a tic.

20      Q.   And do you remember that conversation with him?

21      A.   No.

22      Q.   Do you remember his answer?

23      A.   No.

24      Q.   Do you remember whether or not you determined what

25  sort of such urges he had, if any?

Samuel Zinner, M.D.                                    August 9, 2006

Page 70

1      A.   No.

2      Q.   Do you remember whether or not you determined what the

3  time span was between any such urges and an actual tic?

4      A.   No.

5      Q.   Based on your general experience, if Mr. Muse was able

6  to identify his urges, could he suppress his tics for a certain

7  period of time?

8      A.   Some people can, some people cannot.

9      Q.   You really need to know what his urges were before you

10 started thinking about that, right?

11     A.   No.  There is no way to know what his urges are

12 precisely, it's a subjective experience.

13     Q.   And did you talk with him about the subjective

14 experience?

15     A.   I don't recall.  I would have asked him about

16 premonitory urges but I don't find it documented.

17     Q.   Are you able or familiar with other persons with

18 coprolalia that are able to suppress their tics for periods of

19 time?

20     A.   There are some, yes.

21     Q.   What is the range of periods that they are able to

22 suppress their tics?

23     A.   I don't know.

24     Q.   Okay.

25     A.   It's far too broad a question to respond.

Samuel Zinner, M.D.                                    August 9, 2006

Page 71

1          Q.    Okay.  Did you determine how long Mr. Muse could

2    suppress his tics?

3          A.    I don't remember.

4          Q.    Would reviewing the report again refresh your

5    recollection?

6          A.    No, because it's not documented.

7          O.    If you were asked by an individual such as Mr. Muse to

8    assist him in developing a treatment program involving

9    identification of his urges and behavior to suppress those tics

10   resulting from the urges for a certain period of time, what

11   treatment program would you recommend?

12               MR. SHERMAN:  Objection, calls for speculation.

13         A.    There is an experimental approach that is currently

14   under investigation.  Based on pilot data it has some

15   effectiveness in people with mild to moderate tics.  That's

16   pilot data, that's not anywhere near enough to use as a clinical

17   recommendation other than as an experimental approach.

18         Q.    Are you familiar with the article by Bliss edited by

19   Donald Cohen and Daniel Freedman entitled Sensory Experiences of

20   Gilles de la Tourette Syndrome published in the Archives of

21   General Psychiatry, Volume 37, in December 1980?

22         A.    In 1980?

23         Q.    Yes.

24         A.    Not specifically, no.

25         Q.    Are you familiar with the statement in this article

Samuel Zinner, M.D.                          August 9, 2006

Page 73

1    Clinical P-h-e-n-o-m-e-n-o-l-o-g-y?

2         A.   Clinical phenomenology, published where and when?

3         Q.   It's a clinical -- it's from Tourette's Syndrome -

4    Tics, Obsessions, Compulsions, Developmental Psychopathology and

5    Clinical Care, John Wiley and Sons 1998.

6         A.   It would depend.  If it was published in a text, it

7    would have a different title.  I'm sorry.  I don't know.

8         Q.   And then you're, of course, familiar with your article

9    Tourette's Disorder in Pediatrics in Review, Volume 21, No. 11,

10   November 2000, which says:  "Beyond the first decade of life,

11   most people who have TD describe a sensation or "premonitory

12   urge" preceding a tic.  This sensation occurs in the muscle

13   groups expressing the tic and is described as a tension that is

14   relieved by performing the tic.  With this in mind, the tic

15   usually can be suppressed to a greater or lesser degree; however

16   if the tic is suppressed voluntarily the tension will build and

17   ultimately become unbearable.  The longer in duration that tics

18   are suppressed, the greater will be both the degree of tension

19   and the relaxation training."  Does that sound like an accurate

20   statement that you would have made?

21        A.   That is a global statement encapsulating a very wide

22   spectrum of expression.

23        Q.   But, again, you -- after reviewing your report and all

24   the other records, you can't remember whether or not you

25   assessed whether or not Mr. Muse either had the urges or how

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                                    August 9, 2006

Page 74

1    long he could suppress tics as a result of those urges?

2              MR. SHERMAN:  Objection, mischaracterizes past

3    testimony.  He didn't say he didn't do that, he said he has no

4    independent indicia that he performed those.

5         A.    I didn't document it here so I don't recall the

6    discussion or how I arrived at that.  It's part of my customary

7    discussion when I talk with people about tics.

8         Q.    (By Mr. Harris) And then let me clarify.  Do you

9    recall whether or not you talked to Jon Muse about how long he

10   could suppress his tics after his urges?

11             MR. SHERMAN:  Objection, asked and answered, unduly

12   repetitive.  You are arguing with the witness and you are

13   harassing him.

14        A.    I don't recall.

15        Q.    (By Mr. Harris) Did you suggest any behaviors Mr. Muse

16   could use to satisfy his urge other than the obscene words?

17             MR. SHERMAN:  Objection, lack of foundation, assumes

18   facts not in evidence.  Vague.

19        Q.    (By Mr. Harris) You need to answer if you can.

20        A.    Please restate the question.

21        Q.    Yes.  Did you suggest any behaviors Mr. Muse could use

22   to suppress his tics in response to his urges?

23             MR. SHERMAN:  Same objection as before.

24        A.    Do you mean -- does your question ask did I discuss

25   this with Mr. Muse?

Samuel Zinner, M.D.                                    August 9, 2006

Page 77

1        A.   I also administered an obsessive compulsive scale and

2   he does not have obsessions.

3        Q.   So your obsessive compulsive scale made you determine

4   that he wasn't dangerous despite his elevated YGTSS score?

5        A.   No, I did, it was not -- to the best of my

6   recollection it was not something I was considering.

7        Q.   Okay.  In your report you talked about this on page

8   13, "I was informed that as a potential accommodation while

9   shopping it was proposed" --

10       A.   I'm sorry, tell me again.

11       Q.   Page 13.

12            MR. SHERMAN:  Which exhibit?

13            MR. HARRIS:  Exhibit-3.

14       A.   Okay.

15       Q.   (By Mr. Harris) "I was informed that as a potential

16   accommodation while shopping it was proposed that Mr. Muse be

17   provided a store chaperone.  While I think that this suggestion

18   is reasonable," that part.  What is your basis for you saying

19   that you think the store chaperone suggestion is reasonable?

20       A.   It suggested to me that Home Depot -- I don't remember

21   who was suggesting a chaperone.  I don't know if I knew, to tell

22   you the truth.  But at any rate, that this would be -- that

23   agreements could be made that would be of mutual benefit to meet

24   everyone's needs, and it seemed to me this might be such a way

25   to do that.

Samuel Zinner, M.D.                          August 9, 2006

Page 78

1        Q.    Okay.   Is there any other thought that went into your

2   statement that the store chaperone suggestion is reasonable?

3        A.    I'm sorry.

4        Q.    Do you have any -- can you give me any other reasoning

5   for your statement that the store chaperone suggestion is

6   reasonable?

7        A.    No.

8        Q.    Tell me what your opinion the store chaperone is

9   reasonable anticipates in terms of a store chaperone, what do

10  you mean by that?

11       A.    I don't mean by it because I am not the one, it was

12  not my suggestion.   But my alternative, I had a preferred

13  suggestion and it's listed here.

14       Q.    Well, this is your report.

15       A.    Yes.

16       Q.    You're saying the store, you think that the store

17  chaperone suggestion is reasonable.   Can you tell me what the

18  store chaperone suggestion in your report says is reasonable is?

19            MR. SHERMAN:   Objection, asked and answered.   It's a

20  repetitive series of questions and harassing and abusing the

21  witness.

22       A.    I don't have a specific opinion about a store

23  chaperone.

24       Q.    (By Mr. Harris) You don't have the details on that,

25  right?

Samuel Zinner, M.D.                                    August 9, 2006

1          A.    There are no details.

2          Q.    Okay.  Is it possible for someone with Mr. Muse's

3     condition to sometimes voluntarily say obscene words?

4          A.    Of course.

5          Q.    We all unfortunately sometimes -- or many of us

6     sometimes say obscene words, right?

7          A.    You said unfortunately so I am not sure I can answer

8     that.

9          Q.    Many of us says obscene words at one time or another,

10    right?

11               MR. SHERMAN:  Objection, relevance, vague.

12         A.    Yes.

13         Q.    (By Mr. Harris) On your suggestion about the sign,

14    would your opinion change if store employees and customers

15    didn't read the sign?

16         A.    I don't know that that's a medical opinion.

17         Q.    Okay.  And as a matter of fact, one of the

18    instructions that you got from Mr. Sherman by the email he sent

19    you was don't give opinions outside of your expertise, right?

20         A.    Yes, I don't remember that specifically but I assume

21    so.

22         Q.    And would your opinion change if employees and

23    customers of Home Depot read the sign that you suggest and were

24    nevertheless offended with what Mr. Muse said and did?

25         A.    Would my opinion change if they read the sign and were

Samuel Zinner, M.D.                              August 9, 2006

Page 84

1    harass this witness any further and ask the same question again

2    and again.  It's a loaded question, and you know that as well as

3    anyone else in this room.

4         Q.   (By Mr. Harris) What licenses do you have?

5         A.   I have a license to practice medicine.

6         Q.   Okay.  And what are your board certifications in?

7         A.   I am double board certified in general pediatrics and

8    in developmental and behavioral pediatrics.  As part of

9    developmental pediatrics, advocacy is a -- is subsumed within

10   that subspecialty.

11             MR. SHERMAN:  It's about lunch time.

12             MR. HARRIS:  Let's take a break.

13             VIDEOGRAPHER:  We are now going off the record in the

14   continuing deposition of Dr. Samuel Zinner.  The time is now

15   12:00 p.m.

16             (Off the record.)

17             VIDEOGRAPHER:  We are now back on the record in the

18   continuing deposition of Dr. Samuel Zinner.  The time is now

19   1:01 p.m.

20        Q.   (By Mr. Harris) Dr. Zinner, thank you for coming back.

21   Turning back to Exhibit-1.  With respect to the review of Dr.

22   Sheehan's records, I believe if you look through them you will

23   find that during the 14-month period before November 3rd of 2003

24   Dr. Sheehan had not seen Mr. Muse, had not had any contact with

25   Mr. Muse.

Samuel Zinner, M.D.                              August 9, 2006

Page 88

1    everybody in understanding the disorder and provide resources to

2    help them.

3         Q.   And to advocate for people with Tourette's, correct?

4         A.   Sometimes they do that too.

5         Q.   As a matter of fact, they support litigation in favor

6    of people with Tourette's, correct?

7         A.   I don't know because I don't take part in that role,

8    but I imagine that they might.

9         Q.   Now, going back to the article I asked you about

10   entitled Contemporary Assessment and Pharmacotherapy?

11        A.   I think you are right, I think they do, I'm sorry.

12        Q.   By Lawrence Scahill, Gerald Aaronberg and the

13   Tourette's Syndrome practice parameter work group, are you

14   familiar with that article?

15        A.   I am.

16        Q.   And it lists 14 doctors including you as authors or

17   editors, correct?

18        A.   Yes.

19        Q.   A statement in that article says:  "The clinical

20   interview should include assessment of onset and course of

21   symptoms, current severity of motor and phonic tics, presence of

22   premonitory sensations and capacity for tic suppression, overall

23   burden caused by the tics and treatment approaches implemented

24   to date."

25             Do you agree with that statement?

Samuel Zinner, M.D.                              August 9, 2006

1      A.   Generally speaking I do.

2      Q.   Going back to your report, two reports, your original

3   draft report and your amended or your final report, Exhibits 3

4   and 4, would you please turn to page 13 of each report.  Could

5   you read in Exhibit-4, would you read outloud the second

6   paragraph on page 13?

7      A.   "Any accommodation while shopping other areas of the

8   public is reasonable if it is effective, respectful of the needs

9   of the store and of the rights of other shoppers within the

10  store and respectful of the limitations posed by medical

11  disabilities that are not dangerous to others".

12     Q.   And then in your final report can you read that

13  statement, the fourth paragraph down?

14     A.   "Any accommodation while shopping or in other public

15  areas is reasonable if it is effective, respectful of the needs

16  of the location and of the rights of others in the location and

17  respectful of limitations posed by medical disabilities that are

18  not dangerous to others."

19     Q.   Do you see the change that you made there?

20     A.   There is a spelling change, and what else did I make?

21     Q.   You changed the needs of the store and the rights of

22  other shoppers to the needs of the location and rights of others

23  in the location.

24     A.   To the needs of shoppers -- wait.  And accommodation,

25  shopping(reading to self).  Yes.

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                          August 9, 2006

Page 91

1    others."

2           Do you have an opinion as to whether or not posting

3    the sign that you recommend in your report satisfies the

4    standard that you have set out in your report?

5        A.   I think it does.

6        Q.   Okay.  And have you considered the testimony of

7    Deborah Peterson or Darlyn Kahia in coming to that conclusion?

8           MR. SHERMAN:  Objection, asked and answered.

9        A.   I am not familiar with the names.

10       Q.   (By Mr. Harris) Have you considered the actual

11   reaction to any of the employees or customers at the store?

12          MR. SHERMAN:  Objection, calls for speculation.

13       A.   I wasn't familiar with those details.

14       Q.   (By Mr. Harris) Were you provided the written

15   statements of Deborah Peterson or Darlyn Kahia concerning Jon

16   Muse's visits to the store?

17       A.   To the best of my recollection that's entirely

18   unfamiliar to me.  I have no recollection of that.

19       Q.   What method did you use to reach the opinion that the

20   sign set out, the exemplary sign set out at the bottom of page

21   13 satisfies the standard that you have set?

22       A.   Which part are you referring to?

23       Q.   Okay.

24       A.   The bottom meaning?

25       Q.   Let me clarify.

Samuel Zinner, M.D.                          August 9, 2006

Page 92

1        A.    Thanks.

2        Q.    When I say the standard that you have set, I am

3   referring to your statement in the report, "Any accommodation

4   while shopping or in other public areas is reasonable if it is

5   effective, respectful of the needs of the location and of the

6   rights of others in the location and respectful of limitations

7   posed by medical disabilities that are not dangerous to others."

8        A.    Yes.

9        Q.    What method did you use to decide the sign you

10  recommended at the end of your report --

11       A.    Okay, sorry.

12       Q.    -- satisfied the standard that you had set out?

13       A.    What method did I use?  I used judgment in terms of, I

14  would say just standard medical judgment based on the standards

15  of my specialty in developmental pediatrics.

16       Q.    Can you describe any other method that you used to

17  determine that the sign satisfies the standards that you have

18  set?

19       A.    I mentioned earlier that I may have contacted the

20  Tourette's Syndrome Association to see if there was any

21  information there that could be helpful.  I don't know whether I

22  did contact them and I don't know whether that also helped to

23  support my drafting this particular sign.

24       Q.    I am going to show you exhibit next in order.

25            (WHEREUPON, September 17, 2005 Outline was marked

Samuel Zinner, M.D.                            August 9, 2006

Page 93

1    Exhibit-7 for identification.)

2         Q.    Can you please identify Exhibit-7?

3         A.    It is the template that I used to do my evaluation.

4         Q.    Is that an outline of your report, when you say in

5    your bill "outline report," when you go over in the last page

6    and you look at the notes there; does that exhibit contain the

7    outline of your report?

8         A.    Yes -- well, pieces of it.  I have several documents

9    that I included.  This is one of them.

10        Q.    Are there any other documents that you produced that

11   contained an outline of your report?

12        A.    Well, meaning everything that you have there.  That's

13   everything that I used.

14        Q.    Okay.  So if there is nothing in what you produced

15   today, do you have any other record of how you contacted someone

16   and got the sign?

17        A.    I don't think I contacted anyone to get the sign.

18   This is what I drafted up on my own, but I may have looked on

19   the website for the Tourette's Syndrome Association.

20        Q.    And there may have been something on the website to

21   help you draft the sign; is that what you mean?

22        A.    Well, actually the only part I think that I would have

23   been helped by would have been the last thing, "if you would

24   like to make a tax deductible donation," with that exception I

25   don't think there was any input from any other source other than

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                          August 9, 2006

Page 94

1    myself.

2         Q.   Okay.  Have you ever recommended the posting of the

3    sign at any other retail facility?

4         A.   No.

5         Q.   Have you ever seen a sign like this posted in any

6    other retail facility?

7         A.   I don't think so.

8         Q.   Do you have any information about the known rate of

9    effectiveness or error of this kind of modification -- or of

10   this sort of modification, posting of a sign?

11        A.   No.

12        Q.   Are you aware of any standards that would control the

13   preparation and posting of such a sign under the circumstances

14   outlined in your report?

15        A.   I am not sure I understand.  Please.

16        Q.   Yes.  You have arrived at an opinion that the posting

17   of a sign would be an accommodation that satisfies the standards

18   in your report.

19             Are you aware of any standards that we could look to

20   to determine whether or not your opinion that a sign should be

21   posted as effective modification would be consistent with those

22   standards?

23        A.   Okay, I understand your question now.  My suggestion

24   was an extrapolation of similar kinds of approaches.

25   Specifically a sign in a store, no.  But related kinds of

Samuel Zinner, M.D.                    August 9, 2006

Page 95

1   accommodations, yes.

2       Q.   Do those related kinds of accommodations involve the

3   use of -- in any way involve the use of words like c-u-n-t and

4   f-u-c-k-i-n-g?

5       A.   Yes.

6       Q.   Okay.  In educational situations?

7       A.   Yes.

8       Q.   And in any retail situations?

9       A.   I don't know.  Not specifically retail, no.

10      Q.   Okay.  Generally retail?

11      A.   No, just general.  Not general retail.

12      Q.   Are you familiar with the regulations of the Equal

13   Employment Opportunity Commission?

14           MR. SHERMAN:  I am going to object, relevance.

15      A.   I know of the EEOC.  I don't have any working

16   familiarity with them.

17      Q.   (By Mr. Harris) Have you ever read the regulations

18   published by the Equal Employment Opportunity Commission on

19   reasonable accommodation?

20      A.   I may have.  I had occasion once to consider it.

21      Q.   Have you ever read the regulations published by the US

22   Department of Justice under Title 3 of the ADA?

23           MR. SHERMAN:  Objection, relevance.

24      A.   Not to my knowledge.

25      Q.   (By Mr. Harris) Have you ever read the Hawaii Supreme

Samuel Zinner, M.D.                                August 9, 2006

1    such as brain damage causing these things.  So coprolalia is by

2    in large highly specific to Tourette's Syndrome.

3         Q.    But not absolutely so?

4         A.    (No response.)

5         Q.    Let me ask you this.  Are there -- have you heard of

6    situations where someone has had a brain injury and then

7    exhibited symptoms afterward where they would uncontrollably

8    swear or make certain statements?

9         A.    There are reports of people whose tics have developed

10   after a brain trauma.  And I would have to review the -- I

11   haven't committed to memory the literature on this.  I think

12   that there are, there may be a report, case reports of people

13   who have coprolalia after brain -- traumatic brain trauma,

14   injury rather.

15        Q.    In the beginning you testified that Tourette's

16   Syndrome is a result of a miswiring in the brain?

17        A.    I mean, that's a schematic explanation.  I would be

18   very -- if it pleases everyone I would be happy to be more

19   detailed, but I am not sure that's necessarily called for.  So

20   for all intents and purposes, yes.

21        Q.    Is it a physical condition though?

22        A.    It's a physiologic condition.  So it has to do with

23   physiologic in this regard.  When we're talking neurologic

24   physiologic, the brain, it has to do with chemicals and wiring.

25        Q.    Now, in your experience with adolescents and some few

18f78964-9073-4bc3-945b-8372bce2dbd1

Samuel Zinner, M.D.                                    August 9, 2006

Page 117

1    adults with Tourette's Syndrome, particularly coprolalia, have

2    you had reason to inquire as to -- or research as to possible

3    accommodations?

4         A.   Possible?

5         Q.   As to possible accommodations for these individuals?

6         A.   Accommodations.  I have had experience with it, with

7    accommodations.

8         Q.   Can you describe that experience for us, please?

9         A.   Yes.  I have had lots of experiences and so it's a

10   summation of things.  I will give you some specifics.

11             Very interesting young man who met with me when I was

12   living in St. Louis, and he was not a patient of mine

13   incidentally.  He had called me because he had Tourette's

14   Syndrome and understood that this was my area of interest and he

15   wanted to become a physician and wanted to know if this would

16   pose any difficulties for him.  He was very bright, engaging,

17   social guy, athlete and whatnot, very sort of shy and it was

18   startling watching him, I'll tell you the truth, coming down the

19   hall of the hospital making these kinds of noises, even for me

20   who was very experienced with Tourette's Syndrome.

21             We met and went to the hospital cafeteria and he

22   suddenly shouted out something -- and I don't remember what it

23   was -- and the cafeteria became quiet and people sitting at the

24   next booth behind whispered to each other.  And this young man

25   got up and he was very sheepish about doing this -- and it was

Samuel Zinner, M.D.                                    August 9, 2006

Page 118

1   very interesting to see -- and he had prepared in his pocket a

2   card.  I didn't look at the card but it clearly said, it

3   explained that he had Tourette's Syndrome and he invited the

4   people at the next table -- who incidentally said:  "No.  No.

5   It's okay.  We don't care."  But he was very forthright about it

6   and insisted that they see indeed this is Tourette's Syndrome,

7   it's a neurological condition, I'm assuming is what it said, and

8   please ask questions if you have them.  So this was one,

9   self-designed in his case, accommodation I suppose.  That's one

10  that I have always remembered.  And I will tell you the truth, I

11  think probably that I kept that in mind as I was designing the

12  report.

13            What else?  There are -- I mean, one of the customary

14  things that I will do when I have patients with Tourette's

15  Syndrome is I ask that they use -- they -- most of the time

16  these are children or adolescents who are still in school, so

17  the environment where they find themselves perhaps not being

18  accommodated is usually in the classroom.  And what it is that I

19  try to do is to avail them of similar kinds of tools.  I ask

20  that they show a video.  Recently we have a new video the

21  Tourette's Syndrome Association put out on HBO that's for

22  younger children by and large.  For older kids there are any

23  number of other kinds of tools.  But often it entails a

24  presentation in the classroom in front of the teacher and peers

25  at the beginning of the school year to explain:  "This is

Samuel Zinner, M.D.                                    August 9, 2006

Page 127

1    does that.

2          Q.    Okay.  So it's usually just words.  You described for

3    Mr. Sherman your admirable concentration on Tourette's Syndrome

4    through your education, your postgraduate education, your

5    variety of studies and your nationwide involvement.  Can you

6    please describe any similar experience you have with the

7    assessment of whether people are offended by the use of the

8    terms Jon uses?

9          A.    There is -- I can think of an interesting anecdote

10   that actually doesn't involve my patient, it involves an

11   educational tool.

12         Q.    Okay.  Is that responsive to my question?  I am asking

13   if you have any education or experience concerning whether or

14   not people are offended by the sort of words and actions Jon

15   uses or that come from Jon?

16         A.    The example I have in mind is part of my education

17   that addresses a response that somebody has to that,

18   specifically to the word nigger.

19         Q.    Please go ahead.

20         A.    It's on a video -- it's not the same video

21   incidentally, I don't think it's the same video, it's a woman

22   who saw a man of African extraction who was wearing a purple

23   suit or something and so she suddenly yelled, purple nigger, and

24   he laughed and he said, you really do have a problem if you

25   think niggers are purple.  But his response was one of

Samuel Zinner, M.D.                              August 9, 2006

Page 128

1    amusement.

2        Q.    Do you have any other education, either undergraduate

3    or graduate or extended study or other similar experience like

4    you have with respect to Tourette's in evaluating under what

5    circumstances people find the sort of words Jon uses unwelcome

6    or intimidating?

7        A.    No.

8        Q.    Okay.

9            MR. HARRIS:  I'm finished.

10            MR. SHERMAN:  Just one question.

11   EXAMINATION

12   BY-MR.SHERMAN:

13       Q.    Based on your interview of Jon, he used the word cunt

14   in your presence as well, didn't he?

15       A.    Yes, he did.

16       Q.    And when you were with him there were no females

17   present, were there?

18       A.    No.

19       Q.    So that's not -- the use of that word by Jon is not

20   specific to gender, is it, as far as you can tell?

21       A.    Not to my knowledge.

22            MR. SHERMAN:  No further questions.

23            MR. HARRIS:  Good.

24            VIDEOGRAPHER:  Here ends the deposition of Dr. Samuel

25   Zinner.  This is the end of tape two.  The time is now 2:49 p.m.

CERTIFICATE

I, Syndie Hagardt, do hereby certify that pursuant to the Rules of Civil Procedure, the witness named herein appeared before me at the time and place set forth in the caption herein; that at the said time and place, I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; and that the foregoing transcript pages constitute a full, true and correct record of such testimony adduced and oral proceeding had and of the whole thereof.

IN WITNESS HEREOF, I have hereunto set my hand this 17th day of August , 2006.


*Syndie Hagardt*
_____
Syndie Hagardt

January 30, 2010
_____
Commission Expiration