IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JON MUSE, | CIVIL NO. CV04-00154 DAE/BMK |
| Plaintiff, | |
| v. | MEMORANDUM IN SUPPORT OF MOTION |
| HOME DEPOT USA, INC., | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF MOTION

## I.    INTRODUCTION

This is a disability discrimination case arising under Title III of the
Americans with Disabilities Act ("ADA") and Hawai'i law.

Defendant Home Depot USA, Inc. ("Home Depot") strives to maintain an
environment free of discrimination and harassment, regardless of gender, ethnic, or
education background.  CSOF ¶¶ 1-2.  Thus, Home Depot prohibits racist, sexist,
or otherwise discriminatory epithets in a Home Depot store.  CSOF ¶ 2.  Home
Depot offers an on-line shopping environment.  CSOF ¶ 3.

Plaintiff Jon Muse ("Plaintiff") has Tourette's Syndrome ("TS"), which is
evidenced in Plaintiff's case by coprolalia (uncontrolled swearing—most notably
with use of the words "c[]nt", "f[]ck", "n[]gger", "sh[]t" and "b[]tch") and
copropraxia (uncontrolled physical gestures—most notably the extension of his

middle finger).  CSOF ¶ 49.

On November 3, 2003, Plaintiff entered Defendant Home Depot USA, Inc. ("Home Depot")'s Alakawa store to return a wheelbarrow.  CSOF ¶ ¶ 4-5. Defendant went to the Debra Peterson's counter and called her a "c[]nt".  CSOF ¶¶ 5-7, 11.  Offended, Debra summoned a supervisor.  CSOF ¶¶ 8-10.

Darlyn Kuhia, Head Cashier, arrived.  Plaintiff called Darlyn a "f[]cking c[]nt".  CSOF ¶ 12.  Darlyn asked Plaintiff not to call her that and telephoned her supervisor, Michael Dolan.  CSOF ¶¶ 13-15.  Mike arrived and explained that Plaintiff's verbal abuse of two associates in front of customers was unacceptable. CSOF ¶ 16.  Plaintiff explained that he had TS.  CSOF ¶ 17-18.

Plaintiff was permitted to complete his transaction.  Plaintiff left the store without making any requests for modification.  CSOF ¶¶ 20, 22-24.

On April 25, 2004—after Plaintiff filed a discrimination charges with the Hawai'i Civil Rights Commission—Plaintiff returned to the Alakawa store to exchange a spray canister.  CSOF ¶¶ 25-26, 28.  Plaintiff again went to Debra's counter and called her a "c[]nt".  CSOF ¶¶ 28-29.  This time a customer and her eight-year-old daughter were standing behind Plaintiff.  CSOF ¶ 30.

When Debra completed the transaction, Plaintiff said, "Thanks, c[]nt." CSOF ¶¶ 31-32.

Plaintiff is not psychiatrically disabled.  CSOF ¶ 57.  Plaintiff's TS does not

cause him to be limited in his performance of manual tasks, as well as his ability to walk, ability to see, ability to hear, ability to breathe, or ability to learn. CSOF ¶ 37.

Although Plaintiff was diagnosed on December 7, 2000 as having an adequate ability to relate to others, CSOF ¶ 55, Plaintiff contends that TS affects his ability to speak and work, CSOF ¶¶ 47-48. Plaintiff's conclusory support for this contention is that acquaintances will comment on or mimic his TS and he cannot control what he says. CSOF ¶¶ 40, 47. To the contrary, Plaintiff also explains that he interacts, relates, and identifies with others at several self-help groups and has regular clients and business interactions. CSOF ¶¶ 41-42, 44-45, 59. Plaintiff's own treating physician, Dr. Sheehan, reported that Plaintiff's TS does not prevent Plaintiff from performing every day tasks. Rather, TS causes Plaintiff to become embarrassed. CSOF ¶ 36.

Plaintiff has provoked fights with others to defend his uncontrollable use of epithets and gestures. CSOF ¶ 53. Plaintiff has been threatened because of his uncontrollable use of gestures. CSOF ¶¶ 46, 52, 54. Plaintiff believes he cannot control whether he gets "beaten up" for calling a woman a "c[]nt". CSOF ¶ 58.

## II.    LEGAL ARGUMENT

### A.    HOME DEPOT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THERE IS NO TRIABLE ISSUE OF MATERIAL FACT

Summary judgment is appropriate when the motion papers, affidavits, and other submitted evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986). Substantive law identifies which facts are material, and factual disputes that are irrelevant or unnecessary will not be counted. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 209 (1986).

Home Depot's burden is satisfied by showing the absence of evidence of some element on which the Plaintiff bears the burden of proof. *See Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d. at 273. If Home Depot meets its initial burden, its motion may not be defeated absent significant probative evidence tending to support Plaintiff's legal theory. *See Anderson,* 477 U.S. at 249, 106 S. Ct. at 2510, 91 L. Ed. 2d at 212. Plaintiff cannot merely stand on his pleadings, nor simply assert he will discredit Home Depot's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Anderson*). Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for

summary judgment. *See British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S. Ct. 1790, 60 L. Ed. 2d 241 (1979). Put another way, a "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

When Home Depot proffers "direct evidence", "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31. Only those inferences that are rational or otherwise permissible under the governing substantive law may be drawn in Plaintiff's favor. *See id.* "[I]f the factual context makes the non-moving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir. 1987) (emphasis in original), *cert. denied*, 484 U.S. 1006, 108 S. Ct. 698, 98 L. Ed. 2d 650 (1988).

Plaintiff maintains the burden of pointing to specific facts showing that there is a genuine issue for trial. "It is not the district court's job to sift through the record to find admissible evidence in support of [Plaintiff's] case." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 504 (9th Cir. 1994).



The existence of a genuine issue of a material fact regarding disability and of one regarding reasonable modification require separate inquiries. *See McAlindin v. County of San Diego*, 192 F. 3d 1226, 1237 (9th Cir. 1999), *cert. denied*, 530 U.S. 1243, 120 S. Ct. 2689, 147 L. Ed. 2d 961 (2000).

## B.   PLAINTIFF'S ALLEGED IMPAIRMENT DID NOT SUBSTANTIALLY LIMIT PLAINTIFF IN A MAJOR LIFE ACTIVITY

Only disabled people can claim relief under the ADA. The statute defines a disability as a "physical or mental impairment that substantially limits one or more of [Plaintiff's] major life activities." 42 U.S.C. § 12102 (2005). Put another way, Plaintiff's evidence must satisfy three distinct factors: (1) Plaintiff has a physical or mental impairment; (2) which affects a major life activity; (3) to a substantial degree. *See Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 155 (1st Cir. 1998).

Plaintiff contends that three of his major life activities were and are affected by his TS: (1) interacting with others; (2) speaking; and (3) working.

### 1.   Plaintiff Was Not Substantially Limited In His Ability To Interact With Others

To establish that he is substantially limited in his ability to interact with others, Plaintiff must show that his relations with others were "characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." *McAlindin*, 192 F.3d at 1235. In *McAlindin*, the plaintiff defeated a summary judgment motion by

establishing a "total inability to communicate at times" because of an alleged "fear reaction" and "communicative paralysis". The plaintiff's paralysis was evidenced by his lack of involvement in any groups or political or religious affiliations.

In contrast, Plaintiff does not have a fear reaction or communicative paralysis, as evidenced by his desire to shop in person at Home Depot's Alakawa store rather than relying on Home Depot's on-line services. His own physicians' opinions lend further support to Plaintiff's lack of fear reaction or communicative paralysis. According to Dr. Zen, Plaintiff has an adequate ability to relate to others. According to Dr. Sheehan, Plaintiff can perform every day tasks and his TS is merely the source of Plaintiff's embarrassment.[1]

Additionally, Plaintiff has not alleged any facts supporting high levels of hostility or a failure to communicate when necessary. The facts show that Plaintiff attempted and was successful in conveying to Home Depot management both his desire to exchange products and his claim that he suffered from TS. Plaintiff also testified that he interacts, relates, and identifies with others at several self-help groups and has regular clients and business interactions. Even when encountered with others who mimic him, Plaintiff has not been dissuaded from continuing to

---

[1]     Thus, the problems Plaintiff describes are distinguishable from those suffered by the plaintiff in *Purcell v. Penn. Dep't of Corr.*, No. 95-6720, 1998 U.S. Dist. LEXIS 105, at *22 (E.D. Pa. Dec. 29, 1997), where a prisoner with attention deficit hyperactivity disorder and TS involuntarily shouted obscenities, and *Ray v. Kroger Co.*, 246 F. Supp. 2d 1221, 1226 (S.D. Ga. 2003), where the plaintiff had daily "outbursts" of vocal tics, including profanity. In addition to the fact that Plaintiff himself emphasized that he did not shout during the incident on November 3, 2003, Plaintiff did not have hyperactivity disorder.

attend group sessions and continuing his business relationships.

The ADA purposely defines "disability" in a functional manner, rather than providing coverage for all impairments that could give rise to societal prejudice. *Bell v. Gonzales, No. 03-163*, 2005 U.S. Dist. LEXIS 9231, at *4 (D. D.C. May 6, 2005) (applying Rehabilitation Act to plaintiff with TS and affirming lower court's grant of summary judgment for the defendants on the issue of whether the plaintiff was "disabled") (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 485-87, 144 L. Ed. 2d 450, 119 S. Ct. 2139 (1999)).[2] The major life activity of interacting with others is analyzed from the lens of Plaintiff. The focus is not on whether people avoid contact with Plaintiff—it is whether Plaintiff can initiate contact with other people and respond to them. *See Gonzales,* 2005 U.S. Dist. LEXIS 9231, at *2-3. In *Gonzales*, the court noted that the plaintiff's incorrect reliance on generalized prejudice was "readily apparent from his reliance exclusively on the reactions [of others] of discomfort, misunderstanding, and avoidance to his condition, in attempting to demonstrate that his interaction with others [was] substantially limited." *Id.* (internal quotation marks omitted).

Plaintiff's day-to-day situation is akin to the plaintiff in *Lanci v. Arthur Andersen, LLP.*, No. 4009, 2000 U.S. Dist. LEXIS 3954, at *10-11 (S.D.N.Y. March 29, 2000), where the court distinguished its facts from those in *Purcell*. In

---

[2]    This court can treat the Rehabilitation Act and ADA as imposing parallel requirements. *See Baldwin School*, 133 F.3d at 152 n.13.

*Arthur Andersen*, the court concluded that the plaintiff's TS was debilitating only when it flared up during the acute phase of his condition. The acute phase was marked by serious obsessions that interfered with his ability to concentrate because the plaintiff obsessed over a situation again and again for most of the work day, effectively preventing him from completing assigned projects. The plaintiff's day-to-day TS otherwise was not substantially debilitating.[3]

Like the plaintiff in *Arthur Andersen*, Plaintiff's condition does not affect his day-to-day situations. As in *Gonzales*, our focus is not on the individuals around Plaintiff, but on Plaintiff himself. Plaintiff can interact. He can communicate whether he needs to return a wheelbarrow or a canister and effectuate the return. The fact that others might be offended by his vocabulary has no bearing on our focus on Plaintiff and his ability to interact. To find Plaintiff substantially limited in his ability to interact would equate to finding a sexist or racist—who shares his sexist or racist sentiments with others—substantially limited in his ability to interact.

---

[3] After concluding that the plaintiff's day-to-day TS was not debilitating, the court addressed whether his acute symptoms lasted long enough to fall under the definition of disability under the ADA. The court held that summary judgment was inappropriate because, unlike prior case law, the plaintiff's last debilitating episode lasted for three or four months. Whether a three- or four-month episode met the ADA's protection of non-temporary disability was dependent on disputed material facts. Plaintiff does not claim to suffer from such debilitating episodes of impairment.

### 2.    Plaintiff Was Not Substantially Limited In His Ability To Speak With Others For Extended Periods of Time

Plaintiff does not contend that he is unable to speak, or has an impediment causing slurred or drunken speech. Plaintiff does not contend that he has neurological condition affecting his face, mouth, or voice, such as coughing spasms. He claims that his ability to speak is limited because he cannot control the words he uses, and this affects his interactions with others. He testified that his coprolalia is incorporated into his speech in his normal speaking tones.

To the extent that difficulty speaking is a subset of Plaintiff's alleged disability based on difficulties interacting with others, Plaintiff is not substantially limited in his ability to speak with others for extended periods of time for the reasons explained in the previous section. *See Arthur Andersen, LLP.*, 2000 U.S. Dist. LEXIS 3954, at *10-11.

### 3.    Plaintiff Was Not Substantially Limited In His Ability To Work

When the major life activity under consideration is that of working, "the statutory phrase 'substantially limits' requires plaintiffs, at a minimum, to allege they are unable to work in a broad class of jobs." *Sutton*, 527 U.S. at 491, 144 L. Ed. 2d at 468, 119 S. Ct. at 2151; *accord Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794-95 (9th Cir. 2001) (citing 29 C.F.R. § 1630.2(j)(3)(i) ("To be substantially limited in 'working,' an individual must be "significantly restricted in

the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities . . . [t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working'")); *Bitney v. Honolulu Police Dep't*, 96 Hawai'i 243, 254, 30 P.3d 257, 268 (2001) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice."). If jobs utilizing Plaintiff's skills, but perhaps not his unique talents, are available, Plaintiff is not precluded from a substantial class of jobs. *See Sutton*, 527 U.S. at 492, 144 L. Ed. 2d at 468, 119 S. Ct. at 2151. To be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *See id.*

In the Ninth Circuit, Plaintiff must "present specific evidence about relevant labor markets to defeat summary judgment on a claim of substantial limitation of 'working.'" *Thornton*, 261 F.3d at 795 & n.2 (rejecting the plaintiff's argument that the court take judicial notice that severe restrictions on keyboarding and handwriting would impair any person from working at a variety of clerical jobs).

Plaintiff provides no evidence of jobs from which he was precluded or evidence of the relevant labor markets for those classes of jobs. To the contrary, Plaintiff testified that he was able to do everything required of his business. Such testimony is fatal to any claim that he is substantially limited in the major life activity of working. *See Ray*, 246 F. Supp. 2d at 1226 ("Because [plaintiff] testified that he could physically do everything that was asked of him while working at Kroger, Ray has defeated his claim that he is substantially limited in the major life activity of working.").

### C. PLAINTIFF WAS NOT DENIED A CHAPERONE OR A PROMINENTLY DISPLAYED SIGN WARNING CUSTOMERS AND EMPLOYEES OF PLAINTIFF'S PRESENCE BECAUSE HE NEVER MADE THESE REQUESTS FOR MODIFICATION

Title III of the ADA prescribes, as a "general rule":

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (2005). The term "discrimination" is defined to include:

> [1] a failure to make [2] reasonable modifications in policies, practices, or procedures, [3] when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless [4] the entity can demonstrate that making such modifications would fundamentally alter the nature of

such goods, services, facilities, privileges, advantages, or accommodations.

§ 12182(b)(2)(A)(ii); *accord PGA Tour, Inc. v. Martin*, 532 U.S. 661, 658 n.38, 121 S. Ct. 1879, 1893 n.28, 149 L. Ed. 2d 904, 916 (2001); *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1058-60 (5th Cir. 1997); *Parr v. L& L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1085 (D. Haw. 2002).

Plaintiff has the ultimate burden of proving "that a modification was requested and that the requested modification is reasonable." *Johnson*, 116 F.3d at 1058.[4] In other words, the actual request for modification must be made. *See Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1342 (S.D. Fla. 2003) ("A plaintiff who alleges that a defendant failed to reasonably modify its policies, practices or procedures must show that he or she actually requested a modification that was necessary for full and equal enjoyment and that such a modification is reasonable in the run of cases."); *see also Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004) (assessing the plaintiff's requested modification); *Karr v. Wal-Mart Stores, Inc.*, No. 02-11245 (11th Cir. Sept. 2, 2003) (per curiam; unpub.) ("Karr argues that she is disabled under the terms of the ADA by Tourette's Syndrome, one of the symptoms of which causes her to use profanities

---

[4]      Plaintiff's Title III burden differs from a Title I burden. Title I would require an employer to engage an interactive process upon becoming aware of an employee's request for an accommodation. Title III requires Plaintiff to request a modification and prove that it is a reasonable one.

involuntarily, and that Wal-Mart therefore has a duty to accommodate her disability by permitting her to shop in its store regardless of any profanities she might utter . . . [even] accepting that Karr has Tourette's Syndrome and that it may reasonably be accommodated under the ADA . . . there is no record evidence in this case that Karr timely sought such an accommodation from Wal-Mart and that her request was denied.").

If, and only if, Plaintiff meets this burden, Home Depot has the burden of proving that the requested modification would fundamentally alter the nature of its accommodation. *See Johnson*, 116 F.3d at 1058 & n.4 (noting that the Rehabilitation Act is the predecessor to the ADA, and Rehabilitation Act precedent is to be used in interpreting the ADA).

When asked to describe what modification in policies, practices or procedures or other modification he requested from Home Depot on November 3, 2003 and April 25, 2004, Plaintiff replied:

> I asked if he could finish my business transaction which was to exchange a faulty wheel barrel. I was asked to leave the store and not return in a threatening and angry manner.

CSOF ¶ 29.[5]

---

[5] Although there is a factual dispute as to whether Plaintiff actually made a request to complete his transaction, as alleged, Plaintiff's request—to be permitted to complete his transaction while voicing vulgarities in front of others, including an eight-year-old child—was unreasonable because it was abusive and harassing, as is described in the next section.

Home Depot anticipates that Plaintiff may raise several other possible modifications he feels Home Depot should have suggested, namely the use of signage or a personal shopper.  Plaintiff could not have been denied accommodations he never requested.  *See Axelrod v. Phillips Acad.*, 46 F. Supp. 2d 72, 84 (D. Mass. 1999) ("However, the onus is on [the plaintiff] to request such accommodations . . . [a]t trial, the plaintiffs suggested several additional steps that Phillips Academy could have taken to accommodate Nicholas' ADHD [but the] burden is not on the school to establish that there was nothing else it could have done to help Nicholas to graduate, rather, the burden is on the plaintiffs to show that they requested a reasonable accommodation and the school denied it.").

Alternatively, a request for an accommodation is unreasonable if it is made too late.  *See Zukle v. The Regents Of The Univ. Of Calif.*, 166 F.3d 1041, 1051 n.16 (9th Cir. 1999) ("Furthermore, Zukle requested this accommodation after the Medical School's decision to dismiss her.  At no time did she request that the Medical School place her on a decelerated schedule.  Her failure to request this accommodation earlier contributes to our finding of unreasonableness.") (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 796 n.3 (1st Cir. 1992) (no handicap discrimination pursuant to § 504 of the Rehabilitation Act of 1973 where the plaintiff never sought an accommodation "until after Tufts sent him packing and adversary proceedings were underway"), *cert. denied*, 507 U.S. 1030, 123 L.

Ed. 2d 470, 113 S. Ct. 1845 (1993)).

According to Plaintiff, the only request he made on November 3, 2003 was for the clerk to finish Plaintiff's transaction.[6] Plaintiff was permitted to return the wheelbarrow.  According to Plaintiff, he made no requests on April 25, 2004. Plaintiff was permitted to return the spray canister.  Plaintiff cannot meet his burden of proving that any other modifications were requested.

**D.    PLAINTIFF'S REQUESTED MODIFICATION WAS UNREASONABLE**

This court has an independent duty to inquire into the purpose of Home Depot's core values, and to ascertain whether there can be a reasonable modification made to accommodate Plaintiff without frustrating the purpose of the core values—thereby fundamentally altering the nature of Home Depot's business. *See PGA Tour, Inc. v. Martin*, 532 U.S. at 671, 121 S. Ct. at 1887, 149 L. Ed. 2d. at 916.

**1.    It Would Be Unreasonable To Require Home Depot To Disregard Its Core Values**

Assuming for the purposes of this motion that Plaintiff requested a modification permitting him to utter sexist and vulgar comments in front of employees and customers, it would be unreasonable to require Home Depot to give

---

[6]    Home Depot disputes that Plaintiff made an explicit request to finish his transaction. This is not a material fact, as Plaintiff's requested modification—to utter sexist, vulgar, and harassing comments in front of employees and an eight-year-old child—was unreasonable.

Plaintiff an exemption from the normal operation of Home Depot's core values. Substantial modifications are unreasonable, and are not required. *See Baldwin School*, 133 F.3d at 152.

In *Baldwin School*, the First Circuit, in the context of evaluating whether the plaintiff had met his burden of showing his probable success on the merits of a Title III disability discrimination claim, held that it was unreasonable to require a non-special needs school to provide a student with an exemption from the normal operation of its disciplinary code based on the student's attention deficit hyperactivity disorder (ADHD).[7]

At the start of the suit, the plaintiff was in the sixth grade. The plaintiff had been progressively disciplined for behavioral problems since the fifth grade, when the school had put the plaintiff on probation and worked with the plaintiff's parents and psychologist to accommodate the plaintiff's problems. At the start of the plaintiff's sixth grade year, the plaintiff's problems grew more severe. He swore at the teachers and other students and disobeyed classroom rules. The plaintiff ended up in the principal's office after he called a teacher a "jodido lucio", which in Spanish meant something along the lines of "f[]cking show-off". In the principal's

---

[7] The student was also diagnosed with oppositional defiant disorder (ODD) and childhood depression, but the court evaluated the discrimination claim based on the information provided by the plaintiff's psychologist in support of the plaintiff's request for reinstatement. In other words, the court limited the plaintiff's facts to those relayed in the plaintiff's original request for modification.

office, the plaintiff screamed at his teacher, kicked the principal's desk and stormed out into the hallway, where he kicked other items and ripped everything off a bulletin board. The school suspended him indefinitely.

The plaintiff insisted that he be exempted from the normal operation of the school's disciplinary code. The plaintiff's modification asked that the school only suspend him after three warnings, and then only for the remainder of the day. The First Circuit found the lower court's grant of an injunction based on this request was error "[b]ecause the preliminary injunction went far beyond the requirements of reasonable accommodation". *Id.,* 133 F.3d at 153. The First Circuit pointed out the following problems that are applicable here:

- Significant consumption of staff time;
- Decreased staff morale;
- Inability of employees to effectively carry out their responsibilities (teaching); and
- Customers (students) suffering as a result.

*See id.* The court explained:

> It was beyond the power of the district court to order a school to suspend its normal codes of conduct in order to tolerate disruptive and disrespectful conduct when that behavior impaired the educational experience of the other students and significantly taxed the resources of the faculty and administration.

*Id.*, 133 F.3d at 152.

Home Depot strives to maintain an environment free of discrimination and harassment, regardless of gender, ethnic, or education background. Thus, Home

Depot prohibits racist, sexist, or otherwise discriminatory epithets in a Home Depot store. It is unreasonable to force Home Depot to provide Plaintiff with an exemption from its core values. This would mean impairing the experience of other customers and would significantly tax the resources of the Home Depot staff.

### 2.    It Would Be Unreasonable To Require Home Depot To Become A Courier For Plaintiff's Sexist Remarks

Assuming for the purposes of this motion that Plaintiff made an implicit request to be checked out irregardless of his voicing vulgarities, the implicit request was unreasonable because it would have required Home Depot to become a courier for a sexist viewpoint.

Federal and Hawai'i public accommodations laws cannot require Home Depot to adopt Plaintiff's particular point of view as to women, as embodied by the term "c[]nt". *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group of Boston*, 515 U.S. 447, 559, 115 S. Ct. 2338, 2340-41, 132 L. Ed. 2d 487, 495 (1995) is analogous. In *Hurley*, the South Boston Allied War Veterans Council refused to allow an organization of openly gay, lesbian, and bisexual persons (GLIB) to participate in the council's St. Patrick's Day parade. GLIB sued the council under Massachusetts' public accommodation law, claiming that the council impermissibly denied it access on account of sexual orientation. After noting that parades are expressive endeavors, the Supreme Court rejected GLIB's contention that Massachusetts' public accommodation law overrode the council's right to choose

-19-

the content of its own message.  Applying the law in such circumstances, the

Supreme Court held, made apparent that the "object [was] simply to require

speakers to modify the content of their expression to whatever extent beneficiaries

of the law choose to alter it with messages of their own. . . . In the absence of some

further, legitimate end, this object is merely to allow exactly what the general rule

of speaker's autonomy forbids."  *Hurley*, 515 U.S. at 578, 115 S. Ct. at 2350, 132

L. Ed. 2d at 507.

Similarly, the Supreme Court held in *Boy Scouts of America v. Dale*, that the

state public accommodations law could not operate to require the Boy Scout's to

propound a particular view on homosexuality:

> As the presence of GLIB in Boston's St. Patrick's Day
> parade would have interfered with the parade organizers'
> choice not to propound a particular point of view, the
> presence of Dale as an assistant scoutmaster would just
> as surely interfere with the Boy Scout's choice not to
> propound a point of view contrary to its beliefs.

530 U.S. 640, 654, 120 S. Ct. 2446, 2454, 147 L. Ed. 2d 554, 556 (2000).

Home Depot anticipates that Plaintiff may argue that the assignment of a

personal chaperone or personal shopper circumvents the problem of subjecting all

customers and employees to his sexist, racist, vulgar and harassing statements.

The assignment of a personal chaperone is unreasonable because that employee

would have to risk being fired if he accepted that responsibility.  *See Augustine v.*

*Anti-Defamation League of B'nai B'rith,* 249 N.W.2d 547, 550-51 (Wis. 1977) (upholding termination an employee who was fired for failure to control individuals who used various epithets with respect to African-Americans and Jews).

Indeed, Home Depot would not have to tolerate its own employee uttering epithets, no matter now involuntary. *See Petzold v. Borman's Inc.,* 617 N.W.2d 394, 398 ("We find that it would be ridiculous to expect a business such as defendant Farmer Jack to tolerate this type of language in the presence of its customers, even though we understand that because of plaintiff's condition, his utterance of obscenities and racial epithets is involuntary.").

### 3. It Would Be Unreasonable To Require Home Depot To Incur Liability For Failure To Take Immediate Action In Response To Racist And Sexist Statements

Home Depot respectfully acknowledges this court's earlier statement that, in its Motion to Dismiss, Home Depot "presuppose[d] that the actions by [a] co-worker or customer constitute sexual harassment". Order Denying Defendant's Motion to Dismiss Complaint, filed January 11, 2005. Home Depot respectfully submits that it need not ultimately held liable to incur the expenses resulting from defending against unsuccessful sexual harassment litigation, as well as other tort suits potentially arising from Plaintiff's admitted use of the terms "n[]gger", "c[]nt", "fat []ss", and "b[]itch", as well as Plaintiff's extension of his middle

finger.

This Court already is aware that under Hawai'i law an employer must take immediate corrective action when customers harass employees. Haw. Admin R. § 12-46-109(e) (sexual harassment), § 12-46-175(f) (ancestry harassment). Further, the Supreme Court of Hawai'i held in *Arquero v. Hilton Hawaiian Village L.L.C.*, 104 Hawai'i 423, 432 n.13, 91 P.3d 505, 514 n.13 (2004), that an employer may be liable for even one single act of harassment ("we recognize that there are situations in which name-calling or other verbal harassment constitutes 'severe or pervasive' harassment"). The harasser's intent does not matter under both Title VII and Hawai'i law. Rather, the conduct need only have the "purpose or effect of . . . creating an intimidating, hostile, or offensive work environment." 29 C.F.R. § 1604.11(a)(3); *Arquero*, 104 Hawai'i at 428, 91 P.3d at 510.

Once Plaintiff utters "n[]gger", "c[]nt", or "b[]tch", Home Depot incurs the litigation expenses of defending potential harassment claims, in addition to the possibility of an adverse verdict (no matter how wrong it might be). *See Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 965 (8th Cir. 1993) (plaintiff subjected to the term "c[]nt" had an actionable claim for sexual harassment) (reh'g en banc denied); *State v. Hoshijo*, 102 Hawai'i 307, 312, 76 P.3d 550, 555 (2003), (highlighting the holding in *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) that the word "nigger" is "perhaps the most offensive and inflammatory

racial slur in English . . . a word expressive of racial hatred and bigotry").

Home Depot cannot require its employees to prospectively waive harassment claims. *See generally Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52, 94 S. Ct. 1011, 1021, 39 L. Ed. 2d 147, 160 (1974) ("an employee's rights under Title VII may not be waived prospectively").

Furthermore, Home Depot cannot be expected to incur tort liability and costs resulting from its failure to prevent criminal harassment. Under Hawai'i law, telling someone "f[]ck you", thrusting middle fingers in the air, and commenting that someone is a "c[]nt" rises to the level of criminal harassment, as defined in H.R.S. § 711-1106. *See State v. Ram*, No. 22833, 2001 Haw. App. LEXIS 53, at *13-15 (App. March 12, 2001) (Mem. Op.).

### 4. It Would Be Unreasonable To Require Home Depot To Serve A Customer Whose Statements Are So Incendiary That He Posed A Danger To Himself And Others

A modification is unreasonable under Title III if it poses a danger to the person requesting it. *See Larsen v. Carnival Corp.,* 242 F. Supp. 2d 1333, 1348 (S.D. Fla. 2003) (granting summary judgment in favor of the defendant with respect to alleged violations of Title III).

In *Larsen*, the defendant cruise vessel disembarked a morbidly obese paraplegic, diagnosed with severe obstructive sleep apnea and chronic obstructive pulmonary disease, whose "Bi-Pap" ventilator broke. The plaintiff alleged,

amongst other things, that the defendant's decision to disembark the plaintiff for medical reasons was discriminatory and based on impermissible stereotype.

The court rejected the plaintiff's argument that the neutral eligibility criteria, 28 C.F.R. § 36.301(b), was inapplicable.[8] Although the cruise vessel did not have an eligibility criterion specifically for those traveling with Bi-Paps, it was undisputed that a minimum eligibility criterion for customers was that sailing could not impose a critical risk to the customer's health. The court concluded that plaintiff's proposed modification—remaining on board without a functioning Bi-Pap, was unreasonable. The court declined to reach the issue of whether the circumstances were sufficient to meet the direct threat exception pursuant to 42 U.S.C. § 12182(b)(3).[9]

---

[8]     Section 36.301(b) reads:

> Safety. A public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

28 C.F.R. § 36.301(b) (2005); *see also* ADA Title III Technical Assistance Manual § III-4.1200 (Safety).

[9]     Section 12182(b)(3) reads:

> (3) Specific construction. Nothing in this *title [42 USCS § § 12181 et seq.]* shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of

As in *Larsen*, the minimum eligibility criterion for Home Depot customers is that the customers do not pose a critical risk to themselves or others.  By calling a clerk a "c[]nt", Plaintiff created an atmosphere of sexual tension.  *Cf. Weicherding v. Riege,* 981 F. Supp. 1143, 1146-47 (C.D. Ill. 1997) (the state's interest in maintaining racial harmony in a prison system outweighed the plaintiff's interest in his association with the Ku Klux Klan).  In *Weicherding*, the court considered correction facility operators' fears of permitting a sergeant who was a Ku Klux Klan member to remain on staff:

> Plaintiff's affiliation with the Klan could lead to racial tension and incite violence--and Defendants were not required to wait until such violence resulted before taking action. Furthermore, the perception by the inmates and the community regarding the philosophy of the correctional facility is crucial. Permitting a sergeant affiliated with the Klan to remain at Graham could send the message that the facility condones or even supports the philosophy of the Klan. This could further exacerbate racial tensions in the prison and in the community.

*Id.* at 1148.

As in *Weicherding*, Home Depot did not have to wait to see if Plaintiff would provoke violent responses by those around him.  Indeed, Plaintiff testified that he previously had been beaten up for this sort of behavior.  It would be

---

policies, practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. § 12182(b)(3) (2005); *see also* ADA Title III Technical Assistance Manual § III-3.8000 (Direct threat).

unreasonable to require Home Depot to serve a customer whose statements are so incendiary that he posed a danger to himself and others.

E.    **PLAINTIFF CANNOT SEEK RECOVERY FOR A VIOLATION OF § 347-13 (COUNT II)**[10]

Plaintiff's claims pursuant to § 347-13 fail for the same reasons addressed in sections B through D above.  Home Depot also proffers the following additional arguments.

1.    **Plaintiff Cannot Seek Recovery For A Violation Of § 347-13 Because He Is Not Physically Disabled (Count II)**

Section 347-13(a) of the Hawai'i Revised Statutes provides, in pertinent part:

> (a)  The blind, visually handicapped, and <u>otherwise physically disabled</u> are entitled to full and equal accommodations, advantages, facilities, and privileges of all common carriers, airplanes, motor vehicles, . . . places of public accommodation, amusement, or resort, and other places to which the general public is invited, subject only to the conditions and limitations established by law and applicable alike to all persons.

Haw. Rev. Stat. § 347-13(a) (2004) (emphasis added).  Section 347-13.5 provides a civil action for persons injured by a violation of § 347-13.[11]

---

[10]    Plaintiff's HCRC charge was premised on discriminatory actions occurring on or before November 3, 2003.

[11]    Chapter 347 sets forth the rights of Blind and Visually Handicapped Persons.  The purpose of § 347-13 was to, "recognize the rights of the blind and other handicapped persons by updating existing sections relating to the blind. . . ." *See* H.R. Stand. Comm. Rep. No. 93, 6th Leg., Reg. Sess. (1971), *reprinted in* 1971 Haw. House J. 718; H.R. Stand. Comm. Rep. No. 461-72, 6th Leg., Reg. Sess. (1971), *reprinted in* 1972 Haw. House J. 941.  Unlike "blind" and "visually handicapped", the phrase, "otherwise physically disabled" is undefined in Chapter 347.

The interpretation of the statute is a question of law.  When interpreting the statute, the Court follows the "cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning." *Ross v. Stouffer Hotel Co. (Hawaii) Ltd., Inc.*, 76 Hawai'i 454, 461, 879 P.2d 1037, 1044 (1994) (citing *Kaapu v. Aloha Tower Dev. Corp.,* 74 Hawai'i 365, 388, 846 P.2d 882, 888-89 (1993)).  This means giving operative words their common meaning, unless there is something in the statute requiring a different interpretation.  *See id.*

In *Ross*, the Supreme Court, addressing § 378-2, looked to Black's Law Dictionary to determine what "discharge" meant in the employment discrimination context and then looked to The Random House College Dictionary to define the term "occurred."  *See id.*; *accord, Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001) ("We may "resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined.") (citation omitted).

Plaintiff does not argue that the statute should be extended to mental impairments.  Because Plaintiff is not blind or visually handicapped, it appears that Plaintiff is arguing that that he has a physical disability.

According to Merriam Webster Online Dictionary, the term "physical" means:

> **1 a :** having material existence **:** perceptible especially
> through the senses and subject to the laws of nature
> <everything *physical* is measurable by weight, motion,
> and resistance -- Thomas De Quincey> **b :** of or relating
> to material things
> **2 a :** of or relating to natural science **b** (1) **:** of or relating
> to <u>physics</u> (2) **:** characterized or produced by the forces
> and operations of <u>physics</u>
> **3 a :** of or relating to the body **b :** concerned or
> preoccupied with the body and its needs **:** CARNAL **c :**
> characterized by especially rugged and forceful physical
> activity **:** ROUGH <a *physical* hockey game> <a *physical*
> player>

Merriam Webster Online Dictionary, <u>available at</u> http://www.m-w.com.  The term

"disabled" is defined as,

> to make incapable or ineffective; *especially* **:** to deprive
> of physical, moral, or intellectual strength

*Id.* ("to deprive of legal right" omitted).

Plaintiff is not deprived of his senses.  Plaintiff is able to walk, see, hear,

speak, and breathe.  Plaintiff is not physically disabled.

### 2.    Plaintiff Was Entitled To The Same Privileges As Any Other Customer

Even if Section 347-13(a) applied to mental disabilities, which it does not,

Plaintiff was entitled to the same privileges as any other customer.  *Cf. Baldwin

School*, 133 F.3d at 152-53 (plaintiff not entitled to be "exempted from the normal

operation of the school's disciplinary code . . . [t]hat a private non-special needs

school is covered by the ADA does not, as a matter of law, transform it into a

special needs school"). Home Depot maintains eight core values, and Home

Depot's application of these eight core values is applied uniformly to all customers

and employees. One of the eight core values is "Respect for All People":

> In order to remain successful, our associates must work
> in an environment of mutual respect, free of
> discrimination and harassment. Everyone has vague,
> regardless of gender, ethnic or education background.

CSOF ¶ 2. Home Depot prohibits all racist and sexist statements in its stores.[12]

Home Depot did not discriminate against Plaintiff because Home Depot treated

Plaintiff as it would have treated any other customer making sexist, vulgar, and

harassing remarks.

It is not unusual for a business to refuse service to offensive customers. *See*

*Ward v. Housatonic Area Reg'l Transit Dist.*, 154 F. Supp. 2d 339, 344-45 (D.

Conn. 2001) (bus rider refused service for disruptive acts, which included referring

to the female driver as "he/she/it, whatever" and swearing at another female driver

and calling her an idiot); *cf. Johnson v. Tait*, 774 P.2d 185, 190 (Alaska 1989)

(tavern owner validly refused to serve a customer wearing motorcycle "colors";

"We are aware of no case requiring the individual proprietor of a small

establishment to provide a forum for the expressive rights of her fellow citizens").

---

[12]    Home Depot need not even raise a written policy against epithets to establish its
application of a neutral policy to all customers. *See Larsen*, 242 F. Supp. 2d at 1348 (granting
summary judgment in favor of the defendant with respect to alleged violations of Title III based
on an implied policy).

Plaintiff's claim under § 347-13(a) therefore fails.

## F.    **PLAINTIFF WAS NOT SUBJECT TO A DISCRIMINATORY PRACTICE  (COUNT III)**

Plaintiff's claims pursuant to § 489-3 fail for the same reasons addressed in

sections B through D above.  Section 489-3 provides, in pertinent part:

> Unfair discriminatory practices which deny, or attempt to
> deny, a person the full and equal enjoyment of the goods,
> services, facilities, privileges, advantages, and
> accommodations of a place of public accommodation on
> the basis of race, sex, color, religion, ancestry, or
> disability are prohibited.

Haw. Rev. Stat. § 489-3 (2004).

As argued above, Home Depot could not have denied Plaintiff services

Plaintiff did not request.  Therefore, this analysis is limited to Plaintiff's implicit

request to be checked out, while calling the cashier a "c[]nt" in front of an eight-

year-old child.

As argued in Section E, Plaintiff was not discriminated against because he

received the same treatment any other offensive customer would have received for

calling a cashier a "c[]nt" and referring to members of the staff while using the

term "f[]ck".

G.    **ENFORCEMENT OF TITLE III, H.R.S. § 347-13, AND H.R.S. § 489-3 AS TO HOME DEPOT'S REFUSAL TO SERVE A CUSTOMER MAKING SEXIST AND RACIST STATEMENTS WOULD VIOLATE THE HAWAI'I AND UNITED STATES CONSTITUTIONS**

If this Court interprets Title III, H.R.S. § 347-13, and H.R.S. § 489-3 as requiring Home Depot to serve a customer making sexist (and racist) remarks, such an interpretation would violate First Amendment protections against compelled ideological speech.

This Court cannot force Home Depot to convey an antagonistic ideological message. *See Wooley v. Maynard,* 430 U.S. 705, 713, 51 L. Ed. 2d 752, 762, 97 S. Ct. 1428, 1434-36 (1977) (government may not compel motorists to display license plates bearing the motto "Live Free or Die"; "such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such a message"); *West Virginia Bd. of Ed. v. Barnette*, 39 U.S. 624, 632, 63 S. Ct. 1178, 1183, 87 L. Ed. 1628, 1635 (1943) (government may not compel children, contrary to their conscience, to salute the American flag and become "unwilling converts" to an "affirmation of a belief and an attitude of mind"); *Hurley*, 515 U.S. at 559, 115 S. Ct. at 2340-41, 132 L. Ed. 2d. at 495; *Dale*, 530 U.S. at 654, 120 S. Ct. at 2454, 147 L. Ed. 2d. at 556.

This is true even if this court construes Home Depot's refusal to serve a customer making racist and sexist remarks as an act of commercial speech, which

is "usually defined as speech that does not more than propose a commercial transaction". *See United States v. United Foods, Inc.*, 533 U.S. 405, 410, 121 S. Ct. 2334, 2338, 150 L. Ed. 2d 438, 445 (2001) (assessments imposed on members of the mushroom industry for generic advertising programs violated a mushroom producer's First Amendment rights protecting it from compelled speech and compulsory financing of speech; "[j]ust as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals from compelling individuals to express certain views").

This is because:

> [T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all. A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind.

*Wooley*, 430 U.S. at 714, 51 L. Ed. 2d at 762, 97 S. Ct. at 1435 (citations and internal quotation marks omitted). Home Depot need not utter the speech itself. It is enough "that the mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which includes persons who object to the speech, but who, nevertheless, must remain members of the group by

law or necessity." *United Foods, Inc.*, 533 U.S. at 413, 121 S. Ct. at 2339, 150 L. Ed. 2d at 446.

Plaintiff cannot contend that calling someone a "c[]nt" (or a "n[]gger") is ideologically neutral. Plaintiff does not dispute the sincerity of Home Depot's views on sexism (or racism). Plaintiff also does not dispute that Home Depot found it contrary to its conscience to permit a customer to call one staff member a "c[]nt" and the other a "f[]cking c[]nt". In refusing to serve a customer uttering sexist (and racist) remarks since April 25, 2004, Home Depot has not yielded in conscience, and instead exercises its freedom not to effectively endorse Plaintiff's hateful statements by permitting him to remain. Home Depot should not have to "yield in conscience". *Cf. Rasmussen v. Glass*, 498 N.W.2d 508 (Minn. 1993) (deli owner did not have to yield in conscience because his proffered reason for refusing to service a customer was based upon a sincerely held religious belief; enforcement of a public accommodation ordinance burdened the owner's exercise of his religious beliefs, and the city did not have a compelling governmental interest in enforcement of the ordinance).

III.    **CONCLUSION**

For the reasons set forth more fully above, Defendant requests that the

Complaint be dismissed.

Dated:  Honolulu, Hawaii, November 29, 2005.

TORKILDSON, KATZ, FONSECA,
MOORE & HETHERINGTON,
Attorneys at Law, A Law Corporation

JEFFREY S. HARRIS
JAN MURANAKA BOIVIN
Attorneys for Defendant
HOME DEPOT USA INC.