1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF HAWAII

3    ------------------------------------------

4    JON MUSE,

5              Plaintiff,

6          vs.          Case No. CV04-00154 DAE/BMK

7    HOME DEPOT USA, INC.,

8              Defendants.

9    ------------------------------------------

10

11

12              DEPOSITION OF JON MUSE

13

14   Taken on behalf of the Defendant at Torkildson Katz

15   Fonseca Moore & Hetherington, 700 Bishop St., 15th

16   Floor, Honolulu, Hawaii 96813, commencing at 10:04 a.m.,

17   Wednesday, October 12, 2005, pursuant to Notice.

18

19

20   BEFORE:   BARBARA ACOBA, CSR No. 412, RPR

21             Notary Public, State of Hawaii

22

23

24

25              **EXHIBIT 2**

BY MR. HARRIS:

    Q.   Before we broke, I'd asked you a question and it was, can you please name about 10 people who you consider your closest friends.

    A.   By the first name?

        MR. SHERMAN:  Okay.  Again, I'm gonna restate my objection to the question, which was it's not relevant.  I think it's taking the form of harassment. However, Jon, if you can answer the question, go ahead.

        THE WITNESS:  You want me to answer the question?

        MR. SHERMAN:  If you can answer it.

BY MR. HARRIS:

    Q.   First and last names, please.

    A.   The first person would be Kyle Flemeister.

    Q.   Can you spell that last name?

    A.   F-l-e-m-e-i-s-t-e-r, Flemeister.

    Q.   Okay.

    A.   Ricky Realista.  R-e-a-l-i -- no, R-e-a-l-i-s-t-a, Realista.  My girlfriend, Debbie Pacheco.  Cunt.  I don't remember my friend's name, last name is -- his name's Byron.  I'm not sure if it's Miller or Morris.  I'm not sure his last name.  My son, Justin A. Muse.  My ex-wife, Joanne McKay.  That's all I'll name for now.

1    Q.   Are there some others that you just don't wanna

2    name?

3    A.   There's not too many other people I trust.

4    Q.   Okay.  And about how --

5    A.   No.

6    Q.   About how many acquaintances?  You asked me --

7    when I asked how many close friends do you have, you

8    said -- you distinguished between friends that you could

9    trust and acquaintances.

10   A.   Those are the friends -- those are the friends

11   that I -- those are my close friends that I just stated.

12   There are probably maybe a hundred or few hundred

13   acquaintances.

14        MR. SHERMAN:  I'm gonna object as vague and

15   ambiguous.  I mean, I don't even know what you mean by

16   acquaintances.  You know, I could consider the producer

17   here of this video an acquaintance after having met him.

18   What do you mean?  I mean, how deep a relationship?

19   When?  Where?  How?  Why?  No one could possibly answer

20   that as to what, you know, the definition of

21   acquaintance.

22   BY MR. HARRIS:

23   Q.   You said a hundred or a few hundred

24   acquaintances?

25   A.   Not -- I didn't say a few hundred.  I said

1    maybe a hundred.

2        Q.    Okay.  We -- go ahead and use acquaintances in

3    the way you first used it, because when I asked you how

4    many friends you had, you asked me if I meant close

5    friends or acquaintances.  What do you mean by

6    acquaintances?

7        A.    People I see a few times a week or, that's what

8    I mean by acquaintances.  But I don't -- sorry.  Yeah,

9    people I run into every now and then, a few times a week

10   or once a week or once a month I'll see, you know, but

11   that's what I mean by acquaintances.  Or he could be

12   acquaintances, your videotape guy could be an

13   acquaintance.  I met him today.  I may have said hi to

14   him.  You know, he could have been an acquaintance.  You

15   could have been an acquaintance because I'm dealing with

16   you.  You know, I see different people I've never seen

17   before in my whole life every day on this island.

18       Q.    Okay.  Does your Tourette's cause any severe

19   problems with your close friends?

20       A.    Not at all.

21       Q.    Okay.

22       A.    Not with my close friends, no.

23       Q.    Does your Tourette's cause any severe problems

24   with the people that you see a couple times a week?

25       A.    Not severe.

1    Q.    I understand you play basketball with your son,

2    at least that's one of the things I've seen in the

3    paperwork.

4    A.    Yes.

5    Q.    Okay.  I understand you haven't been to a movie

6    for a couple years.

7    A.    More than that maybe.

8    Q.    What else do you go out of your house and do?

9    Let me ask the question another way.

10    When you -- when you leave your home or your

11    nursery, what sort of places do you go?

12    A.    I spend a lot of time at my neighbor's house.

13    Q.    Okay.  What neighbor -- what neighbor is that?

14    What's his name?  His or her name?

15    A.    Jon Porlas, Jr.

16    Q.    How do you spell that?

17    A.    Jonathan Porlas, Jr.  P-o-r-l-a-s.

18    Q.    Is he one of the people in your list of 10 or

19    is he an acquaintance?

20    A.    No.  He's -- he's a close friend, but -- but

21    I'm, you know, I -- he is a close friend.

22    Q.    Okay.  Other than spending a lot of time at Jon

23    Porlas' house, what else do you do?

24    A.    I'm on the road gathering cut foliage for my

25    customers.  I do a lot of time driving during the day.

1    Q.    Where do you gather cut foliage?

2    A.    All over the island.

3    Q.    From wild areas?

4    A.    No.   From other -- other nurseries.   Other

5  people.   Buy and sell.

6    Q.    Okay.   So what other nurseries do you go to?

7    A.    I go to Olomana Tropicals.   I go to Sharon's

8  Plants.   I go to Koba's Nursery.   I go to a lot of

9  homeowners, people's back yards.

10    Q.    Okay.   Can you tell me --

11    A.    Not only nurseries, but I do go to private

12  homeowners, too.

13    Q.    So Olomana, Sharon's.   Koba's.   Do go to any

14  other nurseries?

15    A.    Not nurseries.

16    Q.    Okay.   How many private homeowners do you go

17  to?

18    A.    Gee, I can't give you that answer offhand.

19    Q.    Can you give me an estimate, please?

20    A.    Six.

21    Q.    Can you give me the homeowners' names?

22    A.    I don't know these names.   They remember --

23  they see my truck.   They see me.   I -- I -- I don't

24  remember, cunt, all of their names.

25    Q.    Okay.   Do you remember any of their names?

```
 1        A.    Give me awhile.   There's this one church I go
 2   to.
 3        Q.    What church is that?
 4        A.    Her name is Auntie Betty.   I call her Auntie
 5   Betty.   Her name is Betty.   She's the grounds keeper.
 6        Q.    Do you have the address --
 7        A.    No.
 8        Q.    -- of these places you go?
 9        A.    No.
10        Q.    Do you go to them regularly?
11        A.    Maybe once, twice a month maybe.
12        Q.    Who do you deal with at Olomana?
13        A.    Ken Vinsant.
14        Q.    Who do you deal with at Sharon's?
15        A.    Robin.   I don't know her last name.
16        Q.    Who do you deal with at Koba's?
17        A.    Either Greg or Carl.   What does this have to
18   do with my --
19             MR. SHERMAN:   Wait.
20   BY MR. HARRIS:
21        Q.    Do you -- with respect to any of the homeowners
22   or Ken, Robin, Greg or Carl, in the last month, have any
23   words that you've involuntarily said, as a result of
24   your Tourette's, resulted in any adverse interactions
25   with those people?
```

1    A.    No.    They understand me.

2    Q.    Okay.    How about in the last year?

3        MR. SHERMAN:    I'm gonna object.    I'm not sure I

4    understand what your question is.    The last year with

5    anyone, at any time or with these specific people?

6        MR. HARRIS:    I'll clarify the question.

7    BY MR. HARRIS:

8    Q.    You described three nurseries that you went to,

9    Olomana, Sharon's, Koba's, and you dealt with a Ken, a

10    Robin, and a Greg or Carl respectively at each of those

11    nurseries.    You estimated about six homeowners that you

12    went to once or twice a month, and you also referred to

13    a church and an Auntie Betty.    With respect to that

14    group of persons, both the people you deal with at the

15    nurseries and the people you may deal with at the homes

16    or the church, have any words you've involuntarily

17    uttered, as a result of your Tourette's, resulted in any

18    adverse interaction with any of those persons over the

19    last year?

20    A.    They understand me.

21    Q.    Okay.

22    A.    No.

23    Q.    Okay.    Other -- other than the retail stores

24    and the -- your neighbor's house and the nurseries and

25    the homeowners, is there anywhere else you go when you

1       A.    When -- you mean what time?

2       Q.    What dates and times are these N.A. meetings?

3       A.    They're every Thursday and every Friday of the

4   week.

5       Q.    What times?

6       A.    Thursday night is from 7:00 to 8:30 p.m. and on

7   Friday is 7:00 to 8:00 p.m.

8       Q.    What happens at these N.A. meetings?

9       A.    I'm not allowed to answer that question because

10  what is said in the rooms, stays in the rooms.

11          MR. SHERMAN:  I'm gonna object -- I want to

12  state an objection at this point in time.  I don't see

13  any relevance to that.

14          THE WITNESS:  You --

15          MR. SHERMAN:  Please, Jon.

16          THE WITNESS:  Yes.  Yes.  Bruce.

17          MR. SHERMAN:  There's no relevance and it's

18  just a typical 12-step program.  I don't think there's

19  any mystery there.

20          THE WITNESS:  There's nothing to hide.

21  BY MR. HARRIS:

22      Q.    I'm not asking you the substance of anything

23  that's said in those -- in those programs.  Let me

24  clarify.

25          How many other attendees are there usually in

1    that room?

2         A.   It fluctuates from week to week.

3         Q.   Give me a low and high, please.

4         A.   Maybe 25 to 40, 50 people.

5         Q.   Okay.  And is there a leader?

6         A.   There's no leaders.

7         Q.   Do you have conversations with other

8    individuals?

9         A.   Yes.

10        Q.   How do you decide which person to talk to?

11        A.   I don't -- sometimes I don't decide that.  They

12   may come up to me and say, hi, Jon, how are you?  They

13   may start a -- spark a conversation with me if they see

14   me.

15        Q.   Is there any formal program at the N.A.

16   meeting?

17        A.   Formal?  What do you mean by formal?

18        Q.   Does anybody ever get up and say, okay, this is

19   what we're gonna do tonight?

20             MR. SHERMAN:  I'm gonna object.  That's vague

21   and ambiguous.  I mean --

22             MR. HARRIS:  Let me clarify.

23             MR. SHERMAN:  -- it's a typical 12-step

24   program.

25

```
 1              MR. HARRIS:  You know what, I want to know what
 2       happens at the meetings.
 3              THE WITNESS:  If you want to know, why don't
 4       you go.
 5              MR. SHERMAN:  We can arrange that.
 6              THE WITNESS:  You wanna know --
 7              MR. SHERMAN:  Jon.
 8       BY MR. HARRIS:
 9          Q.    When you go to the meeting, what happens?
10       Don't tell me the substance of what is said, just tell
11       me what happens.
12          A.    There's a service structure -- people who --
13       people do not govern.  There's no president or so-called
14       head honcho, the guy that calls all the shots.  There
15       are people who do service positions who are called
16       trusted servants.
17          Q.    Okay.
18          A.    So we follow a format.
19          Q.    Tell me the format you follow.
20          A.    The Thursday night meeting, it's my job to find
21       somebody with some experience to share their story about
22       their history of with narcotics, okay.  Then after that
23       person is done, that person, he may choose a topic for
24       discussion, like he can just pick a topic for the group
25       for individuals to just talk about that topic or
```

54

```
 1   whatever they want.

 2        Q.   Okay.  And then --

 3        A.   It's a -- it's a support group.  That's what it

 4   is.

 5        Q.   Okay.  And then individuals, if they want to

 6   talk, they talk?

 7        A.   They talk about whatever they wanna talk about

 8   or they can talk about the topic.

 9        Q.   Everybody -- does everybody sit in a circle

10   or...

11        A.   No.  Not necessarily.

12        Q.   How do you sit?

13        A.   What does this have to do with what we're doing

14   here today?

15        MR. SHERMAN:  I'm gonna object to that

16   question.  What possible relevance does -- please, Jon.

17   What possible relevance is there as to how they sit in a

18   room at an N.A. meeting?  No, explain that to me.  What

19   relevance is there at all, okay, as to how they sit;

20   whether they sit in a circle; whether they sit Indian

21   style; whether they sit in rectangular formation.  Tell

22   me the relevance of that, Jeff.

23        MR. HARRIS:  Okay.  Now --

24        MR. SHERMAN:  No.  No.  Please, because you are

25   harassing him at this point.  This is excruciating,
```

1    how are the participants seated?

2        A.    The Friday night meeting we sit in a circle.

3    We line up a bunch of chairs in a circle.

4        Q.    Okay.  And you look at everybody else in the

5    circle?  You're facing --

6        A.    I'm not looking at everybody, but I can --

7    from -- from -- I can see whoever's in that circle, yes.

8        Q.    How about the Thursday night meeting, how are

9    you seated there?

10       A.    We have chairs around and we have tables in the

11   middle.  People sit wherever they wanna sit.  They can

12   sit on the ground if they want to.

13       Q.    And now, are you responsible every week for --

14       A.    No.

15       Q.    -- obtaining --

16       A.    No.

17       Q.    -- the speaker?

18       A.    No.  Oh, well, yes.

19            MR. SHERMAN:  I'm gonna object, Jon.  Which

20   meeting?  Which meeting are you talking about?  Okay.

21   If you be specific.  I don't think he's responsible for

22   both meetings.  Please specify.

23   BY MR. HARRIS:

24       Q.    Are you responsible for obtaining the speaker

25   for one of the meetings?

```
 1        A.    Yes.

 2        Q.    Are you responsible for obtaining a speaker at

 3   the other meeting?

 4        A.    No.

 5        Q.    Okay.   Which meeting do you obtain the speaker

 6   for?

 7        A.    Thursday night.

 8        Q.    Okay.   And how do you obtain the speaker?   How

 9   do you generally get a guy to speak?

10        A.    Maybe once in awhile I'll go to maybe -- maybe

11   a Saturday night meeting or a Wednesday night meeting

12   and I may hear someone that says something really good,

13   and I'll go up to him and ask him, would you like to be

14   our speaker for Thursday night, can you make it?   That's

15   how I find speakers.   I go around, once in a while I'll

16   go to different meetings.   But generally, I go to

17   Thursday and Friday.

18        Q.    Okay.   And then every Friday it's your job to

19   get a speaker?

20        A.    No.   Just Thursday.   You asked me that question

21   already.

22        Q.    Okay.   Every Thursday?

23        A.    Every Thursday.

24        Q.    Okay.   And you're able to find a speaker to --

25        A.    Sometimes, no.   Sometimes I'll show up at the
```

1  meeting and I'll just let God do his work.  Somebody

2  will show up that I haven't seen in awhile and I'll ask

3  the person on the spot, can you be the speaker tonight?

4  Someone I haven't seen in awhile.

5      Q.  At these Thursday, Friday, and sometimes

6  Saturday meetings, does the -- your involuntarily use of

7  words that you're forced to say by Tourette's result in

8  any adverse interactions?

9      A.  Yes.

10     Q.  Okay.  Tell me about the last time that

11 happened.

12     A.  I don't remember.

13     Q.  Okay.  How long ago?

14     A.  I don't remember.

15     Q.  Was it in the last year?

16     A.  Oh, yeah.

17     Q.  Was it in the last month?

18     A.  Yes.

19     Q.  Okay.  When in the last month was it?

20     A.  About a month ago.

21     Q.  Okay.  And what was the adverse interaction?

22     A.  Cunt.  The girl mimicked my Tourette's to tease

23 me, to -- to ridicule me.

24     Q.  Okay.  Is there any other adverse interaction

25 that is -- any other kind of adverse interaction other

1  an adverse reaction surfing.

2      Q.   Okay.   Is there any other times, any other sort

3  of activities outside of -- let's just think about the

4  last month.   Other than what you've described, are there

5  any other times you went out of the house or nursery to

6  do anything?

7      A.   I went to Starbucks to get coffee.   I go

8  Starbucks almost every day.   Almost every day.   I go

9  except -- yeah, I go to Starbucks and there are

10 customers in Starbucks, you know, and I may be talking

11 to the person at the desk and I've had adverse reactions

12 from customers.

13     Q.   Okay.   In the last month --

14     A.   Yes.   Many times.

15     Q.   In the last month --

16     A.   Many times.

17     Q.   -- have you gone to Starbucks every day?

18     A.   Just about every day.

19     Q.   Okay.   Which Starbucks do you go to?

20     A.   I go to either Manoa or Kaneohe.

21     Q.   At the Manoa Starbucks in the last month,

22 has -- have you uttered words that you're forced to say

23 by your Tourette's that resulted in any adverse

24 reactions?

25     A.   Just by the gestures and -- the physical

1    gestures or the looks people give me.

2        Q.   Please tell me.

3        A.   But because I go there frequently, the people

4    that work there, they know me.   They know I have

5    Tourette's.   Maybe not all of 'em, maybe not the new

6    employees, but I'm sure they've told each other that

7    don't mind this guy.   He's a regular customer.   He has,

8    you know.   But in the last month I've just had maybe

9    adverse reactions from customers like, you know, looking

10   at me and going like that with their friends.   Look at

11   that guy, he's saying that word.   I've seen stuff like

12   that in the past month.

13       Q.   And would that be the similar adverse reaction

14   at the Kaneohe Starbucks?

15       A.   Yes.

16       Q.   And you still go to the Starbucks every day?

17       A.   Where else I'm gonna get good coffee?

18       Q.   And are there any other places that you go?

19       A.   Well, I go to Aiea.   I had a situation in Aiea

20   Starbucks one time.

21            MR. SHERMAN:   I'm gonna object.   You mean

22   Starbuckses -- Starbucks or any other places period?

23   BY MR. HARRIS:

24       Q.   That's what I'm --

25       A.   Any other places or any other Starbucks, what

1    do you mean?

2        Q.    Any other places?

3        A.    No.

4        Q.    Okay.   When -- when did you go to the Aiea

5    Starbucks that you mentioned?

6        A.    I don't exactly remember.   I think it was not

7    this past -- I think it was two weeks ago.   I don't

8    exactly remember what day.   I met a friend there.

9        Q.    Okay.   What friend did you meet there?

10       A.    Daniel.

11       Q.    Okay.   And did you sit down and have coffee

12   with Daniel?

13       A.    We ordered coffee and we sat outside on the

14   tables.

15       Q.    Okay.   And you drank the cup of coffee with

16   Daniel?

17       A.    Yeah.

18       Q.    Talked to Daniel?

19       A.    Talked story, yeah.

20       Q.    Have any other adverse reaction from --

21   interaction from Daniel?

22       A.    Not from Daniel.

23       Q.    Okay.

24       A.    But there was people sitting around us that

25   looked at -- looked at us kind of strange, but my friend

1    Daniel, eh, screw them, Jon.  Screw them.

2        Q.  Okay.  So did you utter words that -- that were

3    for -- involuntarily as a result of your Tourette's?

4        A.  With Daniel, yeah, while we were talking.

5        Q.  And did you have any adverse interaction with

6    any persons?

7        A.  Not at that day.

8        Q.  Okay.

9        A.  Not during that day.  People may have looked

10   at -- looked at me strange, but they never verbally say

11   what's your problem or attack me.  They just looked at

12   me strange like I, you know, we were sitting around we

13   were -- the C word's coming out and people look at me

14   strange, you know, like, what the fuck's wrong with him?

15   You know, that's the kind of reactions I get from

16   people, ignorant people.

17       Q.  Are there any places that you want to go that

18   you don't go because of your Tourette's?

19       A.  Cunt.  The movies.  Maybe to a nightclub, go

20   dancing with some friends or, but it's not something I

21   have to do.  Something I have to sacrifice to protect

22   myself.

23       Q.  Anything else?

24       A.  Surfing.  And there are certain N.A. meetings

25   that I choose not to attend because there are certain

1    individuals there that -- who don't accept me.  So I

2    just try to just stay away.

3        Q.    You go to other N.A. meetings?

4        A.    Hardly.  I normally go to Thursday and Friday.

5        Q.    Okay.  Are there any other activities that you

6    don't engage in because of your Tourette's?

7        A.    Playing basketball.  I just play with my son or

8    one of his friends or couple of my friends that --

9    people that know me well.  But in a game setting, in a

10   five on five, in a real game setting, I -- I -- I don't

11   engage in that.

12       Q.    Is there anything else that you don't do

13   because of your Tourette's?

14       A.    I don't -- I don't go to Home Depot anymore.

15       Q.    Okay.  Anything else?

16       A.    I try -- like if I go to the store, if I have a

17   friend with me, if I have my girlfriend, I send her in

18   there.  I try not to go in the store myself.  But if I

19   gotta go pick up my medication, it's prescribed under my

20   name, so I'm the likely one that's supposed to pick it

21   up, so -- but the Longs Pali, they know me.  The girls

22   that work at the pharmacy know me, and they -- they

23   overlook my Tourette's completely.

24       Q.    Is there any place else that you don't go?

25       A.    I can't think of -- that's -- I've had enough

1      Q.   Okay.  During -- during the last several years,

2   have there been any incidents when you've been unable to

3   communicate with other people when you felt it

4   necessary?

5      A.   Yes.

6      Q.   Okay.  Please describe the last time that

7   happened.

8      A.   I don't exactly know specific time, but there

9   were a few instances where I tried to explain myself and

10  the person that I was trying to explain my condition to

11  did not buy it or accept it and we just parted ways.

12  Just said whatever and, you know, just let it go.  Cunt.

13  Cunt.  Cunt.

14      Q.   And your condition being your Tourette's?

15      A.   Tourette's, right.

16      Q.   Okay.  Other than that, have there been any

17  other incidents in which you've been unable to

18  communicate with another person when you felt it was

19  necessary?

20      A.   Not that I can recall.

21      Q.   Okay.  Have you withdrawn from social events in

22  any respect?

23      A.   Yes.

24      Q.   Tell me how, please.

25      A.   How.  I just haven't attended parties,

1    nightclubs, concerts, surfing, playing basketball with a

2    full court of guys or going to the beach, stuff like

3    that.  It's just second nature already.

4         Q.   And did we talk about some of those events this

5    morning?

6         A.   Yes.

7         Q.   Okay.  When's the last time you went to the

8    beach?

9         A.   I would say within the past three to four

10    months.

11        Q.   Okay.  Any problems?

12        A.   Yeah, just people looking at me strange.

13        Q.   Okay.

14        A.   But no -- no conflict, physical conflict or

15    verbal conflict.  Just people looking at me strange and

16    cunt.

17        Q.   All righty.  Do you find that you have high

18    levels of hostility with other people?

19        A.   No.

20        Q.   Let's go back to the November 3rd incident and

21    there was --

22        A.   At Home Depot?

23        Q.   Yeah.  There was Dar and there was the clerk --

24        A.   The clerk.

25        Q.   -- and there was Mike, right?  For the -- for

1    MR. SHERMAN: I'm gonna object. It calls for

2    speculation. There's no foundation laid for that. He

3    couldn't, you know, he couldn't possibly tell you that.

4    BY MR. HARRIS:

5        Q.    Please answer the question.

6        A.    Do I answer the question, Bruce?

7    MR. SHERMAN: As best you can. If you can

8    answer it. If you can't answer it, if you don't, you

9    know.

10    THE WITNESS: Could you repeat the question,

11    sir.

12    BY MR. HARRIS:

13        Q.    What should Home Depot have done differently

14    during the incident on November 3rd, 2003?

15        A.    What should they have done differently?

16    Treated me with more compassion.

17        Q.    Okay. Is there anything else Home Depot should

18    have done differently?

19        A.    Cunt. Yes. The manager could have pulled me

20    on the side, one on one, outside the store instead of

21    embarrassing -- instead of embarrassing me in front of

22    everybody there.

23        Q.    What else could Home Depot have done

24    differently?

25        A.    Accommodate me.

1    Q.    How?

2    A.    Instead of telling me not to come back.

3    Q.    How?

4    A.    Probably -- I -- I -- I can't answer -- I don't

5    know how.  I really wouldn't know how, but I know how I

6    would treat somebody in this case.

7    Q.    Did you ask them to do anything?

8    A.    No.  I just -- I returned my canister and my

9    wheelbarrow and I left.

10   Q.    Okay.

11   A.    I didn't -- I didn't -- go ahead.

12   Q.    Did you say any of these words, that Tourette's

13   forces you to say, in front of any customers?

14   A.    I don't know if the customers heard it.  I

15   can't tell you that.

16   Q.    How about the second time you came back, did

17   the little eight-year-old girl standing directly --

18          MR. SHERMAN:  I'm gonna object.  There's a lack

19   of foundation.  We don't know anything about an

20   eight-year-old girl.  If he doesn't recall seeing one.

21          MR. HARRIS:  Counsel, are you gonna testify or

22   are you gonna let your --

23          MR. SHERMAN:  No.  No.  I'm gonna state my

24   objection for the record, Mr. Harrison.

25          MR. HARRIS:  Okay.  State an objection.

BY MR. HARRIS:

     Q.   Did you ask Mike or Dar or Debra to supply you a private shopper?

     A.   No.

     Q.   Okay.  Did you tell Mike or Debra or Dar that they were required to have customers submit to your language?

     A.   No.

     Q.   Did you make any specific requests --

     A.   No.

     Q.   -- about how they should deal with you?

     A.   No.

     Q.   What do you think about Home Depot's position that they don't want their employees or their customers hearing the words that you're forced -- that you are involuntarily saying?

          MR. SHERMAN:  I'm gonna object.  That calls for speculation.  He can't know anything about what the basis is or what their position is that way.  I don't see how he can possibly answer that.

          THE WITNESS:  I can't answer that, sir.  I have no control over that.

BY MR. HARRIS:

     Q.   Have you had any medical or psychological consultations as a result of the November 3rd incident?

1    A.    Yes.

2    Q.    Your occupation is field supervisor?

3    A.    At that time, yeah.

4    Q.    And who did you work for?

5    A.    GKK Specialties Incorporated.

6    Q.    What was that?

7    A.    It was a wholesale flower company, but I became

8    a field supervisor later.

9    Q.    Okay.  And that business was located on Waimanu

10   Street?

11   A.    Right.

12   Q.    Okay.  In your capacity as field supervisor,

13   how many people did you supervise?

14   A.    About 12.

15   Q.    Okay.  And what did they do?

16   A.    They did -- I was responsible -- well, they did

17   harvesting, irrigation, fertilizing, plant maintenance,

18   weed control, packing, processing.

19   Q.    And so as field supervisor you were responsible

20   for directing their tasks?

21   A.    I was overseeing their -- their

22   responsibilities, cunt, yes, sir.

23   Q.    So how long did you serve as -- did you work

24   for GKK Specialties, Inc.?

25   A.    Gee, I was 23.  Probably for about three to

1  four years I worked for them.

2      Q.   Okay.  What caused you to leave GKK

3  Specialties?

4      A.   I -- I went to go get help for a personal

5  problem.

6      Q.   Okay.  You voluntarily left?

7      A.   I voluntarily left.

8          (Exhibit 2 marked for identification.)

9  BY MR. HARRIS:

10     Q.   Showing you Exhibit 2.  On each of these

11 exhibits, we'll just look at them in order so you can

12 just stack them up.  We won't go back or I'll tell you.

13         Do you recognize Exhibit 2?

14     A.   Yes.

15     Q.   Okay.  And do you recognize that as the

16 signature of your psychiatrist, Mark Zen?

17     A.   I think so, yeah.  I don't really remember, but

18 I remember this -- this a -- this day and time.

19     Q.   Okay.  You see in this letter he says, I've

20 discussed the need to address his problem via group,

21 family, and individual therapy, specifically education.

22 He requires confrontive measures and needs to attend

23 daily N.A. meetings.

24         Do you remember that discussion with the

25 doctor?

1    the doctor you were staying with?

2         A.    I'd like to -- I can't recall.   I don't recall.

3               (Exhibit 20 marked for identification.)

4    BY MR. HARRIS:

5         Q.    And then do you recognize Exhibit 20?

6         A.    So what was your question, sir?

7         Q.    Do you recognize Exhibit 20?

8         A.    I may have seen this before, but I don't

9    remember exactly.

10        Q.    Did you meet with a Dr. Marvit, Dr. Robert

11   Marvit?

12        A.    Yes.

13        Q.    Okay.

14        A.    Cunt.   Yeah.

15        Q.    And did you take some tests in the morning and

16   then come back in the afternoon and have a conversation

17   with him?

18        A.    Yes.   He asked me questions and stuff, yeah.

19        Q.    And did -- did you see the report that he

20   issued as a result of that meeting?

21        A.    No.

22        Q.    Does your son stay with you on weekends?

23        A.    Yes.

24        Q.    Every weekend?

25        A.    Just about.

1   Q.   Okay.

2   A.   Unless I have things to do.

3   Q.   And then he stays with your wife during the

4   week -- ex-wife during the week?

5   A.   Ex-wife, yes.

6   Q.   And you have a good relationship with your

7   ex-wife?

8   A.   Mm-hmm.

9   Q.   Yes?

10  A.   Yes.  Yes.  Cunt.  Yes.

11  Q.   You sell tropical flowers?

12  A.   Yes.

13  Q.   Do you sell any other sort of --

14  A.   And foliage.  Cut foliage.

15  Q.   Where do you sell those goods to?

16  A.   To -- who do I sell 'em to?  You want to know

17  exactly who I sell it to?

18  Q.   Yes.

19  A.   One of my customers is the Halekulani Hotel,

20  the flower shop.  One of 'em is Sweet Leilani Florist.

21  Another is Ko'Olau Farmers in Kaneohe.  And another one

22  is a wholesaler named Watanabe Floral.  Did you get all

23  that?

24  Q.   Yep.  You've given me four customers.  Do you

25  have any other customers?

1        A.    No.

2        Q.    Who do you -- who are you in contact with at

3   Halekulani?

4        A.    The flower shop manager.

5        Q.    Who is that?

6        A.    Nani Kaonohi.  Kaonohi.

7        Q.    Who are you in contact with at Sweet Leilani?

8        A.    Linda Cole.  She's the owner.

9        Q.    Who are you in contact with at Ko'Olau?

10       A.    With Ko'Olau, I'm in contact with George

11   Kimura.  He's my partner with that account.   George

12   Kimura.

13       Q.    What's George's company?

14       A.    Self-employed.

15       Q.    And what was the last one, I scribbled it?

16       A.    Watanabe Floral.

17       Q.    Who are you in contact with at Watanabe?

18       A.    Either Kala, K-a-l-a, or Philip.

19       Q.    Are these the only individuals that you have

20   contact with at each of these companies when you're

21   selling or delivering the flowers to them?

22       A.    No.

23       Q.    Are there a number of other people at each of

24   those companies that you have contact with?

25       A.    Yes.

1    Q.    Have you ever -- has your involuntarily uttered

2  words, as a result of Tourette's, resulted in any sort

3  of negative interaction with any people?

4    A.    Yes.

5    Q.    How about Halekulani, has that occurred at

6  Halekulani?

7    A.    Yes.

8    Q.    When's the last time that occurred there?

9    A.    I'm not quite sure, but it has happened.

10   Q.    What happened at Halekulani?

11   A.    They mimic me and tease me.

12   Q.    How?

13   A.    By -- by repeating how I talk, what I said, and

14  giggling, and cunt.

15   Q.    Okay.  They still -- other than that, do they

16  take any other negative actions against you?

17   A.    Not that I can recall.

18   Q.    And they still buy your flowers?

19   A.    Yes.

20   Q.    How about Sweet Leilani, any -- is there any

21  adverse interactions with people at Sweet Leilani as a

22  result of your involuntary words?

23   A.    Once in a while with the owner because she's a

24  high-strung woman and she gets irritated easily, but she

25  continues to buy my products.

1    Q.    What's she say when you say those words,

2    involuntarily words?

3    A.    She tells me, just keep it down and try and

4    control yourself.

5    Q.    Any adverse interactions with George Kimura --

6    A.    No.

7    Q.    -- or anybody at Ko'Olau?

8    A.    No.

9    Q.    Any adverse reactions with Kala or is it

10   Philip --

11   A.    No.

12   Q.    -- at Watanabe?

13   A.    No.    They understand.

14   Q.    Any adverse interactions with anybody else at

15   Watanabe?    No?

16   A.    Maybe this one gopher, I should call.    Cunt.

17   Kind of like giggles and laughs at me, but I don't

18   interact with him personally.    But there was -- there

19   has been a few adverse reactions at Watanabe with some

20   of the other workers other than Kala and Philip.

21   Q.    What kind of adverse reactions?

22   A.    I just mentioned, they giggle and they kind of

23   laugh at me and make me feel kind of uncomfortable.

24   Q.    You're able to still sell and deliver your

25   flowers, correct?

1    A.    Correct.

2    Q.    Are there any other customers that you had, but

3    lost, in the last couple years?

4    A.    Yeah.    There was one, Beretania Florist.

5    Q.    Okay.    And when did that occur?

6    A.    I'm not sure.    Few years ago.

7    Q.    Why did that occur?

8    A.    See, I didn't -- why did that occur?

9    Q.    Mm-hmm.

10    A.    I'm assuming it was because of my Tourette's.

11    They couldn't handle the language that I was using and I

12    think -- I'm pretty sure that's why it occurred.

13    Q.    Tell me the incident that led up to your

14    termination.

15    A.    At?

16    Q.    At that florist.

17    A.    I just did one delivery and after -- after they

18    made contact with me, they didn't wanna order from me

19    anymore.

20    Q.    So you had one delivery with that florist?

21    A.    Mm-hmm.    They paid me for it and, you know,

22    that was it.    They didn't order -- they didn't order

23    from me since.

24    Q.    You have any other customers that you lost?

25    A.    Give me some time to think about that.    Cunt.

1    Not that I recall.

2        Q.    Do you -- does your business do anything other

3    than sell flowers?

4        A.    Flowers and foliage.  I sell foliage also.  Cut

5    foliage.

6        Q.    To those same customers or others?

7        A.    Oh, there are other customers that buy

8    different things from me like...

9        Q.    What are the other customers?

10       A.    Sharon's Plants.  But the four customers that

11   I've -- I've mentioned to you are my regular customers.

12   These others are like a one-shot deal kind of thing.

13       Q.    Okay.  So they'll call you for special needs?

14       A.    Yeah.  Once in awhile.  Maybe like once every

15   couple months or something.

16       Q.    Okay.  Who are those customers?

17       A.    Sharon's Plants and Koba's Nursery.  Cunt.

18   Cunt.

19       Q.    Anybody else?

20       A.    That's all I can think of.

21       Q.    And they regularly call -- they call you every

22   couple months to have plants and foliage --

23       A.    To order, yeah.

24       Q.    Do you deliver that -- those materials

25   yourself?

```
 1     A.    Yes.

 2     Q.    Do you have any employees?

 3     A.    I have helpers, but not employees.

 4     Q.    How many helpers do you have?

 5     A.    My son helps me once -- maybe on one day out of

 6   the weekend and my girlfriend helps me at my nursery.

 7     Q.    Does anybody else help you at your nursery --

 8     A.    No.

 9     Q.    -- or for deliveries?

10     A.    No.  I do all the delivering.

11     Q.    In Dr. Marvit's report he says you have a

12   sponsor for your N.A.  Who's your sponsor?

13     A.    Kyle Flemeister.

14     Q.    Say it again.

15     A.    Kyle Flemeister.

16     Q.    Okay.  And what's your sponsor do at N.A.?

17     A.    Cunt.  He's a member of N.A.

18     Q.    Uh-huh.

19     A.    He -- what does he do?

20     Q.    Yeah.

21     A.    At N.A.?  He attends meetings like I do.

22     Q.    What's a sponsor's duties or tasks?

23     A.    A sponsor is someone who gives you guidance to

24   working the 12 steps of N.A.

25     Q.    And so do you have a -- do you have a good
```

```
 1    relationship with Kyle?
 2        A.    Very good.
 3        Q.    Okay.  And he's -- directs you through the
 4    steps of Narcotics Anonymous, yes?
 5        A.    Yes.
 6        Q.    He helps you deal with that serious problem?
 7        A.    Serious problem?
 8        Q.    Yeah.
 9        A.    Working the 12 steps isn't a serious problem.
10        Q.    The 12 steps to get out of the serious problem.
11        A.    Well, primarily to deal my addiction.  So I --
12    yeah.
13        Q.    You also go to Gamblers Anonymous?
14        A.    Yes, I do.  That's the other fellowship I
15    failed to mention as a support group.
16        Q.    How often do you go to Gamblers Anonymous?
17        A.    Once a week.
18        Q.    Okay.  And where is Gamblers Anonymous?
19        A.    Where is it?
20        Q.    Yes.
21        A.    We meet at the Harris United Methodist Church.
22        Q.    And who's the leader of Gamblers Anonymous?
23        A.    Well, there's no leaders, like I said, in the
24    12-step program.  They're all trusted servants.  They --
25    they call that doing -- being of service.  And the one
```

1    who chairs the meeting, his name is David C.  I don't

2    know his last name, but it's David C.  I don't -- his

3    number is on the phone -- David C.  Cunt.  Cunt.  David

4    C.

5        Q.    And how many people attend the Gamblers

6    Anonymous meetings that you attend?

7        A.    Every week?

8        Q.    Mm-hmm.

9        A.    Very few.  Maybe six, seven.

10       Q.    And what do you do at these Gamblers Anonymous

11   meetings?

12       A.    We talk about the steps and how to recover from

13   compulsive gambling.

14       Q.    And how long have you been doing that?

15       A.    April 4th of this year I've been clean for --

16   well, actually, this is October.  I've been clean from

17   gambling, any kind of gambling, any kind of betting for

18   over two and a half years now.  That's the result of me

19   going to G.A. and taking it seriously.

20       Q.    And have you been going to G.A. for two and a

21   half years?

22       A.    Every week.  Just about every week.  Cunt.

23   Cunt.

24       Q.    Okay.  And do you discuss, um, discuss matters

25   of common certain with other members of Gamblers

1    Anonymous?

2        A.    Yeah.    We interact.    We relate.    We identify

3    with each other.

4        Q.    Okay.    And you find that helpful in -- in

5    battling the gambling addiction?

6        A.    Yes.

7        Q.    Okay.    The same way interacting with the

8    members of Narcotics Anonymous helps you battle that

9    addiction?

10       A.    Yes.

11       Q.    Dr. Marvit says at the bottom of page four of

12    this report.

13       A.    Cunt.    Yeah.

14       Q.    Can you turn to the bottom of page four of

15    Exhibit 21.

16       A.    I don't recall we have it.

17            MR. SHERMAN:    If we had an Exhibit 21 we could,

18    but since we don't.

19            MR. HARRIS:    Oh, excuse me.

20            (Exhibit 21 marked for identification.)

21    BY MR. HARRIS:

22       Q.    Can you turn to the bottom of page --

23       A.    Page what?

24       Q.    Page four of Exhibit 21.

25       A.    Cunt.    The bottom?

```
 1        A.    You asked me that question already.

 2        Q.    Yeah.  Why don't you want to go to Home Depot?

 3        A.    Cunt.  Cunt.  Cunt.  'Cause I --

 4            MR. SHERMAN:  Well, I'm gonna object to that.

 5    First of all, he can't go to Home Depot.  We've entered

 6    into an agreement that he can't.  You know that.  We did

 7    so at the hearing where we got the extension of time for

 8    the original motion.  So that's a ridiculous question.

 9            MR. HARRIS:  That's an outrageous speaking

10    objection, Counsel.

11            MR. SHERMAN:  Well, no.  No.  We've entered

12    into agreement.  You know that.  You know he can't go

13    there right now.

14            MR. HARRIS:  Speak.  Speak.  Speak.  Okay.

15    Keep speaking and testifying.  Put your objection on the

16    record.

17            MR. SHERMAN:  I have, you know.  You know, he

18    can't go there.  He's not allowed to at this point.

19    We've agreed to it.  You know that.

20    BY MR. HARRIS:

21        Q.    Why don't you wanna go there?

22        A.    'Cause I don't wanna see these people again.

23        Q.    Why not?

24        A.    I just don't feel comfortable going there.

25        Q.    Okay.  Now let's look at 22.  Did you fill out
```

BY MR. HARRIS:

Q.    I'd like to turn back to Exhibit 26, which is Plaintiff's Response to Defendant's Home Depot USA First Request for Answers to Interrogatories to Plaintiff Jon Muse, dated May 24, 2005.  And then I'd like to look again at the last page, the verification.

Do you remember signing that verification on or about July 18th of 2005?

A.    Yes.

Q.    Okay.  And do you understand that that verification means that you're swearing under oath that the answers in the preceding document are true and correct?

A.    Yes.

Q.    Okay.  Turning back to number three on the next preceding page, right above Mr. Levin's signature, or I don't know if that's Mr. Sherman or Mr. Feeney, can't tell.  See number three at the top of the page; see that?

A.    Yes.

Q.    Okay.  See number three says, "Please describe any modification in policies, practices or procedures or other accommodation that you requested from Defendant at times when you were in Defendant's store."  That's a question.  You see the answer?  What's the answer say?

1       MR. SHERMAN:  I'm gonna object.  The answer --

2  the document speaks for itself.  The answer is there.

3  We can all read it.

4  BY MR. HARRIS:

5       Q.  Okay.  It says, "I asked if he could finish my

6  business transaction, which was to exchange a faulty

7  wheelbarrow.  I was asked to leave the store and not

8  return in a threatening and angry manner."

9       Was that answer true and correct at the time

10  you verified the answers to interrogatories?

11       A.  Yes.  Yes.

12       Q.  Okay.  Did you finish your business

13  transaction, which was to exchange a faulty wheelbarrow?

14       A.  Yes.

15       Q.  Did you ask for anything else at that time?

16       A.  At that time --

17       Q.  Yes.

18       A.  -- no. Cunt.

19       Q.  Now, that occurred on November 3rd, 2003.  Your

20  complaint that we just looked at, which is Exhibit 25,

21  was filed on March 5, 2004.  Did you ask for anything

22  from Home Depot in between the time you left the store

23  on November 3rd, 2003, and the time the complaint was

24  filed on March 5th, 2004?

25       MR. SHERMAN:  I'm gonna object.  Could you be a

1  little clearer.  I mean, when you say Home Depot, do you

2  mean the corporate office?  Do you mean individuals at

3  that particular store?

4  BY MR. HARRIS:

5      Q.    Anybody.  Anybody connected with Home Depot.

6  Did you ask Home Depot for anything?

7      A.    I think I went back and I returned that faulty

8  spray container.  I think -- I think that one time I

9  went back and, yeah.

10     Q.    Okay.  Other than the faulty spray container,

11  did you ask Home Depot for anything else in between

12  November 3rd, 2003, and the time the complaint was filed

13  on March 5th, 2004?

14     A.    I don't think so, no.

15     Q.    Have you had a opportunity to review the

16  written statements that were produced by Home Depot from

17  Ms. Peterson and Dar and Mr. Nolan?

18     A.    Yeah.  I reviewed them awhile -- awhile ago.

19     Q.    At the time you reviewed them, did you see

20  anything in those statements that you disagreed with?

21     A.    Yes.  Cunt.  Cunt.  Cunt.  Yeah.

22     Q.    Okay.  Let's go ahead and look at those

23  statements.

24          (Exhibit 27 marked for identification.)

25

1    A.    They never wrote me a letter or nothing.    Never

2    called.

3    Q.    But you recollect on November 3rd that -- that

4    basically they told you not to come back if you couldn't

5    control your disability; is that correct?

6    A.    Yeah.

7    Q.    Okay.    Let me ask you this:    How long have you

8    been clean and sober?

9    A.    January 7 of 2005 will be 16 years.    I haven't

10   touched any alcohol or drugs, except the medication I

11   take.

12   Q.    So your sobriety date is, what, January 5th of

13   what year?

14   A.    January 7 of 1990.

15   Q.    Okay.    And you -- you go to an N.A. meeting

16   whenever you feel the need to; is that correct?

17   A.    I go 'cause I enjoy.    I don't feel like I'm

18   gonna use drugs as soon as I leave this office.    I'm

19   not -- trying not to give any -- anything power over

20   that over me in that sense, but I do go to check in and

21   to remind myself what'll happen if I ever choose to

22   smoke, shoot, drink, swallow, whatever.    You know, I

23   just go to hear other -- help other people recover from

24   this insidious disease.

25   Q.    Well, let me ask you this:    When you go to

1    these meetings do you help other people yourself?

2        A.    I always try to welcome the new people, stick

3    out my hand, and they look at me strange, how come you

4    saying that?  But then when they get to know me, after

5    they keep coming back to the meetings, they end up

6    liking me and a lot of 'em end up asking me to be their

7    sponsor.  Their guide through the 12 steps, because I

8    have a lot of experience and they like the way I talk.

9        Q.    Do you sponsor some people right now?

10       A.    Yeah, about five people.

11       Q.    Okay.  You don't keep a diary of every incident

12   that occurs to you because of your disability, do you?

13       A.    No.  But I do -- I inventory every so many

14   years, every couple years, cunt, I do a written

15   inventory about my life, like an autobiography, and I

16   share it with my sponsor and we try to get some

17   clarification to the -- try to sort through the

18   contradiction and all the bullshit, the sickness, the --

19   the -- the attitude, the outlook on the disease and how

20   it affects our lives.  And I do talk a lot about living

21   with Tourette's and how I feel about wanting to commit

22   suicide and depression.

23       Q.    You said earlier that there are a lot of things

24   that you don't do because of your Tourette's.  Can

25   you -- can you think of a few?

```
 1                    C E R T I F I C A T E

 2   STATE OF HAWAII                    )

 3   CITY AND COUNTY OF HONOLULU    )

 4            I, BARBARA ACOBA, Certified Shorthand

 5   Reporter and Notary Public, State of Hawaii, do

 6   hereby certify:

 7            That on Wednesday, October 12, 2005, at

 8   10:04 a.m., appeared before me JON MUSE, the

 9   witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11            That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17            I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20            Dated this 27th day of October, 2005,

21   in Honolulu, Hawaii.

22            _____

23            BARBARA ACOBA, CSR NO. 412

24            Notary Public, State of Hawaii

25            My Commission Exp: 10-22-2008
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090