IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

---

JON MUSE, Plaintiff, vs. HOME DEPOT USA, INC., Defendant.

CIVIL NO. 04-00154 DAE/BMK (Civil Rights Violation)

---

DEPOSITION OF MICHAEL J. DOLAN

Taken on behalf of the plaintiff at the office of Davis Levin Livingston Grande, 851 Fort Street, Suite 400, Honolulu, Hawai'i, commencing at 9:32 a.m. on July 21st, 2006, pursuant to Notice.

BEFORE: B. KANOELANI COCKETT
Certified Shorthand Reporter
HI CSR NO. 379, CA CSR NO. 7995

EXHIBIT 6

Q. Okay. And what did you see when you got there?

A. As I recall, I saw the gentleman at the returns register where Debra was working, and she looked upset, and I saw Dar as well was there, and I approached to see what was going on.

Q. Okay. How could you tell Debra Peterson looked upset?

A. Just it appeared to me she looked upset. She just looked upset.

Q. What, describe what she looked like?

A. She looked like she was kind of just upset, you know, like something was going on like, you know, red and kind of just like looking like this (indicating) in shock.

Q. Was she crying?

A. I don't recall if she was exactly crying or not.

Q. Was she shaking?

A. She looked pretty upset.

Q. Was she physically shaking?

A. I don't recall. She looked upset to me.

Q. And who spoke to you first when you got there?

A. When I first got there, I believe Debra said something first, and then I immediately -- I kind of could hear -- I could hear what the gentleman was stating.

Q. And what did Debra say?

A. She just -- you know, I just -- she looked upset.

My initial reaction was try to diffuse the situation, and I wanted just to get the gentleman to the side so I can find out exactly what was going on. I had just walked onto the scene.

Q. But do you recollect exactly what Debra Peterson said to you?

A. Not really.

Q. Did Dar talk to you at that same time?

A. She basically at that time, if I recall correctly, she was standing there because she was the first one they called.

Q. And how long in total were you with Mr. Muse before he eventually left the store?

A. I don't recall exactly, but it was not a very long period of time.

Q. Would it have been more than five minutes or less than five minutes?

A. I don't recall exactly.

Q. Okay. Could you use just your best estimate?

A. It was maybe, it was maybe a little more than five minutes.

Q. Okay. And how soon -- when did you first talk to Mr. Muse directly?

A. When I asked him to step aside from the register.

Q. Okay. And what did you say to him specifically?

A. As I recall, I told him that he cannot use that type

of language in my store.

Q. Okay. Had you actually experienced him using that language?

A. Yes.

Q. What did you hear him exactly say?

A. He was just using some terrible language.

Q. Well, what words exactly?

MR. HARRIS: Objection, harassment.

BY MR. SHERMAN:

Q. You can answer.

A. I believe I wrote those words down. I don't like using those words.

Q. I understand, but we're in the context of litigation and these words are the core of the case. It's not done to embarrass you, but be specific and clear and what words were used.

MR. HARRIS: Is there a -- objection, argument. There's no question.

MR. SHERMAN: I'm just asking him to answer the question.

Q. Which words specifically were used?

MR. HARRIS: Objection, harassment.

THE WITNESS: He was using the F and C word.

MR. SHERMAN: Can we get this marked, please?

(Plaintiff's Exhibit D

                                                                was marked for identification.)

BY MR. SHERMAN:

Q. Okay. Now, which F word? Was it a verb? Was it an adverb? Was it an adjective?

A. It was a profanity.

Q. I understand, but what type of word?

A. I'm not sure what to call that word.

Q. Do you know what an adverb is?

A. It's been a long time since I worked with adverbs.

Q. Okay. Do you know what an adjective is?

A. Been a long time since I did that as well.

Q. Do you know what a noun is?

A. Pretty much know what a noun is.

Q. Okay. Did he use it as a noun?

A. I don't recall how he used it. All I know, I kept hearing it over and over again.

Q. And what word was that?

A. The F and C word.

Q. And that would be the word "fucking"?

A. That was one of them.

Q. And what other word did he use?

A. The C word.

Q. The word "cunt"?

A. That would be the word.

Q. Okay. Were there any other words he used?

A. That was it right there.

Q. Did you take that personally when he said that?

A. Not -- I don't -- you know, I obviously -- that's not something that I like to hear, but I was more concerned with, you know, the people around me than I was -- that's why I tried to get him to come aside.

Q. But did you take it personally?

A. Well, I wasn't happy about it, but I didn't -- I wasn't really like -- you know, I didn't -- I didn't spend a lot of time thinking about it later on.

Q. So it didn't bother you at all to hear --

A. No.

MR. HARRIS: Objection, foundation, argumentative.

THE WITNESS: I think I just said it bothered me. I don't like the word.

BY MR. SHERMAN:

Q. Can you answer "yes" or "no": Did you take it personally?

MR. HARRIS: Objection, vague, argumentative.

THE WITNESS: At the time I don't know how I took it. I just know I didn't like what I was hearing.

BY MR. SHERMAN:

Q. And when did Mr. Muse tell you he had Tourette's Syndrome?

A. He told me that he had -- I believe the first time I

Q. So he wasn't whispering; is that correct?

A. I don't recall. It was loud enough where others could hear it.

Q. Okay. And what type of radius?

A. Within the returns area.

Q. Did Mr. Muse physically threaten anyone at this time?

A. He did not physically threaten me.

Q. Okay. Did he take a swing at anyone?

A. He did not take a swing at me.

Q. Did he physically throw his body towards anyone at this time?

A. He was -- he was very, very, very close to Debra when I first approached them.

Q. Okay. Did he strike her?

A. He did not strike her that I know of.

Q. Did he attempt to strike her?

A. I don't know if he attempted or not. I didn't --

Q. But you, from what you witnessed, did he attempt to strike her?

A. I don't recall whether he attempted it or not. I did not see him strike her.

Q. Well, if he tried to assault her, wouldn't you have called the police?

MR. HARRIS: Objection, foundation, argumentative,

speculation.

THE WITNESS: I don't know if I would have or not. It depends on the situation.

BY MR. SHERMAN:

Q. You mean to tell us today that if there is a physical assault or an attempted assault at your store, you wouldn't want to automatically call 911 or call the police?

MR. HARRIS: Objection, foundation, speculation, argumentative.

THE WITNESS: If I felt I couldn't control it, yes, I would.

BY MR. SHERMAN:

Q. Okay. And if someone physically assaulted or attempted to assault someone, you wouldn't try to have them banned from the store?

MR. HARRIS: Objection, foundation, speculation, argumentative, harassment.

THE WITNESS: I haven't seen anybody physically assault, personally, an associate, like swing at 'em or punch 'em.

BY MR. SHERMAN:

Q. Okay. During the time you were with Mr. Muse?

A. Um-hum.

Q. And how many times did he use the word "cunt," did he actually say it?

A. Quite a few.

Q. Can you give me a number estimate?

A. I wasn't counting.

Q. Was it over five?

A. Maybe. I don't know exactly the number, but it was repeatedly.

Q. Okay. Do you think he was directing it specifically at you at that time?

MR. HARRIS: Objection, foundation, speculation, argumentative.

THE WITNESS: At that time I wasn't sure where it was coming from or going to.

BY MR. SHERMAN:

Q. Okay. Was it used in each sentence he spoke?

A. It was used a lot.

Q. Was it -- did he try -- did he speak in sentences?

A. I don't recall the exact conversation because what I kept hearing over and over again was, you know, what he was saying (indicating).

Q. Have you ever been involved in having someone banned from Home Depot?

A. No.

Q. Do you know of any particular customers or third parties that have been banned from Home Depot?

A. Loss prevention does have the ability to ban people

from Home Depot.

Q. But you didn't ban Mr. Muse --

A. No.

Q. -- from Home Depot?

A. No. I just asked him to leave.

Q. Do you know that Home Depot has told him he can't come back to the store?

MR. HARRIS: Objection, misstates the evidence, assumes facts not in evidence, foundation.

THE WITNESS: I don't know.

BY MR. SHERMAN:

Q. Well, what do you think if that's true about Home Depot not letting him come back to the store?

MR. HARRIS: Objection, foundation, speculation, lay opinion.

THE WITNESS: I don't make those decisions.

BY MR. SHERMAN:

Q. But what do you personally think?

MR. HARRIS: Same objection.

THE WITNESS: I don't make those decision.

BY MR. SHERMAN:

Q. Do you have a personal opinion?

MR. HARRIS: Same objection.

THE WITNESS: It's not my decision to make.

BY MR. SHERMAN:

CERTIFICATE

STATE OF HAWAII )
)ss.
CITY AND COUNTY OF HONOLULU )

I, B. KANOELANI COCKETT, CSR, Notary Public, State of Hawai'i, do hereby certify;

That on July 21st, 2006, at 9:32 a.m. appeared before me MICHAEL J. DOLAN, the witness whose deposition is contained herein; that prior to being examined he was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 27th day of July 2006 in Honolulu, Hawai'i.

B. Kanoelani Cockett

B. KANOELANI COCKETT,
HI CSR NO. 379, CA CSR No. 7995
Notary Public, State of Hawai'i
My commission expires: February 19th, 2009

B. KANOELANI COCKETT NOTARY PUBLIC STATE OF HAWAII