```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE

 2                        DISTRICT OF HAWAII

 3    JON MUSE,                    )    CIVIL NO. 04-00154DAE
                                   )
 4              Plaintiff,         )    Honolulu, Hawaii
                                   )    September 10, 2004
 5         vs.                     )    9:34 a.m.
                                   )
 6    HOME DEPOT USA, INC.,        )    DEFENDANT HOME DEPOT USA,
                                   )    INC.'S MOTION TO DISMISS
 7              Defendant.         )    COMPLAINT
      _____)
 8    JON MUSE,                    )
                                   )
 9              Plaintiff,         )
                                   )
10         vs.                     )    CIVIL NO. 04-00156SOM
                                   )
11    BANK OF HAWAII,              )    DEFENDANT BANK OF HAWAII'S
                                   )    MOTION TO ASSIGN SIMILAR
12              Defendant.         )    CASES TO A SINGLE DISTRICT
      _____)    JUDGE
13
                      TRANSCRIPT OF PROCEEDINGS
14          BEFORE THE HONORABLE DAVID ALAN EZRA,
               CHIEF UNITED STATES DISTRICT JUDGE
15
      APPEARANCES:
16
      For the Plaintiff:          BRUCE F. SHERMAN, Esq.
17                                Attorney at Law
                                  1164 Bishop Street, Suite 124
18                                Honolulu, Hawaii 96813

19                                STANLEY E. LEVIN, Esq.
                                  Davis Levin Livingston Grande
20                                400 Davis Levin Livingston
                                   Grande Place
21                                851 Fort Street
                                  Honolulu, Hawaii 96813
22

23    For Defendant Home Depot:   JEFFREY S. HARRIS, Esq.
                                  Torkildson, Katz, Fonseca, Moore
24                                 & Hetherington
                                  700 Bishop Street, 15th Floor
25                                Honolulu, Hawaii 96813
```

EXHIBIT 8

1     APPEARANCES (Continued):

2     For Defendant Bank                ROBERT A. MARKS, Esq.
         of Hawaii:                     NORMA D. TITCOMB, Esq.
3                                       Price Okamoto Himeno & Lum
                                        Ocean View Center
4                                       707 Richards Street, Suite 728
                                        Honolulu, Hawaii 96813
5

6

7

8

9

10

11

12

13

14

15

16    Official Court Reporter:         Cynthia Tando Fazio, RMR, CRR
                                       United States District Court
17                                     P.O. Box 50131
                                       Honolulu, Hawaii  96850
18

19

20

21

22

23

24

25    Proceedings recorded by machine shorthand, transcript produced
      with computer-aided transcription (CAT).

3

1   FRIDAY, SEPTEMBER 10, 2004                    9:34 A.M.

2          THE CLERK:  Civil Number 04-00154DAE, John Muse

3   versus Home Depot USA, Inc.  This case is called for hearing

4   on Defendant Home Depot USA, Inc.'s Motion to Dismiss

5   Complaint.

6          And Civil Number 04-00156SOM, John Muse versus Bank

7   of Hawaii.  This case is called for hearing on Defendant Bank

8   of Hawaii's Motion to Assign Similar Cases to a Single

9   District Judge.

10         MR. HARRIS:  May it please the court, Jeff Harris for

11  Defendant Home Depot.

12         MR. MARKS:  Good morning, Your Honor.  Robert Marks

13  and Norma Titcomb for Defendant Bank of Hawaii in 04-156.

14         MR. SHERMAN:  Good morning, Your Honor.  Bruce

15  Sherman and Stan Levin on behalf of Defendant John Muse.

16         THE COURT:  Okay.  I'm not quite clear, do you oppose

17  this or not?  I got this kind of a wishy-washy kind of

18  response that didn't -- we don't oppose it, but then we

19  reserve our right to oppose it at a later time?

20         MR. SHERMAN:  Well, not oppose the particular motion

21  to assign it to a single judge, but if they were to seek to

22  consolidate the cases, we would oppose that.

23         THE COURT:  Well, what's the benefit of assigning

24  them to the same judge if they're not consolidated?  It

25  doesn't make any sense to me.

4

1          MR. SHERMAN:  Well, as I read the motion, it was
2     simply to assign a similar case to a single judge, it didn't
3     ask to consolidate that.  If it had, perhaps it's just a
4     question of how it was worded.
5          THE COURT:  Maybe I need to ask the plaintiff.  I
6     mean what -- I mean the defendant.  What is the benefit here
7     of assigning both cases to me if they're not consolidated,
8     they're consolidated for discovery?  Is it just that I'm
9     supposed to be familiar with it?
10          MR. MARKS:  I think the benefit, Your Honor, is the
11     substantial common legal issues that are pled.  I agree that
12     there are different facts.  And I'm not sure there's a
13     concession, but I think the facts will reveal that in the Bank
14     of Hawaii case, services requested were provided to Mr. Muse
15     and that's not the case, as I understand it, in the Home Depot
16     case.  So there is a factual dissimilarity, but there's a
17     basic common element of law that underlies both cases that is
18     pretty clearly set forth in the two complaints.  And it just
19     seems to me that for the purpose of having the case ready --
20          THE COURT:  When you have similar issues of law and
21     for judicial economy purposes it doesn't make a lot of sense
22     for the court not to consolidate because -- at least for
23     purposes of discovery and for purposes of ruling on pretrial
24     motions because otherwise the court is basically doing two
25     separate and distinct cases parallel to one another.

1          MR. MARKS:  I can see the --

2          THE COURT:  The facts are so dramatically different,

3     then there's no sense in consolidating.  There's no sense in

4     assigning to the same judge either.

5          MR. MARKS:  Your Honor, I would just suggest that

6     there may be a good basis to consolidate discovery.  You know,

7     we didn't think we needed to get quite that far today, but I

8     think that that's fairly our view of where it should go.  I

9     don't think the cases would be properly consolidated for trial

10    however.  And it does seem to me that, for example, on the

11    motion that Home Depot has before the court today, that if the

12    motion is granted, that, you know, it would apply with equal

13    force to the underlying legal arguments that have been made in

14    the case against Bank of Hawaii.

15         So, there are definitely common legal issues here and

16    so I can see some measure of consolidation for discovery

17    purposes.  And if the court were inclined to go that

18    direction, we would have certainly no objection.

19         THE COURT:  Well, it seems to me like we can have

20    consolidation for pretrial motions practice as well because if

21    you're going -- somebody is going to file a Motion for Summary

22    Judgment saying that, for instance, this particular -- there

23    is -- whatever even Home Depot did was sufficient under the

24    Americans with Disabilities Act because there is no reasonable

25    accommodation that could be made in short of what they did,

6

1    then it would certainly cover the Bank of Hawaii, which did

2    more.  Why would I need to hear two separate Motions for

3    Summary Judgment on the same legal issue?  Doesn't make any

4    sense to me.

5         MR. MARKS:  I think, Your Honor, if that Motion for

6    Summary Judgment were availing, there would be no reason for

7    the bank to file its other Motion-for Summary Judgment, which

8    would relate to the fact that accommodations were given and

9    services were provided.  I mean from our point of view there

10   can be no violation of the ADA or the other statutes cited

11   because services -- requested services were provided and the

12   bank merely requested that if Mr. Muse was to come back

13   seeking services in the future, that he bring medical evidence

14   to show his disability.  I mean, those are the basic facts of

15   the Bank of Hawaii case.  So, I think we do have an additional

16   Motion for Summary Judgment beyond the common motions that

17   might be brought pretrial.

18        MR. HARRIS:  May I be heard briefly on that?

19        THE COURT:  Yes.

20        MR. HARRIS:  The legal grounds that are presented in

21   our motion would -- would answer the questions you're asking

22   in one way.  If -- if there is some -- if there are some other

23   legal issues presented or some other factual issues that may

24   be relevant, then there may indeed be some differences between

25   the two cases.  But I'd respectfully suggest that before we

1    get to the consolidation issue, as opposed to the relationship

2    issue, we get some guidance from the court on -- on the

3    intersection between the two laws and the law that may apply.

4         THE COURT:  Well, at the very least I'm going to

5    consolidate these for discovery purposes.  It would be a

6    total, absolute waste of money not to do that.  That would be

7    an absolute waste of money.

8         MR. HARRIS:  I'm not sure what interest Home Depot

9    has in the way that the Bank of Hawaii treats its customers

10   outside of Mr. Muse or the other policies and practices that

11   the bank engages in.

12        THE COURT:  Well, then you just choose not to

13   participate in that part of the deposition.

14        MR. HARRIS:  I understand and appreciate it.  I just

15   wanted to identify the difference that I can see right now.

16        THE COURT:  I mean those are issues that would

17   pertain only to you, but certainly Mr. Muse's condition --

18   you're going to take Mr. Muse's deposition and then subject

19   him to a deposition and get all of his medical records and all

20   of this.  Wouldn't your interest and Mr. Marks' interest in

21   getting Mr. Muse's condition and his medical records be

22   exactly the same?

23        MR. HARRIS:  I agree.  And as a matter of fact, we've

24   had that request outstanding for five months now, four months

25   now and we haven't gotten any of that stuff.

1          THE COURT:  Well, for purposes of discovery and those

2     issues, I think it would be unduly burdensome to subject

3     Mr. Muse to dual depositions.  You can notice his deposition,

4     you can get his medical records.  His medical records are his

5     medical records.  You can depose him.  And then with respect

6     to the issues that have swayed for the Bank of Hawaii,

7     Mr. Marks would ask those questions.  With respect to Home

8     Depot, you would ask those questions.  But at least he would

9     only have to take one deposition, he would only have to

10    produce his documents once.  We don't have a situation where

11    he's doing two depos and two document productions and

12    everything else.  Just doesn't make any sense to me.

13         But I -- I won't go so far as to consolidate them for

14    purposes of trial because I can see how that might be

15    prejudicial to one or the other of you.

16         MR. SHERMAN:  Your Honor, we would agree to

17    consolidation at least as to discovery is appropriate in this

18    matter.

19         THE COURT:  All right.  I'm going to grant the Motion

20    to Assign Similar Case and I'm also going to consolidate these

21    cases for purposes of discovery only, but that they shall have

22    separate and distinct trial dates and be tried separately.

23    Unless there's a motion made later to consolidate them for

24    trial for good reason, I'm not going to preclude that, but at

25    this point I'm not consolidating them for trial.  All right?

1    Anything else?

2              MR. HARRIS:  Understood.

3              THE COURT:  Okay.  All right.  The court stands in

4    recess.

5              MR. HARRIS:  Is the court going to hear argument on

6    the Motion to Dismiss?

7              THE COURT:  Do we need to have argument on it?

8              MR. HARRIS:  Well, I've -- I've sensed your

9    inclinations, but I'd like to make a few points.

10             THE COURT:  All right.

11             MR. HARRIS:  This is a page out of the CFR that's

12   been in the books for decades now.  It's been modified

13   recently, but let me just paraphrase.  It says:  Words,

14   language of a sexual nature, which courts have consistently

15   held Mr. Muse's language was, that has an effect, doesn't have

16   to have a purpose, has an effect of creating a hostile

17   environment, and courts have held one or more words can have

18   that hostile environment, must immediately be corrected and

19   prevented.  And that's exactly what Home Depot did.

20             To even suggest to employers that constantly see

21   sexual harassment claims that whenever they encounter any

22   sexual words they must first, before they take any corrective

23   action, inquire as to whether or not that behavior suggests

24   that the individual harasser has an impairment that needs

25   accommodation, the accommodation suggested in this case being

1    training, to tell the harassed employees to accept it, the

2    mere suggestion that that law exists damages sexual harassment

3    law.  And so the reason -- we submit.  So the reason we filed

4    the motion now is we don't see any way to accommodate those

5    two laws other than to ignore the conflict or to tell

6    employers that from now on whenever there's any --

7            THE COURT:  Well, could Home Depot -- my

8    understanding is that Home Depot had the opportunity twice.

9    Didn't he try to get in twice?  Weren't there two incidences?

10            MR. HARRIS:  There was a second incident, yes.  The

11    second incident involved the behavior in front of an

12    eight-year-old customer.

13            THE COURT:  Okay.  Could not Home Depot have asked

14    him to step outside the store, asked him what items he wished

15    to purchase from them and then gone ahead and obtained those

16    items and allowed him to complete his transaction in that way,

17    wouldn't that have been a reasonable accommodation?

18            MR. HARRIS:  Which employee, Judge?  Which employee

19    is exempt from sexual harassment claims?  How can -- is Home

20    Depot to go to an employee and say:  Prospectively waive your

21    sexual harassment claims and then go talk to this guy, because

22    you can't -- there's no such thing as a prospective waiver.

23    And everybody's covered by the law.

24            So the suggestion -- and by the way, we did suggest

25    that he go to the website.  Okay.  But that -- that's not in

1    the record and I don't ask that the court consider that for --
2    for the purposes of the Motion to Dismiss.
3          The point -- the point, and we argued this in our
4    opening memo, is the suggestion that the court just made is
5    assuming that Home Depot is immune from sexual harassment
6    claims from some employees or that it should make a
7    determination that some people won't file those.  Well, as the
8    court is well aware, I see a lot of sex harassment claims, our
9    state sees a lot of sexual harassment claims and they're filed
10   by old people, young people, men and women.  And so -- and so
11   the implicit judgment the court makes to let this case go on
12   is oh, that's not that bad or -- or there's some people that
13   don't care about sex harassment.  But the point is there's a
14   federal regulation that says if words of a sexual nature, and
15   they certainly are, are known by Home Depot, Home Depot needs
16   to take immediate corrective action.  And Home Depot isn't
17   that -- that orange sign, it's people.
18         So any person that the court is suggesting that --
19   that Home Depot assign that task:  Okay, you're the guy.  It's
20   not going to bother you, so you go take care of those words.
21         THE COURT:  Well, it seems to me that -- that it
22   might be argued -- I'm not necessarily -- I'm playing the
23   devil's advocate here -- it might be argued that a management
24   level employee could receive appropriate training and -- on a
25   voluntary basis and understand that what is being said is not

1    a personal slur against them, just as individuals teach people

2    with Tourette's that have this particular issue, and teachers

3    understand, the ones that are teaching them and they do so on

4    a voluntary basis, that when a student with Tourette's might

5    blurt out a sexual anatomical term, that they are not in fact

6    using that term in the same sense that someone who might

7    voluntarily say that term.   But it doesn't appear that Home

8    Depot made any effort to do any of that.

9              MR. HARRIS:  That -- that --

10             THE COURT:  It's just -- you know, this kind of

11   argument, though, is the same argument that businesses make

12   when they attempted to avoid having to deal with people with

13   severe cerebral palsy who would come in the store and be

14   drooling, making involuntary motions with hands and arms, and

15   they say:  We can't have them in our stores because they're

16   very disturbing to our customers, they'll drive our customers

17   out of the store.

18             MR. HARRIS:  I understand the court's firm

19   inclination, but there's a real difference there.   There's not

20   a federal regulation --

21             THE COURT:  Look, I'm not unsympathetic to the

22   argument that you're making.   I mean if we were dealing here

23   with a situation where, for instance, Mr. Muse was attempting

24   to go to a movie theater and sit down, and he sat down in that

25   movie theater and the lights went down and it was a children's

1    program or some other program where people had their kids, or

2    even just a regular audience, Mr. Muse started to blurt out

3    these highly offensive sexual terms, these derogatory terms

4    and people were attempting to watch the movie, and Mr. Sherman

5    came in here with his -- with his client and suggested that he

6    should be able -- his client should be able to sit there and

7    do that during the movie and they should accommodate him,

8    Mr. Sherman would lose because that would be no -- under those

9    circumstances, short of building a soundproof booth for just

10   people with Tourette's, which I think would be going beyond

11   the idea of reasonable accommodation because there aren't that

12   many people with Tourette's, I think that that would not fly.

13            But we're talking about something quite different.

14   We're talking about having somebody on staff who can take a

15   customer like this one, who is justifiably, I think --

16   assuming he really has Tourette's, I mean I don't know.  We

17   haven't gone through the discovery bit.  But assuming he has

18   Tourette's and is incapable of preventing himself from yelling

19   out these quite offensive terms, which I would agree with you

20   offend men as well as women, I find the terms to be, those

21   terms that he allegedly used to be absolutely offensive and I

22   would not tolerate them to be used in my presence.  Even when

23   I was in the military service, people used those terms in my

24   presence and I'll let them know that they were not acceptable.

25            MR. HARRIS:  We're --

1          THE COURT:  -- harassment myself out of that by the

2  way.

3          MR. HARRIS:  The court is still left and -- and I'd

4  like -- if the court is going to make this ruling, then as

5  part of the ruling the court has to assume, and I'd like this

6  ruling, that Home Depot can obtain prospective waivers of

7  claims from employees.  Federal law says it can't.

8          THE COURT:  No, you have to understand something.  I

9  said volunteers.

10         MR. HARRIS:  There's -- there's no way --

11         THE COURT:  Nobody, nobody can -- I would doubt

12  seriously whether anyone, any management level employee at

13  Home Depot who went through an educational process, understood

14  what Tourette's was, volunteered to be the person to deal with

15  somebody with Tourette's and to go in and handle their

16  purchases would then be successful in a sexual harassment

17  claim by -- against Home Depot.  That case I -- I wouldn't

18  think they could find -- maybe they could find a lawyer to

19  take it, but I can tell you it wouldn't survive long.

20         MR. HARRIS:  They could find a lawyer to take it,

21  they can find an agency to investigate it, they can -- they

22  could find a United States federal law that would cost them

23  15, 20, $30,000 to undergo an investigation before it even got

24  to court under these regs.

25         THE COURT:  Well, I don't think they would find -- be

1    successful -- you can find somebody to take anything, I guess,

2    but the bottom line is that if somebody volunteered with a

3    complete and full understanding of what Tourette's was and

4    that they would be subjected to hearing these kinds of

5    epithets and derogatory terms and yet they did it because,

6    first of all, maybe they feel it's something -- they're

7    performing a service for somebody who has a disability that

8    they cannot control, and, you know, I -- I mean I don't know

9    how operating room nurses do it, quite frankly.

10            MR. HARRIS:  Then let me --

11            THE COURT:  I don't know how somebody goes in who

12   deals with people who are severely debilitated and changes

13   their diapers and gives them bed baths every day.  I mean

14   that -- that is a heroic thing in my view.  I couldn't

15   personally do it.  I don't know how they do it.  But there are

16   volunteers that do that job.

17            MR. HARRIS:  Okay.  I understand and appreciate the

18   court's --

19            THE COURT:  You stand in front of me and say:  We can

20   never find anybody in the tens and thousands of people who

21   work for Home Depot.  Fine.  But you didn't try.

22            MR. HARRIS:  Okay.

23            THE COURT:  That's the point.

24            MR. HARRIS:  Okay.  I've got that point.  Let me back

25   up a minute.  Okay.

1     The issue here isn't about us asking him to go

2  somewhere else and be out of the store.  The pleading

3  presented here is:  No, you have to provide him service in the

4  store.  The requested reasonable accommodation, which is all

5  that is presented by this court, is:  No, I want to go through

6  the check-out line.  And the training -- the only

7  accommodation, as the Ninth Circuit teaches, the court has

8  before it a pled requested reasonable accommodation, and

9  that's train that teller, train that teller to -- and the

10  customers to put up with it in the check-out line.  There's no

11  requested reasonable accommodation, which is part of the

12  pleading required by the Ninth Circuit.

13     Now -- now, if -- if the court wants to give leave to

14  re-plead or clarify that it is agreeing now that the check-out

15  line and training customers and the check-out staff would be

16  an unreasonable accommodation, that's all we're asking for now

17  because that's all that's presented to the court.  There was

18  never a request to take somebody and walk outside, and that's

19  not presented by the pleadings.  It's -- the requested

20  reasonable accommodation is:  I get to talk like this in the

21  check-out line.  That's all that's before the court.  Thank

22  you.

23     THE COURT:  Okay.  Mr. Sherman?  I mean maybe -- did

24  I misread your complaint?  Is that what you're suggesting?

25  Are you suggesting --

1  MR. SHERMAN:  No, Your Honor, I think Mr. Harris has

2  misportrayed it.  We're simply asking they be enjoined from

3  denying him service.

4  Now, there may be a number of alternatives that are

5  possible, but at this point in time Home Depot has stated that

6  they can't do anything.  Of course, as the court rightly

7  recognizes, they haven't tried to do anything.

8  THE COURT:  Well, I will tell you, Mr. Sherman, that

9  if -- if the gravamen of your complaint is that your client be

10  permitted to walk through the store unabated and use the kinds

11  of epithets that he used, even though they might be

12  involuntary, you will not prevail in this court.

13  MR. SHERMAN:  Well, I understand the court's concern.

14  If I might point --

15  THE COURT:  Not because I'm not -- not because I'm

16  not, you know, unsympathetic to your client's plight if he

17  really has Tourette's, because, quite frankly, I have the

18  greatest sympathy for that.  I think it is a tragic illness

19  and it is something that is beyond the control to a large

20  degree, as I understand Tourette's, of those who have it.

21  Now, there are some behavioral things that can be done to help

22  with the tics and there are some medications that can be

23  taken, but I appreciate the fact that there may well be

24  individuals for which this doesn't work and they have an

25  extremely difficult and extremely burdensome life to live.

1          That having been said, that having been said, we also

2     live in society.  And we have to recognize that these laws

3     were passed to accommodate reasonably, reasonably, that's why

4     Congress put that term in there, individuals with

5     disabilities.  And a reasonable accommodation is one that will

6     suffice to cover the interests of the individual, but at the

7     same time not unduly, unfairly and -- burden society.  And

8     quite frankly, while it might be true that Home Depot could

9     educate its employees, it does not have the facility to

10    educate its customers.

11         And for someone to walk into a Home Depot store or

12    movie theater or some other -- a supermarket and stand there

13    in front of a child or stand there in front of a woman

14    customer and make references to parts of her body or the

15    child's body in highly vulgar language and then repeatedly do

16    it would not only be offensive, it would be terrifying because

17    it is not something that people would ordinarily expect.  And

18    their first thought is not:  This is a person with Tourette's

19    Syndrome, an illness to which most people are not carefully

20    aware, they would think that this individual is either

21    intentionally doing something to them which might lead to a

22    physical, sexual encounter, or they are high on drugs or they

23    are drunk or they're mentally disturbed and could be violent.

24         It is not just a circumstance where you're dealing

25    with unpleasantness.  You're dealing with potential fear here

1    because these -- this is just not something that society

2    tolerates.  It's just not something that society tolerates on

3    a regular basis.  You don't allow a man to walk up in front of

4    a woman in a public place that they do not know and to make

5    highly offensive sexual comments to them.  It's just not

6    something that we as a society are used to.  And -- and it

7    would be highly frightening.

8          So, I mean, maybe the United States Court of Appeals

9    for the Ninth Circuit might take a different view of this, I

10   can't imagine that they would, but maybe they would, but I

11   certainly don't think the United States Supreme Court would.

12   I think that -- that the bottom line is that reasonable means

13   reasonable.  And under these circumstances it is not

14   reasonable to allow your client to walk through a store and

15   repeatedly -- and my understanding is that his condition is

16   it's not just once in a while, I mean it happens when he gets

17   these tics, as they call them, he gets them.  He uses the C

18   word for a part of the woman's anatomy, he uses other words

19   that are equally vulgar.

20         Now, I don't say that he says them with a vulgar

21   intent, but the words themselves are vulgar.  It's just like

22   the N word.  You know there are people with Tourette's who use

23   the N word repeatedly.  We just don't tolerate that in our

24   society from people who have control over themselves.  I think

25   you would agree with me.

1          MR. SHERMAN:  Well, I certainly would, except that I

2    would point out that Mr. Muse doesn't have control over that.

3          THE COURT:  I understand that, but the average person

4    in that store doesn't know Mr. Muse and they don't know that

5    he has Tourette's and they don't appreciate the fact that he

6    doesn't know what he's doing or understand what he's saying.

7          MR. SHERMAN:  No, I understand that.  I would point

8    out -- and unfortunately a number of recent movies have

9    portrayed people with coprolalia as shouting, making grossly

10   lurid gestures.  And I can -- I will state for the record that

11   Mr. Muse is not in that category.  There is nothing that

12   emphasizes the words.  In fact, the first time you speak with

13   Mr. Muse you sort of blink because you're not sure you heard

14   it.  He does not scream it or shout it.  The frequency

15   increases --

16         THE COURT:  -- enough so that it came to their

17   attention.

18         MR. SHERMAN:  Well, it did, except that I would point

19   out in this instance, as the complaint pled, and this is not

20   to say that the court hasn't suggested a reasonable

21   alternative already or hinted at it, but Home Depot brought

22   Mr. Muse's condition to the attention of all the customers

23   around them.  They certainly could have taken him to the side

24   then and dealt with the issue.  They subjected by choosing to

25   reject his explanation and continue right there in the

1    check-out line, bringing a manager first and then another one.

2    And I'm not -- again, I don't disagree with the court's

3    portrayal of the effect of these words.

4         THE COURT:  Well, I think there is -- it's my

5    understanding of the facts is that there is some dispute.

6         You know, as I said, if you're -- if the gravamen of

7    your complaint, and I will look at it again, is that Mr. Muse

8    ought to be allowed to -- to walk through Home Depot or any

9    other commercial establishment and utter these words in a

10   manner which they could be heard and understood by customers

11   as well as employees and that they're entitled to -- he's

12   entitled to do that simply because he has Tourette's, the

13   answer in my view is no, because I don't think that there is a

14   reasonable accommodation they can make that would insulate

15   every or even a substantial number of patrons from what is

16   highly frightening and offensive language.

17        On the other hand, if I read your complaint as I

18   thought I did, that Home Depot could have made a reasonable

19   accommodation by assisting him in some other way, such as the

20   manner I suggested, then that might be something which you're

21   entitled to go forward on.

22        But if you want to test the law on this and if your

23   complaint is that he should just -- he's got Tourette's and if

24   he wants to walk through the aisles and use the C word, walk

25   up to a woman and use derogatory words about her breasts and

1   other things of that kind, or say these very violent, vulgar

2   things in front of children because he has Tourette's and the

3   ADA covers him and he can just do that, and that's your

4   complaint, then you will lose, you will have an immediate

5   appeal.

6           MR. SHERMAN:   Judge --

7           THE COURT:   Let the Ninth Circuit make the decision.

8   And if their decision is that's okay, hey, I'll abide by that.

9           MR. SHERMAN:   Chief Judge Ezra, our complaint as pled

10  is that we are simply asking for injunctive relief that he be

11  provided services in some form.   If that's in the form of

12  reasonable accommodation, so be it.

13          As I stated before and as the defendant Home Depot

14  concedes, they're not willing to do anything at this point.

15  And that's -- you know, that's uncontroverted.

16          THE COURT:   Okay.  All right.   Mr. Marks, you don't

17  have anything pending before the court.

18          MR. MARKS:   Your Honor, we're not part of this

19  motion.  We believe the relief sought is appropriate and would

20  informally join in it, I suppose, at this point, but I don't

21  have any additional argument to offer.

22          THE COURT:   All right.   You want brief rebuttal?

23          MR. HARRIS:   Just one.

24          THE COURT:   Okay.  You can be seated, Mr. Sherman.

25          MR. SHERMAN:   Thank you, Your Honor.

1            MR. HARRIS:  Just on a pleading note, I'd
2    respectfully request that the court review the pleadings.
3            THE COURT:  Well, I will review the pleadings.
4            MR. HARRIS:  The pleadings are demand for equal
5    service.  And a major aspect of the ADA is that there's a
6    difference between equal service and different service.  And
7    if -- if the suggestion --
8            THE COURT:  But if the service that they're asking
9    for when they say equal service is just the ability to
10   purchase certain items from Home Depot, then that's what
11   they're asking for.
12           MR. HARRIS:  This isn't as of record, but I called up
13   lunch for who was the prior counsel a couple days after this
14   complaint was served and said:  Let's work something out where
15   he can use the website and the stuff will be delivered.  So
16   I'm fine if they want to proceed on that basis.  They don't
17   want that.  Okay, that's what I thought.  But if that's what
18   they want, we can work something out.
19           THE COURT:  Well, maybe he wants to see the item.  If
20   he wants to come to the store and stand outside and he says:
21   I want to buy a shovel and the guy says:  Well, we have three
22   types of shovels.  Well, can you bring the shovels to me and
23   so I can see them?
24           MR. HARRIS:  Some people --
25           THE COURT:  There's a big difference between that and

1    looking at something in a catalogue.  How many times have you

2    sent back something you purchased in a catalogue because it

3    didn't look when you got it as it did in the paper?

4            MR. HARRIS:  I -- I agree with the court there, but

5    now we're getting into minor gradations of reasonableness.

6            THE COURT:  Well, we aren't if we rely on notice

7    pleading and he tells me what he's pleading.

8            MR. HARRIS:  Yeah.  Yeah.  If -- if he wants to plead

9    we didn't provide a good substitute, a good different service,

10   then -- then there's a section of the statute that gives him

11   the right to that, but he didn't plead for that.

12           THE COURT:  Anyone with a disability is entitled to

13   what is referred to as a reasonable accommodation.  They're

14   not necessarily entitled to identical services because

15   identical services may not be possible.

16           So, for instance, if someone with cerebral palsy goes

17   into a bar and they have only high bar stools that would not

18   accommodate somebody who is confined to a wheelchair, there's

19   no way that the bar is going to be required to construct a bar

20   stool that would somehow accommodate that individual.  What

21   they are required to do, though, is to provide an

22   accommodation at a bar that would allow that individual to be

23   served drinks at a level in which they can sit in their

24   wheelchair.

25           MR. HARRIS:  There's a lot of interesting issues here

1    and we've explored some of them and it sounds like we may

2    explore a few more as this case goes on.  My only point now

3    is, if we're going to explore those issues, we need something

4    different than an equal service complaint.  And I have no

5    objection, the complaint hasn't been answered, to the

6    plaintiff re-pleading and tell us actually what he wants isn't

7    equal service, isn't walking through the check-out line.

8         THE COURT:  Well, let me ask you this, Mr. -- statute

9    of limitations hasn't expired, has it?

10        MR. SHERMAN:  No, it hasn't, Your Honor, but

11   Mr. Harris seems to be wanting to bring yet another motion

12   here, an impromptu motion in the alternative to re-plead.

13   We've -- we've covered everything we need to under notice

14   pleading.  Mr. Harris just wants to avoid an answer.

15        THE COURT:  Well, I -- see, I have to look at the

16   complaint again, but if I look at the complaint again and I

17   agree with him that the only thing that you asked for is that

18   this -- see, you didn't draft this complaint.

19        MR. SHERMAN:  No, I didn't, Mr. Phillips did.  And

20   the other thing is, I -- I object to Mr. Harris bringing in

21   matters that aren't even part of the record.

22        THE COURT:  Look, I'm not interested in any of -- I

23   don't consider it.

24        MR. SHERMAN:  I mean, I have no control over what he

25   thinks Mr. Phillips told him.

1          THE COURT:  I know.  I'm not worried about --

2          MR. SHERMAN:  I mean that's ridiculous.

3          THE COURT:  -- what Mr. Phillips did or what Mr.

4    Phillips didn't do.  Mr. Phillips isn't counsel in this case.

5    I'm not paying any attention to any type of settlement things.

6    It's not of any interest to me.

7          What I'm -- what I'm interested in is trying to

8    understand the gravamen of your complaint.  If your -- if the

9    gravamen of your complaint -- if you're telling me that the

10   gravamen of your complaint is that they failed to provide him

11   with a reasonable accommodation in the form of some

12   alternative to walking through the store and using these

13   expletives, that's one thing.  If you're telling me that your

14   complaint -- in your complaint, as it's drafted, your client

15   is entitled to walk through the store and shop just like

16   anybody else using these expletives, however frequently, that,

17   unfortunately, is some other story and I think under those

18   circumstances a Motion to Dismiss would be appropriate with

19   leave to amend.  Because you're telling me one thing and

20   saying the complaint -- he says the complaint says something

21   else.

22          Yes?

23          MR. MARKS:  Your Honor, if I may, I would simply ask

24   the court that if you're going to be reviewing the Home Depot

25   complaint that you also take a look at the Bank of Hawaii

1    complaint rather than having us bring a parallel motion.

2              THE COURT:  Well, this is the whole thing I just

3    discussed with you folks.

4              MR. MARKS:  I understand, Your Honor.  I would also

5    submit, Your Honor, that the issue -- the points that you've

6    made here today really do force the plaintiffs to revisit

7    whether they want a Ninth Circuit ruling or whether we can go

8    ahead with some discussions that we've started and stopped.

9    But I think that your speaking your mind clearly on these

10   issues has been very helpful.  Thank you.

11             MR. SHERMAN:  Judge, you know, it is a standard

12   notice complaint.  There's nothing --

13             THE COURT:  All right.  But, Mr. Sherman, you can't

14   have your cake and eat it, too, I'm sorry to tell you, in this

15   case.  Sometimes you can and sometimes you can't.

16             MR. SHERMAN:  Again --

17             THE COURT:  You know, I am no font of, you know,

18   judicial wisdom to the point that I think I'm never wrong.  I

19   just do the best I can.  Fortunately, I have a pretty good

20   record on appeal, I think one of the best in the Ninth

21   Circuit, I've been told.  But that doesn't mean I don't get

22   reversed occasionally.  I make mistakes.  And, you know, the

23   Ninth Circuit will acknowledge, probably not happily in some

24   quarters, that they make mistakes, too, and they get reversed.

25   And even the Supreme Court reverses itself, as they did

1      recently actually in a major decision.

2            So, I'm more than happy -- I mean if you think that

3      your client deserves to be able to just walk through the store

4      the way that he is and that's the way your complaint -- you

5      intended your complaint to read, even though you didn't draft

6      it, and that's what you meant, then I will be happy to provide

7      you with a ruling that you can take to the Ninth Circuit.  And

8      if I'm wrong, boy, let's find out right away.

9            MR. SHERMAN:  Chief Judge Ezra, Mr. Harris has just

10     created an issue that didn't exist, he never raised in his

11     Motion to Dismiss.  I can read you -- I might have pled this a

12     little differently, but I don't have my druthers in that

13     regard.  Mr. Phillips did this before he left the bar.

14           I can read you for the record Paragraph 22 of the

15     complaint:  "Defendant's denial of equal services was improper

16     discrimination in violation of the state statute."

17           There is nothing in the complaint where we say or

18     even intimate that we demand, as Mr. Harris seems to try to

19     say, that he be permitted to walk through the store.  What the

20     complaint fairly pleads, we believe, at this point in time,

21     maybe not as artfully as it could have, is that we want a

22     reasonable accommodation.  For Mr. Harris to read it otherwise

23     is just pure conjecture.

24           THE COURT:  All right.  I think I understand now.  So

25     let's -- let's -- the arguments are over.  Let's go off the

1    record.

2                        (Off the record.)

3           THE COURT:  I'm going to hold off ruling on these

4    motions to see if you can come to an accommodation.  I don't

5    think it should take more than a couple of weeks.  If you

6    haven't been able to come to an accommodation within a couple

7    of weeks, I will go ahead and issue the orders in this case.

8    Okay?

9           So, Dottie, would you refer this immediately to Judge

10   Kurren?

11          THE CLERK:  I will.

12          THE COURT:  I would -- I don't know what -- okay.  I

13   want you to stick around for a few minutes and maybe Judge

14   Kurren can see you immediately, at least to set up times by

15   which you can come back and see him later.  Okay?

16          All right.  Thank you very much.

17          MR. MARKS:  Thank you, Judge.

18          MR. SHERMAN:  Thank you, Your Honor.

19          (The proceedings concluded at 10:24 a.m., September

20   10, 2004.)

21

22

23

24

25

```
 1                    COURT REPORTER'S CERTIFICATE
 2          I, CYNTHIA TANDO FAZIO, Official Court Reporter,
 3    United States District Court, District of Hawaii, Honolulu,
 4    Hawaii, do hereby certify that the foregoing pages numbered 1
 5    through 29 is a correct transcript of the proceedings had in
 6    connection with the above-entitled matter.
 7
            DATED at Honolulu, Hawaii, September 13, 2004.
 8
 9
10                           _____
                             CYNTHIA TANDO FAZIO, RMR, CRR
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```