1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

JON MUSE,                          CIVIL NO. 04-00154 DAE/BMK

                    Plaintiff,      (Civil Rights Violation)

        vs.

HOME DEPOT USA, INC.,

                    Defendant.

DEPOSITION OF DARLYN KUHIA

        Taken on behalf of the plaintiff at the office of
Davis Levin Livingston Grande, 851 Fort Street, Suite 400,
Honolulu, Hawai'i, commencing at 9:41 a.m. on July 20th, 2006,
pursuant to Notice.

BEFORE:       B. KANOELANI COCKETT

              Certified Shorthand Reporter

              HI CSR NO. 379, CA CSR NO. 7995

# EXHIBIT 9

33

```
 1   is that right?
 2        A.    At what point?
 3        Q.    On February 20th, 2004?
 4        A.    Yes.
 5        Q.    "Yes," it wasn't or "yes," it was?
 6        A.    Yes, it was.
 7        Q.    But -- okay.
 8              Now, do you recollect during the incident, November
 9   of 2003, did you ever have reason to consider calling the
10   police?
11        A.    Yes.
12        Q.    You did?
13        A.    Yes.
14        Q.    And why didn't you write that in this statement?
15        A.    Because it wasn't my responsibility to call the
16   police.  We are not allowed to call the police.  If this had
17   happened outside of Home Depot, I probably would have.
18        Q.    Um-hum.
19        A.    But this happened on my job.  My responsibility to
20   call the manager.
21        Q.    But you didn't say anything in here about calling
22   the police, did you?
23        A.    No, because I had nothing to do with calling the
24   police at the time when I made this statement.
25        Q.    Can you show me in this statement where you've
```

34

1    written down that you were afraid during this incident?

2        A.    Where it says, "I called the manager," I felt it was

3    over my head.

4        Q.    That means you were afraid?

5        A.    To me it does.

6        Q.    Isn't that just part of your job to call the manager

7    when there is a situation that occurs?

8        A.    Yes.

9        Q.    And that doesn't necessarily mean you were afraid,

10   does it?

11       A.    Not every time.

12       Q.    Wouldn't you have said here, "I was afraid"?

13       A.    I could have.

14       Q.    But you didn't, did you?

15       A.    But I didn't.

16       Q.    Okay.  So it's possible that you weren't afraid,

17   isn't it?

18       A.    No.

19       Q.    But you neglected to write that three months after

20   the incident?

21       A.    I didn't write that down.

22       Q.    But today you are testifying that you were afraid,

23   right?

24       A.    Yes.

25       Q.    Okay.  Three years after the incident, is that

35

1  correct, that you've suddenly remembered you were afraid?

2          MR. HARRIS:  Objection, argumentative, foundation,

3  attorney testifying.

4  BY MR. SHERMAN:

5      Q.    Now, have you told anyone else until today that you

6  were afraid during this incident?

7      A.    Yes.

8      Q.    Who did you tell?

9      A.    The other, the first lawyer that I talked to.

10     Q.    Who was that?

11     A.    I don't know her name.

12     Q.    Would her name have been Jan Boiven (phonetic)?

13     A.    Maybe, I don't know.

14     Q.    Now, have you ever -- did you ever meet Mr. Muse

15 before that time?

16     A.    No.

17     Q.    Have you ever seen him since?

18     A.    No.

19     Q.    During the course of that incident did he explain to

20 you that he had a disorder or disease?

21     A.    After.

22     Q.    After what?

23     A.    After he started swearing at me.

24     Q.    Well, you didn't tell anybody at the Home Depot that

25 you were afraid during the incident, did you?

36

1    A.    Yes.

2    Q.    Who did you tell?

3    A.    My supervisor.

4    Q.    Who was that?

5    A.    Jack, Jack Marin.

6    Q.    Who?

7    A.    He's my supervisor.

8    Q.    What is his name again?

9    A.    Jack Marin.

10   Q.    How do you spell his last name?

11   A.    M-A-R-I-N.

12   Q.    M-A?

13   A.    R-I-N.

14   Q.    And where -- is he still with Home Depot?

15   A.    He's at another store.

16   Q.    And what -- when did you tell him you were afraid?

17   A.    After I left the situation.

18   Q.    On that same day?

19   A.    Yeah.

20   Q.    And exactly what did you tell him?

21   A.    If I could take a break.

22   Q.    Pardon me?

23   A.    If I could get a break.

24   Q.    Did you -- okay.

25         But did you tell him, "I'm afraid"?

37

```
1      A.    Yeah, and I had told him what happened.

2      Q.    And what does -- and what was his position exactly?

3      A.    He's a front end supervisor.

4      Q.    Finance supervisor?

5      A.    Front end.

6      Q.    Would he be in charge of the head cashiers?

7      A.    Yes.

8      Q.    Did you talk to anyone else at Home Depot about

9 this?

10     A.    No.

11     Q.    Did you ask to see a counselor at all?

12     A.    No.

13     Q.    Have you ever received any medical treatment,

14 therapy and treatment with respect to your being afraid of

15 this incident?

16     A.    No.

17     Q.    So you couldn't have been that afraid, could you?

18           MR. HARRIS:  Objection, foundation, argumentative.

19           THE WITNESS:  Yes, I was afraid.

20 BY MR. SHERMAN:

21     Q.    Did you lose sleep over it?

22     A.    No.

23     Q.    So you never lost a minute's sleep over the incident

24 in your fear; is that correct?

25     A.    Correct.
```

38

1    Q.    Did you talk to, again -- well, strike that.

2          You never felt any need to seek professional help

3    for your fear resulting from this incident; is that correct?

4    A.    Yes.

5    Q.    And you never have sought treatment for your fear

6    from this incident; is that correct?

7    A.    Yes.

8                (Pause in the proceedings.)

9    BY MR. SHERMAN:

10   Q.    Okay.  Now, do you recollect Debra Peterson calling

11   you that day?

12   A.    Yes.

13   Q.    Where was she located?

14   A.    Returns.

15   Q.    Okay.  And what was her position there?  What was

16   her responsibility at returns?

17   A.    As a cashier, refund merchandise.

18   Q.    And what did she tell you on the phone?

19   A.    That I needed to get there fast because there's

20   someone yelling and screaming at her and swearing at her, and

21   she was -- she was -- sounded like she was afraid.

22   Q.    Okay.  And that's exactly as you recollect today --

23   A.    That's what she said.

24   Q.    -- what she said?

25         Will you take a look at your statement again.

53

1      Q.    So how long did the entire incident with Mr. Muse

2  take?  What was the duration?

3      A.    With me?

4      Q.    With you.

5      A.    About 15 minutes.

6      Q.    And was that just you and Mr. Muse for that whole 15

7  minutes?

8      A.    Me, Mr. Muse and Debra Peterson.

9      Q.    What about Mike Dolan and --

10      A.    When he came, I left.

11      Q.    So when Mr. Dolan was there, did you leave

12  immediately when Mike Dolan came?

13      A.    No.  I explained to him what was going on.

14      Q.    What did you say to him?

15      A.    I told him that this customer here was yelling at

16  her, at Deb, and he was just swearing.

17      Q.    And that's the exact word you used, "yelling"?

18      A.    Well, no.  I said he was swearing at Debra and he

19  started swearing at me, "And I think this is just too much.  I

20  can't handle this."

21      Q.    Why do you think he was swearing at you?

22      A.    I don't know.

23      Q.    At that time why did you think he was swearing at

24  you?

25      A.    I don't know.

54

1    Q.    Why do you think now he used those words?

2          MR. HARRIS:  Objection, foundation, speculation.

3          THE WITNESS:  I don't know.  People say he get this

4    disease (indicating).  That's the only thing I can think of.

5    BY MR. SHERMAN:

6    Q.    You can't think of any other reason that would

7    benefit him to use those words, can you?

8    A.    No.

9    Q.    So it doesn't make a difference to you knowing that

10   he can't help himself using the words?

11         MR. HARRIS:  Objection, vague.

12         THE WITNESS:  I don't understand.

13   BY MR. SHERMAN:

14   Q.    Does it give you a different picture of Mr. Muse

15   knowing that he can't -- he has a disease that he can't help

16   but use the words "cunt" or "fucking" or "nigger"?

17         MR. HARRIS:  Objection, foundation, vague,

18   harassment.

19         THE WITNESS:  I still don't understand your

20   question.

21   BY MR. SHERMAN:

22   Q.    What part of it don't you understand?

23   A.    The whole thing.

24   Q.    Does it matter to you that he has a disease that

25   causes him to use these words?

55

1              MR. HARRIS:  Objection.

2    BY MR. SHERMAN:

3         Q.    Does it make it different now than what you felt at

4    the time of the incident?

5              MR. HARRIS:  Objection, foundation --

6              THE WITNESS:  No.

7              MR. HARRIS:  -- vague.

8              THE WITNESS:  No.

9    BY MR. SHERMAN:

10        Q.    And why is that?

11        A.    Just the way I feel.

12        Q.    You don't care whether or not he has a disease?

13             MR. HARRIS:  Objection, foundation.

14             THE WITNESS:  I don't know any stuff about anything

15   of a disease that allows anybody to swear at anybody.

16             MR. HARRIS:  Foundation and vague.

17             I when I say my objection, I need good answers so

18   just wait until I say my objection before you talk.

19   BY MR. SHERMAN:

20        Q.    So you don't -- do you believe that there is such a

21   disease?

22             MR. HARRIS:  Objection, foundation, speculation.

23             THE WITNESS:  I wouldn't know.

24   BY MR. SHERMAN:

25        Q.    Now, your supervisor, Jack Marin?

71

C E R T I F I C A T E

STATE OF HAWAII                    )

                                  )ss.

CITY AND COUNTY OF HONOLULU   )

            I, B. KANOELANI COCKETT, CSR, Notary Public,

State of Hawai'i, do hereby certify;

            That on July 20th, 2006, at 9:41 a.m. appeared

before me DARLYN KUHIA, the witness whose deposition is

contained herein; that prior to being examined she was

by me duly sworn;

            That the deposition was taken down by me in

machine shorthand and was thereafter reduced to

typewritten form under my supervision; that the foregoing

represents, to the best of my ability, a true and correct

transcript of the proceedings had in the foregoing matter.

            I further certify that I am not an attorney for

any of the parties hereto, nor in any way concerned with

the cause.

            Dated this 27th day of July 2006 in Honolulu,

Hawai'i.

*B. Kanoelani Cockett*

B. KANOELANI COCKETT,

HI CSR NO. 379, CA CSR No. 7995

Notary Public, State of Hawai'i

My commission expires:  February 19th, 2009