```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF HAWAII

 3

 4

 5   JON MUSE,                     )
                                   )
 6                Plaintiff,       )
                                   )
 7       vs.                       )  Civil No. 04-00154 DAE/BMK
                                   )  (Civil Rights Violation)
 8   HOME DEPOT USA, INC.,         )
                                   )
 9                Defendant.       )
     _____)

10

11

12

13

14

15          DEPOSITION OF HOME DEPOT USA, INC.

16      THROUGH ITS REPRESENTATIVE EMORY L. COOPER

17                   ORANGE, CALIFORNIA

18                     JUNE 6, 2006

19

20

21
     ATKINSON-BAKER, INC.
22   COURT REPORTERS
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:  LISA O'SULLIVAN, CSR NO. 7822

25   FILE NO.:  A003F61
```

**Page 18**

1  with customer issues.
2      In my tenure with the Home Depot, I've never had to
3  deal with the legal area or the section in the legal
4  department that deals with customer issues, so I'm not sure
5  exactly what the scope of their responsibility is.
6      Q   Okay, whom else did you speak with besides
7  Mr. McEnroe in order to prepare for this deposition today?
8      A   Outside the people that I've already mentioned to
9  you --
10     Q   Yes.
11     A   -- I don't recall anyone.
12     Q   If at a later date you do recall someone, you'll
13  inform your attorney so he can inform us; is that correct?
14     A   Yes.
15         MR. HARRIS: Objection. There's no duty to
16  supplement deposition testimony.
17     Q   BY MR. SHERMAN: Mr. Cooper, let me refer you to
18  page 3 of the Third Amended Notice of Deposition, and the
19  portion that begins, "The deponent will be a person or
20  persons most knowledgeable for the deposition of the
21  30(b)(6) for the national Home Depot representative about
22  the following."
23         Are you at that point in the document?
24     A   Yes, sir.
25     Q   Are you the person -- are you prepared to testify

**Page 19**

1  today knowledgeably about the corporate policy regarding
2  accommodating customers with disabilities?
3      A   Yes.
4      Q   As a national representative?
5      A   Yes.
6      Q   Okay, are you the person most knowledgeable about
7  that area?
8          MR. HARRIS: Objection, outside the scope of the
9  deposition notice.
10         Go ahead. Unless I tell you not to answer, go
11  ahead and answer after I get done talking.
12         THE WITNESS: Yes.
13     Q   BY MR. SHERMAN: And what did you do to prepare to
14  testify about that area today? How did you prepare to
15  testify about that area today, rather?
16         MR. HARRIS: Objection, attorney-client privilege.
17  Work-product doctrine.
18         Don't discuss any communications you've had with
19  your outside counsel or your in-house counsel or paralegals.
20         THE WITNESS: I reviewed the current company
21  policies, just to make sure I was very clear on the content
22  of those policies.
23     Q   BY MR. SHERMAN: Where are those policies to be
24  found?
25     A   Numerous places within the organization's

**Page 20**

1  communication tools.
2          Specifically, they're listed on our portal, our
3  intranet web site that we have access to within the
4  organization. Plus, we actually have printed versions that
5  are included in our orientation material. Some of our
6  employment practices training programs make reference to it.
7          And then we have part of it as our core values,
8  which there's numerous publications and areas that contain
9  our corporate values, or reference thereto, within the
10 company information.
11     Q   Okay, do you have any -- can you list any of the
12 specific publications or manuals which you recall reviewing
13 to prepare for this particular issue?
14     A   The company's Associate Orientation Guide that is
15 provided to every new associate upon joining the Home Depot
16 organization.
17     Q   Any other manuals or publications by Home Depot?
18     A   The brochure on our core values.
19     Q   Does that have a title?
20     A   Our Core Values. That is the title.
21     Q   Is that a long publication, or a short one?
22     A   Sir, in some reference material, it's very short
23 and concise. In other publications, there's a greater
24 expounding of the content of what it means within the Home
25 Depot's day-to-day operations that we follow and that we

**Page 21**

1  require our associates to be familiar with and expect them
2  to follow as well.
3          Plus, also on our core values, as part of the
4  entire on-boarding process with new associates, every
5  associate within the association is given a core value pin.
6          If you've visited a Home Depot, I'm sure you're
7  aware of the orange aprons. You'll find the core value pin
8  on just about every associate's apron.
9      Q   Did you look at a core value pin in order to
10 prepare for this deposition, Mr. Cooper?
11     A   I'm very familiar with the core value pin, sir.
12     Q   Which publications with respect to the core value
13 did you specifically consult?
14     A   Could you repeat the question?
15         MR. SHERMAN: If I could ask the court reporter to
16 please read that back to Mr. Cooper.
17         (Record is read.)
18         THE WITNESS: The publication that talks about
19 specifically the core value of respect for all people. And
20 we reference that as our respect policy. That incorporates
21 the core value of respect for all people.
22     Q   BY MR. SHERMAN: Okay, let me try to explain what
23 I'm trying to get at. We'd like to be able to review this,
24 if we don't have it already. That's what I'm trying to ask
25 you to identify, so that we can have a copy and review it,

**Page 22**

1 or make sure that we have a copy. That's why I'm asking
2 you.
3    A   I think the section specifically that I reviewed,
4 sir, was the respect for all people, which is one of the
5 eight core values.
6    Q   When you refer to core values, are those found on
7 Home Depot's web site?
8    A   Absolutely.
9    Q   Okay, now --
10   A   Excuse me, sir. Now, when you say "web site," you
11 know, there's several web sites. So I want to make sure
12 that you know that I'm referring to our intranet, which we
13 have access within the Home Depot organization to.
14       To say that our core values are located on the Home
15 Depot internet site, I don't know if they're specifically
16 located there, unless you looked in some area of community
17 relations or investor relations. You may find it there.
18       But I'm referring to our intranet.
19   MR. HARRIS: I-n-t-r-a-n-e-t?
20   THE WITNESS: Yes.
21   Q   BY MR. SHERMAN: Did you consult or use your
22 intranet site to prepare for this deposition?
23   A   Yes.
24   Q   Are there things that are contained on the intranet
25 site that aren't otherwise published or available?

**Page 23**

1    A   As it relates to information that I specifically
2 looked at?
3    Q   That's correct, sir.
4    A   No.
5    Q   So is it your testimony now that everything on the
6 intranet site is available in print as well?
7        MR. HARRIS: Objection, outside the scope.
8 Harassment.
9    Q   BY MR. SHERMAN: You may answer the question.
10   A   Could you repeat the question?
11       MR. SHERMAN: If I could ask the reporter to read
12 the question back, please.
13       (Record is read.)
14       THE WITNESS: No, sir, that's not my testimony.
15   Q   BY MR. SHERMAN: So are there materials relating to
16 your testimony today, your preparation, that are only
17 contained on the intranet site?
18   A   No. Everything that I used in preparation for
19 today is on the intranet and is in print form.
20   Q   Would that be in exactly the same format?
21   A   Sir, I'm not sure I understand what you mean about
22 the format.
23   Q   Would, let's say for an example, the associate's
24 manual be available in some -- in the same printed version
25 on the intranet site as is printed?

**Page 24**

1    MR. HARRIS: Is that the end of the question?
2    MR. SHERMAN: Yes.
3    MR. HARRIS: Objection, way outside the scope of
4 the deposition notice. Not reasonably calculated to lead to
5 the discovery of admissible evidence. Harassment.
6    THE WITNESS: Could I ask the question be repeated?
7    MR. SHERMAN: Sure. If I could ask the court
8 reporter to repeat that question.
9       (Record is read.)
10   THE WITNESS: By "associate's manual," I'm assuming
11 that you're referring to the Associate Orientation Manual?
12   Q   BY MR. SHERMAN: The manual you referred to earlier
13 in your testimony today, sir, yes.
14   A   Okay, that is the Associate Orientation Manual.
15       Sir, I'm assuming that it would be in the same
16 format. But I've never referenced the Associate Orientation
17 Manual on the intranet, so I don't know if it is in fact in
18 the same exact printed format.
19   Q   Are the materials we've been discussing on your
20 intranet site available to the general public?
21   A   Via the intranet site, no.
22   Q   Okay, let me refer you back to page 3 of the Third
23 Amended Notice of Deposition.
24       Are you the person -- are you prepared to testify
25 knowledgeably today as to corporate employee training policy

**Page 25**

1 or programs relating to accommodating customers with
2 disabilities?
3    A   Sir, I think I've already answered that.
4    Q   If you could answer this question as asked.
5    A   Yes.
6    Q   Are you the person most knowledgeable in that area?
7        MR. HARRIS: Objection, outside the scope of the
8 notice.
9        THE WITNESS: Yes.
10   Q   BY MR. SHERMAN: Did you prepare exactly the same
11 way to testify to that issue as you did -- let me rephrase
12 that.
13       Did you do anything additionally to prepare to
14 answer that issue than you've already testified to?
15   A   No, sir.
16   Q   Okay, you consulted the same materials, is that
17 correct, as to that issue?
18   A   That is correct.
19   Q   Let me refer you -- let me ask this. Did you
20 consult exactly the same people with respect to that issue
21 as you did all the other issues?
22   A   Sir, I don't know if I covered all of this with the
23 individuals that I have identified as people that I have
24 talked to. The people that I have talked to, to the best of
25 my recollection, are the only people that I've talked to, so

## Page 26

1  I would have to answer yes.
2      Q  Okay, let me refer you to -- let me ask you this.
3  Are you prepared to testify today knowledgeably as to the
4  corporate policy which relates to the use of sexually,
5  racially, or otherwise offensive language, by or in the
6  presence of customers or associates, while on store
7  premises, as the national designee?
8      A  Yes.
9      Q  Are you the person most knowledgeable as to that
10 issue?
11         MR. HARRIS:  Objection, outside the scope of the
12 notice and the rule.
13         THE WITNESS:  Yes.
14     Q  BY MR. SHERMAN:  Did you prepare to answer or
15 testify as to that issue in exactly the same way you did all
16 the other issues?
17     A  Yes.
18     Q  Did you review any additional materials
19 specifically with respect to that area?
20     A  Sir, not that I can recall.
21     Q  Did you talk to any additional person with respect
22 to that issue?
23     A  No, sir.
24     Q  Are you the person -- are you able to testify today
25 most knowledgeably as to the extent to which any of the

## Page 27

1  above policies are subject to modification at the regional
2  or store level, as the national designee?
3         MR. HARRIS:  Objection, outside the scope of the
4  notice and the rule.
5         THE WITNESS:  Yes.
6      Q  BY MR. SHERMAN:  Okay, are you the person most
7  knowledgeable in that area?
8      A  Yes.
9      Q  Again, did you prepare to testify as to that issue
10 in any way -- in any different manner or fashion than you
11 did for the other issues?
12     A  No, sir.
13     Q  Did you review any other materials with respect to
14 that specific issue?
15     A  No, sir.
16     Q  Did you talk to anyone else in preparation to
17 testify as to that issue?
18     A  No, sir.
19     Q  Are you prepared to testify knowledgeably as to the
20 application of such policies, except as modified at the
21 regional or store level, to individuals with disabilities
22 such as plaintiff's alleged disability?
23     A  Yes.
24     Q  Did you review any other manuals than we've
25 discussed in your testimony so far, in order to prepare to

## Page 28

1  testify as to that issue?
2      A  No, sir.
3      Q  Did you talk to anyone else other than the people
4  you've identified so far in your testimony, in order to
5  prepare for that issue?
6      A  No, sir.
7      Q  Okay, now, just a few things I want to ask you as
8  background for this deposition.  We wanted to make sure that
9  you understood what we had requested as to the Third Amended
10 Notice of Deposition.
11        Have you ever testified in a deposition before?
12     A  Yes, sir.
13     Q  Approximately how many times?  How many depositions
14 have you testified at?
15     A  At least 10.
16     Q  Now, you understand in this deposition, if you can
17 answer a yes or no, that's acceptable.  You understand that?
18     A  Yes.
19     Q  However, if either Mr. Harris or I request an
20 explanation, you should explain your answer.  Do you
21 understand that?
22     A  Yes.
23     Q  Also do you understand that we are now on the
24 record?  It will be a certified record.  And unless the
25 attorneys agree to go off the record, everything will be

## Page 29

1  recorded.
2         Do you understand that?
3      A  Yes.
4      Q  You understand it's important to answer orally,
5  because the court reporter can't pick up nods or gestures?
6      A  Yes.
7      Q  Okay, now, I'm sure you understand this already,
8  but I would like to briefly go through it.
9         You understand that at certain times, Mr. Harris
10 may object to a question?
11     A  Yes.
12     Q  You understand that unless Mr. Harris instructs you
13 not to answer the question, you are to answer the question?
14     A  Yes.
15     Q  And that his objections are to preserve these
16 issues, to be decided later.
17        Now, if you have any question or any confusion
18 about a question, I want you to make it clear that you do.
19 And I can try to rephrase it, or we can clear it up.
20        Do you understand that?
21     A  Yes, sir.
22     Q  And if you feel the need to use a document or some
23 other material to answer a question, feel free to do so, but
24 just let us know you're doing so.
25        Do you understand that?

**Page 42**

1  A  Yes, sir, I do.
2  Q  Do you agree today that the answers you will give
3  to our questions will be binding on Home Depot?
4      MR. HARRIS: Objection, outside the scope of the
5  notice and the rule. And asks for a legal conclusion.
6      THE WITNESS: Could you repeat the question?
7      MR. SHERMAN: If I could ask the court reporter to
8  read the question back to the witness, please.
9      (Record is read.)
10     MR. HARRIS: Objection, outside the scope of the
11 notice and the rule. And requests a legal conclusion.
12     Go ahead and answer.
13     THE WITNESS: Yes.
14 Q  BY MR. SHERMAN: What is Home Depot's policy
15 regarding accommodating customers with disabilities?
16     MR. HARRIS: Objection, assumes facts not in
17 evidence.
18 Q  BY MR. SHERMAN: You can answer.
19 A  Sir, the policy that we have as it relates to
20 maintaining our workforce or our work environment has to do
21 with respecting individuals, whether they're customers or
22 associates or vendors or, you know, anyone that visits our
23 workplace.
24     You know, there's not a specific policy per se that
25 talks about customers with a disability. We treat anyone

**Page 43**

1  that comes onto our premises with respect, and that's a
2  requirement within the organization.
3  Q  Is there a written version of this policy?
4  A  Of our respect policy, sir? Yes, sir.
5  Q  No, of the policy with regard to accommodating
6  customers with disabilities.
7  A  No, sir.
8  Q  Have you reviewed any e-mails or memos regarding
9  any policy regarding accommodating customers with
10 disabilities?
11 A  No, sir, not that I recall.
12 Q  Has this lawsuit, to your knowledge, resulted in
13 any change or implementation of any policy for Home Depot
14 for the accommodation of customers with disabilities?
15 A  No, sir, not that I'm aware of.
16 Q  Are there any written policies regarding
17 accommodating customers with disabilities on a local level
18 in Hawaii?
19 A  Not that I'm aware of, sir. I think it's the same
20 policy in Hawaii as it is throughout the organization.
21 Q  So would it be fair to say that Hawaii doesn't have
22 a written policy specifically as to the accommodation of
23 customers with disabilities?
24 A  The only policy that Hawaii should be operating
25 under is the same policy that we have throughout the

**Page 44**

1  organization, and that's primarily found in our respect
2  policy on how we treat customers and associates and our
3  vendors when they come into our workplace.
4  Q  Is anyone responsible for applying your respect
5  policy specifically in order to ensure that customers with
6  disabilities are accommodated?
7      MR. HARRIS: Objection, vague and confusing.
8      THE WITNESS: Sir, I'm not sure I understand your
9  question. Could you repeat it?
10     MR. SHERMAN: Certainly. If we could have the
11 court reporter read the question back.
12     (Record is read.)
13     MR. HARRIS: Objection, vague and confusing.
14 Assumes facts not in evidence.
15     THE WITNESS: Sir, in ensuring that our respect
16 policy is being carried out within the organization, every
17 manager within a Home Depot organization or a Home Depot
18 store, any assistant manager, human resource manager, as
19 well as all associates, are charged with the responsibility
20 of maintaining respect in our workplace as it relates to
21 associates, vendors, customers, and anyone that comes onto
22 our premises.
23 Q  BY MR. SHERMAN: Is there anyone who's responsible
24 for national corporate policy, to implement a policy
25 regarding accommodating customers with disabilities

**Page 45**

1  specifically?
2      MR. HARRIS: Objection, assumes facts not in
3  evidence. Misstates the prior testimony.
4  Q  BY MR. SHERMAN: You may answer, sir.
5      MR. HARRIS: Objection. There's been no testimony
6  as to any such specific policy.
7  Q  BY MR. SHERMAN: Mr. Cooper, you may answer.
8  A  I think I've said before, we don't have a national
9  corporate policy on addressing disabilities of customers.
10 Q  What do you know about the Americans with
11 Disabilities Act, Mr. Cooper?
12     MR. HARRIS: Objection, outside the scope of the
13 deposition. Specifically covered by a prior magistrate
14 judge's order. Harassing.
15 Q  BY MR. SHERMAN: Mr. Cooper, you can answer.
16 A  Could you repeat the question?
17 Q  Certainly. What do you know about the Americans
18 with Disabilities Act, Mr. Cooper?
19     MR. HARRIS: Same objection, outside the scope of
20 the deposition. Harassing. Violates the court's order and
21 the parties' agreement.
22     THE WITNESS: Could I have a moment with my
23 counsel?
24 Q  BY MR. SHERMAN: I'd like to ask you if you could
25 try to answer the question without consulting with

Page 58

public accommodations be accessible to persons with disabilities, in addition to the requirements of the Americans with Disabilities Act?
    MR. HARRIS: Objection, outside the scope of the deposition notice and the rule. Harassing. Seeks a legal conclusion.
    THE WITNESS: Sir, I'm familiar with the provision of the accessibility. But to say that it's the interplay between the Americans with Disabilities Act and the Rehabilitation Act, you know, I'm not prepared to make that conclusion.
    Q   BY MR. SHERMAN: Okay, Mr. Cooper, can you point out in Exhibit 2, the associate's guide, where there are references to the Americans with Disabilities Act?
    A   (No audible response.)
    Q   Mr. Cooper, let me make this a little easier for you. Can you point out in the associate's manual where there are references to Title III of the Americans with Disabilities Act, or anything with respect to accessibility of public accommodations?
    MR. HARRIS: Would you like him to review the entire manual?
    MR. SHERMAN: I assume he's already done that, Mr. Harris, in preparation for this deposition.
    MR. HARRIS: Well, would you like him to take the

Page 59

time to review the entire manual, which speaks for itself?
    Q   BY MR. SHERMAN: Mr. Cooper, you testified earlier that you had the opportunity to review this manual prior to your testimony today; is that correct?
    A   Sir, I don't believe that was my testimony. I think you asked if I had the opportunity. And if I wanted to, I could have.
        But I think in my testimony in terms of, you know, what did I review, I specifically outlined several of our policies, and those policies that I looked at were contained in this manual. I have not reviewed this entire manual.
    Q   Do you know which pages specifically you did review?
    A   Sir, I reviewed the section beginning on page 24 as it relates to our code of conduct and our ethics, and also the page that contained the "respect for all people" provisions, which I think is page 13.
    MR. HARRIS: The witness is referring to the original page numbers and not the Bates stamp numbers.
    THE WITNESS: I'm sorry, it was page 18 that says "respect for all people." And then I think I made reference to our core values or our value pin or our value wheel, and that happens to be on page 17.
    MR. HARRIS: Bruce, it's a little bit after 1:00 here, and we're going to need to take a lunch break here

Page 60

pretty soon.
    MR. SHERMAN: Okay, let's just go through a few more questions.
    MR. HARRIS: Okay.
    MR. SHERMAN: And then we can reach a point that's appropriate.
    Q   Mr. Cooper, would you be surprised to learn that there are no references in this particular manual, Exhibit 2, to Title III of the Americans with Disabilities Act?
    A   Sir, considering the purpose of this manual for an orientation and an on-boarding process, I think your question is would I be surprised, and my response would be no.
    Q   Okay, do you know what a public accommodation is, pursuant to the Americans with Disabilities Act?
    MR. HARRIS: Objection, outside the scope of the notice and the rule. Harassing. Seeks a legal conclusion.
    THE WITNESS: Not specifically, sir.
    Q   BY MR. SHERMAN: Do you know whether or not Home Depot itself, the stores, are public accommodations?
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing. Seeks a legal conclusion.
    THE WITNESS: Could you repeat the question?
    MR. SHERMAN: If I could ask the court reporter

Page 61

kindly to repeat the question.
    (Record is read.)
    MR. HARRIS: Same objection.
    THE WITNESS: Sir, I can't really speak for all 1900-plus Home Depot stores.
    Q   BY MR. SHERMAN: What about the Home Depot store that's the subject of this litigation? Is that a public accommodation?
    MR. HARRIS: Same objection as to outside the scope of the notice. Harassing. Seeks legal conclusion.
    THE WITNESS: Sir, I've never been to the store.
    Q   BY MR. SHERMAN: Who defines disability for Home Depot with respect to Title III of the Americans with Disabilities Act?
    MR. HARRIS: Objection, outside the scope of the notice. Harassing. Seeks a legal conclusion.
    THE WITNESS: Sir, I don't know.
    Q   BY MR. SHERMAN: To your knowledge, has Home Depot ever been sued before for violations of Title III of the Americans with Disabilities Act?
    MR. HARRIS: Objection, outside the scope of the deposition. Harassing.
    THE WITNESS: Sir, I don't know.
    Q   BY MR. SHERMAN: To your knowledge, has Home Depot ever been sued for violations of the Rehabilitation Act of

**Page 62**

1973?
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing.
    THE WITNESS: Sir, I don't know.
    Q   BY MR. SHERMAN: Are you aware of any complaints by customers or third parties to Home Depot concerning violations of Title III of the Americans with Disabilities Act?
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing.
    THE WITNESS: Could you repeat the question?
    MR. SHERMAN: If I could have the court reporter kindly repeat the question, please.
        (Record is read.)
    THE WITNESS: No, sir, I'm not.
    Q   BY MR. SHERMAN: Are you aware of any complaints by any federal agencies -- or are you aware of any complaints by individuals with respect to violations of Section 504 of the Rehabilitation Act of 1973, against Home Depot?
    MR. HARRIS: Objection, outside the scope of the deposition notice and rule. Harassing.
    THE WITNESS: Sir, I'm not familiar with 504.
    Q   BY MR. SHERMAN: How would you implement the corporate policy regarding accommodating customers with disabilities? How is that done?

**Page 63**

    MR. HARRIS: Objection, assumes facts not in evidence. Outside the scope of the deposition notice. Harassing.
    THE WITNESS: Could you repeat the question, please?
    MR. SHERMAN: If I could have the court reporter repeat it, please.
        (Record is read.)
    MR. HARRIS: Same objection.
    THE WITNESS: Sir, we don't have a policy dealing with disabilities of customers, so I'm not sure I understand your question as it relates to implementing such a policy that we don't have.
    Q   BY MR. SHERMAN: How would Home Depot accommodate someone in a wheelchair who came there to shop, who couldn't reach items on the shelf? How would you do that?
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing.
    THE WITNESS: Sir, that's part of our customer service.
    We have associates in our stores that wear the orange apron that are committed to providing exceptional customer service. So if a customer is having difficulty reaching a product, there are people there in the store to assist them.

**Page 64**

    Q   BY MR. SHERMAN: Could a person in a wheelchair ask for a personal shopper while they went to a Home Depot store?
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing. May seek a legal conclusion.
    THE WITNESS: Could you repeat the question, please?
    MR. SHERMAN: If I could ask the court reporter to kindly repeat the question.
        (Record is read.)
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing. Seeks a legal conclusion.
    THE WITNESS: Sir, in our stores, that wouldn't be requesting a personal shopper. That's just asking for good customer service.
    And that's what we strive for within our stores. If a customer has an issue and requests assistance, certainly we're going to assist them.
    Q   BY MR. SHERMAN: And that would be if someone were in a wheelchair throughout their entire time at the store, if that's what they needed; is that correct?
    A   Sure.
    Q   And Home Depot doesn't consider that an extra cost or an extraordinary cost that they shouldn't bear?
    A   Well, it's the individuals that are located in

**Page 65**

various departments, so it wouldn't necessarily be, you know, the same individual. It's dependent on what departments they go into. And there are certainly associates with orange aprons in those departments.
    Q   Could someone in a wheelchair, as an accommodation, request that a Home Depot employee, one of those people in the orange aprons, walk with them throughout the store, so that they didn't have to wait for someone to show up to help them?
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing. Seeks a legal conclusion.
    THE WITNESS: Could you repeat the question, please?
    MR. SHERMAN: If I could ask the court reporter to kindly repeat the question, please.
        (Record is read.)
    MR. HARRIS: Objection, outside the scope of the deposition notice. Harassing. Seeks a legal conclusion. And speculative.
    THE WITNESS: Sir, since I'm not employed in a particular store, I really don't know how that would be done, since the associates are assigned to departments. So I would be purely speculating beyond that.
    Q   BY MR. SHERMAN: Well, wouldn't that be part of the local implementation of a corporate policy to accommodate

**Page 66**

1  persons with disabilities?
2      MR. HARRIS: Objection, assumes facts not in
3  evidence. Outside the scope of the deposition notice.
4  Harassing.
5      THE WITNESS: Sir, our focus is the exceptional
6  customer service.
7  Q  BY MR. SHERMAN: What about the exceptional
8  customer service for the customer with a disability? How
9  does Home Depot accomplish that?
10     MR. HARRIS: Objection, vague and confusing.
11 Speculative. Overbroad.
12     THE WITNESS: Could you repeat the question,
13 please?
14     MR. SHERMAN: If I could ask the court reporter to
15 kindly repeat the question.
16     (Record is read.)
17     MR. HARRIS: Objection, vague and confusing.
18 Outside the scope of the deposition notice. Harassing. And
19 close to lunchtime. It's 1:15 here.
20     THE WITNESS: Sir, I can only go back to, you know,
21 when a customer, you know, asks for assistance from an
22 associate, going back to the product that the customer
23 couldn't reach, or if it's a matter of the associate getting
24 on a ladder and bringing product down.
25     You know, that's the assistance that I'm familiar

**Page 67**

1  with. That's just a part of our day-to-day customer
2  service.
3      MR. HARRIS: The witness has asked me several times
4  for lunch. It's 1:15. Would you please reach an
5  appropriate time in your questioning for a break? And he
6  says he needs to go to the restroom.
7      MR. SHERMAN: Well, I think we'll try and
8  accommodate him. One last question, though.
9  Q  So how do you assist someone with a disability at a
10 Home Depot, a customer with a disability, so that it's
11 consistent with the national policy? How would you do that
12 on a local level in Hawaii?
13     MR. HARRIS: Objection, vague and confusing.
14 Outside the scope of the notice of taking deposition.
15 Harassing.
16     THE WITNESS: Could you repeat the question,
17 please?
18     MR. SHERMAN: If I could ask the court reporter to
19 kindly repeat the question.
20     (Record is read.)
21     MR. HARRIS: Same objection, outside the scope of
22 the deposition notice. Harassing. Vague and confusing.
23     THE WITNESS: Sir, could I ask for a clarification
24 on which national policy we're referring to?
25     MR. SHERMAN: The national policy referring to

**Page 68**

1  accommodating customers with disabilities.
2      MR. HARRIS: Objection, assumes facts not in
3  evidence.
4      THE WITNESS: Sir, I think I've said before, we
5  don't have a national policy on disabilities with customers.
6      MR. SHERMAN: Okay, let's take a break now. But
7  because we're on sort of a tight schedule with respect to
8  the time zone, if we could make this a quick lunch and set a
9  time certain for us to begin again.
10     MR. HARRIS: 45 minutes, so we're starting back at
11 2:00 our time.
12     MR. SHERMAN: So we start at 2:00 your time, 11:00
13 our time; is that correct?
14     MR. HARRIS: What time do you have?
15     MR. SHERMAN: I've got approximately 1:15, 1:16.
16     MR. HARRIS: Okay, we'll be back at 2:00 our time,
17 which will be 11:00 your time.
18     MR. SHERMAN: Okay.
19     MR. HARRIS: Thanks.
20     (Lunch recess taken.)
21     MR. SHERMAN: All right, back on the record.
22 Q  Mr. Cooper, you're still under oath. Do you
23 understand that?
24 A  Yes.
25 Q  What exactly are the -- what is your job

**Page 69**

1  description exactly? What does that entail?
2  A  I am a resource to the field HR or field Human
3  Resources as it relates to compliance with company policy.
4  Q  I'm sorry, you said field agents?
5  A  Field HR, field Human Resources.
6  Q  Okay, and is there a field HR in Hawaii?
7  A  There's a regional HR manager in Hawaii, yes.
8  Q  And who would that be?
9  A  Sir, her first name is Rowena. She's relatively
10 new. We just had a change in the regional HR position. The
11 gentleman that was there was Larry Anderson. He has left
12 the company.
13     Rowena, I forget her last name, is currently the
14 regional HR for both Hawaii and Alaska. She's actually
15 in -- she actually lives in Alaska and visits Hawaii on a
16 regular basis.
17 Q  Does she live in Anchorage?
18 A  I don't know where she lives, but she does live in
19 Alaska.
20 Q  Did you talk to her --
21 A  Now, sir, that's a temporary assignment for her.
22 We are trying to fill the position of regional HR manager
23 for the islands, and I don't think we've completed that
24 process yet.
25 Q  Would there be a specific field manager for Hawaii,

**Page 70**

1 or would there be one just for Hawaii and Alaska combined?
2   A   No, there would be one for Hawaii. It's just that
3 Rowena is covering both states right now until we fill the
4 position in Hawaii. There will be and has been in the past
5 a regional HR manager for Hawaii.
6   Q   Did you talk to Rowena prior to this in preparation
7 for this testimony today?
8   A   No, sir, I did not.
9   Q   Did you talk at any time with Larry Anderson in
10 preparation for this testimony today?
11   A   No, I did not.
12   Q   So is it fair to say that there's no special
13 procedure per se for when a person with a disability
14 requests an accommodation at a Home Depot?
15   A   Could you repeat the question, please?
16       MR. SHERMAN: If I could ask the court reporter to
17 kindly repeat that.
18       (Record is read.)
19       THE WITNESS: Sir, are we talking about an
20 associate, or are we talking about a customer?
21   Q   BY MR. SHERMAN: When a customer would request an
22 accommodation.
23       MR. HARRIS: Objection, speculation.
24       THE WITNESS: I'm not familiar with one, no, sir.
25   Q   BY MR. SHERMAN: We spoke earlier about a person in

**Page 71**

1 a wheelchair requesting assistance at a Home Depot.
2       If a blind person were to come in there to a Home
3 Depot, could they request that a particular associate
4 accompany them throughout the store in order to assist them
5 in their shopping, as an accommodation?
6       MR. HARRIS: Objection, outside the scope of the
7 deposition notice, which requests a representative to
8 testify on the application of policies to individuals with
9 disabilities such as plaintiff's alleged disability.
10       This witness is not prepared and has not been
11 designated to testify with respect to the applications of
12 the policies to individuals with disabilities that are not
13 such as plaintiff's alleged disability.
14   Q   BY MR. SHERMAN: Okay, Mr. Cooper, you can answer
15 the question.
16   A   Could you repeat the question, please?
17       MR. SHERMAN: If I could ask the court reporter to
18 kindly repeat the question, please.
19       (Record is read.)
20       MR. HARRIS: Same objection. And irrelevant. Not
21 reasonably calculated to lead to the discovery of admissible
22 evidence. Harassment. Speculative.
23       THE WITNESS: Sir, since I am not working in a
24 store, you know, for me to respond to that would be pure
25 speculation on my part. I don't know, from the store

**Page 72**

1 management standpoint, if that could be done.
2   Q   BY MR. SHERMAN: Do you know if that can be done in
3 the context of the subject store in this litigation?
4       MR. HARRIS: Objection, outside the scope of the
5 notice of taking deposition, which requests a representative
6 to be designated with respect to the application of policies
7 to disabilities such as plaintiff's alleged disability.
8       This representative has not been prepared and is
9 not prepared to testify with respect to questions concerning
10 the application of policies to disabilities that are not
11 such as plaintiff's alleged disability.
12       Go ahead and answer.
13       THE WITNESS: Could you repeat the question,
14 please?
15       MR. SHERMAN: If I could ask the court reporter to
16 kindly repeat the question.
17       (Record is read.)
18       THE WITNESS: Sir, I'm not familiar with the store
19 that's the subject of this litigation. And since I'm not a
20 part of the leadership team there in the store, I really
21 don't know.
22   Q   BY MR. SHERMAN: What do you mean by "leadership
23 team"?
24   A   Management team.
25   Q   Would the leadership team in that particular store

**Page 73**

1 which is the subject of this litigation -- would they know
2 what would be done in such an instance?
3       MR. HARRIS: Objection, the question is vague if it
4 refers back to the blind individual who theoretically was
5 requesting the accommodation.
6       This witness is not designated to testify as to
7 that question, because the notice requested a witness to
8 testify with respect to the application of policies to
9 individuals with disabilities such as plaintiff's alleged
10 disability.
11       THE WITNESS: Could you repeat the question, sir?
12       MR. SHERMAN: If the court reporter could kindly
13 repeat the question.
14       (Record is read.)
15       MR. HARRIS: Same objection. And speculation. Not
16 reasonably calculated to lead to the discovery of admissible
17 evidence. Harassment.
18       THE WITNESS: Sir, I don't know what the leadership
19 team in that store -- since I've never been in the store
20 that's the subject of this litigation, I really don't know
21 what they know.
22   Q   BY MR. SHERMAN: What do you know about the local
23 implementation of corporate policy regarding accommodating
24 customers with disabilities? And by "local" I mean Hawaii.
25       MR. HARRIS: Objection, outside the scope of the

1  notice.
2      This witness has been designated to testify with
3  respect to the local application of such policies to
4  individuals with disabilities such as plaintiff's alleged
5  disability.
6   Q   BY MR. SHERMAN: You may answer the question.
7   A   Sir, the expectation in the local market -- when I
8  say "local," I'm referring to Hawaii -- is that they follow
9  the company's expectation as it relates to the workplace and
10 customer service and maintaining the environment, for not
11 only the associates but for the customers and for the
12 vendors and for the people that visit the store.
13     So the policy in Hawaii is the same policy that we
14 have everywhere else.
15  Q   Who in Hawaii is responsible for ensuring that that
16 policy is implemented and followed?
17  A   Within each store, the ultimate responsibility
18 would rest with the store manager. However, there is an
19 expectation within the Home Depot culture that all
20 associates are responsible for maintaining the type of
21 environment for our associates and our customers and our
22 vendors.
23     So while management has the responsibility, or the
24 overseeing responsibility, it is an expectation of every
25 associate within our organization to adhere to the values,

Page 74

1  and part of those values in our respect policy have to do
2  with our commitment to customer service.
3   Q   Who makes the final decision at a store, a local
4  store, with respect to what is a proper accommodation for a
5  person with a disability? Is it the manager?
6       MR. HARRIS: Objection, outside the scope of the
7  notice.
8       This witness has been designated to testify with
9  respect to local application of policies to individuals with
10 disabilities such as plaintiff's alleged disability and not
11 all disabilities in general.
12  Q   BY MR. SHERMAN: You can answer the question,
13 Mr. Cooper.
14  A   Okay, I think the question was, who has the final
15 say?
16  Q   That's correct.
17  A   That would rest in partnership between the store
18 manager, the HR manager, the district manager, the regional
19 HR manager, the regional HR director, and potentially
20 myself.
21  Q   Where does the buck stop in that instance? Is that
22 with you?
23  A   Well, that decision could also be appealed to the
24 regional -- or the vice-president of Human Resources, which
25 is my boss. It could go further up, to the vice-president

Page 75

1  of employment practices within the Home Depot corporation.
2       No. The stopping point is higher than myself.
3   Q   With respect to the current litigation, who has
4  made the decision as to what is a proper accommodation with
5  respect to Jon Muse?
6       MR. HARRIS: Objection, outside the scope of the
7  deposition notice. Work product. Attorney-client
8  privilege.
9       THE WITNESS: Could you repeat the question,
10 please?
11      MR. SHERMAN: If I could ask the court reporter to
12 kindly repeat it.
13     (Record is read.)
14      MR. HARRIS: Same objection.
15      THE WITNESS: Sir, I guess I'm not familiar with
16 what decision you're referring to.
17      MR. SHERMAN: The decision that he's not allowed to
18 go into any of the Home Depot stores: That decision.
19      MR. HARRIS: Objection, assumes facts not in
20 evidence.
21      MR. SHERMAN: In Hawaii.
22      MR. HARRIS: Objection, assumes facts not in
23 evidence. Outside the scope of the deposition notice.
24 Speculative. Work product. And attorney-client privilege.
25     That's actually an agreement between counsel, I

Page 76

1  should say.
2       THE WITNESS: Could I speak to my counsel?
3       MR. SHERMAN: Well, if you could try and answer the
4  question first, I'd appreciate that.
5       THE WITNESS: And what was the question?
6       MR. SHERMAN: If we could ask the court reporter to
7  repeat it, please.
8      (Record is read as follows:)
9      "Q   With respect to the current
10     litigation, who has made the decision as to
11     what is a proper accommodation with respect
12     to Jon Muse?"
13      MR. HARRIS: Objection, outside the scope of the
14 notice. Work product. Attorney-client privilege. Subject
15 to stipulation among counsel.
16      THE WITNESS: Sir, I don't know.
17      MR. SHERMAN: Okay, I'm going to ask the court
18 reporter to take what we've given her as Exhibit 12, and I
19 guess we could mark that as Exhibit 3.
20     (Plaintiff's Exhibit 3 is marked for
21     identification.)
22  Q   BY MR. SHERMAN: Mr. Cooper, have you seen that
23 document before?
24  A   Yes, I have.
25  Q   Okay, now, moving down to the third

Page 77

**Page 78**

1 bold-printed line item, which reads "respect for all
2 people," is that the genesis of Home Depot's policy to
3 accommodate persons with disabilities both nationally and
4 locally?
5     MR. HARRIS: Objection, vague.
6     THE WITNESS: Sir, I'm not sure I understand the
7 question.
8   Q   BY MR. SHERMAN: Can you identify this document?
9   A   Yes, I can.
10  Q   And what is it?
11  A   It looks like it came from our Home Depot dot-com
12 web site, and it lists our eight core values.
13  Q   And what is the basis for your program or policy to
14 accommodate persons with disabilities?
15     MR. HARRIS: Objection, assumes facts not in
16 evidence. Vague and confusing.
17     THE WITNESS: I don't know.
18  Q   BY MR. SHERMAN: You don't have a basis for a
19 policy either nationally or locally to accommodate persons
20 with disabilities?
21     MR. HARRIS: Objection, outside the scope of the
22 notice. Vague and confusing.
23     THE WITNESS: Sir, the core values started with the
24 organization long before I actually joined the company. To
25 say that there is a connection between our core values of

**Page 79**

1 respect for all people and that that led to our
2 non-discrimination policy, I can't make that connection.
3   Q   BY MR. SHERMAN: Could you read what's underneath
4 the bold core value "respect for all people"? If you could
5 read that out loud, please.
6   A   "In order to remain successful, our associates must
7 work in an environment of mutual respect, free of
8 discrimination and harassment. Everyone has value,
9 regardless of gender, ethnicity, or educational background."
10  Q   Now, the word "everyone": Do you understand that
11 to include customers as well?
12     MR. HARRIS: Objection, outside the scope of the
13 deposition notice. Seeking the witness's own personal
14 opinion.
15     THE WITNESS: Could you repeat the question,
16 please?
17     MR. SHERMAN: If the court reporter could kindly
18 repeat the question.
19        (Record is read.)
20     MR. HARRIS: Same objection.
21     THE WITNESS: Based on the statement at the
22 beginning of "respect for all people," it refers to our
23 associates.
24     But if you look up at the top, it says, "We
25 continue to strive for excellence in both our business and

**Page 80**

1 our community by upholding eight core values," so that could
2 refer to everyone.
3     But I actually take this as referring to the
4 associates, since that's what's in the provision under
5 "respect for all people."
6   Q   BY MR. SHERMAN: Well, can you tell me which of the
7 listed eight core values would pertain to customers, and
8 particularly customers with disabilities?
9   A   "Excellent customer service," "doing the right
10 thing."
11  Q   Is that your complete answer?
12  A   Yes, sir.
13  Q   Okay, in the context of Home Depot's employee
14 training program and policy, how would a Home Depot employee
15 accommodate a person with Tourette Syndrome?
16  A   Could you repeat the question?
17     MR. SHERMAN: If I could ask the court reporter to
18 kindly repeat the question.
19        (Record is read.)
20     MR. HARRIS: Objection, assumes facts not in
21 evidence.
22     THE WITNESS: Sir, I don't believe that we have any
23 special standard as far as how an associate would assist a
24 customer with Tourette Syndrome. It still falls under the
25 larger umbrella of providing the excellent customer service.

**Page 81**

1   Q   BY MR. SHERMAN: In any of the training materials
2 you have reviewed or you're aware of that would relate to
3 implementing a policy nationally or locally relating to
4 accommodating customers with disabilities, are there
5 examples provided; such as, if a person with a wheelchair
6 asked for assistance, you should accompany them throughout
7 the store, helping them retrieve items from the shelves; or
8 the same as to a person who's blind; or you would assist
9 someone who is deaf, in terms of communication?
10     Are there any examples given as to ways to
11 implement such policies?
12     MR. HARRIS: Objection, outside the scope of the
13 notice and the rule. Harassing. Not reasonably calculated
14 to lead to the discovery of admissible evidence.
15     THE WITNESS: Could you repeat the question,
16 please?
17     MR. SHERMAN: If I could ask the court reporter to
18 kindly repeat it.
19        (Record is read.)
20     MR. HARRIS: Also, objection, compound.
21     THE WITNESS: Sir, I have not reviewed any material
22 having to do with training for associates to assist
23 customers with disabilities. Again, that falls within our
24 customer service, the desire to provide the exceptional
25 customer service to all customers. So I've not reviewed any

**Page 82**

training.
And I think you referred to an implementation of a national policy or a local policy. And again, there is no such policy.
Q  BY MR. SHERMAN: Mr. Cooper, would you agree that every day, throughout all of the Home Depot stores in America, customers with disabilities come to shop at Home Depot?
MR. HARRIS: Objection, outside the scope of the notice and outside the scope of the rule. Harassing. Not reasonably calculated to lead to the discovery of admissible evidence.
THE WITNESS: Could you repeat the question, please?
MR. SHERMAN: If the court reporter could kindly repeat the question.
(Record is read.)
MR. HARRIS: Same objection.
THE WITNESS: Sir, I have no knowledge that every day in every Home Depot, there are customers that come in shopping with disabilities. I have no way of knowing that.
Q  BY MR. SHERMAN: What would it cost to assign an individual employee to assist a customer with a disability during the time of their shopping at a Home Depot store?
MR. HARRIS: Objection, outside the scope of

**Page 83**

notice. Speculative. Vague and confusing.
This witness has not been designated to testify with respect to the application of the company's policies to anyone other than a person with a disability such as plaintiff's alleged disability.
THE WITNESS: Sir, I have no idea.
Q  BY MR. SHERMAN: Based on your earlier testimony, you assume, don't you, that persons with disabilities do shop at Home Depots?
MR. HARRIS: Objection, misstates prior testimony. Outside the scope of the deposition notice and the rule. Harassing.
THE WITNESS: Could you repeat the question?
MR. SHERMAN: If I could ask the court reporter to kindly repeat the question.
(Record is read.)
MR. HARRIS: Same objection.
THE WITNESS: I'm assuming that some do.
Q  BY MR. SHERMAN: But you have no specific program or policy to provide guidance to the associates as to how to handle specific situations for accommodating persons with disabilities while they're shopping at Home Depot?
MR. HARRIS: Objection. This witness has been designated to testify as to the application of policies to individuals with disabilities such as plaintiff's alleged

**Page 84**

disability.
THE WITNESS: Could you repeat the question, please?
MR. SHERMAN: If I could ask the court reporter to repeat the question, please.
(Record is read.)
MR. HARRIS: Same objection.
THE WITNESS: No.
Q  BY MR. SHERMAN: Okay, are you familiar with the Pro Plan at Home Depot?
A  Which plan, sir?
Q  Pro, or Professional Plan.
A  Is it known by something other than the Professional Plan?
Q  It's a plan whereby Home Depot provides special services for contractors, professional builders. It's described in the materials that Mr. Harris provided us.
A  It's called Pro Sales. Yes, I'm familiar with it as Pro Sales. I never heard it referred to as Professional Plan.
Q  Okay, and are you aware that the description of the Pro Sales states that a contractor can call up in advance and be met by an associate who will help him with his shopping needs?
MR. HARRIS: Objection, outside the scope of the

**Page 85**

deposition notice. Assumes facts not in evidence.
THE WITNESS: Sir, I'm familiar with the process whereby a professional contractor can actually fax in their order, and then the order would be waiting on the contractor when they arrived. I'm not familiar with it being designated for one person.
I do know that in pulling orders, it can be pulled by a multiple of individuals, and the order would be complete when the contractor arrived. That's the aspect of the program that I am familiar with.
Q  BY MR. SHERMAN: Would there be a separate checkout for that contractor?
MR. HARRIS: Objection, outside the scope of the notice and the designation. Speculative. Foundation.
THE WITNESS: Sir, there are registers in the stores that I'm familiar with, that are down near the lumber area, which is an area that is most frequented by the contractors.
Those registers that are in that particular location are not used exclusively for contractors. Any customer can take their purchases to those registers.
Primarily, the reason why they're used by the contractors and that those registers are there is so that the large cargo or the lumber or the lumber carts do not have to travel throughout the store all the way up to, you

1  Those are the ones I can think of right offhand.
2      Q  BY MR. SHERMAN:  Is Home Depot the largest home
3  improvement retailer in the United States?
4      MR. HARRIS:  Objection, outside the scope of the
5  notice.
6      THE WITNESS:  Yes.
7      Q  BY MR. SHERMAN:  Is it the second largest retailer
8  in the United States?
9      MR. HARRIS:  Same objection, outside the scope of
10 the notice.
11     THE WITNESS:  Yes, sir.
12     Q  BY MR. SHERMAN:  In 2005, did Home Depot do about
13 $81.5 billion in sales?
14     MR. HARRIS:  Objection, outside the scope of the
15 notice and designation.
16     THE WITNESS:  I think so.
17     Q  BY MR. SHERMAN:  In 2005, did Home Depot realize
18 $5.8 billion in earnings?
19     MR. HARRIS:  Objection, outside the scope of the
20 notice and the rule.
21     THE WITNESS:  No.
22     Q  BY MR. SHERMAN:  So if I were to tell you that I
23 was getting these figures from a fiscal 2005 investor fact
24 sheet published by Home Depot on the internet, that figure
25 would be wrong?

Page 90

1      MR. HARRIS:  Objection, assumes facts not in
2  evidence.  Outside the scope of the notice.  The attorney is
3  testifying.
4      THE WITNESS:  Sir, I may have misunderstood you.  I
5  thought you said that we had $81.5 billion in sales, and I
6  think you said that that equates to $5.8 billion in
7  earnings.
8      By "earnings" do you mean profit?
9      MR. SHERMAN:  I'm using it exactly as it's listed
10 here, whatever it means.  It says "earnings."
11     MR. HARRIS:  Same objection, the attorney is
12 testifying.  It's outside the scope of the deposition
13 notice.
14     THE WITNESS:  Sir, I don't know what the term
15 "earnings" means.  I have reason to believe that it was
16 probably $5.8 billion in profit.
17     Q  BY MR. SHERMAN:  So if we use the phrase
18 "$5.8 billion in profit," that would work for you?
19     MR. HARRIS:  Same objection.
20     THE WITNESS:  That's reasonable.
21     Q  BY MR. SHERMAN:  Okay, and you would agree that
22 that was approximately a 16.7 percent increase from the
23 profit in 2004?
24     MR. HARRIS:  Same objection, outside the scope of
25 the notice, way far outside.  Harassing.

Page 91

1      THE WITNESS:  Sir, I don't know what the 2004
2  figures were.
3      Q  BY MR. SHERMAN:  Are there over 2,000 Home Depot
4  stores in North America?
5      MR. HARRIS:  Outside the scope of the notice,
6  objection.  This witness isn't designated as to that fact.
7      THE WITNESS:  Sir, I believe it's over 1900.  I
8  don't have the exact figure.
9      Q  BY MR. SHERMAN:  Okay, now, is there any manual or
10 written policy or procedures document that would specify the
11 reasons for banning a customer from a Home Depot store?
12     MR. HARRIS:  Objection, outside the scope of the
13 notice, except to the extent that it relates to the subjects
14 designated.
15     THE WITNESS:  Not that I'm aware of, sir.
16     Q  BY MR. SHERMAN:  Are you familiar with the
17 self-checkout procedure at Home Depot?
18     A  Yes, sir.
19     Q  And is that common to all Home Depots at this point
20 in time?
21     A  No, sir, I don't believe that it is.
22     Q  Do you know if it's used at the Home Depot which is
23 the subject of this litigation?
24     MR. HARRIS:  Objection, outside the scope of the
25 notice.

Page 92

1      THE WITNESS:  Sir, I don't know that I visited that
2  store, and I'm not familiar with which store is impacted by
3  this litigation, so I don't know if they have self-checkout
4  there or not.
5      Q  BY MR. SHERMAN:  Would you be surprised to know
6  that they do have a self-checkout at this point in time?
7      A  No, I would not be surprised by that.
8      MR. HARRIS:  Objection --
9      Q  BY MR. SHERMAN:  What is the --
10     MR. HARRIS:  Hold on a second, hold on a second.
11 Objection, attorney testifying, outside the scope of the
12 notice, on the last question.
13     Go ahead and ask your next question.
14     Q  BY MR. SHERMAN:  What is the point of the
15 self-checkout?
16     MR. HARRIS:  Same objection, outside the scope of
17 the notice and designation.  Vague.
18     THE WITNESS:  To expedite the process of paying for
19 one's purchases.
20     Q  BY MR. SHERMAN:  Now, if the self-checkout operates
21 correctly, the customer doesn't have to have any interface
22 with a checkout clerk; is that correct?
23     MR. HARRIS:  Objection, outside the scope of the
24 notice and designation.
25     THE WITNESS:  I don't know that I could factually

Page 93

**Page 94**

```
 1   agree with that.
 2           There is an associate that is assigned to the group
 3   of self-checkout registers. Depending on the purchases,
 4   depending on the product, that may involve some sort of
 5   rebate, which could be at random through the store. Then
 6   the customer would have to have interface with the
 7   individual that is stationed at self-checkout.
 8           I can't say that it would be totally a
 9   non-associate-contact situation.
10      Q   BY MR. SHERMAN: But assuming you don't have those
11   special situations, rebates as you've described, isn't the
12   self-checkout designed to minimize the contact between
13   customers and checkout clerks and thereby speed up the sales
14   transaction?
15           MR. HARRIS: Objection, outside the scope. Asked
16   and answered. Attorney testifying. And compound.
17           THE WITNESS: Yes, I think the purpose is to
18   minimize, but, sir, it's not necessarily to eliminate it
19   altogether.
20      Q   BY MR. SHERMAN: Well, certainly, an associate
21   would be available to help someone in the instance where
22   there was a problem, is that correct, at a self-checkout
23   stand?
24           MR. HARRIS: Same objection as before. And
25   argumentative.
```

**Page 95**

```
 1           THE WITNESS: Yes, there would be an associate
 2   there to help the customer as a part of our "excellent
 3   customer service" emphasis.
 4      Q   BY MR. SHERMAN: But there's not an associate
 5   assigned to each specific self-checkout stand; is there?
 6      A   No, sir, they're there in a group, and it's one
 7   person generally that is assigned to that one group of
 8   self-checkout registers.
 9      Q   So, for example, you might have four self-checkout
10   registers and one sales associate assigned to all of them;
11   is that correct?
12      A   One cashier or one front-end supervisor, yes. It's
13   not sales associates.
14      Q   Okay, earlier you testified about certain
15   examples -- threatening a Home Depot employee, violence --
16   which could result in a customer being banned from a Home
17   Depot store.
18           Where did you get those examples?
19      A   Sir, those were examples that I'm familiar with.
20   And I think I used the term "offensive situation" as well.
21      Q   Well, what do you mean by "offensive situation"?
22   That seems somewhat broad. Can you specify that a little
23   bit more?
24      A   Sir, as a part of our respect policy, we often talk
25   about, in our training program on the respect policy, being
```

**Page 96**

```
 1   sensitive to how your behavior or your actions are perceived
 2   by the person that you're dealing with.
 3           So if my actions offend one of my fellow
 4   associates, then I am violating our respect policy. So I
 5   have to be sensitive to how other people are going to
 6   perceive my actions. That's what I was referring to from an
 7   "offensive" standpoint.
 8      Q   Are you aware of any calculation by Home Depot
 9   regarding the costs of providing assistance to persons with
10   disabilities who shop at Home Depot stores?
11           MR. HARRIS: Objection, outside the scope of the
12   notice and the designation. Harassing. Speculation. And
13   vague.
14           THE WITNESS: Sir, could you repeat the question?
15           MR. SHERMAN: If I could ask the court reporter to
16   kindly repeat the question.
17           (Record is read.)
18           MR. HARRIS: Same objection.
19           THE WITNESS: No.
20      Q   BY MR. SHERMAN: Has Home Depot, to your knowledge,
21   ever been contacted by groups, either nationally or locally,
22   representing persons with disabilities, who have complained
23   about policies or treatment by Home Depot of persons with
24   disabilities at their stores?
25           MR. HARRIS: Objection, outside the scope of the
```

**Page 97**

```
 1   notice and the designation. Not reasonably calculated to
 2   lead to the discovery of admissible evidence. Harassing.
 3           THE WITNESS: No, sir.
 4      Q   BY MR. SHERMAN: Are you aware of any actions by
 5   Home Depot not complying with any requirements of the
 6   federal government that Home Depot make its stores
 7   accessible to persons with disabilities?
 8           MR. HARRIS: Objection, outside the scope of the
 9   notice and designation.
10           THE WITNESS: No.
11      Q   BY MR. SHERMAN: Have you read any of the
12   statements by the employees relating to this particular
13   lawsuit or litigation?
14      A   No, sir.
15      Q   Do you know who Debra Peterson is?
16           MR. HARRIS: Objection, attorney-client privilege.
17           Do not testify with respect to any conversations
18   that you've had with me.
19           THE WITNESS: No.
20      Q   BY MR. SHERMAN: You don't know who -- I'm not
21   clear. Let me just restate that.
22           You don't know who Debra Peterson is; is that
23   correct?
24      A   Can I talk to counsel for a second?
25      Q   I'd like to ask if you can answer without talking
```

Page 98

1  to counsel.
2  MR. HARRIS: I instruct you not to answer with
3  respect to any discussions that you had with me concerning
4  this case as to any Debra Peterson, and testify only with
5  respect to information that you may have obtained from any
6  other source.
7  THE WITNESS: Okay. No, sir.
8  Q  BY MR. SHERMAN: Do you know who Darryl Puna is?
9  A  No, sir.
10 Q  Do you know who Mike Dolan is?
11 MR. HARRIS: Wait a minute, he's got his finger up.
12 Did you have something else to say?
13 THE WITNESS: No. I was going to ask if now I
14 could talk to my counsel, since I had answered the
15 questions.
16 MR. SHERMAN: Well, we can take a break now, if
17 you'd like. Five-minute break?
18 MR. HARRIS: Okay, good.
19     (Recess taken.)
20 Q  BY MR. SHERMAN: All right, Mr. Cooper. You
21 realize you're still under oath; is that correct?
22 A  Yes, sir.
23 Q  After consulting with your attorney, is there
24 anything you want to change about your answers to the last
25 questions with respect to Debra Peterson, Darryl Puna, or

Page 99

1  Mike Dolan?
2  A  No, sir.
3  Q  To be clear, are you saying you have no independent
4  knowledge of them, or you have no knowledge whatsoever of
5  them?
6  MR. HARRIS: Object with respect to conversations
7  that you may have had with in-house or outside counsel
8  concerning those three individuals in your preparation for
9  this deposition, and instruct you not to answer with respect
10 to conversations concerning those three individuals.
11 THE WITNESS: Sir, could you repeat the question?
12 MR. SHERMAN: If I could ask the court reporter to
13 repeat the question, please.
14     (Record is read.)
15 THE WITNESS: I have no independent knowledge of
16 these individuals.
17 Q  BY MR. SHERMAN: Okay, are you aware of the
18 circumstances which generated this lawsuit and occurred on
19 or about November 3, 2003?
20 A  Could you repeat the question?
21 MR. SHERMAN: If I could ask the court reporter to
22 read the question back.
23     (Record is read.)
24 MR. HARRIS: Objection, outside the scope of the
25 deposition notice.

Page 100

1  But go ahead and testify if you do, if you know.
2  THE WITNESS: No, sir, I don't.
3  Q  BY MR. SHERMAN: Do you know what Tourette Syndrome
4  is?
5  A  Yes, sir, I do.
6  Q  And can you define for us today what you believe
7  Tourette Syndrome to be?
8  A  In my limited understanding of it, it's an
9  impairment that an individual may have that causes
10 involuntary tics and possibly the utterance of different
11 types of outbursts. That's my limited knowledge as to what
12 Tourette's is.
13 Q  Do you know what coprolalia is? And if you'd like,
14 I can spell it for you.
15 MR. HARRIS: Somebody needs it spelled.
16 MR. SHERMAN: If Mr. Harris won't object to me
17 testifying by spelling it, we can waive that.
18 MR. HARRIS: Well, you may turn yourself into a
19 witness.
20 MR. SHERMAN: Well, it won't be the first time.
21 C-o-p-r-o-l-a-l-i-a, I think.
22 MR. HARRIS: And the question again is what?
23 Q  BY MR. SHERMAN: Do you know what it is?
24 A  No, I'm not familiar with that term.
25 Q  Do you know what copropraxia is?

Page 101

1  A  No, sir.
2  Q  Are you aware that the plaintiff in this case, Jon
3  Muse, has been diagnosed with Tourette Syndrome?
4  MR. HARRIS: Objection, assumes facts. Outside the
5  scope of the notice.
6  THE WITNESS: Yes.
7  Q  BY MR. SHERMAN: Are you aware he's been diagnosed
8  with -- are you aware that coprolalia is a form of
9  Tourette's?
10 MR. HARRIS: Objection, assumes facts not in
11 evidence. Outside the scope of the notice.
12 THE WITNESS: No, sir.
13 Q  BY MR. SHERMAN: You seemed to hit upon it in your
14 description of Tourette's or definition of Tourette's
15 earlier. You're aware that there are physical tics and
16 verbal tics in Tourette's; is that so?
17 MR. HARRIS: Objection, outside the scope of the
18 notice. Assumes facts not in evidence.
19 Go ahead and answer.
20 THE WITNESS: Yes.
21 Q  BY MR. SHERMAN: And you seemed -- and you were
22 aware that the manifestation of these tics by the person
23 with Tourette's is involuntary; is that correct?
24 MR. HARRIS: Objection, outside the scope of the
25 notice. Assumes facts. Foundation. Speculative.

**Page 102**

1  THE WITNESS: Yes.
2  Q  BY MR. SHERMAN: Do you understand that in using
3  the term "involuntary," that also would mean that the person
4  exhibiting that symptom does not intentionally say offensive
5  words?
6      MR. HARRIS: Objection, outside the scope of the
7  notice. Speculative. Assumes facts.
8      THE WITNESS: Could you repeat the question?
9      MR. SHERMAN: If I could ask the court reporter to
10 kindly repeat the question.
11     (Record is read.)
12     MR. HARRIS: Same objection. Plus speculative.
13     THE WITNESS: Yes.
14 Q  BY MR. SHERMAN: What is the corporate policy
15 relating to use of sexually, racially, or otherwise
16 offensive language, by or in the presence of customers or
17 associates, while on store premises, nationally?
18     THE WITNESS: Could you repeat the question?
19     MR. SHERMAN: If I could ask the court reporter to
20 repeat the question, please.
21     (Record is read.)
22     THE WITNESS: Sir, it is absolutely unacceptable
23 for any of our associates to use or to make comments that
24 are sexual or racial or offensive, and we also tell our
25 associates that they don't have to work in an environment

**Page 103**

1  where that is being used. That falls under our respect
2  policy.
3  Q  BY MR. SHERMAN: And is this contained specifically
4  in a manual or other publication by Home Depot?
5  A  Sir, I believe it is in the detailed provisions of
6  the respect policy, but I would have to verify that. I
7  believe it is.
8  Q  Is it the company policy -- does the company policy
9  distinguish between intentional or unintentional use of
10 sexual language?
11     MR. HARRIS: Objection, speculation.
12     THE WITNESS: Not that I'm aware of.
13 Q  BY MR. SHERMAN: So if someone unintentionally used
14 a phrase, they could be terminated?
15     MR. HARRIS: Objection.
16 Q  BY MR. SHERMAN: An associate?
17     MR. HARRIS: Speculation.
18     THE WITNESS: Sir, I don't know of any distinction
19 that's ever been made between intentional or unintentional.
20 If the statements are made, of course, we look into every
21 situation and make a determination from there.
22 Q  BY MR. SHERMAN: Let me give you an example. And I
23 want first to prepare you.
24     We may use some language in the rest of the
25 deposition that some people, you know, might consider

**Page 104**

1  offensive, but these are some of the words that are part of
2  this lawsuit. They're not intended to embarrass or make
3  anyone uncomfortable, but we do have to use them so that
4  we're clear on them.
5      MR. HARRIS: You know, no, you don't. We object to
6  their use. You can use "the C word" and "the N word" and
7  complete the same effect without creating a harassing
8  environment in the context of this deposition.
9      And I'll object to your use of any of the offensive
10 words in front of myself or the court reporter or any of the
11 other participants that may listen to or view this
12 deposition.
13     MR. SHERMAN: Mr. Harris, we're not going to be
14 held hostage by you and your attempt to blow up this
15 situation, all right? You've done this again and again, and
16 it's nothing more than, you know, an attempt to make it
17 worse or make it seem worse than it is, all right?
18     You've done this again and again, and it's
19 tiresome, all right?
20     MR. HARRIS: I'm --
21     MR. SHERMAN: No, no. Let me finish, Mr. Harris,
22 all right? And, you know, I understand you're grinning
23 because you're doing this again.
24     MR. HARRIS: No, you're being silly. You're
25 violating the code of professional responsibility and

**Page 105**

1  judicial conduct, which prohibits you from using harassing
2  comments in the context of litigation.
3      You don't need to use those words. You don't need
4  to use those words. You can use substitutes. You can use
5  abbreviations, okay? So I object to your use of those
6  words.
7      MR. SHERMAN: We're going to use other words, and
8  it's going to be on a case-by-case basis, okay, Mr. Harris?
9  And if you can't take the heat, you can get out of the depo
10 room, all right?
11 Q  All right, Mr. Cooper. Now, if someone at Home
12 Depot, an associate, were to drop a block on their foot and
13 say "son of a bitch," would they be terminated for that, or
14 disciplined?
15     MR. HARRIS: Objection, speculation.
16     THE WITNESS: The associate would be subject to
17 disciplinary action up to and including termination.
18     But as you just used the word, I would say there
19 would not be termination involved, but there would be a
20 record of discussion and a degree of discipline within our
21 progressive discipline system.
22 Q  BY MR. SHERMAN: Now, if a customer were to have a
23 block dropped on their foot by an associate, and the
24 customer exclaimed "son of a bitch," would they be banned
25 from the store?

**Page 106**

1  A  Sir, you're asking for speculation on my part, so
2  that's what I'm going to give you. If the term was that the
3  customer said to the associate "you son of a bitch," they
4  would be asked to leave the store.
5      There's a difference between saying "son of a
6  bitch" and "you son of a bitch."
7  Q  How about if they said "damn it" in either
8  circumstance?
9  A  If the associate that was with the customer found
10 such word to be offensive and escalated it to a manager, to
11 where the associate said, "I don't want to work in that
12 environment, and I don't want to service that customer," it
13 could lead to banning from the store.
14 Q  Banning the customer, you mean?
15 A  Yes.
16 Q  So this seems to be somewhat subjective; doesn't
17 it?
18 A  There is a degree of subjectivity, because not all
19 individuals receive the same comments the same way.
20     However, when we look at the environment in which
21 we're asking associates to work, there's less and less
22 subjectivity in that as it relates to our environment. And
23 if more than one associate hears that, or more than one
24 associate is involved in the situation, then it becomes less
25 subjective; when if it's just one customer with one

**Page 107**

1  associate, it becomes more of an individual subjectivity.
2      But from our culture, from our workplace
3  altogether, we don't believe that profanity of any kind is
4  ever acceptable in our workplace.
5  Q  You have a zero tolerance?
6  A  And we talk to associates along those lines as it
7  relates to dealing with other associates and dealing with
8  customers.
9      An associate knows what they should do if a
10 situation happens with another associate or with a customer
11 where they are offended.
12 Q  So it's a question of who's offended and not what's
13 said?
14 A  If it's a one-on-one situation, it's whether or not
15 the associate was offended. Because if it's one-on-one
16 between an associate and a customer, the managers may not
17 know about that, unless they overhear it or the associate
18 reports it to a member of the leadership team.
19 Q  Well, isn't the procedure at Home Depot, if an
20 associate is uncomfortable in a situation, for them to take
21 it to the manager? Aren't they obligated to report it?
22 A  They are encouraged, and then they're told they
23 should report it.
24 Q  Isn't it the procedure that after the manager has
25 been informed, he or she is to bring in someone from Human

**Page 108**

1  Resources?
2  A  Sir, I don't believe the procedure goes to that
3  detail. I think the associates are advised that if they're
4  in a situation with an associate -- with a customer,
5  specifically with a customer, they are to escalate that to
6  the manager and allow the manager to handle that.
7      I'd have to go back and check to see whether or not
8  the procedure specifically says you must bring in or the
9  manager must bring in someone from HR.
10 Q  I'd appreciate it if you would, because I recall
11 reading that in the documents provided us by your attorney.
12 A  And, sir, you may have well read that. I haven't
13 read that provision lately.
14 Q  Okay, how would you define offensive language in
15 terms of national corporate policy?
16 A  Sir, any language that our associates find to be
17 offensive or inappropriate in the workplace. And certainly,
18 anything of a sexual nature or a racial nature would be
19 considered offensive.
20 Q  And how is that corporate policy implemented at a
21 local level, particularly here in Hawaii?
22 A  How is it implemented --
23 Q  Yes.
24 A  -- is the question?
25 Q  Yes.

**Page 109**

1  A  The expectation is that they implement it the same
2  way within the Hawaii market as we do in any other market
3  around the country. There is no special provisions for
4  Hawaii.
5      If an associate in Hawaii is offended based on
6  comments that are made by, in this case, a customer, that's
7  of a sexual or racial nature, then that associate should
8  escalate the issue to a manager. And then the original
9  associate steps out of the situation and allows the manager
10 to handle it.
11 Q  Does the manager then make the final decision?
12 A  It depends on what the manager sees as the
13 seriousness of the situation and the availability of -- the
14 ability to partner with either the district manager or the
15 regional HR manager for that particular market.
16 Q  How would you define sexual language in the context
17 of the corporate policy regarding language?
18 A  Oh, sir, I think that is a -- I think that can run
19 the gamut. Any comment of a sexual nature that the
20 associate finds to be offensive is inappropriate.
21 Q  Well, that seems to be pretty open-ended; doesn't
22 it?
23     MR. HARRIS: Talk to the 1974 Congress.
24     MR. SHERMAN: I think I'm asking Mr. Cooper,
25 Mr. Harris.

Page 110

```
 1         MR. HARRIS: Okay.
 2         MR. SHERMAN: If you'd like, we can arrange your
 3   depo later.
 4         THE WITNESS: Sir, you know, to use your words, it
 5   may be open-ended, but I think it almost falls in a category
 6   of, "I know it when I hear it."
 7    Q    BY MR. SHERMAN: Well, that's a nice saying, but
 8   isn't what you're describing -- let me ask you this.
 9         Where is it written down in the manuals
10   specifically, and where does it set forth some examples?
11         MR. HARRIS: Would you like him to go through the
12   manual now?
13         MR. SHERMAN: I was hoping he had done it in
14   preparation for his deposition, but perhaps we'll retake it
15   later, Mr. Harris.
16         MR. HARRIS: We've gone over this a number of
17   times. The inch-, half-inch-thick manual is in front of us.
18   Do you want him to go over it and find everywhere it says
19   "of a sexual nature," or not? Or do you want to move on?
20         MR. SHERMAN: Why don't you let him answer the
21   question, Mr. Harris, where they use specific examples.
22         MR. HARRIS: Objection, vague, burdensome.
23         THE WITNESS: Sir, could you repeat the question?
24    Q    BY MR. SHERMAN: Certainly. Where is it written
25   down in any publication or manual by Home Depot where it
```

Page 111

```
 1   uses specific examples as to what types of language could be
 2   considered sexual in nature so as to invoke the corporate
 3   policy prohibiting that type of language?
 4    A    Sir, I believe it is in the training material that
 5   accompanies the respect policy training that associates
 6   receive somewhere during their on-boarding process.
 7         And if you're asking for specific locations and
 8   specific examples, I'll have to get that information to my
 9   attorney afterwards.
10    Q    That would be great. I'd appreciate that.
11         For example, if someone used in a particular
12   context the word "titillate," could that be considered
13   sexually offensive?
14    A    I think to the reasonable person, probably not, but
15   I'm sure you could find someone that would find that to be
16   offensive.
17    Q    What about racial language? Is there any -- are
18   there any manuals that define certain terms that are
19   prohibited or that give examples of language, racial
20   language, that would violate Home Depot corporate policy?
21    A    Sir, I'm not familiar with any material that
22   specifically talks about particular words or particular
23   language, so I don't think those are in any of our training
24   materials, words per se. It's more of situations that would
25   imply that.
```

Page 112

```
 1    Q    Now, would this vary contextually from locale to
 2   locale?
 3    A    No, sir.
 4    Q    For example --
 5    A    The translation may be slightly different, but some
 6   of our material is in Spanish, and some of it is in French,
 7   for our fellow associates in the Canadian market and the
 8   Mexico market.
 9    Q    For example, in Hawaii at a store if someone used
10   the phrase "haole," could that be considered offensive
11   racially?
12         MR. HARRIS: Objection, outside the scope.
13         THE WITNESS: Sir, I've never heard that word, so I
14   can't make -- I can't speculate on that.
15         MR. SHERMAN: It's a local word. It's spelled
16   h-a-o-l-e.
17    Q    Did you talk to anyone locally about the
18   implementation of the corporate policies locally as to
19   language?
20         MR. HARRIS: Outside the scope, as it relates to
21   the term "haole."
22         THE WITNESS: No, sir, I did not.
23    Q    BY MR. SHERMAN: Okay, you're in charge of -- one
24   of the areas of your region is Hawaii; is that correct?
25    A    That is correct.
```

Page 113

```
 1    Q    But you're not familiar with the term "haole"; is
 2   that correct?
 3    A    That's correct.
 4    Q    Okay, would it --
 5    A    Sir, but I'm also not familiar with some of the
 6   terms -- I'm taking that as slang -- that are used here in
 7   East LA either.
 8         So our standard is what's appropriate for a
 9   business environment, not what's appropriate for the streets
10   or what's appropriate in your slang language or your native
11   language.
12         We have associates, I'm sure, that use a different
13   language outside the workplace than what they currently use
14   in our workplace.
15    Q    So what happens when a third party uses such
16   language at a Home Depot?
17    A    "Uses such language" meaning what?
18    Q    Offensive language, sexual language, or racial
19   language.
20    A    "A third party" meaning a customer?
21    Q    Let's say a vendor.
22    A    Okay, if a vendor used inappropriate language and
23   was reported by the associate to a member of management, we
24   would either talk specifically to the vendor or, if we felt
25   that the case was severe enough, we would contact the
```