1                 IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF HAWAII

3   _____

4   JON MUSE,                           CIVIL NO. 04-00154 DAE/BMK

5                   Plaintiff,      (Civil Rights Violation)

6         vs.

7   HOME DEPOT USA, INC.,

8                   Defendant.

9   _____

10

11

12               DEPOSITION OF MICHAEL J. DOLAN

13

14       Taken on behalf of the plaintiff at the office of

15  Davis Levin Livingston Grande, 851 Fort Street, Suite 400,

16  Honolulu, Hawai'i, commencing at 9:32 a.m. on July 21st, 2006,

17  pursuant to Notice.

18

19

20

21

22

23  BEFORE:       B. KANOELANI COCKETT

24                Certified Shorthand Reporter

25                HI CSR NO. 379, CA CSR NO. 7995

Page 2

1 APPEARANCES:
2 For Plaintiff:   STANLEY E. LEVIN, ESQ.
3              Davis Levin Livingston Grande
4              851 Fort Street, Suite 400
5              Honolulu, Hawai'i 96813
6              slevin@davislevin.com
7              and
8              BRUCE F. SHERMAN, ESQ.
9              The Law Office of Bruce F. Sherman
10             1164 Bishop Street, Suite 124
11             Honolulu, Hawai'i 96813
12             failey52@hawaii.rr.com
13
14 For Defendant:   JEFFREY S. HARRIS, ESQ.
15             Torkildson Katz
16             Topa Financial Center, Bishop Street Tower
17             700 Bishop Street, Floor 15
18             Honolulu, Hawai'i 96813
19             jsh@torkildson.com
20
21
22
23
24
25                    -oOo-

Page 3

1                  I N D E X
2 EXAMINATION                          PAGE
3 MR. SHERMAN                            4
4
5
6           EXHIBITS FOR IDENTIFICATION
7 PLAINTIFF'S                           PAGE
8 A    Employee Statement of Michael J. Dolan    33
9      dated February 24, 2004
10 B   Declaration of Michael Dolan dated    71
11     November 28, 2005
12 C   Supplemental Declaration Of Michael Dolan    47
13     In Support of Motion For Summary Judgment
14     Filed November 29, 2005
15 D   Employee Statement of Darlyn P. Kuhia    57
16     dated February 20, 2004
17 E   Declaration of Michael Dolan with Exhibit    72
18     B-1 attached
19
20           SEALED TESTIMONY
21           PAGES 25 through 28
22
23
24
25                    -oOo-

Page 4

1        (Reporter's Disclosure was displayed.)
2              MICHAEL DOLAN,
3         Having been first duly sworn,
4      testified under his oath as follows:
5              EXAMINATION
6 BY MR. SHERMAN:
7    Q.   Good morning, Mr. Dolan. My name is Bruce Sherman.
8 I'm here with my co-counsel, Stan Levin, and we represent the
9 plaintiff in this matter, Jon Muse, in the lawsuit involving
10 your company, Home Depot. We need to go through some
11 preliminary questions and statements so that you understand
12 and we're all clear, on the same page, as to how we're going
13 to do this deposition.
14        First of all, could you state your full name for the
15 record?
16    A.   Michael John Dolan.
17    Q.   And what's your date of birth?
18    A.   5-11-56.
19    Q.   Now, we have a trial set on October 24th.
20        Will you be available that date?
21    A.   Yes.
22    Q.   Okay. Will you be willing to accept a subpoena
23 through Mr. Harris?
24        MR. HARRIS:  No.
25 BY MR. SHERMAN:

Page 5

1    Q.   Okay. What's your home address, please?
2    A.   1650 Ala Moana Boulevard, and the ZIP code there is
3 96815, and I'm in unit 1613.
4    Q.   Is there a name for that building?
5    A.   Yeah. It's called Yacht Harbor Tower.
6    Q.   Okay. Okay. Are you aware of the nature of this
7 lawsuit?
8    A.   Yes, somewhat.
9    Q.   Okay. You understand that Mr. Muse has sued Home
10 Depot pursuant to the Americans with Disabilities Act and the
11 Hawai'i state statute?
12    A.   Yes.
13    Q.   In preparation for today who did you speak with?
14    A.   As far as for this deposition?
15    Q.   Yes.
16    A.   My attorney, our attorney.
17    Q.   Okay. That's Mr. Harris?
18    A.   Yes.
19    Q.   Okay. When did you speak to him?
20    A.   This morning.
21    Q.   Okay. Did you speak to him anytime other than in
22 the last month?
23    A.   We spoke once before in January, I believe, and
24 because we were doing inventory and I came and spoke with him.
25    Q.   Okay. And you met with Mr. Harris this morning?

Page 6

1    A.    Correct.
2    Q.    And that's the only time in the last month you've
3    met with Mr. Harris?
4    A.    Met with him once before at the store, briefly.
5    Q.    Was that in January?
6    A.    No, that was not too long ago.  I don't remember the
7    exact date.
8    Q.    Would it have been June?
9    A.    I'm not sure.
10    MR. HARRIS:  That was -- we met on a different case
11    on --
12    THE WITNESS:  You came over with another attorney.
13    MR. HARRIS:  Mr. Mackey and I came over and that was
14    in the Dunham case.
15    THE WITNESS:  Okay, but January I met with you on
16    this one, correct?
17    MR. HARRIS:  Yeah.
18    BY MR. SHERMAN:
19    Q.    Okay.
20    A.    Because it was inventory time, I don't remember
21    specifically.  It was inventory day.
22    Q.    How long did you spend with Mr. Harris in January?
23    A.    I was in his office a little while.  I can't
24    remember exactly how long.  I wasn't there that long because
25    we were doing inventory that day.

Page 7

1    Q.    Today how long did you spend with Mr. Harris?
2    A.    Fifteen minutes.
3    Q.    Did you review any written documents or materials
4    for this deposition?
5    A.    This morning I read this (indicating).
6    Q.    And what is this?
7    A.    This is my statement, and it's on the back of this.
8    It is basically a Declaration of what happened that day.
9    MR. HARRIS:  You're free to take a look at it.
10    MR. SHERMAN:  Yeah.
11    (The document was reviewed.)
12    BY MR. SHERMAN:
13    Q.    Thank you.
14    A.    Um-hum.
15    Q.    So material, the only materials you reviewed were
16    your Declaration In Support of the Plaintiff's -- or the
17    Defendants Motion For Summary Judgment?
18    A.    These documents.
19    Q.    And your handwritten statement; is that correct?
20    A.    Correct.
21    Q.    You didn't review anything else?
22    A.    No.
23    Q.    Did you at any time prior to this deposition in
24    preparation review the manager's manual or associate's manual?
25    A.    No.

Page 8

1    Q.    You do have copies of those, don't you?
2    A.    We keep any manuals we have, SOP, that's stuff, we
3    keep at the store.
4    Q.    Okay.  Is it readily available to everyone?
5    A.    The manuals, the associate manuals, they get that
6    during orientation with a kit.
7    Q.    Okay.
8    A.    That's theirs to keep.
9    Q.    What about a manager's manual?
10    A.    We just have SOP, store operating procedures.
11    Q.    Do you have your own office there?
12    A.    No.
13    Q.    Are store operating procedures in a written form?
14    A.    They are in a binder.
15    Q.    A hard copy?
16    A.    Um-hum.
17    Q.    And where are they kept?
18    A.    In the office.
19    Q.    Okay.  Do you have ready access to that?
20    A.    If I need to look at them, I can.
21    Q.    Is there any reason today that you would have
22    difficulty, because of a language problem, in terms of
23    testifying or communicating or understanding any of the
24    questions?
25    A.    I'm not sure yet.

Page 9

1    Q.    Is English your first language?
2    A.    Yes, it is.
3    Q.    Okay.  Do you have any difficulty hearing?
4    A.    Not a problem.
5    Q.    Okay.  You have any difficulty normally
6    understanding questions that are posed to you?
7    A.    Normally not.
8    Q.    Okay.  Are you able to read and write?
9    A.    Yes.
10    Q.    Okay.  Is there any physical impediment you know of
11    that you possess that would impair your ability to communicate
12    or understand questions or testify today?
13    A.    Not that I'm aware of.
14    Q.    Okay.  Have you taken any medications in the last 24
15    hours?
16    A.    No.
17    Q.    Okay.  Have you had any drugs in the last 24 hours?
18    A.    No.
19    Q.    Have you had any alcohol in the last 24 hours?
20    A.    I had a beer after work last night.
21    Q.    Okay.  About what time?
22    A.    7:00.
23    Q.    Just one beer?
24    A.    One.
25    Q.    Okay.  Have you been deposed before in any lawsuit

Page 10

1 or matter?

2 A. One time.

3 Q. Okay. Where was that?

4 A. Hawai'i.

5 Q. Okay. Do you remember the lawsuit, what it was

6 about?

7 A. What it was about was, in simple terms, my name was

8 put on a document by someone else, and they deposed me. Once

9 they showed me the document, it wasn't my name, that was the

10 last I heard of it. I got a letter saying that was the end of

11 it.

12 Q. Was this lawsuit as a result of your working with

13 Home Depot?

14 A. No.

15 Q. It was -- had to do with your own private life or

16 private affairs?

17 A. No. It had to do with a business I was working at

18 at the time, and the owner had put my name on some documents

19 and then I was deposed. It was clearly not my name or my

20 writing, and that was the end of it.

21 Q. Okay. Where were you working at that time?

22 A. At that time it was called Pacific Sales.

23 Q. And what was the nature of the business of Pacific

24 Sales?

25 A. We supplied paint supplies to contractors.

Page 11

1 Q. Okay. What were the dates that you worked at

2 Pacific Sales?

3 A. The last it was -- I'm not sure exactly when I

4 started, but the last I worked there was 1996.

5 Q. Okay. Why did you leave Pacific Sales?

6 A. They closed the business.

7 Q. What was the document that your name was put on or

8 it was attributed --

9 A. It was a document that basically the owner had

10 signed my name that I would assume credit responsibility for

11 some debt he had.

12 Q. Was this document filed with the bank or --

13 A. I'm not sure. It was with a vendor, and that he

14 gave it to a vendor, and then next thing I know, after

15 business closed I got subpoenaed. I went in there, they

16 showed me the document, signed my name a couple times, got a

17 letter, all done. Never heard from them again.

18 Q. Do you remember who the lawyers were in that case?

19 A. No, I don't. It was here in town, though.

20 Q. Do you know if the case was in federal court or

21 state court?

22 A. I don't know what happened. I was out of it at that

23 point.

24 Q. Okay. About when did the case occur, what year?

25 A. That was I believe '96.

Page 12

1 Q. Who was the owner of the business?

2 A. At that time it was Tony Nagle.

3 Q. Is he still around?

4 A. No, he passed away. That's one of the reasons they

5 closed the business.

6 Q. But he was the person who put your name on --

7 A. Correct.

8 Q. -- this document?

9 A. Correct.

10 Q. Did he forge your signature?

11 A. Yes.

12 MR. HARRIS: Objection, foundation.

13 BY MR. SHERMAN:

14 Q. So he fraudulently put your name on this document;

15 is that correct?

16 MR. HARRIS: Objection, foundation, speculation,

17 legal conclusion.

18 THE WITNESS: My name was on that document and it

19 wasn't my signature.

20 BY MR. SHERMAN:

21 Q. Do you know who created that document?

22 A. I'm not sure. I'm not sure who created it.

23 Q. You think Mr. Nagle created it?

24 A. I don't know.

25 Q. But it was a fraudulent document, to the best of

Page 13

1 your knowledge; is that right?

2 MR. HARRIS: Objection, foundation, speculation.

3 THE WITNESS: It wasn't my signature.

4 BY MR. SHERMAN:

5 Q. Would it be fair to say it was a fraudulent

6 document, then?

7 MR. HARRIS: Asked and answered.

8 THE WITNESS: Yeah.

9 BY MR. SHERMAN:

10 Q. Now, do you know Jon Muse?

11 A. No.

12 Q. Okay. How many times have you met him, though?

13 A. The only time I recall meeting him was that

14 particular day.

15 Q. Would that be November 3rd, 2003?

16 A. Yes.

17 MR. HARRIS: You looked at something.

18 THE WITNESS: Yeah.

19 BY MR. SHERMAN:

20 Q. I'd like to ask you if you could possibly testify

21 first without looking at the document, and then if you need

22 to, we can let you see it to refresh your recollection.

23 MR. HARRIS: (Attorney complies.)

24 THE WITNESS: (Witness nods head.)

25 BY MR. SHERMAN:

Page 14

1  Q.  You haven't seen Mr. Muse since then?
2  A.  Not that I recall.
3  Q.  Okay.  How long have you worked at Home Depot?
4  A.  March 29th, 1999.
5  Q.  And you're still currently employed by them?
6  A.  Yes.
7  Q.  And what is your position at this time?
8  A.  At this time I'm the assistant store manager.
9  Q.  How many assistant store managers are there?
10  A.  Right now we have a total of seven.
11  Q.  And that's at the store...
12  A.  Yes.
13  Q.  The subject...
14     What's the address of that store?
15  A.  421 Alakawa Street.
16  Q.  Do you normally work an eight-hour shift?
17  A.  Eleven.
18     (The reporter asked for clarification.)
19  BY MR. SHERMAN:
20  Q.  Are you considered management?
21  A.  Yes.
22  Q.  Who is above you in terms of the hierarchy at the
23  store?
24  A.  The store manager.
25  Q.  How many of those are there?

Page 15

1  A.  One.
2  Q.  How many store managers are on at the store at one
3  time usually?
4     MR. HARRIS:  Objection, vague.
5     You mean assistant store manager?
6  BY MR. SHERMAN:
7  Q.  Assistant store managers.
8  A.  It can vary.
9  Q.  Normally what would the number be?
10  A.  It varies.
11  Q.  Okay.  You wouldn't have all seven there at once,
12  would you?
13  A.  If we had a meeting.
14  Q.  But in the normal course of the day without a
15  special meeting being called?
16  A.  No.
17  Q.  Okay.  Are you ever the only assistant store manager
18  there?
19  A.  Occasionally.
20  Q.  Okay.  On November 3rd, 2003, were you the only
21  store assistant store manager there?
22  A.  I don't recall.
23  Q.  Okay.  Is the assistant store manager in charge of
24  the store when the store manager isn't there?
25  A.  Yes.

Page 16

1  Q.  If there's more than one assistant store manager
2  there at the store when the store manager is there, which one
3  of the assistant store managers is in charge?
4  A.  We're equals.
5  Q.  When you began working March 29th of 1999, what was
6  your position?
7  A.  At that time I was training in preparation to open
8  the Honolulu store.
9  Q.  Which store was that, the Alakawa store?
10  A.  Yes, the one I'm currently.
11  Q.  And the store wasn't open at that time?
12  A.  No.
13  Q.  And you said "training in preparation".
14     "In preparation" being what position?
15  A.  At that time my position was a department head.
16  Q.  And is that lower or higher than the assistant store
17  manager?
18  A.  It's one level lower.
19  Q.  And what department were you being trained for?
20  A.  Paint department.
21  Q.  And is that what you -- the position you had when
22  the store actually opened?
23  A.  Yes.
24  Q.  How long were you in charge of the paint department?
25  A.  Approximately a year.

Page 17

1  Q.  Okay.  And then what position did you assume?
2  A.  My current position.
3  Q.  So you've been an assistant store manager for six
4  years; is that correct?
5  A.  Pretty much.
6  Q.  Are there grades within the position of assistant
7  store manager?
8  A.  We're equals.
9  Q.  Okay.  Are there pay step grades within that
10  position?
11  A.  I'm not privy to what other people are paid.
12  Q.  But during the course of your six years as assistant
13  store manager has your pay increased?
14  A.  Yes.
15  Q.  Okay.  And has that increased on automatic steps, or
16  are these merit increases?
17  A.  You are reviewed once a year.
18  Q.  Okay.  And have you consistently increased?  Has
19  your pay increased each year?
20  A.  Yes.
21  Q.  Okay.  Now, prior to working at Home Depot,
22  beginning there in 1999, where did you work?
23  A.  Okay.  I was involved in painting, painting houses
24  and small buildings.
25  Q.  Okay.  Would that be from 1996 to 1999?

Page 18

1   A.   Approximately that time.
2   Q.   And when you say "painting," you were actually
3   physically painting them?
4   A.   Yes.
5   Q.   Were you an independent contractor at that time?
6   A.   I worked by myself, yes.
7   Q.   Okay.  Did you have your own business?
8   A.   No.  I pretty much just helped out.  You know, when
9   I got a job, I painted and I didn't -- you know, that's all I
10  did.
11  Q.   Okay.  Did you have a contractor's license?
12  A.   No.
13  Q.   Did you have a GET license?
14  A.   Yes.
15  Q.   Is that still active?
16  A.   No.
17  Q.   Are there any particular big jobs you worked on, or
18  were these just small houses?
19  A.   Small.
20  Q.   Okay.  And why did you stop that work?
21  A.   To take a position with Home Depot.
22  Q.   Okay.  Now, prior to that you worked at Pacific
23  Sales?
24  A.   Correct.
25  Q.   Okay.  And that was a painting store?

Page 19

1   A.   Yeah, a paint store.
2   Q.   Okay.  Where was that located?
3   A.   By the airport.
4   Q.   How long did you work there?
5   A.   A couple years.
6   Q.   Do you know when you began?
7   A.   I don't recall exactly.
8   Q.   Okay.  Do you know approximately how many years you
9   actually worked there?
10  A.   It was a couple years.
11  Q.   Okay.  And you left that job because the business
12  closed?
13  A.   Correct.
14  Q.   Where did you work before working at Pacific Sales?
15  A.   Before I worked at Pacific Sales I just came to
16  Hawai'i.  I was basically still helping my family in Chicago,
17  so I was going back and forth.
18  Q.   Okay.  Do you know when you came to Hawai'i?
19  A.   In 1991.
20  Q.   And you came here from Chicago?
21  A.   Correct.
22  Q.   Did you leave a job in Chicago to come here?
23  A.   Worked for my family.
24  Q.   Okay.  Was that a family business?
25  A.   Correct.

Page 20

1   Q.   What was the nature of the business?
2   A.   We were manufacturer's rep in the home improvement
3   industry for vend -- you know, manufacturers.
4   Q.   What was the name of the company?
5   A.   It was called Dolan & Associates.
6   Q.   Does that still exist?
7   A.   No.
8   Q.   Okay.  Why did you leave that position?
9   A.   To move to Hawai'i.
10  Q.   Okay.  When you left that business was it still in
11  existence?
12  A.   Yes.
13  Q.   Okay.  But you decided that you wanted to move to
14  Hawai'i and stop working for the family?
15  A.   Correct.
16  Q.   How long did you work for Dolan & Associates?
17  A.   Ten years.
18  Q.   And what was your position during that period of
19  time?
20  A.   Basically I called on our accounts and sold product
21  and, you know, that was pretty much what I did.
22  Q.   What was the type of product?
23  A.   Building materials.
24  Q.   Now, did Dolan Associates manufacture those
25  materials?

Page 21

1   A.   No.  We were manufacturer's representatives.
2   Q.   So were you -- that like sort of being
3   independent contractor for other manufacturers?
4   A.   We would represent manufacturers to the home
5   improvement industry.
6   Q.   What particular kinds of products did you market?
7   A.   Many different kinds of products, building
8   materials.
9   Q.   And what were some of the companies you sold them
10  to?
11  A.   Ace Hardware, True Value, those types.
12  Q.   Home Depot?
13  A.   They weren't in existence then in Chicago.
14  Q.   Okay.  Prior to working for Dolan & Associates,
15  where did you work?
16  A.   Owens-Corning Fiberglas.
17       MR. HARRIS:  You want some water?
18       THE WITNESS:  No, I'm fine.
19       MR. SHERMAN:  Yeah, if you want some, we can get
20  you.
21       THE WITNESS:  I'm fine.
22  BY MR. SHERMAN:
23  Q.   And what did you do for them?
24  A.   I was a sales representative.
25  Q.   How long did you work for them?

Page 22

1  A.  Three years.
2  Q.  Do you remember the dates?
3  A.  1978 to 1981.
4  Q.  Why did you leave Owens-Corning?
5  A.  My father passed away.  I moved back to Chicago to
6  help take over the business.
7  Q.  Where were you working for Owens-Corning then?
8  A.  Florida.
9  Q.  Do you know what city?
10  A.  Fort Myers.
11  Q.  Did you attend college?
12  A.  Yes.
13  Q.  Okay.  Which college?
14  A.  University of North Dakota.
15  Q.  You play hockey there?
16  A.  No.
17  Q.  Okay.  When did you graduate?  Did you graduate
18  from --
19  A.  Yes, I did.
20  Q.  When did you graduate?
21  A.  1978.
22  Q.  And what is your degree in?
23  A.  B.S./B.A. in marketing.
24  Q.  I'm sorry, what?
25  A.  B.S./B.A. in marketing.

Page 23

1  Q.  What is a B.S./B.A.?
2  A.  Bachelor of Science, Business Administration.
3  Q.  And you did the University of North Dakota in
4  four years?
5  A.  Yes.
6  Q.  Did you receive any honors upon graduation?
7  A.  I made the dean's list a bunch of times.
8  Q.  Okay.  Did you graduate cum laude or --
9  A.  No.
10  Q.  And then after college you began work for
11  Owens-Corning?
12  A.  Correct.
13  Q.  Okay.  Where did you grow up?
14  A.  I grew up in quite a few places now.  Been living in
15  New York City for a while and then Chicago, before New York
16  City, Detroit.
17  Q.  Where did you go to high school and finish high
18  school?
19  A.  I finished in Chicago, Naperville.
20  Q.  Okay.  Where were you born?
21  A.  North Dakota.
22  Q.  When you went to college you still had family in
23  North Dakota?
24  A.  I have some relatives there, yes.
25  Q.  I'm curious:  Where is the University of North

Page 24

1  Dakota?
2  A.  Grand Forks.
3  Q.  I'm sorry, what?
4  A.  Grand Forks.
5  Q.  Have you ever been convicted of a crime of moral
6  turpitude or dishonesty?
7  A.  No.
8  Q.  Have you ever been charged with one?
9  A.  No.
10  Q.  Now, something we didn't say, and you're doing fine,
11  but it's important that you answer verbally to every question
12  that I ask.
13  A.  Okay.
14  Q.  That's the only way the court reporter can pick them
15  up.  If at any time or during times in the deposition Mr.
16  Harris may object to a question, you should stop answering the
17  question, let him state his objection for the record.  At that
18  point, unless he instructs you specifically not to answer the
19  question, you should then answer the question.  There are very
20  narrow reasons for not answering a question, and if that's the
21  case, that would be stated, but otherwise you should answer
22  the question.
23      Okay?
24  A.  (Witness nods head.)
25  Q.  If you don't understand a question, feel free to say

CONFIDENTIAL

Page 25

1  so or to ask that it be rephrased.  Sometimes I'll ask you
2  what you don't understand just so that we can clarify it.  I
3  don't always ask perfect questions.  No attorney does.
4      Do you understand that?
5  A.  Yes, I do.
6  Q.  Okay.  And you understand that you're under oath
7  today?
8  A.  Yes, I do.
9  Q.  Do you know a Debra Peterson?
10  A.  Yes.
11  Q.  Okay.  Are you friends with Debra Peterson?
12  A.  She was an associate at my store.
13  Q.  Okay, but would you consider yourself her friend?
14  A.  She was an associate at my store as far as I know
15  her.
16  Q.  Okay.  When is the last time you talked to her?
17  A.  I don't remember the last date, but it was when we
18  terminated her.
19  Q.  Okay.  Do you know what year that was?
20  A.  I don't recall exactly the year.
21  Q.  Okay.  And why did you terminate Ms. Peterson?
22  A.  She was suspected of stealing.
23  Q.  And what was she suspected of stealing?
24  A.  I'm not exactly sure.
25  Q.  Okay.  Was she prosecuted?

CONFIDENTIAL

Page 26

1    A.   I don't know, sir.

2    Q.   Okay. Did you actually terminate her?

3    A.   Yes, I did.

4    Q.   And what did that entail, that process, with regard

5  to Mrs. Peterson?

6    A.   I --

7         MR. HARRIS:  I'll just -- let's agree that this is

8  sealed as sensitive personnel matter. You're talking to a

9  manager about termination of another employee. You can use it

10  in this action, but not outside of this action.

11        MR. SHERMAN:  Yeah.

12        MR. HARRIS:  Agreed?

13        MR. SHERMAN:  Yeah, within this action, that's fine,

14  as long as there's no problem with that.

15        MR. HARRIS:  Yeah.

16        THE WITNESS:  Can you repeat the question?

17        MR. SHERMAN:  Sure.

18    Can you repeat the question, please?

19        (The record was read.)

20        THE WITNESS:  Okay. Basically I was summoned by the

21  loss prevention department, and I was told that I needed to

22  terminate an employee, an associate, and I was brought to

23  where they had her sitting in an office, and I terminated her.

24  BY MR. SHERMAN:

25    Q.   Who in loss prevention called you?

CONFIDENTIAL

Page 27

1    A.   At that time I don't recall exactly who it was.

2    Q.   Who made the decision to terminate; was it loss

3  prevention?

4    A.   Loss prevention.

5    Q.   And that's part of their authority and power?

6    A.   At that time.

7    Q.   Is it still?

8    A.   It's changed.

9    Q.   Who would make that decision now?

10    A.   Generally the store manager.

11    Q.   Did you have -- with respect to Mrs. Peterson, did

12  you have any discretion as to whether or not you would

13  terminate her?

14    A.   No.

15    Q.   So you basically went through the formal process of

16  terminating her?

17    A.   Correct.

18    Q.   And during that process did you explain to her what

19  the grounds were?

20    A.   I briefly touched on it.

21    Q.   And what did she say to you in response?

22    A.   I don't recall.

23    Q.   Did she deny the claims?

24    A.   I don't recall.

25    Q.   Do you recollect the specific basis for her

Page 28

1  termination involved return of merchandise?

2    A.   I'm not sure.

3    Q.   Okay. But you do recollect it involved an act of

4  dishonesty?

5    A.   Yes.

6    Q.   Okay. When an employee is terminated from Home

7  Depot for an act of dishonesty, are they banned from the store

8  at that time?

9    A.   I'm not sure.

10    Q.   Is there a way of finding out if they are permitted

11  back in the store? Would that be in the store operating

12  procedures?

13    A.   I'm not sure of that either.

14    Q.   Let me ask you this.

15    In the hypothetical where someone is arrested for

16  shoplifting or charged with shoplifting, are they banned from

17  the store?

18    A.   I'm not sure.

19    Q.   So you don't know whether or not the shoplifter

20  would be allowed back in the store after being charged?

21        MR. HARRIS:  Objection, asked and answered.

22        THE WITNESS:  I don't. I'm not sure.

23  BY MR. SHERMAN:

24    Q.   Do you know -- now, loss prevention, are they

25  concerned with what's called shrinkage?

Page 29

1    A.   That's part of their responsibilities.

2    Q.   What is shrinkage?

3    A.   Loss.

4    Q.   Would that be loss through theft?

5    A.   One of the ways.

6    Q.   Okay. What are some of the other ways?

7    A.   Damage.

8    Q.   What else is loss prevention responsible for?

9    A.   I don't get that involved in loss prevention. So

10  they are responsible for certain things that I know about.

11  There may be other responsibilities that I'm not aware of.

12    Q.   Are there video cameras throughout the Home Depot

13  store?

14    A.   Yes.

15    Q.   And essentially is almost all the Home Depot store

16  covered by at least one video camera in one angle?

17        MR. HARRIS:  Objection, time frame.

18        THE WITNESS:  The video system has changed since

19  that period.

20  BY MR. SHERMAN:

21    Q.   Okay. Was there in 2000 -- November of 2003,

22  specifically November 3rd, was there a video surveillance

23  system in effect at Home Depot?

24    A.   There was. There were cameras.

25    Q.   Okay. And were there cameras trained on either the

Page 30

1 return desk or cashiers' stations.
2 A. They could be.
3 Q. Okay. Would they rotate or scan the area?
4 A. I didn't -- I'm not that familiar with the systems,
5 but they -- I really don't know exactly how they worked. I do
6 know the systems were changed.
7 Q. Okay. When were the systems changed?
8 A. A couple years ago.
9 Q. After November of 2003?
10 A. Yes.
11 Q. And how were they changed?
12 A. An updated version.
13 Q. Did the systems record? Were there videotapes made
14 of what was recorded on the -- by the cameras?
15 A. They recorded tapes, but I did not get involved
16 really in the video system.
17 Q. Was loss prevention responsible for the video
18 system?
19 A. As I remember, yes.
20 Q. Are they still?
21 A. As I know now, I believe they are.
22 Q. Okay. Have you ever seen a video, or do you know of
23 a video that exists with respect to the incident involving Mr.
24 Muse on November 3rd, 2003?
25 A. No.

Page 31

1 Q. Do you know how long they keep the videotapes?
2 A. I don't know.
3 Q. Now, have you -- do you know Darlyn Kuhia?
4 A. Dar?
5 Q. Yeah.
6 A. Yes, I do.
7 Q. Is that her first name or her nickname, Dar?
8 A. That's what we refer to her in the store, yes.
9 Q. That's Dar Kuhia?
10 A. I believe so, yes.
11 Q. And how do you know her?
12 A. She's one of our head cashiers.
13 Q. Okay. And did you talk to her at all prior to this
14 deposition about the incident on November 3rd, 2003?
15 A. I saw her yesterday afternoon.
16 Q. Okay. And about what time?
17 A. She had come back to the store from the deposition
18 and I happened to be near the front entrance when she walked
19 in.
20 Q. Okay. And she worked yesterday?
21 A. I sent her home.
22 Q. Okay. What time did you send her home?
23 A. I told her as soon as her replacement was there she
24 is to leave and go home. In the meantime, I told her to go to
25 the break room, stay on the clock, and try to compose herself.

Page 32

1 Q. Okay. And why did she want to go home?
2 A. She was upset.
3 Q. Okay.
4 A. She didn't want to go home. I insisted she go home.
5 Q. So she wanted to work; is that correct?
6 A. I didn't give her a chance to really explain that to
7 me.
8 Q. But you sent her home?
9 A. Yes.
10 Q. It wasn't her decision?
11 A. I told her I wanted her to go home as soon as her
12 replacement came in.
13 Q. Was it her decision to go home?
14 A. Yes, but she did go home.
15 Q. I'm sorry, a moment ago you testified that it was
16 your decision that she -- you sent her home.
17 A. I sent her home, but she -- I wasn't there walking
18 her out the door. She went home on her own.
19 Q. I know, but was it her -- did she ask you if she
20 could go home?
21 A. No. I said, "Dar, I'd like you to go home as soon
22 as your replacement is here. I can tell you're upset."
23 Q. Okay. But she didn't ask you to go home; is that
24 correct?
25 A. Correct.

Page 33

1 Q. Did you talk to her about the deposition?
2 A. I simply asked her how it went, and I could tell she
3 was crying and upset.
4 Q. Okay. Did she say anything?
5 A. That she was upset about some of the language that
6 was used during the deposition.
7 Q. Okay. And specifically what language?
8 A. I didn't go into great detail with her.
9 Q. Okay. Now, have you ever seen the statement she
10 wrote with respect to the November 3rd, 2003 incident?
11 A. She wrote a statement. I wrote a statement. I
12 never actually read her statement.
13 Q. You've never read her statement?
14 A. I don't recall.
15 Q. Now, prior to yesterday did you ever talk to her
16 about the incident of November 3rd, 2006 (sic)?
17 A. No, I did not.
18 Q. Okay. Now, let me hand you what's been marked as
19 Exhibit A.
20      (Plaintiff's Exhibit A
21      was marked for identification.)
22 THE WITNESS: Okay.
23 BY MR. SHERMAN:
24 Q. That's your statement.
25     Do you have a copy of that, Jeff?

Page 34

1    MR. HARRIS: Bates stamp 11013300004, first page?
2    THE WITNESS: Yup.
3    MR. HARRIS: Okay.
4    BY MR. SHERMAN:
5    Q.    Okay. Let me ask you to read through that, and let
6    me know when you've finished reading through that. You don't
7    have to read it out loud. Just silently read it.
8    A.    (Witness complies.) Okay. I'm finished.
9         (Whereupon Mr. Levin left the room.)
10   BY MR. SHERMAN:
11   Q.    All right. When did you -- let me refer you to the
12   last page.
13   A.    Um-hum.
14   Q.    First of all, is this your handwriting on this
15   statement?
16   A.    Yes, it is.
17   Q.    Okay. Do you have -- do you remember writing it?
18   A.    Yes, I do.
19   Q.    Okay. Do you remember when you wrote it?
20   A.    I wrote it on February 24th of '04.
21   Q.    Okay. And where were you when you wrote it?
22   A.    In the store.
23   Q.    And specifically where?
24   A.    I don't recall exactly where I wrote the statement.
25   Q.    Would you have been in the break room?

Page 35

1    A.    No.
2    Q.    Is there a special room or place for the assistant
3    managers and the manager to congregate?
4    A.    We have a manager's office.
5         (Whereupon Mr. Levin returned to the room.)
6    BY MR. SHERMAN:
7    Q.    Do you remember why you wrote this statement?
8    A.    I was asked to write it.
9    Q.    And who asked you to write it?
10   A.    I don't recall who exactly asked me to write it. I
11   was asked to make a statement, and I did.
12   Q.    Okay. Do you recall if Mr. Harris asked you to
13   write it, or one of his associates?
14   A.    Mr. Harrison?
15   Q.    Mr. Harris, the attorney to your --
16   A.    Yeah, no, I had not met Jeff at that time.
17   Q.    Okay. Did someone from Home Depot ask you to write
18   it?
19   A.    Yes.
20   Q.    Okay. Would that have been the store manager?
21   A.    No.
22   Q.    Would it have been someone higher up?
23   A.    I don't recall, but I was asked by someone outside,
24   within our company to write a statement.
25   Q.    Okay. And was it someone at the store?

Page 36

1    A.    I don't recall exactly where it came from.
2    Q.    When were you asked to do this?
3    A.    Probably that day.
4    Q.    Okay. What time did you begin work that day?
5    A.    Well, I wrote the statement at 7:25 a.m., so
6    normally I probably came in at five
7    Q.    Okay. Now, did you talk to anyone from Mr. Harris'
8    office about the time this statement was written?
9    A.    No.
10   Q.    After you wrote this statement did you talk to
11   someone about the statement?
12   A.    No.
13   Q.    Okay. So the first time you talked to Mr. Harris
14   about this situation was in, what, January of this year?
15   A.    I don't recall when I first talked to Mr. Harris
16   exactly, but it was well after this date.
17   Q.    Okay. Can you explain why Ms. Kuhia -- are you
18   aware that Ms. Kuhia wrote a statement in this matter?
19   A.    I was told that she was also going to write a
20   statement.
21   Q.    That's what you were told at that time?
22   A.    I believe so.
23   Q.    Okay. Are you aware that she wrote a statement on
24   February 20th, 2004?
25   A.    That I don't know. I'm not aware of the date that

Page 37

1    her statement was written.
2    Q.    Do you have an explanation why she wrote her
3    statement four days before you wrote yours?
4    A.    Could be I was out of the store for four days.
5    Q.    Would that have been personal leave or vacation?
6    A.    Days off, vacation. Could have been any number of
7    things, holiday.
8    Q.    Okay. Are you aware, also, that Debra Peterson
9    wrote a statement as well?
10   A.    That I was not aware of.
11   Q.    Okay. Do you have an explanation why she wrote her
12   statement on February 20th, 2004?
13   A.    I have no explanation for that.
14   Q.    Are you aware that they spoke to attorneys from Mr.
15   Harris' office?
16   A.    That I'm not aware of.
17   Q.    But you're very clear that you did not speak to Mr.
18   Harris or any of his attorneys in February of 2004 regarding
19   this incident?
20   A.    I am not aware of that.
21   Q.    I'm sorry?
22   A.    I am not aware of that. I was told to write a
23   statement. I wrote it and turned it in, and that was it.
24   Q.    I guess I need a "yes" or "no" answer.
25        Did you -- in February of 2004 did you speak with

Page 38

1 Mr. Harris or any of his associates or employees from his law
2 firm regarding this incident?
3    A.   I don't recall.
4    Q.   Is it possible you did speak to them?
5    A.   I don't recall.
6    Q.   I'm not asking if you actually recall. I'm asking
7 if it's possible.
8        MR. HARRIS: Asked and answered.
9        THE WITNESS: I don't recall.
10        MR. HARRIS: Objection.
11 BY MR. SHERMAN:
12    Q.   Okay. Can you explain why there's such a gap
13 between the date of the incident, November 3rd, 2003, and the
14 time you actually wrote up the statement, February 24th, 2004?
15    A.   The only thing I can say to that is that on the day
16 of the incident, I felt the incident was closed, and that was
17 it until I was asked to write a statement.
18    Q.   Okay. What is the policy about when an incident
19 occurs at Home Depot in terms of writing up a report?
20    A.   There's no specific policy. It just depends on the
21 circumstances.
22    Q.   And who makes that decision?
23    A.   A manager can, depending on the situation, or it
24 could come from corporate, or it could come from, possibly,
25 human resources.

Page 39

1    Q.   Okay. With respect to the incident on November 3rd,
2 2003, did you make a decision not to write up a report?
3        MR. HARRIS: Objection, vague.
4        THE WITNESS: Evidently I did. I didn't write a
5 report.
6 BY MR. SHERMAN:
7    Q.   Okay. Did you consult with the manager of the store
8 regarding the incident?
9    A.   I don't recall.
10    Q.   Would that have been standard operating procedure to
11 consult with him regarding the incident?
12    A.   Not necessarily.
13    Q.   What -- under what circumstances would it have been
14 standard operating policy to consult with him regarding an
15 incident?
16        MR. HARRIS: Objection, vague, speculation.
17        THE WITNESS: I guess it would be the manager's
18 decision. If he felt he needed to consult with the store
19 manager, he would. If he felt he did not need to, he may not.
20 BY MR. SHERMAN:
21    Q.   Do you mean assistant manager's decision?
22    A.   Yes.
23    Q.   Because if a manager didn't know of the incident, he
24 couldn't make a decision as to whether it should be written
25 up; is that correct?

Page 40

1        MR. HARRIS: Objection, vague and confusing,
2 speculation.
3        THE WITNESS: When we write a statement, it's the
4 manager that is involved in the issue determines, most of the
5 time, whether a statement will be written. Obviously that day
6 I determined one was not needed.
7 BY MR. SHERMAN:
8    Q.   Now, are you aware that Debra Peterson indicated in
9 her testimony in her deposition that she actually made notes
10 of the incident on -- let me finish the question, please,
11 thank you -- November 3rd, 2003?
12        MR. HARRIS: Objection, attorney testifying, assumes
13 facts not in evidence.
14        THE WITNESS: I don't know whether she made notes or
15 not.
16 BY MR. SHERMAN:
17    Q.   Okay. But you didn't instruct her to make notes?
18    A.   No.
19    Q.   Did you instruct Ms. Kuhia to make notes?
20    A.   No.
21    Q.   Okay. To your knowledge, did either of them make
22 notes as to the incident at the time of the incident?
23    A.   Like I said, I don't know.
24    Q.   Who is the store manager at the time of the
25 incident?

Page 41

1    A.   At that time it was Tom Luiz.
2    Q.   How do you spell his last name?
3    A.   L-U-I-Z.
4    Q.   Is he still the store manager?
5    A.   No.
6    Q.   Who is the store manager now?
7    A.   Brian Zinn.
8    Q.   What happened to Tom Luiz?
9    A.   He left the company.
10    Q.   Do you know why?
11    A.   He obviously found a better opportunity.
12    Q.   Do you know if he's still in Hawai'i?
13    A.   Yes, he is on Hawai'i.
14    Q.   Who is he working for now?
15    A.   It's Best Buy, last I recall.
16    Q.   But he wasn't terminated, to your knowledge, was he?
17    A.   No.
18    Q.   Was ever made aware of this incident?
19    A.   I don't know. I don't know.
20    Q.   You never told him about the incident; is that
21 correct?
22    A.   I don't recall, but probably not.
23    Q.   Now, let me -- in your statement you state that you
24 received two phone calls on November 3rd, 2003 about the
25 incident.

Page 42

1    A.    Yes.
2    Q.    Okay.  Who were those from?
3    A.    I received a call from Dar, the head cashier, and I
4    also received a call from the phone center.
5    Q.    And what is the phone center?
6    A.    The phone center is right there by returns, and it's
7    all incoming calls go into our phone center before they are
8    passed out throughout the store.
9    Q.    Incoming calls?
10   A.    Um-hum.
11   Q.    Where would an incoming call come from?
12   A.    Could be from another store, could be from a
13   customer, could be from an associate, could be from corporate.
14   It could be any incoming call.
15   Q.    It could be coming from within the store; is that
16   correct?
17   A.    Yeah, you can call the phone center from within the
18   store, correct.
19   Q.    Okay.  And who spoke to you from the phone center?
20   A.    That I don't remember.  It was one of the phone
21   center associates.
22   Q.    Are they physically located at the store?
23   A.    Yeah.  They are right there.  They are in that glass
24   enclosure, witnessing the whole thing.
25   Q.    Do you know who was on the phone center that day?

Page 43

1    A.    I told you, I don't recall who was there that day.
2    Q.    Are there records that would indicate?
3    A.    We don't keep records that far back when employees,
4    you know, are there or not there.
5    Q.    How far back do you keep records?
6    A.    I don't know how far back it is, but we don't keep
7    those kind of records that far back.
8    Q.    Well, would you keep the records for six months or a
9    year?
10   A.    I don't know.  Human resources would know that.
11   Q.    Who at human resources would know that?
12   A.    The human resource manager.
13   Q.    Who is that?
14   A.    There's actually two in my store, Melody and the
15   other one is Kathleen.
16   Q.    What is Melody's last name?
17   A.    I can't remember right offhand.
18   Q.    Okay.  You could find that out, though, and get that
19   information to your attorney?
20   A.    Oh, yeah, yes, I could.
21   Q.    And who is the other one?
22   A.    Kathleen.
23   Q.    What is her last name?
24   A.    I don't know.  She's relatively new with the
25   company.

Page 44

1    Q.    But you could find out her last name and give that
2    information --
3    A.    Yes, of course.
4    Q.    -- to your attorney?
5         Okay.  What is the policy -- is there a standard
6    operating policy with respect to banning someone from Home
7    Depot store?
8    A.    I don't believe there is a set policy.
9    Q.    Is there any kind of procedure that you follow in
10   terms of banning someone from the store?
11   A.    Depending on the situation.
12   Q.    What type of criteria exists for banning someone
13   from the store?
14        MR. HARRIS:  Objection, foundation, speculation.
15        THE WITNESS:  You'd have to talk to loss prevention
16   as far as when this comes to theft or shrink.  As far as, you
17   know, in this particular case, I had no reason to ban this
18   gentleman from the store.
19   BY MR. SHERMAN:
20   Q.    Now, yesterday during her deposition, Ms. Kuhia
21   testified that she talked to you after the incident about the
22   incident.
23        Do you recall that?
24        MR. HARRIS:  Objection, assumes facts not in
25   evidence, attorney testifying, and vague.

Page 45

1         THE WITNESS:  She might have.
2    BY MR. SHERMAN:
3    Q.    She mentioned that she talked to you about
4    Tourette's Syndrome.
5         Do you recall that conversation?
6         MR. HARRIS:  Objection, attorney testifying, assumes
7    facts, vague.
8         THE WITNESS:  I don't remember if she specifically
9    talked to me about anything, much less Tourette's.
10   BY MR. SHERMAN:
11   Q.    She also testified that you told her that she had --
12   that you had seen a special on TV about Tourette's Syndrome?
13        MR. HARRIS:  Objection, attorney testifying, assumes
14   facts, vague.
15   BY MR. SHERMAN:
16   Q.    Do you recall ever seeing a special?
17   A.    No.  I recall this, though.  I recall mentioning
18   Tourette's to somebody and because I was not familiar with it,
19   and they said -- they explained it to me slightly because they
20   had seen a special.  I have never seen a special on
21   Tourette's.
22   BY MR. SHERMAN:
23   Q.    Okay.  Who did you mention it to?
24   A.    I don't remember.  I just remember somebody in the
25   store explaining it to me.

Page 46

1   Q.   When did they -- when did that occur?
2   A.   Probably right after the incident, because I had
3   just heard that word for the first time and I may have asked
4   somebody if they had ever heard of it, and maybe they said to
5   me they had seen a special. I do recall the "special" part,
6   but I had not seen the special. At that point I had never
7   heard the disease prior.
8   Q.   Okay. How did they describe Tourette's to you?
9   A.   I don't remember the exact description, but the
10  gentleman here displayed similar things that they explained to
11  me.
12  Q.   What is your understanding today of Tourette's
13  Syndrome?
14  A.   I don't know really a lot about it. I know -- I
15  just really don't know much about the disease, sir.
16  Q.   But from what you know, Mr. Muse's actions were
17  consistent with the definition of that disease?
18      MR. HARRIS:  Objection, foundation, speculation, lay
19  opinion.
20      THE WITNESS:  I can't really answer that one. I
21  don't know.
22  BY MR. SHERMAN:
23  Q.   Do you know what a verbal tic is?
24      MR. HARRIS:  Objection, foundation, speculation, lay
25  opinion.

Page 47

1       THE WITNESS:  Not exactly.
2   BY MR. SHERMAN:
3   Q.   Do you understand what I mean, though, by "tic"?
4   A.   Like a twitch or something like that? I don't
5   really know, sir.
6   Q.   Do you know what a physical tic is?
7   A.   No.
8   Q.   Okay. Do you know what a twitch is?
9   A.   Kind of. You know, I mean, I can't really give you
10  a scientific explanation for it, but I -- you know, a twitch
11  is somebody that -- you know, a twitch. I really don't have
12  an explanation for exactly what it is.
13  Q.   So you really couldn't identify someone with
14  Tourette's based on your knowledge?
15  A.   No.
16  Q.   Let me hand you just for a moment Exhibit C.
17      (Plaintiff's Exhibit C
18              was marked for identification.)
19      MR. HARRIS:  Can I see a copy, please?
20      MR. SHERMAN:  Sure.
21  Q.   Okay. Do you recognize this document?
22      THE WITNESS:  It's the one I have right here, right,
23  Jeff?
24      MR. HARRIS:  No, this is a separate one.
25      THE WITNESS:  Is this different than the other one

Page 48

1   you gave me?
2       MR. HARRIS:  Yes.
3       THE WITNESS:  No.
4   BY MR. SHERMAN:
5   Q.   You've never seen this document before?
6       THE WITNESS:  This isn't the one you gave me this
7   morning?
8       MR. HARRIS:  No. Why don't you read it.
9       THE WITNESS:  Oh.
10      MR. HARRIS:  Read it.
11  BY MR. SHERMAN:
12  Q.   Okay. All right. Let me direct your attention to
13  page No. 3.
14  A.   Okay.
15  Q.   The last line before the signature line, could you
16  read that out loud, please?
17  A.   "Dated:  Honolulu, Hawai'i, January 10th, 2006."
18  Q.   Okay. Now, the typed signature, could you read
19  that?
20  A.   It's my name.
21  Q.   Could you read it out loud, please?
22  A.   "Michael Dolan."
23  Q.   Okay. Is that your signature above it?
24  A.   Yes.
25  Q.   Okay. Now, you recognize that?

Page 49

1   A.   I guess I read it in January. I just don't recall
2   reading it when I'm looking at it in front of me.
3   Q.   That's unlike the case before someone fraudulently
4   used your signature, this is your signature; is that correct?
5   A.   This is my signature.
6   Q.   You have no doubt whatsoever about that?
7   A.   That's my signature.
8   Q.   Let me refer you, then, to page 2.
9   A.   Um-hum.
10  Q.   Okay. Let me refer you specifically to paragraph 4,
11  and let me ask you to read that silently.
12  A.   Okay. There is a customer that does come in that
13  does appear to have the Tourette's Syndrome, yes.
14  Q.   Okay. A moment ago you testified that you didn't --
15  you couldn't recognize it or you didn't know about it; is that
16  correct? Do you recall that?
17  A.   This particular customer I was told has Tourette's.
18  Q.   Who told you?
19  A.   An associate.
20  Q.   Who was the associate?
21  A.   I don't recall, but it was someone in the garden
22  department.
23  Q.   Okay. Do you know when they told you this?
24  A.   They told me this, it had to be before January, but
25  I don't recall exactly when.

Page 50

1  Q.  Okay.  Here it doesn't say that the associate told
2  you that he had Tourette's.  It appears to say that you
3  recognized him as having Tourette's.
4      Is that incorrect, then?
5  A.  Yes.
6      MR. HARRIS:  Objection, misstatement.
7      MR. SHERMAN:  Because --
8      MR. HARRIS:  Hold on a second.  There is an
9  objection.
10     Mischaracterizes prior testimony, mischaracterizes
11 the Declaration.
12 BY MR. SHERMAN:
13  Q.  You personally didn't recognize anyone as having
14 Tourette's; is that correct?
15 A.  Correct.
16  Q.  Because you don't know what Tourette's really is; is
17 that correct?
18 A.  Again, I'm not an expert on Tourette's.
19  Q.  Okay.  And could you find out the name of the
20 associate who told you that this person had Tourette's?
21 A.  I don't recall who it was.
22  Q.  Have you ever seen this person who --
23 A.  I have not seen this gentleman.
24  Q.  So you've never personally experienced the
25 manifestation of his condition?

Page 51

1  A.  Personally, no.
2  Q.  Yes.  You've never even met him; is that correct?
3  A.  Not that I'm aware of.
4  Q.  Okay.  And you've never actually met a customer
5  there who goes "yup"?
6  A.  I don't recall meeting a customer that goes "yup".
7  I know there is a customer that does that particular saying
8  when he's in the store.
9  Q.  And how do you know that?
10 A.  The associates have told me.
11  Q.  Okay.  But you've never seen him, yourself?
12 A.  Not that I can recall.
13  Q.  So you actually don't know if this customer has
14 Tourette's or not, do you?
15 A.  I don't have his medical information, no.
16  Q.  Okay.  But you don't have a medical degree, do you?
17 A.  No, I do not.
18  Q.  All right.  And you -- okay.  Never mind, strike
19 that.
20     Now, is it possible for you to find out who the
21 associates were who told you about this gentleman?
22 A.  I don't know exactly which associate told me.  I do
23 recall the associate was working in the garden department.
24  Q.  Okay.  Now, here in paragraph 3 you say your
25 capacity as a store manager.

Page 52

1      Do you see that?
2  A.  Um-hum.
3  Q.  At Alakawa store you directly and indirectly
4  supervise associates; is that correct?
5  A.  Um-hum, correct.
6  Q.  And was that part of your function in November of
7  2003?
8  A.  Yes.
9  Q.  Okay.  Now, getting back to paragraph 4, with
10 respect to the customer who someone told you has Tourette's,
11 was that Mr. Muse?
12     MR. HARRIS:  Objection, vague.
13     THE WITNESS:  I don't understand exactly what the
14 question is.
15 BY MR. SHERMAN:
16  Q.  Well, do you know if the customer your associate
17 stated to you that has Tourette's, do you know if that
18 customer was actually Mr. Muse?
19 A.  I have no idea.
20  Q.  It could have been Mr. Muse?
21 A.  I don't know.
22  Q.  But -- okay.  They never -- okay.
23     So it's possible it was Mr. Muse?
24     MR. HARRIS:  Objection, asked and answered,
25 argumentative.

Page 53

1      THE WITNESS:  The associate simply told me that
2  there is a customer in our garden, that comes in our garden
3  department that says "yup".  I have no idea exactly what the
4  person's name is, who he is.
5  BY MR. SHERMAN:
6  Q.  Did he say there was any problem with that customer?
7  A.  No.
8  Q.  Okay.  Let's get back to Exhibit A.
9  A.  Okay.
10  Q.  Now, what did you do after you received the two
11 telephone calls regarding the incident on November 3rd, 2003?
12 A.  I went to the returns area.
13  Q.  And where were you before going to the returns area?
14 A.  I don't recall exactly where I was because they
15 called me on my phone that I carry with me throughout the
16 store.
17  Q.  Is that a cell phone?
18 A.  It's a Home Depot cell phone, correct, not a regular
19 cell phone.  It's our own phone system.
20     MR. HARRIS:  Your own what system?
21     THE WITNESS:  It's our own company phone system.
22 BY MR. SHERMAN:
23  Q.  And how long did it take you to get to the return
24 department?
25 A.  I went very quickly.

Page 54

1  Q.  Okay.  And what did you see when you got there?
2  A.  As I recall, I saw the gentleman at the returns
3  register where Debra was working, and she looked upset, and I
4  saw Dar as well as there, and I approached to see what was
5  going on.
6  Q.  Okay.  How could you tell Debra Peterson looked
7  upset?
8  A.  Just it appeared to me she looked upset.  She just
9  looked upset.
10  Q.  What, describe what she looked like?
11  A.  She looked like she was kind of just upset, you
12  know, like something was going on like, you know, red and kind
13  of just like looking like this (indicating) in shock.
14  Q.  Was she crying?
15  A.  I don't recall if she was exactly crying or not.
16  Q.  Was she shaking?
17  A.  She looked pretty upset.
18  Q.  Was she physically shaking?
19  A.  I don't recall.  She looked upset to me.
20  Q.  And who spoke to you first when you got there?
21  A.  When I first got there, I believe Debra said
22  something first, and then I immediately -- I kind of could
23  hear -- I could hear what the gentleman was stating.
24  Q.  And what did Debra say?
25  A.  She just -- you know, I just -- she looked upset.

Page 55

1  My initial reaction was try to diffuse the situation, and I
2  wanted just to get the gentleman to the side so I can find out
3  exactly what was going on.  I had just walked onto the scene.
4  Q.  But do you recollect exactly what Debra Peterson
5  said to you?
6  A.  Not really.
7  Q.  Did Dar talk to you at that same time?
8  A.  She basically at that time, if I recall correctly,
9  she was standing there because she was the first one they
10  called.
11  Q.  And how long in total were you with Mr. Muse before
12  he eventually left the store?
13  A.  I don't recall exactly, but it was not a very long
14  period of time.
15  Q.  Would it have been more than five minutes or less
16  than five minutes?
17  A.  I don't recall exactly.
18  Q.  Okay.  Could you use just your best estimate?
19  A.  It was maybe, it was maybe a little more than five
20  minutes.
21  Q.  Okay.  And how soon -- when did you first talk to
22  Mr. Muse directly?
23  A.  When I asked him to step aside from the register.
24  Q.  Okay.  And what did you say to him specifically?
25  A.  As I recall, I told him that he cannot use that type

Page 56

1  of language in my store.
2  Q.  Okay.  Had you actually experienced him using that
3  language?
4  A.  Yes.
5  Q.  What did you hear him exactly say?
6  A.  He was just using some terrible language.
7  Q.  Well, what words exactly?
8  MR. HARRIS:  Objection, harassment.
9  BY MR. SHERMAN:
10  Q.  You can answer.
11  A.  I believe I wrote those words down.  I don't like
12  using those words.
13  Q.  I understand, but we're in the context of litigation
14  and these words are the core of the case.  It's not done to
15  embarrass you, but be specific and clear and what words were
16  used.
17  MR. HARRIS:  Is there a -- objection, argument.
18  There's no question.
19  MR. SHERMAN:  I'm just asking him to answer the
20  question.
21  Q.  Which words specifically were used?
22  MR. HARRIS:  Objection, harassment.
23  THE WITNESS:  He was using the F and C word.
24  MR. SHERMAN:  Can we get this marked, please?
25  (Plaintiff's Exhibit D

Page 57

1  was marked for identification.)
2  BY MR. SHERMAN:
3  Q.  Okay.  Now, which F word?  Was it a verb?  Was it an
4  adverb?  Was it an adjective?
5  A.  It was a profanity.
6  Q.  I understand, but what type of word?
7  A.  I'm not sure what to call that word.
8  Q.  Do you know what an adverb is?
9  A.  It's been a long time since I worked with adverbs.
10  Q.  Okay.  Do you know what an adjective is?
11  A.  Been a long time since I did that as well.
12  Q.  Do you know what a noun is?
13  A.  Pretty much know what a noun is.
14  Q.  Okay.  Did he use it as a noun?
15  A.  I don't recall how he used it.  All I know, I kept
16  hearing it over and over again.
17  Q.  And what word was that?
18  A.  The F and C word.
19  Q.  And that would be the word "fucking"?
20  A.  That was one of them.
21  Q.  And what other word did he use?
22  A.  The C word.
23  Q.  The word "cunt"?
24  A.  That would be the word.
25  Q.  Okay.  Were there any other words he used?

Page 58

1    A.   That was it right there.
2    Q.   Did you take that personally when he said that?
3    A.   Not -- I don't -- you know, I obviously -- that's
4    not something that I like to hear, but I was more concerned
5    with, you know, the people around me than I was -- that's why
6    I tried to get him to come aside.
7    Q.   But did you take it personally?
8    A.   Well, I wasn't happy about it, but I didn't -- I
9    wasn't really like -- you know, I didn't -- I didn't spend a
10   lot of time thinking about it later on.
11   Q.   So it didn't bother you at all to hear --
12   A.   No.
13        MR. HARRIS:  Objection, foundation, argumentative.
14        THE WITNESS:  I think I just said it bothered me.  I
15   don't like the word.
16   BY MR. SHERMAN:
17   Q.   Can you answer "yes" or "no":  Did you take it
18   personally?
19        MR. HARRIS:  Objection, vague, argumentative.
20        THE WITNESS:  At the time I don't know how I took
21   it.  I just know I didn't like what I was hearing.
22   BY MR. SHERMAN:
23   Q.   And when did Mr. Muse tell you he had Tourette's
24   Syndrome?
25   A.   He told me that he had -- I believe the first time I

Page 59

1    really actually heard that word "Tourette's" was he was just
2    outside the front door of the store.
3    Q.   When did he -- did he tell you he had a disease?
4    A.   He told me he had something, but he was going on and
5    on with this, and like I said, I was kind of just trying to
6    diffuse it and get the transaction taken care of and, you
7    know, get this thing back to what it should be.
8    Q.   Okay.  Did you listen to him when he tried to
9    explain the situation?
10   A.   I told him that I cannot tolerate that type of
11   language in my store.
12   Q.   Did you give him an opportunity to explain his
13   situation?
14   A.   I wanted to get the transaction done because there
15   was associates around, there were customers around, and I
16   wanted to get -- you know, have Mr. Muse, you know, leave the
17   store.
18   Q.   Okay.  If you could answer this question "yes" or
19   "no":  Did you give him an opportunity to explain himself?
20   A.   I don't recall the exact whether I did or not.
21   Q.   Was he yelling at you?
22   A.   I wouldn't call it exactly yelling.
23   Q.   Okay.  So he wasn't yelling; is that correct?
24   A.   It was he was -- it was loud enough where others
25   could hear it.

Page 60

1    Q.   So he wasn't whispering; is that correct?
2    A.   I don't recall.  It was loud enough where others
3    could hear it.
4    Q.   Okay.  And what type of radius?
5    A.   Within the returns area.
6    Q.   Did Mr. Muse physically threaten anyone at this
7    time?
8    A.   He did not physically threaten me.
9    Q.   Okay.  Did he take a swing at anyone?
10   A.   He did not take a swing at me.
11   Q.   Did he physically throw his body towards anyone at
12   this time?
13   A.   He was -- he was very, very, very close to Debra
14   when I first approached them.
15   Q.   Okay.  Did he strike her?
16   A.   He did not strike her that I know of.
17   Q.   Did he attempt to strike her?
18   A.   I don't know if he attempted or not.  I didn't --
19   Q.   But you, from what you witnessed, did he attempt to
20   strike her?
21   A.   I don't recall whether he attempted it or not.  I
22   did not see him strike her.
23   Q.   Well, if he tried to assault her, wouldn't you have
24   called the police?
25        MR. HARRIS:  Objection, foundation, argumentative,

Page 61

1    speculation.
2        THE WITNESS:  I don't know if I would have or not.
3    It depends on the situation.
4    BY MR. SHERMAN:
5    Q.   You mean to tell us today that if there is a
6    physical assault or an attempted assault at your store, you
7    wouldn't want to automatically call 911 or call the police?
8        MR. HARRIS:  Objection, foundation, speculation,
9    argumentative.
10       THE WITNESS:  If I felt I couldn't control it, yes,
11   I would.
12   BY MR. SHERMAN:
13   Q.   Okay.  And if someone physically assaulted or
14   attempted to assault someone, you wouldn't try to have them
15   banned from the store?
16       MR. HARRIS:  Objection, foundation, speculation,
17   argumentative, harassment.
18       THE WITNESS:  I haven't seen anybody physically
19   assault, personally, an associate, like swing at 'em or punch
20   'em.
21   BY MR. SHERMAN:
22   Q.   Okay.  During the time you were with Mr. Muse?
23   A.   Um-hum.
24   Q.   And how many times did he use the word "cunt," did
25   he actually say it?

Page 62

1    A.    Quite a few.
2    Q.    Can you give me a number estimate?
3    A.    I wasn't counting.
4    Q.    Was it over five?
5    A.    Maybe.  I don't know exactly the number, but it was
6    repeatedly.
7    Q.    Okay.  Do you think he was directing it specifically
8    at you at that time?
9        MR. HARRIS:  Objection, foundation, speculation,
10   argumentative.
11       THE WITNESS:  At that time I wasn't sure where it
12   was coming from or going to.
13   BY MR. SHERMAN:
14   Q.    Okay.  Was it used in each sentence he spoke?
15   A.    It was used a lot.
16   Q.    Was it -- did he try -- did he speak in sentences?
17   A.    I don't recall the exact conversation because what I
18   kept hearing over and over again was, you know, what he was
19   saying (indicating).
20   Q.    Have you ever been involved in having someone banned
21   from Home Depot?
22   A.    No.
23   Q.    Do you know of any particular customers or third
24   parties that have been banned from Home Depot?
25   A.    Loss prevention does have the ability to ban people

Page 63

1    from Home Depot.
2    Q.    But you didn't ban Mr. Muse --
3    A.    No.
4    Q.    -- from Home Depot?
5    A.    No.  I just asked him to leave.
6    Q.    Do you know that Home Depot has told him he can't
7    come back to the store?
8        MR. HARRIS:  Objection, misstates the evidence,
9    assumes facts not in evidence, foundation.
10       THE WITNESS:  I don't know.
11   BY MR. SHERMAN:
12   Q.    Well, what do you think if that's true about Home
13   Depot not letting him come back to the store?
14       MR. HARRIS:  Objection, foundation, speculation, lay
15   opinion.
16       THE WITNESS:  I don't make those decisions.
17   BY MR. SHERMAN:
18   Q.    But what do you personally think?
19       MR. HARRIS:  Same objection.
20       THE WITNESS:  I don't make those decision.
21   BY MR. SHERMAN:
22   Q.    Do you have a personal opinion?
23       MR. HARRIS:  Same objection.
24       THE WITNESS:  It's not my decision to make.
25   BY MR. SHERMAN:

Page 64

1    Q.    Do you think Mr. Muse should be able to shop at Home
2    Depot?
3    A.    It's not my decision to make.
4    Q.    Do you have a personal opinion anyway?
5        MR. HARRIS:  Objection, asked and answered.
6        THE WITNESS:  Again, I don't make those decisions.
7    You know, that's Home Depot.
8    BY MR. SHERMAN:
9    Q.    Now, what kind of policies do you enforce at Home
10   Depot regarding accommodating people with disabilities at the
11   store?
12       MR. HARRIS:  Objection, vague.
13       THE WITNESS:  We try to take care of all of our
14   customers.  My associates understand I'm very customer
15   oriented and we try to take care of every customer that comes
16   through that front door.
17   BY MR. SHERMAN:
18   Q.    Okay.  And do you try to accommodate persons with
19   disabilities in that regard, too?
20   A.    We take care of every customer that comes through
21   the door, or that's at least what I try to get them to do is
22   take care of every customer that comes through the front door.
23   Q.    What about the customers who have special needs,
24   when they come through the door, say they are in the
25   wheelchair?

Page 65

1        MR. HARRIS:  Objection, speculation, foundation.
2        THE WITNESS:  Like I said, we try to take care of
3    all of our customers.
4    BY MR. SHERMAN:
5    Q.    What about when a blind customer comes to Home
6    Depot:  Would you, if they asked, provide them with a personal
7    shopper?
8        MR. HARRIS:  Objection, foundation, speculation,
9    vague.
10       THE WITNESS:  We try to take care of everybody.
11   BY MR. SHERMAN:
12   Q.    How do you think a blind person could shop at Home
13   Depot without help?
14       MR. HARRIS:  Objection, foundation, speculation.
15       THE WITNESS:  I really don't know how they -- I
16   mean, I haven't encountered that I recall a blind person
17   shopping in my store, but I believe, you know, over the years
18   there probably has been some in there.
19   BY MR. SHERMAN:
20   Q.    And how do you think they find items without help?
21       MR. HARRIS:  Objection, foundation, speculation,
22   asked and answered.
23       THE WITNESS:  Take care of the customers.
24   BY MR. SHERMAN:
25   Q.    Who takes care of the customers?

Page 66

1    A.   The 350-plus associates I have working there.
2    Q.   Okay.  And would one of them walk around the store
3  with a blind person?
4        MR. HARRIS:  Objection, foundation, speculation.
5        THE WITNESS:  I don't know.
6  BY MR. SHERMAN:
7    Q.   Are there labels on the various shelves describing
8  what is there?
9    A.   Every product, if everything is okay, should have a
10  price tag underneath it on the -- what we call the beams.
11    Q.   Okay.  And are there also product descriptions on
12  the beams?
13    A.   It pretty much tells what the product is, the price
14  of the product, and then there's some company information on
15  there.
16    Q.   Okay.  So that's how you could determine if you
17  wanted to get an Ace widget, if you were going to buy some
18  sort of product like that; is that correct?
19        MR. HARRIS:  Objection, vague and confusing.
20        THE WITNESS:  If a customer came in and asked for an
21  Ace Widget, I would hope one of the associates would direct
22  them to where the Ace widget is.
23  BY MR. SHERMAN:
24    Q.   Okay.  Are you -- is there any Braille signage on
25  where the descriptions of the products and prices are?

Page 67

1    A.   The price tags, no.
2    Q.   So you have no Braille signage there; is that
3  correct?
4    A.   Not on the price tags.
5    Q.   So how could a blind person comparison shop?
6    A.   One way would be to have an associate help them in
7  front of the product.
8    Q.   Okay.  And do you have personal shoppers at Home
9  Depot?
10    A.   No.  We're there to take care of every customer.  We
11  do not have personal shoppers.
12    Q.   Do you have motorized carts at Home Depot for
13  persons with mobility disabilities?
14    A.   You mean the handicapped carts?
15    Q.   Is that the term you use, "handicapped"?
16    A.   We have motorized handicapped carts.
17    Q.   Do you have self-serve or automated checkout cashier
18  points at Home Depot?
19    A.   Yes.
20    Q.   Okay.  Could Mr. Muse use one of these and minimize
21  his contact with other people there?
22        MR. HARRIS:  Objection, foundation, speculation, lay
23  opinion.
24        THE WITNESS:  Each self-checkout center has
25  associates there to assist all customers.

Page 68

1  BY MR. SHERMAN:
2    Q.   But isn't the purpose to having the automatic
3  checkout center so that you don't have to have a cashier
4  actually do it?
5        MR. HARRIS:  Objection, foundation, speculation,
6  argumentative, asked and answered.
7        THE WITNESS:  They are there simply to assist.
8  BY MR. SHERMAN:
9    Q.   Okay, but they are not at each specific one, are
10  they?
11    A.   Depending how busy it is at the time.
12    Q.   Okay.  Isn't part of the point of having an
13  automatic checkout point --
14    A.   There is a lot --
15    Q.   -- to cut back on the number of employees you have?
16        MR. HARRIS:  Hold on.  Objection, asked and
17  answered, argumentative.
18        THE WITNESS:  There is a lot of reasons we have them
19  there.
20  BY MR. SHERMAN:
21    Q.   Okay.  Is that one of the reasons?
22    A.   Say again the question, please.
23    Q.   Is one of the reasons you have the automatic
24  checkout points to cut back on the number of cashiers who have
25  to work?

Page 69

1    A.   I don't know specifically if that cuts back the
2  cashiers or not.
3    Q.   Isn't it a money saving situation to have automatic
4  checkout?
5        MR. HARRIS:  Objection, foundation.
6        THE WITNESS:  There is a lot of reasons we have them
7  there.
8  BY MR. SHERMAN:
9    Q.   Is that one of the reasons, to save money?
10    A.   I don't know.
11    Q.   Well, do you think Home Depot would put that into
12  effect if it didn't save them money or make them money?
13        MR. HARRIS:  Objection, foundation, argumentative,
14  compound.
15        THE WITNESS:  There is a lot of reasons they put
16  those self-checkout centers in.
17  BY MR. SHERMAN:
18    Q.   What are some of the reasons?
19    A.   There is a lot of reasons.
20    Q.   No, but what are specifically some of them that you
21  know?
22    A.   Accuracy.
23    Q.   And how are they more accurate than having a
24  physical -- having an actual cashier check it out?
25    A.   The -- I don't get in the self-checkout centers as

Page 70

1 far as why they put them in. One of the reasons I was told
2 when I came in is they are actually more accurate.
3 Q. And did they tell you the reason why they were more
4 accurate?
5 A. They are just more accurate.
6 Q. Okay. What are some of the other reasons?
7 A. Customers like it.
8 Q. Have you heard customers say this?
9 A. Yes, I have.
10 Q. And why were you told that customers like it?
11 A. Customers like it because they are engaged with
12 their checkout process.
13 Q. What does that mean?
14 A. Customers like it because they get engaged with
15 actually checking themselves out. They like that.
16 Q. As opposed to having a human being check them out?
17 A. There is customer service people there, cashiers to
18 assist them if they need it, but customers, customers like
19 self-checkout.
20 Q. Okay. And you've seen surveys done by Home Depot
21 that supports this?
22 A. I've seen the Voice of the Customer where our
23 customers make comments, and it comes up all the time.
24 Q. What are some of the other reasons?
25 A. Accuracy, expediting things, possibly you might have

Page 71

1 a couple cashiers call in sick on a particular day. The self-
2 checkouts, for the most part, don't call in sick.
3 Q. They don't have health insurance either, right?
4 A. None.
5 Q. Okay. Let me ask you to take a look at Exhibit B.
6         (Plaintiff's Exhibit B
7         was marked for identification.)
8 THE WITNESS: (Witness complies.)
9 (The witness conferred with Mr. Harris.)
10 MR. SHERMAN: Make sure I have a copy of that.
11 MR. HARRIS: You can have that. You can use that
12 one I have.
13 MR. SHERMAN: That's all right. I think the one I
14 had was kind of marked up.
15 Q. All right. Let me direct you to -- well, let me
16 direct you to the page No. 3.
17 A. Um-hum.
18 MR. HARRIS: I'd object to your showing the witness
19 an incomplete document.
20 MR. SHERMAN: What's missing?
21 MR. HARRIS: Paragraph 11 refers to an exhibit.
22 MR. SHERMAN: Okay. And that exhibit is Home
23 Depot's eight core values; is that correct.
24 MR. HARRIS: I have an Exhibit B-1 that's attached
25 to a copy I have, and it's --

Page 72

1 MR. SHERMAN: Why don't you show that to him, then.
2 MR. HARRIS: Pardon me?
3 MR. SHERMAN: Why don't we make a copy of that and
4 show it to him so there's no problem.
5 Isn't that the easiest way to do it?
6 MR. HARRIS: If you want that included, you can. As
7 a matter of fact, it's about time for a break anyway.
8 MR. SHERMAN: Sure, we can take a break.
9        (Recess was taken from 10:54 to 11:08 a.m.)
10        (Plaintiff's Exhibit E
11        was marked for identification.)
12 MR. SHERMAN: Can we go back on the record?
13 Q. Okay. Mr. Dolan, you realize you're still under
14 oath; is that correct.
15 A. Yes, I do.
16 Q. I'm going to hand you what's been marked as Exhibit
17 E.
18 MR. HARRIS: You have that?
19 THE WITNESS: I have a copy already.
20 MR. SHERMAN: But this is actually the exhibit.
21 MR. HARRIS: You want to trade?
22 MR. SHERMAN: I actually have -- I'm going to use
23 the old one, myself.
24 MR. HARRIS: I'll take this.
25 MR. SHERMAN: It's the same as Exhibit C except for

Page 73

1 the fact that it has the exhibit referenced in the
2 Declaration, itself. That's the only difference.
3 MR. LEVIN: (Indicating.)
4 BY MR. SHERMAN:
5 Q. Let me refer you on this exhibit to page 3, and let
6 me ask you to read the last line, just above the signature
7 line where it starts "dated".
8 A. Oh, "Honolulu, Hawai'i, November 28th, 2005."
9 Q. Okay. Let me now refer you to the signature line,
10 the typed name. Read that, please.
11 A. "Michael Dolan."
12 Q. Okay. Is that your name?
13 A. Yes, it is.
14 Q. Okay. Just immediately above that is a signature?
15 A. Um-hum.
16 Q. Is that your signature?
17 A. Yes, it is.
18 Q. Okay. And do you remember executing this
19 Declaration?
20 A. I don't remember exactly, but obviously I did read
21 it because I did sign it.
22 Q. Okay. And you understand that you signed that under
23 penalty of law?
24 A. Um-hum, yes.
25 Q. Do you remember who you met with in terms of signing

Page 74

1  this?
2      A.  I don't recall.
3      Q.  Did you come down to Mr. Harris' office to sign it?
4      A.  I don't recall.  I signed it, but I don't recall
5  where I signed it.
6      Q.  Okay.  But did you talk to someone in order for them
7  to prepare this document?
8      A.  I signed the document, so I read it.
9      Q.  Okay.  This was prepared for you, though?
10     A.  Yes.  I didn't write this document.
11     Q.  Okay.  Now, let me refer you to paragraph 10 on page
12  2.
13     A.  Okay.
14     Q.  Could you read that paragraph, please.
15     A.  Paragraph 10?
16     Q.  Yes.
17     A.  "The customer did not make any other requests,
18  including a request for a personal shopper or a sign
19  explaining that he had Tourette's Syndrome."
20     Q.  Okay.  Now, it was your testimony earlier, wasn't
21  it, that Home Depot does not have personal shoppers; is that
22  correct?
23     A.  That is correct.
24     Q.  What good would it have done for Mr. Muse to ask for
25  a personal shopper?

Page 75

1      MR. HARRIS:  Objection, foundation, speculation.
2      THE WITNESS:  He did not ask me for a personal
3  shopper, and like I stated earlier, we take care of all of our
4  customers.
5  BY MR. SHERMAN:
6      Q.  But how could you ask for a personal shopper if Home
7  Depot doesn't provide personal shoppers?
8      MR. HARRIS:  Objection, foundation, speculation,
9  argumentative.
10     THE WITNESS:  Customer might have thought we did.
11  BY MR. SHERMAN:
12     Q.  Pardon me?
13     A.  Customer may have thought we offered personal
14  shoppers.
15     Q.  Do you mean Mr. Muse may have thought that?
16     A.  I don't know if Mr. Muse did, but a customer may
17  think we do.
18     Q.  But did -- to your knowledge did Mr. Muse think
19  that.
20     A.  I don't know.
21     MR. HARRIS:  Objection, foundation, speculation.
22  BY MR. SHERMAN:
23     Q.  But it wouldn't have made any difference, would it,
24  because you don't have personal shoppers; is that correct?
25     MR. HARRIS:  Objection, foundation, speculation,

Page 76

1  argumentative, asked and answered.
2      THE WITNESS:  Again, I go back.  We try to take care
3  of all of our customers, and we do not have a personal
4  shopping -- you know, personal shopper in place.
5  BY MR. SHERMAN:
6      Q.  Okay.  Would it have been helpful that day if Mr.
7  Muse had given you a sign explaining he had Tourette's
8  Syndrome?
9      MR. HARRIS:  Objection, foundation, speculation.
10     THE WITNESS:  I don't know.
11  BY MR. SHERMAN:
12     Q.  Let me refer you to paragraph 5.  Let me ask you to
13  read that silently.
14     A.  Okay.  (Witness complies.)
15     Q.  Now, before I ask you about that, in paragraph 10,
16  what do you mean by "a sign"?
17     A.  I don't know exactly because this was a while back,
18  but I assume a sign, a written sign
19  saying, "I have a" -- that "I have this condition."
20     Q.  Do you mean like a written letter from a doctor?
21     A.  Some sort of written sign.
22     Q.  Okay.  And would that have been helpful that day?
23     MR. HARRIS:  Objection, foundation, speculation,
24  argumentative, asked and answered.
25     THE WITNESS:  I don't know.  He didn't have a sign.

Page 77

1  BY MR. SHERMAN:
2      Q.  In the future would that be helpful if Mr. Muse came
3  to your store?
4      MR. HARRIS:  Objection, foundation, speculation,
5  argumentative, asked and answered.
6      THE WITNESS:  I don't know if it would be useful.
7  BY MR. SHERMAN:
8      Q.  Okay.  In paragraph 5 it says, "Home Depot has a
9  policy against harassment and sexist or racist epithets."
10     What do you understand sexual harassment to be?
11     A.  I'm really not, you know, in a position to describe
12  sexual harassment.  Normally our human resource department
13  would handle that.
14     Q.  Okay.  Let me ask you:  During the time you were
15  with Mr. Muse on November 3rd, 2003, did you ever hear him use
16  the word "nigger"?
17     A.  I don't recall that one.
18     Q.  Well, what words do you recall him using?
19     A.  As we discussed earlier, the F and the C was what I
20  recall.
21     Q.  You mean "fucking" and "cunt"?
22     A.  Correct.
23     MR. HARRIS:  Objection.
24  BY MR. SHERMAN:
25     Q.  You don't have any independent recollection that he

Page 78

1  used the word "nigger"?
2      A.    No, I do not.
3      Q.    You know, in paragraph 5 why did you put in the
4  policy -- that Home Depot has a policy against the use of
5  racial -- racist epithets if you didn't hear Mr. Muse use any
6  racial epithets?
7      A.    That particular sentence was probably taken out of
8  one of our policy manuals.  That is -- you know, that is not a
9  sentence I put together.  I believe I took that out of the
10  manual.
11      Q.    Okay.  So from your experience with the November
12  3rd, 2003 incident, that has no relevance to it specifically?
13          MR. HARRIS:  Objection, vague, compound.
14          THE WITNESS:  I'm not really in a position to
15  actually determine that.
16  BY MR. SHERMAN:
17      Q.    Well, you don't recall any racial epithets being
18  used at that time by Mr. Muse?
19      A.    What I recall is the words we previously discussed,
20  the two words.
21      Q.    Let me refer you in Exhibit E to the first
22  paragraph, and the third complete sentence in the first
23  paragraph which begins, "In my capacity."
24          Could you read that?
25      A.    Where does it say?

Page 79

1          MR. HARRIS:  Paragraph 1.
2  BY MR. SHERMAN:
3      Q.    Paragraph 1.
4      A.    Oh, okay.  (Witness complies.)
5          Oh, "In my capacity as assistant store manager, I
6  maintain certain business documents and official company
7  policies.  Such records are kept in the course of regularly
8  conducted business."
9      Q.    Okay.  What records are these?
10      A.    We have manuals that describe different things, and
11  they are more manuals, only records -- the manuals that all
12  associates receive during orientation describing certain
13  policies we maintain at the company.
14      Q.    And what are -- what policies are described in these
15  manuals, specifically?
16      A.    There's all kinds of policies depends on the manual
17  you're reading.
18      Q.    Okay.  Could you list a few of the manuals?
19      A.    That's a manual on code of conduct.
20      Q.    And what's contained in the code of conduct?
21      A.    Behavioral things that we, you know, that we accept
22  and things we don't accept, and the associates do receive each
23  one of them, individually, that manual.
24      Q.    Okay.  Does the assistant manager receive that
25  manual, too?

Page 80

1      A.    Yes.
2      Q.    Is that applicable to the assistant manager, that
3  manual?
4      A.    Absolutely.  The code of conduct is applicable to
5  all Home Depot associates.
6      Q.    What are some of the things that aren't permitted in
7  that manual?
8      A.    I'd have to have the manual in front of me to really
9  specifically go into that.  It's been a while since I've read
10  the manual.
11      Q.    Well, of the manuals you've just listed, which one
12  would apply most specifically to the situation that occurred
13  on November 3rd, 2003?
14      A.    The manual that -- I'm not sure which manual would
15  apply specifically to that certain instance.
16      Q.    Did you consult any manual with respect to that
17  situation?
18      A.    No, I did not.
19      Q.    To your knowledge, there is there a manual that
20  specifically addresses how to accommodate persons with
21  disabilities?
22      A.    Again, we keep going back to this.  We try to take
23  care of all of our customers.
24      Q.    Is there manuals that list examples how you would
25  help somebody with a disability specifically?

Page 81

1      A.    No, not that I'm aware of.
2      Q.    Okay.  So other than the general admonition that you
3  should help all of your customers, you don't know of any
4  specific manuals or procedures that relate to disabled
5  persons?
6      A.    Not that I'm aware of.
7      Q.    Okay.  So you don't know if there is actually a
8  specific policy as to someone with a disability?
9      A.    If you look at our policies or our values, excellent
10  customer service is one of the eight, and that applies to
11  every customer.
12      Q.    Okay.  But there is no manual, for example, that
13  says if a blind person comes in to a Home Depot store and asks
14  for a personal shopper, you should give them one to assist
15  them in traversing the store?
16          MR. HARRIS:  Objection, foundation.
17          THE WITNESS:  There is no manual that I'm aware of
18  that addresses a blind customer coming into our store.
19  BY MR. SHERMAN:
20      Q.    Okay.  Or a customer in a wheelchair as well; is
21  that correct?
22          MR. HARRIS:  Same objection.
23          THE WITNESS:  There's no manual that I'm aware of
24  that addresses that either.
25  BY MR. SHERMAN:

Page 82

1  Q.  Or a customer who is deaf; is that correct?
2  MR. HARRIS:  Same objection.
3  THE WITNESS:  There is no manual that I'm aware of
4  that addresses that issue as well.
5  BY MR. SHERMAN:
6  Q.  Or a customer who has Tourette's; is that correct?
7  MR. HARRIS:  Same objection.
8  THE WITNESS:  Same answer.
9  BY MR. SHERMAN:
10  Q.  And what was the answer, if you can state?
11  A.  That there's no manual that I know of that addresses
12  that specific issue.
13  Q.  Okay.  Let me -- I think this is Exhibit D.
14  Was that the Kuhia statement?
15  A.  Of Dar's, yeah.
16  Q.  Let me ask you to read through that.
17  A.  (Witness complies.)
18  Q.  Let me know when you've finished.
19  A.  I'm done.
20  Q.  Okay.  Have you ever seen this statement before?
21  A.  Not that I recall.
22  Q.  Okay.  So you had nothing to do with the statement
23  being put together; is that correct?
24  A.  I'm not the one that asked her to write this
25  statement.

Page 83

1  Q.  And you weren't there with her when she wrote it,
2  were you?
3  A.  I believe the way it worked, she wrote hers on the
4  20th and I wrote mine on the 24th, so no, I wasn't there.
5  Q.  But it is possible you were in the room with her
6  when she wrote it on the 20th?
7  A.  I don't recall.
8  Q.  You would recall, wouldn't you, if you were?
9  A.  I don't know.  Normally when we asked an associate
10  or associate is asked to write a statement, we give them
11  someplace private to write it.
12  Q.  Okay.  Do you know who asked her to write this?
13  A.  I don't know exactly who.  I know someone asked me
14  to write one, and it might have been that very same person.
15  Q.  And that would have been one of Mr. Harris'
16  associates?
17  MR. HARRIS:  Objection, foundation.
18  THE WITNESS:  I don't recall who I was asked to
19  write the statement from.  It may have been from the Home
20  Depot.
21  BY MR. SHERMAN:
22  Q.  Well, when you were asked to write your statement,
23  what did they ask you to do exactly?
24  A.  Like any other statement they ask me, "We need you
25  to write a statement on what happened on a particular day and

Page 84

1  with a particular incident," and, you know, "When can you have
2  it done?"
3  Q.  Okay.  They didn't direct you what they wanted to be
4  in the statement?
5  A.  Not at all.
6  Q.  Did they ask you to write a truthful statement?
7  A.  Absolutely.
8  Q.  And they asked you to write an accurate statement?
9  A.  "Just tell us what happened and write it in the
10  statement."
11  Q.  Okay.  And did you infer from that direction that
12  you should be as complete as possible in describing what
13  happened?
14  A.  Home Depot values require us to be honest when we
15  write a statement, or anything else for that matter.  So they
16  just want what happened.
17  Q.  Which of the core values would that come under?
18  A.  It may not be on that wheel, but it's called ethics,
19  just being ethical and honest.
20  Q.  And what do you understand to be ethical to mean?
21  A.  Do the right thing, which I believe is on that
22  wheel, and honesty.
23  Q.  Now, let me direct you to Ms. Kuhia's statement.
24  A.  Um-hum.
25  Q.  How many times in that statement does she write out

Page 85

1  in its entirety the word "fucking"?
2  MR. HARRIS:  Objection, attorney testifying, assumes
3  facts not in evidence, harassment.
4  THE WITNESS:  You mean the full word, right?
5  BY MR. SHERMAN:
6  Q.  Yes.
7  A.  There's one for sure.  There's two.  Two that I see
8  for sure.
9  Q.  Okay.  How many times does she write out the word
10  "cunt"?
11  MR. HARRIS:  Objection, absolutely senseless
12  harassment.
13  THE WITNESS:  Again, two.
14  BY MR. SHERMAN:
15  Q.  Do you know whether or not someone specifically
16  instructed her to write the words out, herself, or she just
17  did that, herself?
18  A.  I don't know.
19  Q.  Okay.  Did they instruct you specifically to write
20  out the words?
21  A.  No.  They told me just to write a statement.
22  Q.  Okay.
23  A.  The words were chosen by myself.
24  Q.  So would you assume that she chose the words,
25  herself, as well?

Page 86

1    MR. HARRIS:  Objection, speculation.
2    THE WITNESS:  I don't know.
3    MR. HARRIS:  Asked and answered.
4    THE WITNESS:  I did not get involved in the
5  statement with her.
6  BY MR. SHERMAN:
7    Q.    Now, getting back to Exhibit E.
8    A.    Okay.
9    Q.    Paragraph 1, what other records do you maintain or
10  keep?
11    A.    Coaching records.
12    Q.    What are coaching records?
13    A.    We have a 360-plus employees.  There might be an
14  issue, and we keep -- there may be a document that is written
15  to record a specific issue.
16    Q.    Do you mean an employment related issue?
17    A.    Could be an attendance issue.
18    Q.    Could it be a customer relations issue?
19    A.    Could possibly be that.
20    Q.    Would you be responsible for customer complaints?
21    A.    If I receive a complaint from a customer, yes, I
22  address it.
23    Q.    Okay.  And do you always make a record of that
24  complaint?
25    A.    Depends on the situation.  Not always.

Page 87

1    Q.    Do you understand when I say "record" I mean a
2  written record?
3    A.    Again, depends on the situation.  Not always.
4    Q.    So that's in your discretion whether it's important
5  enough or not to make a written record of it?
6    A.    To document it, yes, it is.
7    Q.    So it's your call whether something is important
8  enough or serious enough as to whether it should be written up
9  or not; is that correct?
10    A.    It can be my call.  If I have any concerns I will,
11  you know, get together with my peers or possibly human
12  resources or possibly with the store manager, depending on the
13  situation.
14    Q.    With respect to the incident of November 3rd, 2003,
15  did you do any of that?
16    A.    I didn't feel it was necessary.  The situation was
17  under control.
18    MR. SHERMAN:  Why don't we take a short break and we
19  will determine whether we're done or not.
20    MR. HARRIS:  Okay.  You want us out?
21    MR. SHERMAN:  (Attorney nods head.)
22    (Recess was taken from 11:29 to 11:34 a.m.)
23    MR. SHERMAN:  Okay.  This concludes our, at this
24  time, questioning of Mr. Dolan.
25    Mr. Dolan, do you --

Page 88

1    MR. HARRIS:  We'll take signature.
2    MR. SHERMAN:  Okay.  You have an opportunity and
3  choice to waive your signature or to review the deposition and
4  make certain changes.
5    Do you want to waive it or not?
6    MR. HARRIS:  Mr. Dolan will take the opportunity to
7  review the transcript and make any changes that are necessary
8  and sign the transcript.
9    Correct?
10    THE WITNESS:  Yes.
11    MR. HARRIS:  Yeah.
12    MR. SHERMAN:  All right.
13    (Whereupon the deposition
14        was concluded at 11:35 a.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 89

1            W I T N E S S   C E R T I F I C A T E
2
3    I, MICHAEL J. DOLAN, hereby certify that I have
4  read the foregoing typewritten pages 1 through 89,
5  inclusive, and corrections, if any, were noted by
6  me, and the same is a true and correct transcript
7  of my testimony.
8
9
10  Dated this _____ day of _____, _____
11
12
13  _____
14        MICHAEL J. DOLAN
15
16
17  Signed before me this _____ day of _____
18  _____
19
20
21  _____
22
23  JON MUSE VS. HOME DEPOT, Civil No. 04-00154 DAE/BMK
24  Taken July 21st, 2006, by B. Kanoelani Cockett,
25  HI CSR No. 379, CA CSR No. 7995

Page 90

```
 1              C E R T I F I C A T E
 2  STATE OF HAWAII          )
 3                           )ss.
 4  CITY AND COUNTY OF HONOLULU  )
 5        I, B. KANOELANI COCKETT, CSR, Notary Public,
 6  State of Hawai'i, do hereby certify;
 7        That on July 21st, 2006, at 9:32 a.m. appeared
 8  before me MICHAEL J. DOLAN, the witness whose deposition is
 9  contained herein; that prior to being examined he was
10  by me duly sworn;
11        That the deposition was taken down by me in
12  machine shorthand and was thereafter reduced to
13  typewritten form under my supervision; that the foregoing
14  represents, to the best of my ability, a true and correct
15  transcript of the proceedings had in the foregoing matter.
16        I further certify that I am not an attorney for
17  any of the parties hereto, nor in any way concerned with
18  the cause.
19        Dated this 27th day of July 2006 in Honolulu,
20  Hawai'i.
21  _____
22  B. KANOELANI COCKETT,
23  HI CSR NO. 379, CA CSR No. 7995
24  Notary Public, State of Hawai'i
25  My commission expires:  February 19th, 2009
```