1              IN THE UNITED STATES DISTRICT COURT
2                   FOR THE DISTRICT OF HAWAII
3    _____

4    JON MUSE,                         CIVIL NO. 04-00154 DAE/BMK
5              Plaintiff,     (Civil Rights Violation)
6         vs.
7    HOME DEPOT USA, INC.,
8              Defendant.
9    _____

10
11
12              DEPOSITION OF DARLYN KUHIA
13
14    Taken on behalf of the plaintiff at the office of
15   Davis Levin Livingston Grande, 851 Fort Street, Suite 400,
16   Honolulu, Hawai'i, commencing at 9:41 a.m. on July 20th, 2006,
17   pursuant to Notice.
18
19
20
21
22
23   BEFORE:    B. KANOELANI COCKETT
24              Certified Shorthand Reporter
25              HI CSR NO. 379, CA CSR NO. 7995

Page 2

```
 1  APPEARANCES:
 2  For Plaintiff:   STANLEY E. LEVIN, ESQ.
 3                   Davis Levin Livingston Grande
 4                   851 Fort Street, Suite 400
 5                   Honolulu, Hawai'i 96813
 6                   slevin@davislevin.com
 7                   and
 8                   BRUCE F. SHERMAN, ESQ.
 9                   The Law Office of Bruce F. Sherman
10                   1164 Bishop Street, Suite 124
11                   Honolulu, Hawai'i 96813
12                   failey52@hawaii.rr.com
13
14  For Defendant:   JEFFREY S. HARRIS, ESQ.
15                   Torkildson Katz
16                   Topa Financial Center, Bishop Street Tower
17                   700 Bishop Street, Floor 15
18                   Honolulu, Hawai'i 96813
19                   jsh@torkildson.com
20
21
22
23
24
25                       -oOo-
```

Page 3

```
 1              I N D E X
 2  EXAMINATION BY:                              PAGE
 3  MR. SHERMAN                                    4
 4  MR. HARRIS                                    68
 5  FURTHER EXAMINATION BY MR. SHERMAN            69
 6
 7
 8         EXHIBITS FOR IDENTIFICATION
 9  PLAINTIFF'S                                  PAGE
10  A    Employee Statement of Darlyn Kuhia dated   8
11       February 20, 2004
12  B    Declaration of Darlyn P. Kuhia dated      41
13       November 22, 2005
14
15
16
17             SEALED TESTIMONY
18                 PAGE 14
19
20
21
22
23
24
25
```

Page 4

```
 1        (Reporter's Disclosure was displayed.)
 2              DARLYN KUHIA,
 3        Having been first duly sworn,
 4        testified upon her oath as follows:
 5                 EXAMINATION
 6  BY MR. SHERMAN:
 7     Q.  Good morning, Ms. Kuhia.  My name is Bruce Sherman.
 8  I'm here on behalf of the plaintiff, Jon Muse.  I'm with
 9  co-counsel, Stanley Levin.  I want to ask you a few questions
10  in preparation before we get into the factual part of the
11  deposition just to make sure you understand what we're going
12  to be doing here today in a deposition.  I'm sure Mr. Harris
13  has talked to you about that, but I just want to make it clear
14  for the record.
15        Are you familiar with the nature of this lawsuit?
16     A.  Yes.
17     Q.  Okay.  And is there anything -- let me get this
18  straight.
19        How do I pronounce your last name?
20     A.  Kuhia.
21     Q.  Kuhia?
22     A.  Yes.
23     Q.  Okay.  And it's -- how do I pronounce your first
24  name?
25     A.  Darlyn.
```

Page 5

```
 1     Q.  Darlyn, okay.  Have you ever testified before in a
 2  matter?
 3     A.  No.
 4     Q.  Okay.  And never in a court or in a deposition
 5  before?
 6     A.  No.
 7     Q.  Okay.  Is there anything today that would impede
 8  your ability to understand or communicate during the
 9  deposition such as a language problem or a physical problem
10  such as hearing?
11     A.  No.
12     Q.  Okay.  Are you on any medications or drugs right now
13  that would impede your ability to recollect or to answer the
14  question and communicate otherwise during the course of the
15  deposition?
16     A.  No.
17     Q.  Have you had any alcohol within the last 24 hours?
18     A.  No.
19     Q.  Now, during the course of this deposition, one of
20  the things I've just been reminded is it's important that you
21  answer our questions in a "yes" or a "no" because otherwise
22  the court reporter can't pick it up, okay?  So try and recall
23  that.  Otherwise we'll have to remind you, but to the extent
24  you can answer verbally, nods and shrugs don't work.
25        MR. HARRIS:  Well, she was ready to be on TV, but I
```

Page 6

```
1   note we're not going to video it, right?
2       MR. SHERMAN: Apparently not.
3       MR. HARRIS: Okay.
4   BY MR. SHERMAN:
5   Q.  During the course of the questions I'll be asking
6   you -- during the course of the deposition, rather, I'll be
7   asking you questions. It's important that you listen to the
8   question and, you know, try to respond to it as well as you
9   can.
10      If you don't understand the question, if there's
11  some part of it, you know, feel free to say, you know, "Can
12  you explain this?" Or if you didn't hear the question, we can
13  always ask the court reporter to read it back for you.
14      Do you understand?
15  A.  Yes.
16  Q.  Okay. Now, during the course of the deposition
17  there may be times when Mr. Harris will object to a question
18  for a number of reasons. Mr. Harris will state his objection
19  for the record and then you will answer the question unless he
20  instructs you not to answer. There are very narrow grounds
21  for instructing a witness not to answer, but those will be
22  stated, but unless you were specifically instructed not to
23  answer a question, after he objects, you should answer the
24  question.
25      Do you understand?
```

Page 7

```
1   A.  Yes.
2   Q.  Okay. You should wait for him to state the
3   objection and then answer the question.
4       Now, let me for the record get you to state your
5   name again.
6   A.  Darlyn Kuhia.
7   Q.  Okay. And what is your business address?
8   A.  I don't understand what you mean.
9   Q.  Where do you work?
10  A.  I work at Home Depot.
11  Q.  And what address is that?
12  A.  451 Alakawa Street.
13  Q.  Okay. We have a trial set in this matter in on or
14  about October 24th.
15      Would you be available to testify during that trial
16  at that time?
17  A.  I should be.
18  Q.  Okay.
19  A.  Yes.
20  Q.  Would you accept a subpoena through your attorney?
21  A.  Yes.
22  Q.  Okay. Can you state your age for the record,
23  please?
24  A.  I'm 40.
25  Q.  Okay. What's your date of birth?
```

Page 8

```
1   A.  May 28th, 1966.
2       MR. HARRIS: I told you he'd be asking rude
3   questions.
4   BY MR. SHERMAN:
5   Q.  I'm sorry, 19?
6   A.  '66.
7   Q.  Okay. Now, in preparation for today, did you read
8   any materials?
9   A.  I don't understand.
10  Q.  Okay. Before you came to this deposition, did you
11  look at any statements, documents, written materials at all?
12  A.  Yes.
13  Q.  Okay. Can you identify those, please?
14  A.  The one here.
15      Oh, identify that, the evidence?
16  Q.  I want you just to tell me what you read before.
17  A.  I read this (indicating).
18      MR. HARRIS: She's pointing to a one-page statement
19  that you appear to have marked as Exhibit A. It's Bates
20  stamped 11013300003.
21      MR. SHERMAN: Okay.
22      MR. HARRIS: Employee's Statement.
23          (Plaintiff's Exhibit A
24          was marked for identification.)
25  BY MR. SHERMAN:
```

Page 9

```
1   Q.  Okay. Did you read anything else in preparation?
2   A.  No.
3   Q.  Did you read any employee manuals in preparation for
4   today's deposition?
5   A.  No.
6   Q.  Okay. Did you recall signing a Declaration in this
7   matter?
8   A.  No.
9   Q.  Okay. So you didn't review a Declaration, then?
10  A.  No.
11  Q.  Okay. Now, prior to this deposition you spoke with
12  Mr. Harris; is that correct?
13  A.  Yes.
14  Q.  And when did you meet with Mr. Harris?
15  A.  Yesterday.
16  Q.  Okay. And for how long did you meet with Mr. Harris?
17  A.  About half an hour.
18  Q.  Okay. Did you meet with anyone else from Mr.
19  Harris' office?
20  A.  No.
21  Q.  Okay. Was that the only time in the last month that
22  you had talked to Mr. Harris about the...
23  A.  Yes.
24  Q.  Okay. Now, previously we had a deposition
25  scheduled, I don't know if you recall, back in the wintertime.
```

Page 10

1  Did you talk to anyone in February about that time
2  regarding your testimony?
3  A. Yeah. I can't be sure.
4  Q. Okay. You may have, though?
5  A. Yes.
6  Q. Okay. Do you recollect if it was Mr. Harris?
7  A. No.
8  Q. Do you think it might have been an associate of his?
9  A. No.
10 Q. Okay. Someone at his office?
11 A. No.
12 Q. Have you talked in the last month to anyone at Home
13 Depot about your testimony today?
14 A. No.
15 Q. You didn't talk to Mr. Dolan?
16 A. To who?
17 Q. Mike Dolan?
18 A. No.
19 Q. No, you didn't talk to anyone in human resources
20 about coming here to testify?
21 A. No, not about this testimony, no.
22 Q. Okay. How long have you worked at Home Depot?
23 A. Seven years.
24 Q. Okay. Do you remember the date you started?
25 A. August 24th, 1999.

Page 11

1  Q. Okay.
2     MR. HARRIS: (Indicating.) This says 1998.
3     Is this one wrong?
4     THE WITNESS: Maybe.
5  BY MR. SHERMAN:
6  Q. Okay. Would you like to correct your answer?
7  A. Could be 1998.
8  Q. Okay. And what did you start -- what was your
9  position when you started at Home Depot?
10 A. Cashier.
11 Q. And what does a cashier do there?
12 A. Run register.
13 Q. Okay. Anything else?
14 A. Customer service, assist customers in finding
15 things, merchandise on the floor.
16 Q. Would a cashier wander the store or walk around the
17 store as part of their function?
18 A. No, no, just right by the register.
19 Q. Okay. Now, what kind of training did you receive
20 from Home Depot to be a cashier?
21 A. Just learning their registers.
22 Q. Okay. Was there a cashier school you went to?
23 A. Yes. We had personal trainers one-on-one.
24 Q. Okay. Did you do that on computer?
25 A. No.

Page 12

1  Q. Okay. Was there a computer course you went through
2  with respect to the Associate's Manual?
3  A. No.
4  Q. Do you know what I mean by "the Associate's Manual"?
5  A. Yes.
6  Q. Okay. Can you tell us for the record what the
7  Associate's Manual is?
8  A. The manual of what we are responsible and what our
9  duties are.
10 Q. Is that what that is?
11 A. Yeah.
12 Q. Okay. And you were given that when you began
13 working at Home Depot?
14 A. Yes.
15 Q. Okay. And you still have a copy of it?
16 A. Yes.
17 Q. Now, what is your current position with Home Depot?
18 A. Head cashier.
19 Q. Okay. And what does that mean?
20 A. I'm right below the front end supervisors. I take
21 the responsibility as a manager if a manager is not available.
22 Q. Okay. How long have you been the head cashier?
23 A. Six and a half years.
24 Q. Is that a management position?
25 A. Yes.

Page 13

1  Q. So in November of 2003 you would have been head
2  cashier?
3  A. Yes.
4  Q. Now, in a typical shift, do you work an eight-hour
5  shift there at Home Depot?
6  A. Yes.
7  Q. When you're on, are you the head cashier at that
8  time?
9  A. Yes, and others. There's also other ones on duty,
10 too.
11 Q. How many other head cashiers are there?
12 A. Maybe one or two more.
13 Q. Do you actually work at a particular checkout
14 station, or are you just available to go to one?
15 A. Actually, I have a register myself, and I also have
16 to be available to go to any other register.
17 Q. Okay. Now, before you worked at Home Depot where
18 did you work?
19 A. Ace Hardware.
20 Q. How long did you work there?
21 A. About a year.
22 Q. That would have been, what, 1997?
23 A. Yeah.
24 Q. Okay. What did you do at Ace Hardware?
25 A. Same thing, head cashier.

Page 14

1  Q. Okay. Prior to Ace Hardware where did you work,
2  immediately prior?
3  A. No place.
4  Q. Okay.
5  A. I mean, I was out for five years.
6  Q. Okay. What were you doing during that period of
7  time if you weren't working?
8      THE WITNESS: Do I have to answer that?
9      I had cancer. So I was fighting cancer.
10 BY MR. SHERMAN:
11 Q. Okay. You're okay now?
12 A. Yeah. I'm in remission.
13 Q. Okay. Prior to that illness --
14     MR. HARRIS: That's protected health information,
15 and I think we can agree that that part of the deposition
16 would be sealed.
17     MR. SHERMAN: Sure, I have no problem with that.
18 Q. Prior to that incident, your illness, where did you
19 work?
20 A. At City Mill.
21 Q. City Mill, okay.
22     Do you know the years approximately you worked at
23 City Mill?
24 A. Probably in the '80s or late '80s.
25 Q. Okay. What did you do at City Mills -- City Mill?

Page 15

1  A. Same thing, head cashier.
2  Q. Okay. Prior to City Mill where did you work?
3  A. I don't know. Pay-N-Save.
4  Q. Do you know when you worked at Pay-N-Save?
5  A. '84.
6  Q. Okay. Now, prior to Pay-N-Save where did you work?
7  A. I didn't.
8  Q. Okay. What were --
9  A. I was in school.
10 Q. If you were school --
11 A. Um-hum.
12 Q. -- would that be high school?
13 A. College.
14 Q. College, which college did you go to?
15 A. Kapi'olani Community College.
16 Q. Do you have an associate's degree from there?
17 A. Yes.
18 Q. And that's a two-year program, right?
19 A. Yes.
20 Q. And what's that associate's degree in?
21 A. Social science.
22 Q. Do you have any other degrees?
23 A. No.
24 Q. Where did you go to high school?
25 A. Roosevelt.

Page 16

1  Q. Okay. Do you remember the year you graduated?
2  A. '84.
3  Q. '84?
4  A. Um-hum.
5      MR. HARRIS: A youngster.
6  BY MR. SHERMAN:
7  Q. Now, why did you leave Pay-N-Save?
8  A. They closed.
9  Q. Okay. I assume that you left City Mill during the
10 course of your illness; is that correct?
11 A. Yes.
12 Q. Why did you leave Ace Hardware?
13 A. To work for Home Depot.
14 Q. Oh, okay. You left of your own volition?
15 A. Yes.
16 Q. Okay. Do you know Debra Peterson?
17 A. Yes.
18 Q. Okay. Is she -- do you still maintain contact with
19 her?
20 A. No.
21 Q. Okay. Do you recollect the last time you talked to
22 her?
23 A. Yes.
24 Q. When was that?
25 A. Sometime last year before Christmas.

Page 17

1  Q. Do you consider yourself her friend?
2  A. I'm an acquaintance, that's about it, but not a
3  friend.
4  Q. Did you happen to talk about this case at all when
5  you were talking to her?
6  A. No.
7  Q. Are you aware of the reasons she was terminated at
8  Home Depot?
9  A. No.
10 Q. But it's correct that she doesn't -- she was
11 terminated at Home Depot, to the best of your knowledge?
12 A. Yes.
13     MR. HARRIS: Objection, foundation.
14 BY MR. SHERMAN:
15 Q. Now, let me ask you this.
16     Are the cashier checkout points, are they subject to
17 video surveillance?
18     MR. HARRIS: Objection, foundation, speculation.
19     THE WITNESS: I really don't know.
20 BY MR. SHERMAN:
21 Q. Okay. You have no idea whether or not there are
22 cameras recording on a continuous basis all the transactions?
23     MR. HARRIS: Objection.
24     THE WITNESS: No.
25     MR. HARRIS: Asked and answered.

Page 18

```
 1  BY MR. SHERMAN:
 2     Q.  You've never talked to anyone?  You've never been
 3  informed that there is a video surveillance system there?
 4     A.  Yes.
 5     Q.  You have been informed?
 6     A.  Yes.
 7     Q.  Who told you about it?
 8     A.  LP.
 9     Q.  Who?
10     A.  Loss prevention.
11     Q.  Okay.  Do you know when they told you about it?
12     A.  Not sure.  I'm not sure.
13     Q.  Would it have been -- do you know when the video
14  surveillance system was put in at Home Depot?
15     A.  No, I don't.
16     Q.  Is it possible it's been there as long as you've
17  been working there?
18         MR. HARRIS:  Objection, foundation, speculation.
19         THE WITNESS:  I don't know.
20  BY MR. SHERMAN:
21     Q.  Is the primary purpose of video surveillance system,
22  as you know it, to prevent shrinkage?
23         MR. HARRIS:  Objection, foundation, speculation.
24         THE WITNESS:  I don't know.
25  BY MR. SHERMAN:
```

Page 19

```
 1     Q.  Do you know what I mean by "shrinkage"?
 2     A.  Yes.
 3     Q.  What does shrinkage mean?
 4     A.  Merchandise either moving out of the store without
 5  being paid.
 6     Q.  Would that be a nice term for shoplifting?
 7     A.  Yeah.
 8     Q.  Okay.  Have you spoken to Mike Dolan at any time
 9  about this lawsuit?
10     A.  No.
11     Q.  Now, I'd like you to take a look at what's been
12  marked as Exhibit A.  Now, I'm going to ask you -- and the
13  only reason I say this is we had a problem in one of the depos
14  before where a witness found a mistake on the exhibit she
15  made, and she tried to correct the exhibit, and so even if
16  there's something, like a date's wrong or something like that,
17  don't make any corrections on the exhibit, okay?  The exhibit
18  is as it is, okay?
19         MR. HARRIS:  Objection, argumentative, attorney
20  testifying.
21  BY MR. SHERMAN:
22     Q.  Okay.  Do you recognize Exhibit A?
23     A.  Yes.
24     Q.  Okay.  Tell me what it is.
25     A.  It's a statement.
```

Page 20

```
 1     Q.  Is that your statement?
 2     A.  Yes.
 3     Q.  Okay.  Is that your handwriting on it?
 4     A.  Yes.
 5     Q.  Okay.  Down at the bottom where it says "signature,"
 6  is that your signature?
 7     A.  Yes.
 8     Q.  And where it says "time," is that a.m. or p.m.?
 9     A.  P.m.
10     Q.  Okay.  So the time is 4:49 p.m.?
11     A.  Yes.
12     Q.  And the date you wrote that statement is February
13  20th, 2004; is that correct?
14     A.  Yes.
15     Q.  Okay.  I want to give you a chance to read the
16  statement again, so just take a moment to go through it and
17  let me know when you've had a chance to read it.
18         Okay?
19     A.  (Witness complies.)  Okay.
20     Q.  Now, do you remember the exact date that the
21  incident you refer to here occurred?
22     A.  No, not the date.
23     Q.  Okay.  When you say "November of 2003," could that
24  have been early November, late November?
25     A.  I'm not too sure.
```

Page 21

```
 1     Q.  Is it possible that the event occurred on November
 2  3rd, 2003?
 3     A.  Don't really know.
 4     Q.  When the event occurred, do you recollect writing
 5  down anything about it --
 6     A.  No.
 7     Q.  -- on the day it occurred?
 8     A.  No.
 9     Q.  And you kept no notes whatsoever about it?
10     A.  No.
11     Q.  Do you know if anyone else did?
12     A.  No.
13     Q.  Do you know if Debra Peterson made notes about it?
14     A.  No.
15     Q.  Is that -- wouldn't it be policy for to write down
16  the facts of an incident like this when it occurred?
17     A.  No.
18     Q.  It's not the policy?
19     A.  Not my policy.  It's the manager's policy, which is
20  Mike Dolan's policy, not for me.
21     Q.  So you have no obligation to --
22     A.  No.
23     Q.  -- as you understand it, to write down what
24  happened?
25     A.  Right.
```

Page 22

1  Q. At the time?
2  A. Right.
3  Q. Did Mr. Dolan -- does he have the authority to tell
4  you to write something down about it at the time?
5  A. Yes.
6  Q. Okay. Did he tell you to write down something about
7  it at the time?
8  A. No, no.
9  Q. Did you talk to him about it at the time?
10 A. No.
11 Q. Do you know if Mr. Dolan told Debra Peterson to
12 write something down about it at the time of the event?
13 A. No.
14 Q. On November 3rd of 2003?
15 A. No.
16 Q. Let me pose a hypothetical to you. If someone --
17 you were at a cashier register and you were checking them out,
18 and you discovered that they were stealing something, they had
19 hidden something, and you confronted them, what would you do
20 then?
21    MR. HARRIS: Objection, speculation.
22    THE WITNESS: Call a manager.
23 BY MR. SHERMAN:
24 Q. Okay. And what would you tell -- would the manager
25 come then to your station immediately?

Page 23

1  A. Yeah.
2  Q. You don't have some sort of security that would come
3  instead?
4  A. No.
5  Q. And then you would confront the person about the
6  stealing?
7  A. No.
8  Q. What would you do?
9  A. Like I said, call a manager.
10 Q. And then you would have nothing else to do with the
11 situation?
12 A. No.
13 Q. Do you understand what the manager would do at that
14 time?
15 A. No.
16    MR. HARRIS: Objection, speculation.
17 BY MR. SHERMAN:
18 Q. Okay. So what you're testifying, then, is that once
19 you called a manager, you have no other responsibility or
20 obligation in a situation that as we described in the
21 hypothetical; is that correct?
22 A. Yes.
23 Q. Is it -- and you have no ability to make your own
24 decision with respect to that situation other than calling
25 your manager; is that correct?

Page 24

1  A. Yes.
2     MR. HARRIS: Objection, speculation.
3  BY MR. SHERMAN:
4  Q. But wouldn't you talk to the manager about the
5  situation when he came there?
6     MR. HARRIS: Objection, speculation.
7     THE WITNESS: Yes.
8  BY MR. SHERMAN:
9  Q. And you would explain to him what occurred; is that
10 correct?
11 A. Yes.
12 Q. And then he would make whatever decision had to be
13 made; is that correct?
14 A. Yes.
15 Q. Okay. So can you explain why there is a gap of
16 almost three months from the time of the incident in November
17 of 2003 to February 20th, 2004, a gap between the time the
18 incident occurred and you wrote up this statement?
19 A. I don't know.
20 Q. Okay. Were the facts of the incident fresh in your
21 mind at the time it occurred?
22 A. Yes.
23 Q. And you had a clear recollection then; is that
24 correct?
25 A. Yes.

Page 25

1  Q. And so when you wrote this statement in February of
2  2004, it was just the best that you could remember after three
3  months; is that correct?
4     MR. HARRIS: Objection, vague, argumentative,
5  attorney testifying.
6     THE WITNESS: Yeah, yes.
7  BY MR. SHERMAN:
8  Q. It would have been more accurate if you had done it
9  at the time of the incident; is that correct?
10 A. Yes.
11    MR. HARRIS: Objection, vague, argumentative,
12 attorney testifying.
13 BY MR. SHERMAN:
14 Q. Now, you wrote this statement out on February 20th,
15 2004; is that correct?
16 A. Yes.
17 Q. Okay. You didn't write it out another date and then
18 date it?
19 A. No.
20 Q. Okay. And where were you when you wrote it out?
21 A. In the manager's office.
22 Q. And who is the manager?
23 A. Nobody was in the office when I wrote this out.
24 Q. Okay. Why were you in the office then?
25 A. To write this paper.

Page 26

1   Q.  Okay.  Who told you to go to the office?
2   A.  Home Depot's lawyer.
3   Q.  Who was that?
4   A.  I don't know.  I don't remember her name.
5   Q.  Okay.  And how did she tell you that?
6   A.  She explained to me that I needed to write down what
7   had happened that day.
8   Q.  Did she call you on the phone or did she appear
9   personally?
10  A.  She came up to the front end.
11  Q.  Did you know she was coming?
12  A.  No.
13  Q.  And do you know about what time of the day she
14  appeared?
15  A.  Have to be after two.
16  Q.  Okay.  And she told you that you had to go to the
17  manager's office and write up a statement?
18  A.  Um-hum.  (Witness nods head.)
19  Q.  And that's what you did?
20  A.  Yes.
21  Q.  Did she talk to you about the incident?
22  A.  After.
23  Q.  After you wrote the statement?
24  A.  Um-hum.  (Witness nods head.)
25  Q.  Is this the only statement you wrote out?

Page 27

1   A.  Yes.
2   Q.  Okay.  You didn't write out another one?
3   A.  No.
4   Q.  Did you -- were you the only one in the manager's
5   office writing out a statement?
6   A.  Yes.
7   Q.  Debra Peterson wasn't in there with you?
8   A.  No.
9   Q.  Mike Dolan wasn't in there with you?
10  A.  No.
11  Q.  Okay.  Is Mike Dolan a manager?
12  A.  Yes.
13  Q.  Okay.  And you mean by that a full manager?
14  A.  I mean by that a department manager.
15  Q.  Okay.  And what's a department manager as you
16  understand it?
17  A.  He has certain areas that he take care of.
18  Q.  Okay.  And --
19  A.  Certain departments that he takes care of.
20  Q.  Okay.  Do you know what his particular department
21  is?
22  A.  Well, it always changes, so really hard to say.
23  Right now he's in department 23, 24 and 25.  I don't remember
24  what he was at that time.
25  Q.  Okay.  So you spoke with the attorney for Home Depot

Page 28

1   both before and after the statement, you wrote the statement?
2   A.  Yes.
3   Q.  How long did you speak with her afterwards?
4   A.  Maybe another half an hour.
5   Q.  Okay.  What did you -- have you spoken to her since
6   then?
7   A.  No.
8   Q.  Okay.  You never have.
9       You ever seen her since then?
10  A.  No.
11  Q.  Okay.  You can't remember her name?
12  A.  No.
13  Q.  Now, do you have -- other than reading this
14  statement, do you have an independent memory or recollection
15  of the events of November 3rd, 2003?
16      MR. HARRIS:  Objection, assumes facts not in
17  evidence, the witness hasn't identified a particular date, so
18  the question is also vague and confusing.
19      THE WITNESS:  I don't...
20      MR. HARRIS:  I want to make sure you answer the
21  question, so I'm going to tell you you've previously testified
22  that you remember an event sometime in November.
23      MR. SHERMAN:  I'm going to object.  You're telling
24  the --
25      MR. HARRIS:  So go ahead and answer that question.

Page 29

1       MR. SHERMAN:  Let me state an objection for the
2   record, please.
3       MR. HARRIS:  I'm not interrupting you.  So when I
4   get done with my statement to her, you can say what you need
5   to say.
6       MR. SHERMAN:  You're basically telling her what to
7   say.
8       MR. HARRIS:  No.  I'm advising you his question is
9   vague and confusing.  He's identifying a particular date.
10  You've already told him you remember an incident occurred --
11      MR. SHERMAN:  I object.  She can tell me that,
12  herself.
13      MR. HARRIS:  Don't interrupt me, please.
14      You've already told me you don't remember a
15  particular date.
16      THE WITNESS:  Um-hum.
17      MR. HARRIS:  But make sure you listen to the
18  question carefully.
19      THE WITNESS:  (Witness nods head.)
20      MR. SHERMAN:  Yeah, I'm going to object again and
21  I'm going to ask you not to do that again.  You certainly can
22  make your objection to the question as vague or ambiguous or
23  confusing, but the witness can determine that, but you
24  shouldn't be instructing her to --
25      MR. HARRIS:  You don't need to argue.

Page 30

1  MR. SHERMAN: Can I finish this, please?
2  MR. HARRIS: You don't need to argue with me --
3  MR. SHERMAN: I want to state this for the record.
4  I understand what you're going to say. We've gone through
5  this before. You don't need to instruct her what to say.
6  MR. HARRIS: Ask your next question.
7  BY MR. SHERMAN:
8  Q. Do you recollect the incident in November of 2003
9  involving Mr. Muse?
10 A. Yes.
11 Q. Okay. You don't remember the exact date, though?
12 A. No.
13 Q. Do you know if it was before Thanksgiving or after
14 Thanksgiving?
15 A. I don't know. I don't know.
16 Q. Do you have a clear memory of it?
17 A. Yes.
18 Q. And that's three years later you have a crystal
19 clear memory?
20 A. Yes.
21 Q. Okay. Now, what time of the day did this incident
22 occur?
23 A. In the afternoon.
24 Q. Would it have been 1:00?
25 A. Anytime after two.

Page 31

1  Q. So it would have been after 2:00?
2  A. (Witness nods head.)
3  Q. That's two p.m.?
4  A. (Witness nods head.)
5  Q. And how do you know it was after two p.m.?
6  A. I don't start work until after two.
7  Q. So while you don't remember the date, you're crystal
8  clear it didn't happen until after two p.m. because that's
9  when your shift started; is that correct?
10 A. Um-hum. (Witness nods head.)
11 Q. Would it have been, then, between two and six p.m.?
12 A. Maybe.
13 Q. When you take your -- you take a lunch break, don't
14 you?
15 A. Yes.
16 Q. Okay. When is that?
17 A. Whenever there's coverage.
18 Q. Okay. Do you recollect that day when there was
19 coverage?
20 A. No.
21 Q. Do you recollect whether this occurred before or
22 after?
23 A. No.
24 Q. Okay. Now, when you wrote this statement out, did
25 you have a crystal clear memory then of the incident?

Page 32

1  A. Not so. I had to go back to times when I don't want
2  to remember again.
3  Q. I'm sorry, what?
4  A. I had to go and to remember something I didn't want
5  to remember again.
6  Q. Um-hum. But your memory now is crystal clear as to
7  the incident?
8  A. Yes.
9  Q. So it's fair to say, then, your memory is better now
10 today three years after the incident than it was three months
11 after the incident?
12 A. Yes, because I had gone through it with Mr. Harris
13 yesterday, so yesterday it came all back again.
14 Q. But you also went through it with another lawyer of
15 Mr. Harris' office on February 20th of 2004?
16 MR. HARRIS: Objection, leading, assumes facts not
17 in evidence.
18 MR. SHERMAN: Correct?
19 THE WITNESS: Can you repeat that question again?
20 MR. HARRIS: And foundation.
21 (The record was read.)
22 MR. HARRIS: Same objection.
23 THE WITNESS: No.
24 BY MR. SHERMAN:
25 Q. So at that point your memory wasn't crystal clear;

Page 33

1  is that right?
2  A. At what point?
3  Q. On February 20th, 2004?
4  A. Yes.
5  Q. "Yes," it wasn't or "yes," it was?
6  A. Yes, it was.
7  Q. But -- okay.
8  Now, do you recollect during the incident, November
9  of 2003, did you ever have reason to consider calling the
10 police?
11 A. Yes.
12 Q. You did?
13 A. Yes.
14 Q. And why didn't you write that in this statement?
15 A. Because it wasn't my responsibility to call the
16 police. We are not allowed to call the police. If this had
17 happened outside of Home Depot, I probably would have.
18 Q. Um-hum.
19 A. But this happened on my job. My responsibility to
20 call the manager.
21 Q. But you didn't say anything in here about calling
22 the police, did you?
23 A. No, because I had nothing to do with calling the
24 police at the time when I made this statement.
25 Q. Can you show me in this statement where you've

Page 34

1  written down that you were afraid during this incident?
2      A.   Where it says, "I called the manager," I felt it was
3  over my head.
4      Q.   That means you were afraid?
5      A.   To me it does.
6      Q.   Isn't that just part of your job to call the manager
7  when there is a situation that occurs?
8      A.   Yes.
9      Q.   And that doesn't necessarily mean you were afraid,
10 does it?
11     A.   Not every time.
12     Q.   Wouldn't you have said here, "I was afraid"?
13     A.   I could have.
14     Q.   But you didn't, did you?
15     A.   But I didn't.
16     Q.   Okay.  So it's possible that you weren't afraid,
17 isn't it?
18     A.   No.
19     Q.   But you neglected to write that three months after
20 the incident?
21     A.   I didn't write that down.
22     Q.   But today you are testifying that you were afraid,
23 right?
24     A.   Yes.
25     Q.   Okay.  Three years after the incident, is that

Page 35

1  correct, that you've suddenly remembered you were afraid?
2          MR. HARRIS:  Objection, argumentative, foundation,
3  attorney testifying.
4  BY MR. SHERMAN:
5      Q.   Now, have you told anyone else until today that you
6  were afraid during this incident?
7      A.   Yes.
8      Q.   Who did you tell?
9      A.   The other, the first lawyer that I talked to.
10     Q.   Who was that?
11     A.   I don't know her name.
12     Q.   Would her name have been Jan Boiven (phonetic)?
13     A.   Maybe, I don't know.
14     Q.   Now, have you ever -- did you ever meet Mr. Muse
15 before that time?
16     A.   No.
17     Q.   Have you ever seen him since?
18     A.   No.
19     Q.   During the course of that incident did he explain to
20 you that he had a disorder or disease?
21     A.   After.
22     Q.   After what?
23     A.   After he started swearing at me.
24     Q.   Well, you didn't tell anybody at the Home Depot that
25 you were afraid during the incident, did you?

Page 36

1      A.   Yes.
2      Q.   Who did you tell?
3      A.   My supervisor.
4      Q.   Who was that?
5      A.   Jack, Jack Marin.
6      Q.   Who?
7      A.   He's my supervisor.
8      Q.   What is his name again?
9      A.   Jack Marin.
10     Q.   How do you spell his last name?
11     A.   M-A-R-I-N.
12     Q.   M-A?
13     A.   R-I-N.
14     Q.   And where -- is he still with Home Depot?
15     A.   He's at another store.
16     Q.   And what -- when did you tell him you were afraid?
17     A.   After I left the situation.
18     Q.   On that same day?
19     A.   Yeah.
20     Q.   And exactly what did you tell him?
21     A.   If I could take a break.
22     Q.   Pardon me?
23     A.   If I could get a break.
24     Q.   Did you -- okay.
25          But did you tell him, "I'm afraid"?

Page 37

1      A.   Yeah, and I had told him what happened.
2      Q.   And what does -- and what was his position exactly?
3      A.   He's a front end supervisor.
4      Q.   Finance supervisor?
5      A.   Front end.
6      Q.   Would he be in charge of the head cashiers?
7      A.   Yes.
8      Q.   Did you talk to anyone else at Home Depot about
9  this?
10     A.   No.
11     Q.   Did you ask to see a counselor at all?
12     A.   No.
13     Q.   Have you ever received any medical treatment,
14 therapy and treatment with respect to your being afraid of
15 this incident?
16     A.   No.
17     Q.   So you couldn't have been that afraid, could you?
18         MR. HARRIS:  Objection, foundation, argumentative.
19         THE WITNESS:  Yes, I was afraid.
20 BY MR. SHERMAN:
21     Q.   Did you lose sleep over it?
22     A.   No.
23     Q.   So you never lost a minute's sleep over the incident
24 in your fear; is that correct?
25     A.   Correct.

Page 38

1  Q. Did you talk to, again -- well, strike that.
2     You never felt any need to seek professional help
3  for your fear resulting from this incident; is that correct?
4  A. Yes.
5  Q. And you never have sought treatment for your fear
6  from this incident; is that correct?
7  A. Yes.
8     (Pause in the proceedings.)
9  BY MR. SHERMAN:
10 Q. Okay. Now, do you recollect Debra Peterson calling
11 you that day?
12 A. Yes.
13 Q. Where was she located?
14 A. Returns.
15 Q. Okay. And what was her position there? What was
16 her responsibility at returns?
17 A. As a cashier, refund merchandise.
18 Q. And what did she tell you on the phone?
19 A. That I needed to get there fast because there's
20 someone yelling and screaming at her and swearing at her, and
21 she was -- she was -- sounded like she was afraid.
22 Q. Okay. And that's exactly as you recollect today --
23 A. That's what she said.
24 Q. -- what she said?
25    Will you take a look at your statement again.

Page 39

1  A. Okay.
2  Q. I want you to read the first, I think, full sentence
3  starting with, "In November of 2003."
4  A. "In November of 2003, I was called to the returns
5  desk by Debra Peterson. She sounded afraid. I asked her over
6  the phone what was wrong. She said come immediately, that her
7  customer was calling her a"...
8     MR. HARRIS: You can say it.
9     THE WITNESS: "And not once. I came immediately and
10 was approached by this customer who started with"..."in my
11 face."
12 BY MR. SHERMAN:
13 Q. Okay. Was calling her a what? What did you write
14 there?
15 A. F-U-C-K-I-N-G - C-U-N-T.
16 Q. Okay. You didn't write here when you did this in
17 February of 2004 that he was yelling and screaming, did you?
18 A. No.
19 Q. Now, when they asked you to write a statement, the
20 lawyer back in 2004, didn't they ask you to be honest?
21 A. Yes.
22 Q. And accurate?
23 A. No. She just told me to write what I remembered
24 because it's been such a long time.
25 Q. She didn't ask you to be honest and accurate?

Page 40

1  A. She said be as honest and accurate as you can.
2  Q. Okay. And so if you didn't write in this statement
3  that he was yelling and screaming, isn't it possible that he
4  wasn't yelling and screaming?
5  A. Maybe.
6  Q. So maybe your recollection today is a little flawed;
7  is that correct?
8  A. No.
9  Q. So which is correct, what you're saying that he was
10 yelling and screaming today or what you wrote then, which
11 doesn't mention that he was yelling or screaming?
12 A. What I wrote there was he wasn't even yelling and
13 screaming. I didn't write anything about no yelling and
14 screaming.
15    MR. HARRIS: Yeah.
16 BY MR. SHERMAN:
17 Q. Well, wouldn't you have written that then if it had
18 happened?
19    MR. HARRIS: Objection, argumentative, asked and
20 answered, assumes facts not in evidence.
21 BY MR. SHERMAN:
22 Q. You can answer the question.
23 A. Can you repeat the question again?
24    MR. SHERMAN: Can you read it back, please?
25    (The record was read.)

Page 41

1     THE WITNESS: I can't answer that question.
2     MR. HARRIS: Objection, asked and answered.
3  BY MR. SHERMAN:
4  Q. Did you first remember that you thought Mr. Muse was
5  yelling and screaming after you spoke to Mr. Harris yesterday,
6  or today is that the first time you remembered it?
7  A. (Witness shakes head.) No.
8  Q. Well, why don't you -- let's introduce Exhibit B.
9     (Plaintiff's Exhibit B
10       was marked for identification.)
11    MR. HARRIS: I'll need a copy of this.
12    THE WITNESS: (Indicating.)
13    MR. HARRIS: No, you get that. You get the one with
14 the pretty sticky on it. I get another one.
15    MR. SHERMAN: Here you go, thanks.
16 Q. Do you recognize that document?
17 A. No.
18 Q. Okay. Why don't you turn to the last page?
19 A. (Witness complies.)
20 Q. Where it says "dated," look under there, there is a
21 signature line.
22 A. Um-hum.
23 Q. Read the signature line, the typed signature, the
24 typed name there.
25 A. "Darlyn Kuhia."

Page 42

1    Q.   Is that your name?
2    A.   Yes, it is.
3    Q.   Okay. Right above that there is a signature.
4    Is that your signature?
5    A.   Yes, it is.
6    Q.   Okay. Do you recall signing that document on
7    November 22nd, 2005?
8    A.   Not really.
9    Q.   So you didn't, you didn't sign this document, you
10   don't know?
11   A.   I signed it, but I don't remember signing, remember
12   this document.
13   Q.   Do you remember you signed it under penalty of
14   perjury?
15   A.   What is that?
16   Q.   Do you understand you're under oath to testify today
17   truthfully and honestly?
18   A.   Yes.
19   Q.   Okay. Do you understand that you'd be subject to
20   penalty of perjury if you don't?
21   A.   Yes.
22   Q.   Do you understand what, then, what it states there
23   in the document, Exhibit B, that you signed it under penalty
24   of perjury?
25   A.   I signed it, yeah.

Page 43

1    Q.   Do you understand now that you signed that under
2    penalty of perjury?
3    A.   No.
4    Q.   Why don't you read, read the last sentence right
5    above, "Dated: Honolulu, Hawai'i, November 22nd, 2005." Read
6    the sentence that starts, "I declare."
7    A.   "I declare under penalty of law that the foregoing
8    to true and correct."
9    Q.   Okay. Do you understand that this is a Declaration;
10   it's a formal document?
11   A.   Yes.
12   Q.   Okay. But you're not clear on whether you signed it
13   under penalty of perjury or penalty of law?
14   A.   I'm just not clear of this document, period.
15   Q.   So you didn't understand the document you were
16   signing; is that right?
17   A.   Maybe I did at the time.
18   Q.   Well, what about now? You're looking at it now.
19   We're here today.
20   A.   It looks like brand-new to me.
21   Q.   So you've never seen this document before?
22   A.   Maybe I did, maybe I didn't.
23   Q.   You don't have any independent recollection of it
24   today?
25   A.   Not really.

Page 44

1    Q.   So why don't we go through the document.
2    You didn't prepare the document yourself, did you?
3    A.   No.
4    Q.   Okay. Did you talk to somebody about the document?
5    A.   I guess.
6    Q.   Well --
7    A.   Like I said, I don't remember --
8    Q.   Do you remember, "yes" or "no"?
9    A.   -- this document, so, no.
10   Q.   You didn't talk to someone about the document?
11   A.   I didn't prepare it and I didn't talk to somebody.
12   Q.   Okay. Why don't you read through the document,
13   please. Please read through the document, Exhibit B.
14   A.   "Darlyn Kuhia, upon penalty of perjury, states as
15   follows."
16        MR. HARRIS:  I think he means -- do you mean out
17   loud or to herself?
18        MR. SHERMAN:  No, just to herself.
19        THE WITNESS:  Oh, to myself, okay.
20        MR. HARRIS:  Yeah.
21        MR. SHERMAN:  Yeah.
22        THE WITNESS:  Okay. (Witness complies.)
23   BY MR. SHERMAN:
24   Q.   Okay. You've read it?
25   A.   Yeah.

Page 45

1    Q.   Why don't you tell me where in this document -- read
2    out where it says that Mr. Muse was yelling and screaming at
3    the time of the incident in November of 2003.
4    A.   It doesn't say that.
5    Q.   So on neither your handwritten statement nor the
6    Declaration you signed under penalty of law does it say
7    anywhere that Mr. Muse was yelling or screaming; is that
8    right?
9    A.   Yes.
10   Q.   And yet today, after talking to Mr. Harris
11   yesterday, you testify that you have a crystal clear
12   recollection now that Mr. Harris -- that Mr. Muse was yelling
13   and screaming at the time of the incident in November of 2003;
14   is that correct?
15        MR. HARRIS:  Objection.
16        THE WITNESS:  (Witness shakes head.)
17        MR. HARRIS:  Foundation, vague and confusing,
18   argumentative.
19        THE WITNESS:  (Witness shakes head.) No.
20   BY MR. SHERMAN:
21   Q.   I'm sorry, you need to answer "yes" or "no."
22   A.   No.
23   Q.   What?
24   A.   I don't understand your question.
25   Q.   Okay. Why is there no mention in either your

## Page 46

1  written statement or the written Declaration that Mr. Muse was
2  yelling and screaming?
3    A.  I don't know.
4    Q.  Well, why didn't you make sure it was put in?
5    A.  I didn't see him yelling or screaming.
6    Q.  Okay. So he wasn't yelling and screaming at that
7  time; is that correct?
8    A.  He was swearing at us.
9    Q.  But he wasn't yelling and screaming; is that right?
10   A.  He was just swearing at us.
11   Q.  Okay. Was he yelling or screaming at that time,
12 "yes" or "no"?
13   A.  No.
14       MR. SHERMAN: Thank you. Now, why don't we take a
15 break right now, if that's all right. We've been going about
16 an hour.
17       Go off record, please.
18       (Recess was taken from 10:33 to 10:44 a.m.)
19       MR. SHERMAN: Let's go back on the record.
20   Q.  We're back on the record.
21       Ms. Kuhia, you understand you're still under oath?
22   A.  Yes.
23   Q.  I want to refer you to Exhibit A again.
24       Now, did Mr. -- when you first met Mr. Muse did he
25 tell you that he had a disorder?

## Page 47

1    A.  No.
2    Q.  Well, how long were you with him before he told you
3  he had a disorder?
4    A.  About five, five minutes.
5    Q.  Did he tell you that he had Tourette's Syndrome?
6    A.  Yes.
7    Q.  When did he tell you that?
8    A.  When I told him that I was going to call a manager.
9    Q.  Okay. Now, he did, though, tell you that he had
10 Tourette's; is that correct?
11   A.  Yes.
12   Q.  And he used the word "Tourette's"?
13   A.  Yes.
14   Q.  And you remember that?
15   A.  Yes.
16   Q.  Now, do you have personal shoppers at Home Depot?
17   A.  I don't understand.
18   Q.  Do you have what are called personal shoppers at
19 Home Depot?
20       MR. HARRIS: Objection, foundation, vague,
21 speculation.
22       THE WITNESS: I don't know what you're asking.
23 BY MR. SHERMAN:
24   Q.  Let me refer you to Exhibit B, then. Let me ask you
25 to take a look at paragraph No. 13, the second page.

## Page 48

1    A.  (Witness complies.)
2    Q.  Could you read that paragraph out loud, please.
3    A.  "The customer did not make any other requests,
4  including a request for a personal shopper or a sign
5  explaining that he had Tourette's Syndrome."
6    Q.  Do you know what a personal shopper is now?
7    A.  Yeah.
8    Q.  What is a personal shopper?
9    A.  Someone that within my store or someone that he
10 brings along with him that shops with him, his own personal
11 shopper, or we could supply him with one, I guess.
12   Q.  So it's a policy of Home Depot that you could supply
13 Mr. Muse with a personal shopper?
14   A.  I don't know.
15       MR. HARRIS: Objection, foundational, vague.
16       THE WITNESS: I don't know if it's a policy. I
17 don't know.
18 BY MR. SHERMAN:
19   Q.  So would it make any difference whether he'd asked
20 for a personal shopper or not, then, if you don't know whether
21 Home Depot has a policy permitting it?
22       MR. HARRIS: Objection, foundation, speculation,
23 argumentative.
24       THE WITNESS: I don't know.
25 BY MR. SHERMAN:

## Page 49

1    Q.  You don't recollect any written policy you've ever
2  read saying you can give a customer a personal shopper if they
3  ask for one?
4    A.  No.
5    Q.  Would it have made a difference during the situation
6  if he'd given you a sign explaining that he had Tourette's
7  Syndrome?
8        MR. HARRIS: Objection, foundation, vague,
9  speculation.
10       THE WITNESS: I don't know.
11 BY MR. SHERMAN:
12   Q.  Well, would you have understood better what his
13 condition was if he had?
14   A.  Yes.
15   Q.  Would you have still called the manager if he had
16 given you that sign?
17       MR. HARRIS: Objection, foundation, vague.
18       THE WITNESS: Yes.
19       MR. HARRIS: Speculation.
20 BY MR. SHERMAN:
21   Q.  So it wouldn't have made any difference whether he
22 gave you a sign explaining he had Tourette's Syndrome or not,
23 would it?
24   A.  I don't even know what is that. At the time I did
25 not know what Tourette's Syndrome was to begin with.

Page 50

1  Q.  Do you know what it is now?
2  A.  Not really, very vague, what I've been told.
3  Q.  Who told you?
4  A.  Many people.
5  Q.  Name a few?
6  A.  Management.
7  Q.  Who in management?
8  A.  Mike Dolan, who didn't know at the time either what
9  that was.
10 Q.  When did Mike Dolan tell you what Tourette's
11 Syndrome was?
12 A.  Maybe months later that he saw it on the TV,
13 infomercial kind of show about kids.
14 Q.  But he didn't know what Tourette's Syndrome was --
15 A.  Hum-um.
16 Q.  -- in November of 2003?
17 A.  No.
18 Q.  Do you have a policy that you know of about treating
19 people with disabilities at Home Depot?
20     MR. HARRIS:  Objection, foundation, vague.
21     THE WITNESS:  Not really.
22 BY MR. SHERMAN:
23 Q.  Let me give you a hypothetical.
24     What if someone came in there who was blind and
25 asked for a personal shopper?  Would they be given a personal

Page 51

1  shopper?
2      MR. HARRIS:  Objection, foundation, speculation.
3      THE WITNESS:  Would you repeat that again?
4      MR. SHERMAN:  Could you repeat the question, please?
5      (The record was read.)
6      MR. HARRIS:  Objection, foundation, speculation.
7      THE WITNESS:  All depends who they asked, and most
8  of them come with help.
9  BY MR. SHERMAN:
10 Q.  What do you mean "them"?
11 A.  Well, people who have hard time either moving
12 around, they come with someone who helps them.
13 Q.  Home Depot won't help them?
14 A.  They will.  We will help them.
15 Q.  They would supply them with a personal shopper?
16     MR. HARRIS:  Objection, foundation, speculation.
17     THE WITNESS:  If there's one available.  I don't
18 know how the policy at Home Depot is.
19 BY MR. SHERMAN:
20 Q.  Who else has talked to you about Tourette's
21 Syndrome?  Who else has explained to you?
22 A.  My mother-in-law.
23 Q.  Does she know someone who has Tourette's?
24 A.  Yeah.
25 Q.  Have you met other people who have Tourette's

Page 52

1  Syndrome?
2  A.  No.
3  Q.  What if the request for a personal shopper is made
4  to you?
5      MR. HARRIS:  Objection, foundation, speculation,
6  vague.
7      THE WITNESS:  I don't understand the question.
8  BY MR. SHERMAN:
9  Q.  What would you do if a customer with a disability
10 asked you for a personal shopper?
11     MR. HARRIS:  Objection, foundation, speculation,
12 vague.
13     THE WITNESS:  I'll see if I have someone available.
14 BY MR. SHERMAN:
15 Q.  Would you call your supervisor?
16 A.  Most likely, yes.
17 Q.  But you're pretty -- you think someone would be
18 available as a personal shopper?
19     MR. HARRIS:  Objection, foundation --
20     THE WITNESS:  Maybe.
21     MR. HARRIS:  --speculation, vague.
22     Did you get her answer, too?  What was it?
23     THE REPORTER:  "Maybe."
24     MR. HARRIS:  "Maybe," yeah.
25 BY MR. SHERMAN:

Page 53

1  Q.  So how long did the entire incident with Mr. Muse
2  take?  What was the duration?
3  A.  With me?
4  Q.  With you.
5  A.  About 15 minutes.
6  Q.  And was that just you and Mr. Muse for that whole 15
7  minutes?
8  A.  Me, Mr. Muse and Debra Peterson.
9  Q.  What about Mike Dolan and --
10 A.  When he came, I left.
11 Q.  So when Mr. Dolan was there, did you leave
12 immediately when Mike Dolan came?
13 A.  No.  I explained to him what was going on.
14 Q.  What did you say to him?
15 A.  I told him that this customer here was yelling at
16 her, at Deb, and he was just swearing.
17 Q.  And that's the exact word you used, "yelling"?
18 A.  Well, no.  I said he was swearing at Debra and he
19 started swearing at me, "And I think this is just too much.  I
20 can't handle this."
21 Q.  Why do you think he was swearing at you?
22 A.  I don't know.
23 Q.  At that time why did you think he was swearing at
24 you?
25 A.  I don't know.

Page 54

1  Q. Why do you think now he used those words?
2      MR. HARRIS: Objection, foundation, speculation.
3      THE WITNESS: I don't know. People say he get this
4  disease (indicating). That's the only thing I can think of.
5  BY MR. SHERMAN:
6  Q. You can't think of any other reason that would
7  benefit him to use those words, can you?
8  A. No.
9  Q. So it doesn't make a difference to you knowing that
10 he can't help himself using the words?
11     MR. HARRIS: Objection, vague.
12     THE WITNESS: I don't understand.
13 BY MR. SHERMAN:
14 Q. Does it give you a different picture of Mr. Muse
15 knowing that he can't -- he has a disease that he can't help
16 but use the words "cunt" or "fucking" or "nigger"?
17     MR. HARRIS: Objection, foundation, vague,
18 harassment.
19     THE WITNESS: I still don't understand your
20 question.
21 BY MR. SHERMAN:
22 Q. What part of it don't you understand?
23 A. The whole thing.
24 Q. Does it matter to you that he has a disease that
25 causes him to use these words?

Page 55

1      MR. HARRIS: Objection.
2  BY MR. SHERMAN:
3  Q. Does it make it different now than what you felt at
4  the time of the incident?
5      MR. HARRIS: Objection, foundation --
6      THE WITNESS: No.
7      MR. HARRIS: -- vague.
8      THE WITNESS: No.
9  BY MR. SHERMAN:
10 Q. And why is that?
11 A. Just the way I feel.
12 Q. You don't care whether or not he has a disease?
13     MR. HARRIS: Objection, foundation.
14     THE WITNESS: I don't know any stuff about anything
15 of a disease that allows anybody to swear at anybody.
16     MR. HARRIS: Foundation and vague.
17     I when I say my objection, I need good answers so
18 just wait until I say my objection before you talk.
19 BY MR. SHERMAN:
20 Q. So you don't -- do you believe that there is such a
21 disease?
22     MR. HARRIS: Objection, foundation, speculation.
23     THE WITNESS: I wouldn't know.
24 BY MR. SHERMAN:
25 Q. Now, your supervisor, Jack Marin?

Page 56

1  A. Um-hum.
2  Q. Did he ever make a statement?
3  A. No.
4  Q. Do you know why he didn't?
5  A. Because he wasn't there.
6  Q. But you talked to him about it; is that correct?
7  A. Yeah.
8  Q. If this were -- if this was such an upsetting
9  incident for you at the time, why didn't you write a statement
10 at that time?
11     MR. HARRIS: Objection, foundation, vague,
12 argumentative.
13     THE WITNESS: I didn't want to think about it again.
14 That's why I took a break.
15 BY MR. SHERMAN:
16 Q. Why didn't Mike Dolan write a statement at the time?
17 A. I don't know.
18 Q. Pardon me?
19 A. I don't know.
20 Q. Why didn't anyone write a statement at the time if
21 this was such an upsetting incident?
22 A. I don't know.
23 Q. Isn't it possible that it wasn't such an upsetting
24 incident?
25     MR. HARRIS: Objection, argumentative.

Page 57

1      THE WITNESS: No.
2  BY MR. SHERMAN:
3  Q. And yet no one thought it was a big enough deal to
4  make -- keep a written record of what happened at the time?
5      MR. HARRIS: Objection, argumentative, asked and
6  answered, attorney testifying, harassment.
7      THE WITNESS: No, I don't know.
8  BY MR. SHERMAN:
9  Q. How many times did Mr. Muse, during the 15 minutes
10 you were there, use the word "cunt"?
11     MR. HARRIS: Objection, harassment.
12     THE WITNESS: Maybe three or four.
13 BY MR. SHERMAN:
14 Q. That's during the 15 minutes' time; is that correct?
15 A. Yes.
16 Q. So, let me just say is it your testimony that during
17 the 15 minutes that you were with Mr. Muse and Debra Peterson,
18 he used the work "cunt" three or four times; is that correct?
19     MR. HARRIS: Objection, asked and answered,
20 harassment. It's unnecessary to continue using the word.
21     THE WITNESS: Yes.
22 BY MR. SHERMAN:
23 Q. And you were both you --
24     (Mr. Levin conferred with Mr. Sherman.)
25     (Mr. Harris conferred with the witness.)

Page 58

1  MR. SHERMAN: I'm going to object, there's no --
2  MR. HARRIS: There's no pending question, is there,
3  Counsel?
4  MR. SHERMAN: I don't think you get to consult with
5  your client in the middle of the deposition.
6  I'm going to object for the record. Let the record
7  reflect that Mr. Harris is whispering in the witness' ear.
8  (Mr. Harris conferred with the witness.)
9  MR. HARRIS: Counsel, your continued use of that
10 word is upsetting the witness and I don't think it's necessary
11 to subject her to continued harassment to make your point.
12 You can ask those questions without using the offensive word.
13 MR. SHERMAN: We've gone through this before. We
14 tried to minimize the use of the word, but it is a word that
15 is operative in this case and it's only in the context of this
16 litigation. We have had this before. We will certainly try
17 to minimize it. However, I will note for the record that she
18 actually used the word, herself, in her written statement and
19 wrote it out several times. All right.
20 MR. HARRIS: Counsel, you're arguing. I've advised
21 you that the witness that you're examining is offended by the
22 use of the word. You go ahead and use the word after I advise
23 you of that and you're violating the disciplinary rules in the
24 Judicial Code.
25 MR. SHERMAN: No, I'm not.

Page 59

1  MR. HARRIS: Okay. Go ahead. Go ahead.
2  MR. SHERMAN: So for the record so you're clear if
3  something -- if you should take whatever action you're
4  threatening to take at this point, there are a number of
5  cases, written decisions that use the words. No one wants to
6  use these words. However, when they are in the context of
7  litigation, it's certainly not done to upset anyone, but they
8  are necessary, all right? I am -- and that's just our
9  position.
10 MR. HARRIS: I understand.
11 MR. SHERMAN: I'm not intentionally trying to upset
12 her, and I -- you know, it seems sort of convenient at this
13 point you say -- you know, you whispered to her for a while
14 and suddenly you claim she's upset.
15 MR. HARRIS: I see her wiping her eyes as if she may
16 be crying, Counsel. You've just started repeatedly using
17 that word. You don't need to use it. It's obviously --
18 obvious that you're using it to harass her during the
19 deposition. It's unnecessary to use that word.
20 MR. SHERMAN: Is there a question pending?
21 MR. HARRIS: No.
22 MR. SHERMAN: We disagree on that, and I -- we will
23 certainly minimize the use to the extent we can, but it is --
24 we want to make sure that we understand and which words we're
25 talking about and the context and exactly what was said.

Page 60

1  There seems to be some discrepancy at this point.
2  Q. Now, did Mr. Muse use the word "nigger" at any point
3  during your conversations with him?
4  A. No.
5  Q. Okay. How many times did he use the word "fucking"?
6  A. More than the other word. He just kept repeating
7  that word.
8  Q. And this was during the 15 minutes that you were
9  with him?
10 A. Um-hum. (Witness nods head.)
11 MR. HARRIS: You need to answer because you're just
12 nodding.
13 THE WITNESS: Yes.
14 BY MR. SHERMAN:
15 Q. And it was after about five minutes of talking with
16 Mr. Muse that he told you that he had Tourette's Syndrome; is
17 that correct?
18 A. Yes.
19 Q. Did you understand at that point that he wasn't
20 calling you those names but that he had a disease that he
21 couldn't control saying those words?
22 MR. HARRIS: Objection, foundation, vague,
23 argumentative.
24 THE WITNESS: No.
25 BY MR. SHERMAN:

Page 61

1  Q. You didn't understand that?
2  MR. HARRIS: Same objections.
3  THE WITNESS: No.
4  BY MR. SHERMAN:
5  Q. If you had understand that -- understood that at the
6  time, would it have made any difference as to how you
7  perceived Mr. Muse?
8  MR. HARRIS: Objection, foundation, vague,
9  argumentative, speculation.
10 THE WITNESS: I can't say anything. I don't know.
11 BY MR. SHERMAN:
12 Q. Have you ever filed a complaint with Home Depot
13 based on the incident of November 3rd, 2003?
14 A. No.
15 Q. Have you ever sought counseling through their human
16 resources department because of that incident?
17 A. No.
18 Q. Have you ever talked to other workers about how
19 upset you were that day?
20 A. Only my front end supervisor, Jack Marin.
21 Q. I'm sorry?
22 A. Jack Marin.
23 Q. But no one else?
24 A. No.
25 Q. Have you ever heard anyone else swear at Home Depot?

Page 62

1  A. Yeah, yes.
2  Q. Have you heard customers swear?
3  A. Yes.
4  Q. What are -- do you remember any particular incidents
5  and times when this occurred?
6  A. No.
7  Q. In each of the times, did you immediately call a
8  supervisor?
9  A. I hear them swearing. I don't -- it's not to me or
10 to anybody. They are talking to somebody else and I hear them
11 swearing, not necessarily having anything to do with Home
12 Depot.
13     (Electronic interruption in the proceedings.)
14 BY MR. SHERMAN:
15 Q. So when you hear --
16    MR. HARRIS: Excuse me, did you get that answer?
17    (The record was read.)
18    THE REPORTER: Was that correct?
19    THE WITNESS: Um-hum.
20 BY MR. SHERMAN:
21 Q. So you don't recall any other incident involving
22 profanity where you called the supervisor to deal with it?
23 A. No.
24 Q. And yet you've heard other people use profanity
25 around you at Home Depot?

Page 63

1     MR. HARRIS: Objection, foundation, vague.
2     THE WITNESS: Um, yes.
3  BY MR. SHERMAN:
4  Q. Now, how many times did you talk -- have you spoken
5  to Jack Marin about this incident?
6  A. Once.
7  Q. And when was that?
8  A. That day.
9  Q. Okay. You haven't spoken to him at all since then?
10 A. I have.
11 Q. About this incident?
12 A. No.
13 Q. Okay. Is Jack Marin your friend?
14 A. No.
15 Q. Now, you mentioned before, I thought, that you also
16 talked to a friend about this incident; is that correct?
17 A. No.
18 Q. You talked to any family members about it?
19 A. Yes.
20 Q. And who were those?
21 A. My mother-in-law.
22 Q. And what's her name?
23 A. Marsha.
24 Q. Marsha what?
25 A. Dante.

Page 64

1  Q. How do you spell her last name?
2  A. D-A-N-T-E.
3  Q. And what did you say to her?
4  A. I asked her about it.
5  Q. About Tourette's Syndrome?
6  A. Yes.
7  Q. What did she say to you?
8  A. She said that she knows of it. She knows what
9  happens to these kids. She had a brother who died at the age
10 of seven
11 Q. Of Tourette's Syndrome?
12 A. Um-hum. It became more difficult for him.
13 Q. Did she tell you what a physical tic was?
14 A. No.
15 Q. Did she tell you what a verbal tic was?
16 A. No. She was only five. She's the younger one of
17 the family.
18 Q. But she explained to you what Tourette's was?
19 A. Um-hum. (Witness nods head.)
20 Q. When did she -- when did you talk to her about it?
21 A. Not until maybe probably Christmas, Christmas of
22 that --
23 Q. Of which year?
24 A. Christmas of that year.
25 Q. Of that year?

Page 65

1  A. Yeah.
2  Q. Do you understand now that Mr. Muse has no control
3  over what he says that way?
4     MR. HARRIS: Objection, foundation, vague,
5  speculation.
6     THE WITNESS: No, no.
7  BY MR. SHERMAN:
8  Q. Well, if Mr. Muse grunted instead of using the
9  words, would you understand that?
10    MR. HARRIS: Objection, vague.
11    THE WITNESS: Yeah, I don't understand the question.
12 BY MR. SHERMAN:
13 Q. If Mr. Muse's -- the manifestation of Mr. Muse's
14 condition resulted in him grunting instead of using the words?
15 A. (Witness nods head.)
16 Q. Would you understand that?
17    MR. HARRIS: Objection, vague.
18    THE WITNESS: Would I understand what?
19 BY MR. SHERMAN:
20 Q. Would you appreciate his condition then?
21    MR. HARRIS: Objection, vague.
22    THE WITNESS: I don't know. I mean, I don't know
23 what you're trying to ask me is what I'm saying.
24 BY MR. SHERMAN:
25 Q. Do you understand Mr. Muse has no control over

Page 66

1  saying the words "cunt," "fucking" or "nigger"? Do you
2  understand that?
3         MR. HARRIS: Objection, foundation.
4         THE WITNESS: Um-hum, yes.
5         MR. HARRIS: And speculation and harassment.
6  BY MR. SHERMAN:
7    Q.  Okay. And you understand that that's a disease; is
8  that correct?
9    A.  Yes.
10        MR. HARRIS: Objection, foundation, vague,
11 speculation.
12 BY MR. SHERMAN:
13   Q.  Do you think he should be allowed to shop at Home
14 Depot?
15   A.  Yes.
16   Q.  Do you think there's some things that could be done
17 to make it easier for both Home Depot and its customers and
18 Mr. Muse that might be helpful?
19        MR. HARRIS: Objection, foundation, vague,
20 speculation.
21        THE WITNESS: Yes.
22 BY MR. SHERMAN:
23   Q.  What are some of those things?
24   A.  Like coming in with someone, coming in immediately
25 asking for a manager, you know, letting someone know. My

Page 67

1  personal thing is come with someone.
2    Q.  What if he had a sign or a letter from a doctor,
3  both a small one and then a longer letter that he gave the
4  Home Depot, would that be helpful?
5         MR. HARRIS: Objection, foundation, speculation.
6         THE WITNESS: I don't know that. That I wouldn't
7  know.
8  BY MR. SHERMAN:
9    Q.  What if he called up before he came and contacted a
10 specific person and asked if they could help him when he got
11 there, would that be helpful?
12        MR. HARRIS: Objection, foundation, and speculation.
13        THE WITNESS: Maybe.
14 BY MR. SHERMAN:
15   Q.  I mean, you can understand how hard it would be for
16 Mr. Muse not to be able to go anywhere because of this
17 disease, can't you?
18        MR. HARRIS: Objection, foundation, speculation,
19 argumentative.
20        THE WITNESS: Yes.
21        MR. SHERMAN: Why don't we take a break.
22        (Recess was taken from 11:10 to 11:17 a.m.)
23        MR. SHERMAN: Back on the record, please.
24   Q.  Okay. Miss Kuhia, you're still under oath.
25        You understand that?

Page 68

1    A.  Yes.
2    Q.  Okay. Just a few more questions and we'll be done.
3         Does Home Depot store that you're at now have
4  computerized checkouts?
5    A.  Yeah, yes.
6    Q.  And these are self -- that a customer can check
7  themselves out with their items?
8    A.  Yes.
9    Q.  And they don't need a cashier there; is that
10 correct?
11   A.  Yes.
12   Q.  Does Home Depot also have motorized carts?
13   A.  Yes.
14   Q.  For persons of disabilities and mobility issues to
15 use?
16   A.  Yes.
17        MR. SHERMAN: I don't have any other questions at
18 this time.
19             EXAMINATION
20 BY MR. HARRIS:
21   Q.  Were you crying during the deposition?
22   A.  Yes.
23   Q.  How come?
24   A.  Because I didn't like how he was using the word.
25        MR. HARRIS: Okay. Nothing further.

Page 69

1         MR. LEVIN: (Indicating.)
2         (The record was read.)
3         FURTHER EXAMINATION
4         MR. SHERMAN: Then we have more questions.
5    Q.  Let me refer you to Exhibit A again.
6         That's your handwriting, isn't it?
7    A.  Yes.
8    Q.  And you wrote out the words there yourself?
9    A.  Yes.
10   Q.  And no one told you exactly what to write, did they?
11   A.  No.
12   Q.  And you used the words "fucking" and "cunt"?
13   A.  Yes.
14   Q.  In Exhibit A; is that correct?
15   A.  Yes.
16   Q.  And you wrote them out entirely; is that correct?
17   A.  Yes.
18        MR. SHERMAN: Okay. No further questions.
19        Oh, do you want to waive your...
20        MR. HARRIS: No.
21        MR. SHERMAN: You have a right to review the
22 deposition or you can waive your right to review it.
23        MR. HARRIS: She'll review it.
24        (Whereupon the deposition
25         was concluded at 11:19 a.m.)

Page 70

WITNESS CERTIFICATE

I, DARLYN KUHIA, hereby certify that I have read the foregoing typewritten pages 1 through 70, inclusive, and corrections, if any, were noted by me, and the same is a true and correct transcript of my testimony.

Dated this _____ day of _____, _____

_____
DARLYN KUHIA

Signed before me this _____ day of _____, _____

_____

JON MUSE VS. HOME DEPOT USA, Civil No. 04-00154 DAE/BMK
Taken July 20th, 2006, by B. Kanoelani Cockett,
HI CSR No. 379, CA CSR No. 7995

Page 71

CERTIFICATE

STATE OF HAWAII        )
                       )ss.
CITY AND COUNTY OF HONOLULU   )

I, B. KANOELANI COCKETT, CSR, Notary Public, State of Hawai'i, do hereby certify;

That on July 20th, 2006, at 9:41 a.m. appeared before me DARLYN KUHIA, the witness whose deposition is contained herein; that prior to being examined she was by me duly sworn;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 27th day of July 2006 in Honolulu, Hawai'i.

_____
B. KANOELANI COCKETT,
HI CSR NO. 379, CA CSR No. 7995
Notary Public, State of Hawai'i
My commission expires: February 19th, 2009