IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JON MUSE,<br>Plaintiff,<br>vs.<br>HOME DEPOT USA, INC.,<br>Defendants. | ) Civil No. CV04-00154 DAE/BMK |

DEPOSITION OF DEBRA PETERSON

Taken on behalf of the Plaintiff at the offices of Davis Levin Livingston Grande, 851 Fort Street, 500 Davis Levin Livingston Grande Place, Honolulu, Hawaii, commencing at 9:01 a.m. on January 7, 2006, pursuant to Notice.

BEFORE: JESSICA R. PERRY, CSR NO. 404
Certified Shorthand Reporter

APPEARANCES:

For the Plaintiff: STANLEY E. LEVIN, ESQ.
Davis Levin Livingston Grande
851 Fort Street
400 Davis Levin Livingston Grande Place
Honolulu, Hawaii 96813

BRUCE F. SHERMAN, ESQ.
1164 Bishop Street
Suite 124
Honolulu, Hawaii 96813

For the Defendant: JEFFREY S. HARRIS, ESQ.
JAN MURANAKA BOIVIN, ESQ.
Torkildson, Katz, Fonseca,
Moore & Hetherington
700 Bishop Street, 15th Floor
Honolulu, Hawaii 96813



INDEX


| EXAMINATION BY: | Page |
| --- | --- |
| Mr. Sherman | 4 |

EXHIBITS FOR IDENTIFICATION

| | |
| --- | --- |
| 1. Employee Statement | 24 |
| 2. Associate Statement | 60 |
| 2A. Associate Statement | 72 |
| 3. Declaration of Debra Peterson | 89 |




PROCEEDINGS

VIDEOGRAPHER: This is the deposition of Debra Peterson in the matter of Jon Muse versus Home Depot U.S.A., Incorporated. We are located at Davis Levin Livingston Grande, 851 Fort Street, Suite 500, Honolulu, Hawaii 96813. My name is Derrick Bryant, certified legal video specialist for Certified Legal Video Services.

Will counsel please state your names.

MR. SHERMAN: I'm Bruce Sherman, on behalf of the Plaintiff, Jon Muse. I'm here with Stan Levin, who is also co-counsel on behalf of Jon Muse.

MR. HARRIS: Good morning. Jeff Harris and Jan Boivin, appearing on behalf of Home Depot, Inc., the Defendant, and also representing the deponent in this deposition.

VIDEOGRAPHER: Today's date is January 7th, 2006. We're now on the record at 9:02 a.m.

Will the court reporter please swear in the deponent.

DEBRA PETERSON,

having first been duly sworn, testified upon her oath as follows:

EXAMINATION

BY MR. SHERMAN:

Q. Good morning, Ms. --



A. Good morning.

Q. Is it Ms. or Mrs.?

A. Mrs.

Q. Mrs., okay. I'm Bruce Sherman, here on behalf of Plaintiff Jon Muse. If we -- if I could ask you to state your name for the record again and spell it so that we're clear.

A. Okay. Debra Ann Peterson, D-E-B-R-A, A-N-N, P-E-T-E-R-S-O-N.

Q. And where do you currently reside?

A. 45-1133 Makaleha Street, Kaneohe, Hawaii 96744.

Q. Are you familiar with the nature of this lawsuit or what it's about?

A. Yes.

Q. And have you ever had your deposition taken before?

A. No.

Q. Do you know what a deposition is?

A. Yes.

Q. You understand that you'll be asking -- you'll be asked questions and you'll be asked to answer the questions while under oath?

A. Yes.

Q. You understand that at this point in time, from the time that you were sworn in, that you're under oath?

A. Yes.

Page 6

Q. Is there anything -- is there any medication you've taken in the last 24 hours or have you consumed any alcohol that would impede --
A. No.
Q. -- your ability to testify?
A. No.
Q. When I ask you questions during this deposition -- I'll ask in a minute whether you've spoken with Mr. Harris about formatting of it, but it's important --
MR. LEVIN: Wait.
Q. It's important that you listen to each question as it's asked and answer it to the best of your ability as it's asked. Do you understand that?
A. Yes.
Q. You should also wait until I've actually asked the whole question. The reason for that is sometimes, after a line of questioning, you'll start to think that you know what the next question -- or what it's going to be and you'll answer beforehand, and that prevents the court reporter from getting the exact question and testimony down. Do you understand that?
A. Yes.
Q. So it's important to wait until the question is asked. There will be times when your attorney, Mr. Harris, will object to a question. At that point in time you should

Page 7

stop answering the question. Let him state his objection for the record. And virtually -- in most cases then you'll be asked to answer the question. There are only a few rare exceptions where you may be instructed not to answer the question. I'm not sure we'll encounter those here, but Mr. Harris, I'm certain, will make that very clear on the record. Do you understand that?
A. Yes.
Q. It's also very important -- while we are videotaping this, we are having it transcribed as well. It's very important that you answer verbally each question. Do you understand that?
A. Yes.
Q. Oftentimes we will start to have a non-verbal answer to a question, and unfortunately the court reporter can't pick that up. Do you understand that?
A. Yes.
Q. So if you don't understand a question that I've asked, you know, feel free to say so and ask that I clarify. We're not asking you necessarily to guess, so there may come a time when we do, but that would be very explicit, okay, so just to the best of your recollection answer the questions. Do you understand that?
A. Yes.
Q. And are there any health barriers or issues that

Page 8

would prevent you from testifying truthfully today?
A. No.
Q. The other thing is if at any point you become tired and need to take a break, just let us know, and if we can, we'll certainly accommodate you. Do you have any -- can you read and write?
A. Yes.
Q. And, again, you've never testified in a deposition before?
A. No.
Q. Have you ever testified in court before?
A. No.
Q. Have you ever been party to a lawsuit before?
A. No.
Q. Not as a defendant or a plaintiff?
A. No.
Q. Now, prior to this meeting today, have you -- prior to the deposition today, have you looked at any documents in preparation for today's testimony?
A. Yes.
Q. And what documents were those?
A. My declaration and my written statement.
Q. Are there two written statements you looked at?
A. Yes.
Q. And one of those would be regarding a November 3rd

Page 9

incident; is that correct?
A. Yes.
Q. And one would be --
MR. SHERMAN: I'm sorry.
MR. HARRIS: Objection, best evidence.
Q. And one would be regarding the April 25th --
A. Yes.
Q. -- incident?
Did you meet with Mr. Harris today before this deposition to prepare?
MR. HARRIS: Objection, attorney-client privilege. Instruct the witness not to answer with respect to communications between her and I.
MR. SHERMAN: I understand, but we can certainly ask the question did she meet with you.
MR. HARRIS: Sure, sure.
Q. Did you meet with Mr. Harris to prepare?
A. Yes.
Q. And that was this morning?
A. Yes.
Q. At his office?
A. Yes.
Q. And who was present then?
A. Mr. Harris and Ms. Jan and myself.
Q. When you say Ms. Jan, you mean Jan Boivin?

A. Yes.
Q. Is that the attorney sitting next to Mr. Harris?
A. Yes.
Q. How long did you meet with them?
MR. HARRIS: Objection. Instruct the witness not to answer. Attorney-client privilege.
MR. SHERMAN: Okay, I don't think the time --
MR. HARRIS: I'm sorry, I'm not going to argue with you. I'm instructing the witness not to answer. Please ask your next question.
MR. SHERMAN: Okay, can we -- let's mark this on the transcript.
Q. Okay, one thing you should understand is -- and it may be difficult today, but in the instance where there is a dispute as to whether your attorney properly instructs you not to answer a question, we may have to go to court, okay. I'm not sure we're going to do that right now, but I want you to understand it. Now, is it your understanding today that Mr. Harris represents you?
A. Yes.
Q. And is that in your capacity as an employee of Home Depot?
A. Yes.
Q. Are you in fact today an employee of Home Depot?
A. No.



Q. Where do you work now?
A. Young Laundry & Dry Cleaning.
Q. What do you do there?
A. Clerk.
Q. How long have you worked there?
A. Ten months.
Q. Immediately prior to there where did you work?
A. Home Depot.
Q. Do you know the time period you worked at Home Depot?
A. November 2002 to August 2004.
Q. And why did you leave Home Depot?
A. Termination.
Q. What was the basis of that termination?
A. I was told by supervisor -- supervisor, higher-ups to do -- to make returns and -- from upstairs, the LPS people didn't see me doing the -- with the products at my counter, so they took me in for questioning for that. They would just give me a list of UPC codes to do returns.
Q. Was there a specific designation or reason for the termination that you can recall?
A. Repeat the question.
Q. Was there a specific term they used for the termination?
A. They said fraudulent returns.



Q. Was there a -- any kind of investigation?
A. Yes.
Q. Okay, and what was the result of that investigation?
MR. HARRIS: Objection, speculation, foundation.
Q. What was the result of that investigation?
A. Case was dropped. No evidence.
Q. When you say the case was dropped, was there an investigation by the police in that regard?
A. Yes.
Q. Okay, and that would be the Honolulu Police Department?
A. Yes.
Q. Do you happen to remember the name of the officer investigating that?
A. Susan Medeiros.
Q. And would this have been in August of 2004?
A. Yes.
Q. And it's your testimony that the police department decided to prosecute this case?
MR. HARRIS: Objection, foundation, speculation.
Q. You can answer that.
A. It was LPS at Home Depot, loss preventions at Home Depot.



Q. They declined to prosecute?
A. Yes.
Q. Could you say that again, loss prevention?
A. LPS, loss prevention. I don't know if it's service or...
Q. Are they located in that particular store?
A. Yes.
Q. Is there a statewide loss prevention system or service?
MR. HARRIS: Objection, foundation, speculation.
THE WITNESS: I don't know.
Q. Okay.
A. I don't recall.
Q. Who was the -- who was in charge of that investigation at Home Depot?
A. Harold Han.
Q. Do you know how to spell his last name?
A. H-A-N.
Q. Do you know if he's still working at Home Depot?
A. Yes.
Q. Is he still working at Home Depot?
A. Yes.
Q. When did this investigation begin?

Page 14

MR. HARRIS: Objection, speculation.
THE WITNESS: I don't know. I don't recall.
Q. When were you first contacted about it by Home Depot?
A. I don't recall.
Q. Would it have been July of 2004?
A. No. It was in 2005 sometime.
Q. Was it after you left Home Depot?
A. Yes.
Q. So let me get this straight, were you terminated before they finished the investigation by Home Depot?
A. Yes.
Q. So let me get this straight, before they investigated you, they fired you; is that correct?
A. Yes.
Q. Had they taken your statement before they fired you?
A. Yes.
Q. Had they taken anyone else's statement?
MR. HARRIS: Objection, speculation.
Q. To your knowledge, had they taken anyone else's statement?
A. I don't recall. I don't know.
Q. Do you have any -- did they give you a letter regarding the termination?

Page 15

A. Yes.
Q. And would that have been in August of 2004?
A. Yes.
Q. Do you think you should have been fired?
MR. HARRIS: Objection, speculation, lay opinion.
Q. Do you think you should have been fired?
A. No.
Q. Why do you think they fired you?
MR. HARRIS: Objection, speculation, lay opinion, irrelevant, harassing.
Q. Go ahead.
A. I don't know.
Q. Okay. When did they first bring to your attention the problem about the returns?
A. The day I was terminated.
Q. So is it your testimony, then, that they just terminated you and then they did an investigation?
A. Yes.
Q. And you had no idea that this was coming when they terminated you in August of 2004?
A. No.
Q. That must have been very upsetting.
MR. HARRIS: Objection, speculation, harassing.

Page 16

THE WITNESS: Yes.
Q. Doesn't seem very fair, does it?
A. No.
Q. Were you ever put on any kind of paid leave --
A. No.
Q. -- pending this?
A. No.
Q. Did you apply for unemployment insurance?
A. No.
Q. Did you just not want to or did you know you couldn't?
A. Just didn't want to.
Q. Has this affected you -- your ability to get any other work?
A. Yes.
Q. How so?
A. I was devastated. I couldn't get out of bed, couldn't eat. I was -- I didn't know what was going on. I was just following procedures. Just following procedures.
Q. You don't think there was any justification for them terminating you, do you?
MR. HARRIS: Objection, foundation, speculation, lay opinion.
Q. You can answer.
A. Repeat.

Page 17

Q. You don't think there's any good reason for them terminating you, then?
A. No.
Q. After -- when did you find out the police were not going to take their case?
A. In 2005 sometime. I don't recall the exact.
Q. At that time -- have you had any contact with Home Depot since you were terminated in August of 2004?
A. I go shopping in there.
Q. They haven't banned you from the store or anything?
A. No.
Q. I guess you -- is it comfortable for you to go to that store?
A. I go shopping. It's okay.
Q. Do you still have friends there, who work --
A. A lot of friends.
Q. Do you talk to them when you go to the store?
A. Yes.
Q. Is Darlyn Kuhia a friend of yours?
A. She was a co-worker of mine.
Q. You wouldn't classify her as a friend?
A. Personal friend, no. Just a co-worker.
Q. What about Michael Dolan, was he a friend of yours there?
A. A co-worker. He was my manager.

Page 18

Q. Did either of these people have anything to do with your termination, to your knowledge?
A. No.
Q. Besides Mr. Han, do you know if anyone in particular complained about your situation at Home Depot that led to your termination?
A. No.
Q. Have you ever seen any documents or reports regarding the investigation and the findings?
A. No.
Q. Has anyone ever offered you -- anyone ever offered to show you these?
A. No.
Q. Have you received any kind of an offer of settlement from Home Depot for your termination?
A. No.
Q. No one has ever talked to you about it?
A. I just go on with my life.
Q. Have -- you've never talked to an attorney -- another attorney besides Mr. Harris about this?
A. No.
Q. And let me get this straight, I guess, one last time. You were never placed on any kind of paid leave pending the investigation; is that correct?
A. No.

Page 19

Q. They just fired you outright?
A. Yes.
Q. And you showed up for work one day and they just said, here's a termination letter?
MR. HARRIS: Objection, argumentative.
MR. SHERMAN: Leading too, probably.
MR. HARRIS: Yeah, but the argumentative will get sustained.
MR. SHERMAN: I know.
Q. And I don't want to dwell on this, but I do need to be clear. What exactly did Home Depot claim you were doing?
MR. HARRIS: Objection, foundation, speculation.
Q. You can answer the question.
A. I was following procedures, doing what I was told to do, and they told me I was doing fraudulent returns.
Q. And what -- what basis did they have to claim that you were doing a fraudulent return?
MR. HARRIS: Objection --
THE WITNESS: Video.
MR. HARRIS: Hold on. Objection, foundation, speculation.
Q. Okay, go ahead.
A. Video.
Q. Do they have -- and were these doing -- were these

Page 20

fraudulent returns at your checkpoint?
A. Yes.
Q. Do they have a video on each checkpoint, to your knowledge?
A. No, no.
Q. Let me ask you this, to your knowledge -- and I want to refer to the two incidents with Mr. Muse -- do you know if there was a video on those checkpoints at the time?
A. Videos are on the ceiling of the store and can see everything clearly.
Q. Are they on, to your knowledge, all the time?
A. Yes.
Q. So is it possible, then, that there is a video recording of the November 2003 encounter with Mr. Muse?
MR. HARRIS: Objection, foundation, speculation.
Q. Go ahead.
A. I'm sure there is.
Q. Have you ever seen such a video?
A. No.
Q. Do you know if one has -- a copy has been made of one?
A. Don't recall.
Q. Since you began working at Home Depot in -- is it November or December of 2002?

Page 21

A. November.
Q. Where did you work prior to that?
A. I stayed home for a little while.
Q. When you say -- was that a few years?
A. Yes.
Q. Where did you -- when was your -- what was your last job before you began working at Home Depot?
A. Hardware Hawaii.
Q. I'm sorry, what?
A. Hardware Hawaii.
Q. And what did you do there?
A. I was an assistant manager.
Q. And why did you leave that job?
A. They had a new GM that came in and we didn't get along. We didn't see eye to eye there, and he was -- a lot of people quit when he got there. I wasn't the only one.
Q. Where is Hardware Hawaii located?
A. Kahuhipa Street.
Q. It still exists?
A. Yes.
Q. Have you had any other kind of allegations about fraudulent returns or anything of that nature in your work history?
A. No.
Q. This is the only time at all --

Page 22

A. Yes.
Q. -- that this has ever occurred?
A. Yes. Can I say something?
MR. LEVIN: No.
MR. HARRIS: Why don't you wait until he asks a question, and then if you want to tell him something later, I'll ask you to talk to me.
Q. Let me get this straight one last time. You've never had a problem -- an accusation of theft or dishonesty in your work -- in your work history?
A. No.
Q. You've never been charged with a crime at all?
A. No.
Q. You've never been convicted of such a crime?
A. No.
Q. Do you know who maintains the videos at Home Depot?
A. Harold Han.
Q. Is Harold Han security at Home Depot, to your knowledge?
A. LPS.
Q. Is that a fancy name for security?
A. Security is -- I think it's different, security. LPS is loss preventions.
Q. Do you know how long the videos are maintained?
MR. HARRIS: Objection, speculation,

Page 23

foundation.
THE WITNESS: No.
Q. Do you know if Harold Han is still working at Home Depot?
A. Yes.
Q. You think he is?
A. Yes.
Q. Have you ever seen one of these videos from a checkpoint?
A. No.
Q. But to the best of your knowledge, every transaction is videoed?
MR. HARRIS: Objection, foundation, speculation.
Q. You can answer.
A. Yes.
Q. Is that general knowledge among all the clerks there?
MR. HARRIS: Objection, foundation, speculation, hearsay.
Q. Go ahead. You can answer.
A. The video cameras are above the ceiling. It's focusing on everybody in the store, not just the cashiers.
Q. How many -- do you know how many video cameras are on the ceiling?

Page 24

A. Approximately about 30.
MR. HARRIS: Did you want to ask me something?
Q. I'm going to hand you what's been marked as Exhibit 1.
(Exhibit No. 1 marked.)
MR. HARRIS: There's no question pending now, is there?
MR. SHERMAN: No.
MR. HARRIS: The witness wants to tell me something.
Okay, I'll follow up on that when I talk to you.
Q. To the best of your knowledge, does loss prevention maintain the videos?
A. Yes.
Q. Why don't you take a look at what's been marked as Exhibit 1. Can you identify that document?
A. Yes.
Q. What is it?
A. My statement the day Jon Muse came in to return a wheelbarrow.
Q. Is this your handwriting?
A. Yes.
MR. HARRIS: Excuse me, Counsel, what exhibit is this marked? I have an unmarked copy. It's 1, right? Okay. I don't need a sticker.

Page 25

MR. SHERMAN: Well, I want to make sure it's clear, Jeff. I don't want any confusion here.
Q. Now, let me ask you to take a look at the top of the employee statement. Is that your residence, 45-113 Makaleha Street?
A. Yes.
Q. Is that still your residence?
A. Yes.
Q. And you earlier testified that you thought you had been employed at Home Depot since November of 2002?
A. Yes.
Q. Does this refresh your recollection?
A. Yes.
Q. Since when have you been employed at Home Depot, to your --
A. November 4th, 2002.
Q. November 4th, 2002?
A. Yeah.
Q. So on this statement here, though, you said you had been employed since December of 2002; is that correct?
A. I don't recall, because my daughter was hired at her job in November and I was December, the same time, so I might have that two dates mixed with hers.
Q. So you're not really sure --
A. Yes.

Page 26

Q. -- at this point whether it was November or December 2002?
A. Yes.
Q. Let me ask you to take -- we can take a moment here just to read through this statement, if you would, or are you familiar enough with it?
A. (Witness nods).
Q. You're familiar enough with it just to testify now?
A. Yes.
Q. Now, is this statement accurate?
A. Just the date, a date -- I think the date on the top.
Q. What date would that be?
A. That would be on November 3rd, 2003.
Q. You're sure?
A. Yes.
Q. So you made a mistake there; is that correct?
A. Just on the 2, should be changed to a 3. That's the only --
Q. That --
A. -- year.
MR. HARRIS: Please don't interrupt.
Q. So that part of the statement is not correct; is that true?
A. Just the date.

Page 27

Q. Okay. So is it your testimony, then, that the occurrence about which you're writing took place on November 3rd, 2003?
A. No, 2004.
Q. Okay. Then when you encountered Mr. Muse, that was on November 3rd, 2004?
A. Yes.
Q. Okay. Now, remembering the day of the incident, did you write up a report that day?
A. Yes, I wrote my -- a note sheet, stuck it in my locker.
Q. Do you know who has that note sheet now?
A. I threw it away after I wrote my statement.
Q. Okay.
A. It's the same.
Q. Okay, so you actually had an earlier statement that you destroyed; is that correct?
A. Yes.
Q. And what format was that in? What does that look like?
A. Exactly the same.
Q. Did you copy this statement word for word from there?
A. Yes.
Q. Was it -- at the time, to your knowledge, was it

Page 28

company policy that when you had an incident like you did with Mr. Muse that you would make a statement immediately thereafter?
A. Yes.
Q. And when did you make that statement that day?
A. I wrote up my statement, my -- and I stuck it in my locker until I was told to give it to them. Then I rewrote it.
Q. Let me ask you, do you remember what time the incident with Mr. Muse occurred, what time of the day?
A. I don't recall.
Q. It's not in your statement, though, is it, the time it occurred?
A. No.
Q. Do you know if it was early morning?
A. It was approximately between -- early afternoon.
Q. After 1:00 o'clock?
A. Yes.
Q. Now -- so what was your shift that day? What were your hours that day, November?
A. I don't recall.
Q. Do you know when you got off that day?
A. No.
Q. Would you have written up the statement after you got off?

Page 29

A. Yes.
Q. Okay, would you have made a copy of it?
A. I had -- the statement that I wrote was in my locker. That's the only one I --
Q. Is it company policy that you would keep that statement and not give it to anyone else?
MR. HARRIS: Objection, foundation, speculation.
Q. To the best of your knowledge, at that time, was it company policy that you would keep that statement for yourself?
A. Repeat the question.
Q. To the best of your knowledge, at that time, was it Home Depot's policy that you would not give that statement to anyone else but keep it in your locker?
A. No.
MR. HARRIS: Objection, foundation, speculation. Did I interrupt you?
THE WITNESS: No.
MR. HARRIS: Did you say something? Okay.
Q. You can answer the question.
A. No.
Q. What was the policy as you understood it at that time?
MR. HARRIS: Objection, foundation,

Page 30

speculation.
Q. You can answer.
A. To write a statement right when it happened, the day that it happened.
Q. But what were you supposed to do with this statement after you wrote it?
MR. HARRIS: Objection, foundation, speculation.
Q. You can answer.
A. I kept it in my locker.
Q. You weren't aware of any policy at the time that would require you to give it to a manager or someone higher up in the company?
A. Yeah.
Q. What was that policy that you were aware of at the time?
A. To give it to the manager or -- I wasn't told to give it to them until February.
Q. There was no policy, to your knowledge, that you would give it to them immediately?
MR. HARRIS: Objection, foundation, speculation, asked and answered.
THE WITNESS: I don't recall.
Q. How did you know that you were supposed to give it to the manager?

Page 31

MR. HARRIS: Objection, foundation, speculation, assumes facts, asked and answered.
Q. You can answer.
A. It's the right thing to do.
Q. When you began work at Home Depot, were you given a manual of company policy?
A. Yes.
Q. And did that manual tell you what to do in certain circumstances?
A. Yes.
Q. Okay, did that manuel address a situation like you had with Mr. Muse?
A. Yes.
Q. And to your recollection, what did the manual say?
A. Treat every individual, every customer with dignity, respect.
Q. Did the manual tell you to make a written report after an incident with a customer?
A. I don't recall.
Q. Do you still have a copy of that manual?
A. No.
Q. Did they take it back from you when you were terminated?
A. No.
Q. Did you -- what happened to the manual you were

Page 32

given?
A. It was probably in the junk at home and it got tossed out with the junk, you know.
Q. But the manual they gave you told you what you had to do as an employee at Home Depot; is that correct?
A. Yes.
MR. HARRIS: Objection, best evidence and foundation.
Q. You can answer.
A. Yes.
Q. And did you -- would you refer to that manual when you had a question about what you were supposed to do at Home Depot?
A. Yes.
Q. At the time this incident occurred, did you still have that manual?
A. Yes.
Q. Did you refer to it at the time of this incident to see what you should do?
A. Yes.
Q. And what did the manual state, to the best of your recollection?
A. Treat the person -- each person as a regular customer.
Q. What did the manual state about taking a -- making

Page 33

a report about an incident?
MR. HARRIS: Objection, assumes facts, best evidence, hearsay.
THE WITNESS: I don't recall.
Q. Do you think the manual may have said something about making a report?
MR. HARRIS: Same objection, asked and answered.
THE WITNESS: I don't recall.
Q. So let me direct your attention to the bottom of the report. Is that your signature?
A. Yes.
Q. Could you read the time for us into the record?
A. 4:55 p.m.
Q. Okay. And the date?
A. February 20th, 2004.
Q. You were still an employee of Home Depot at that time?
A. Yes.
Q. Do you know where you wrote this statement out?
A. In the lunch room.
Q. At Home Depot?
A. Yes.
Q. And who asked -- did someone ask you to write this statement out?

A. Yes.
Q. Who was that?
A. I don't recall.
Q. Would it have been Mike Dolan?
A. I don't recall.
Q. How many times -- how many times have you met with Mr. Harris?
MR. HARRIS: Objection, attorney-client privilege. Instruct the witness -- instruct the witness not to answer.
MR. SHERMAN: Actually, what communication is being violated there?
MR. HARRIS: I'm not arguing with you. You can take that question and go talk to the magistrate. I'm objecting. I'm instructing the witness not to answer.
Q. Are you going to follow Mr. Harris's instruction in this regard, knowing that we may have to go to court on this?
A. Yes.
Q. How many times have you been to Mr. Harris's office?
MR. HARRIS: Same objection, same instruction.
Q. Has Mr. Harris ever come out to Home Depot to talk to you?
MR. HARRIS: Same objection, same instruction.
Q. Have you met with employees at Mr. Harris's law



firm regarding this matter?
MR. HARRIS: Same objection, same instruction.
Q. Have they helped you prepare for this deposition in any form or fashion?
MR. HARRIS: Same objection, same instruction.
Q. Did you -- let me ask you one more time, what documents did you review for this deposition?
MR. HARRIS: Asked and answered.
Q. You can answer that question.
A. My declaration and my written statements.
Q. Now, your declaration, did you prepare that yourself?
A. No.
Q. Was it prepared for you?
A. Yes.
Q. And you went somewhere to sign it; is that correct?
A. No.
Q. Was it sent to you in the mail?
A. No.
Q. How did you get it physically to sign it?
A. It was dropped off at my work of employment.
Q. Was it picked up from your work of employment as well?
A. Yes.
Q. Do you know who picked it up?



A. Yes.
Q. Okay, who was that?
A. Ms. Jan.
Q. That was Jan Boivin?
A. Yes.
Q. Did she drop it off as well?
A. Yes.
Q. Without getting into your -- exactly what was said, she spoke to you when she dropped it off; is that correct?
MR. HARRIS: Objection, attorney-client privilege. Instruct the witness not to answer.
MR. SHERMAN: Again, I don't understand that, because I'm not asking the content.
MR. HARRIS: Just stop arguing. Just keep going.
MR. SHERMAN: Jeff, for the record, I don't have to take instruction from you. We can certainly make our points for the record, all right? There's no reason for either me to be condescending to you or you to be condescending to me. We're not going to spend a lot of time on this. I want to make sure it's very clear, you know, if and when we take this to Judge Kurren. All right?
MR. HARRIS: Sure.
MR. SHERMAN: And it will just go faster if we just stop going along this route. Obviously, you know, you



have an idea that -- a much more expansive view of the attorney-client privilege than we do, and I think we all understand that at this point, but I do have to make the record.
MR. HARRIS: Ask a question and keep going.
Q. Have you spoken with anyone at Home Depot about this incident?
A. No.
Q. You never spoke to Mr. Dolan about it?
A. No.
Q. At any time?
A. No.
Q. Okay. What about Darlyn Kuhia, never spoken to her about this?
A. I misunderstood the question. I thought you meant -- the incident that happened that day?
Q. That's correct.
A. Yes, yeah, I spoke to them.
Q. Okay. Is it easier for you to remember things right after they've happened than it is to wait, let's say, five months to write it down?
A. I'm pretty sharp. I can remember a lot of things.
Q. So for you, there's no reason to write anything down immediately? You can just remember it five or six months later; is that correct?

Page 38

MR. HARRIS: Objection, argumentative.
Q. You can answer.
A. I usually write it down right away.
Q. But the statement you wrote down right away has been destroyed; is that correct?
A. It's the same statement that I have here. It's just a re-handwritten one of it.
Q. Are you saying it's exactly the same statement?
A. Yes.
Q. Then why don't we have it?
MR. HARRIS: Objection, foundation, speculation, argumentative.
Q. Go ahead.
A. It's the same thing. It was just jotted down fast in my -- on paper and I rewrote it.
Q. Why would you rewrite it?
A. On a different sheet of paper, on the employment statement paper.
Q. But you stated that the earlier statement was on exactly the same form?
A. It was on paper. It was on plain paper, then I rewrote it on the Home Depot statement, exactly wording the same.
Q. Okay, with exactly the same dates?
A. I might have just made a mistake on the top, the

Page 39

year, 2002. Instead of 2004 I wrote 2002.
Q. Now, have you -- did you ever -- have you ever met Mr. Muse since this incident in November?
A. No.
Q. Did you ever meet him prior to the incident in November of 2004?
A. No.
Q. Didn't you meet him in April 25th, 2004?
MR. HARRIS: Objection, vague as to the term meet.
Q. You can answer the question, if you can.
A. Yes.
Q. So you have met him after the November incident?
A. Yes.
Q. And would that have been April 25th, 2004?
A. Yes.
Q. Now, since your termination from Home Depot, have you spoken to anyone other than Mr. Harris about this incident?
MR. HARRIS: Objection as to communications with anyone in my office covered by the attorney-client privilege and with respect to -- such as Jan Boivin, and instruct the witness not to answer with respect to communications with anyone in my office.
Q. Have you spoken with anyone about this incident?

Page 40

A. No.
Q. You haven't spoken with anyone at Home Depot?
A. During the time it happened, yes.
Q. Now, going back to the November incident, when Mr. Muse spoke to you, did he speak to you in an even voice, a low voice?
A. No.
Q. How would you describe his voice?
A. The tone was normal, but every time the C word would come out it was a higher tone, higher.
Q. Did you at that time think he was calling you a cunt himself?
A. Yes.
Q. And how long -- did you think that the whole time?
A. Yes.
Q. And did you continue to think that after he told you he had Tourette's?
MR. HARRIS: Objection, assumes facts.
Q. You can answer that.
A. He told me he had Tourette's, but I didn't know if he had Tourette's, so I still thought he was calling me the C word.
Q. At that time did you know what Tourette's was?
A. Yes.
Q. What do you think -- what did you think it was at

Page 41

that time?
A. The Tourette's I knew about was the motion, the movements with the arms and the legs, the ticking. That's the only Tourette's that I ever knew about.
Q. At that time you weren't aware that there was a verbal Tourette's?
A. No.
Q. You weren't aware that there were verbal tics?
A. No.
Q. Have you since become aware that there are verbal tics?
MR. HARRIS: Objection, foundation, speculation, lay opinion.
Q. You can go ahead and answer.
A. I don't know. I don't know. I don't know if that's what he has. I don't know.
Q. Well, if you had known at the time, would that have made a difference as to how you felt about Mr. Muse?
MR. HARRIS: Objection, foundation, speculation, lay opinion, vague.
Q. Go ahead and answer.
A. No.
Q. You mean if you knew he had a disease like Tourette's with verbal tics, you would have still been offended --

MR. HARRIS: Objection.
Q. -- at that time; is that correct?
MR. HARRIS: Objection, foundation, speculation, lay opinion, vague, argumentative.
Q. Go ahead.
A. Repeat the question.
MR. SHERMAN: Could you read the question back, please.
(Record read.)
MR. HARRIS: Same objection.
THE WITNESS: No.
Q. Looking back at the incident, are you still offended --
A. Yes.
Q. -- knowing what you know now?
A. Yes.
Q. Even though --
MR. HARRIS: Objection, vague -- are you done? You stopped.
MR. SHERMAN: No, I paused for a second. I know you want to get these objections on the record, but give me a second.
MR. HARRIS: It's just you had paused and you were looking at her like you were asking for an answer.
MR. SHERMAN: I was trying to make a



grammatical question, that's all.
MR. HARRIS: It's hard for both of us sometimes.
MR. SHERMAN: I understand. We're getting to that age.
Q. So assuming that Mr. Muse has a verbal tic that forces him to use the word cunt and fucking and he has no control over that, you were still offended by the fact that he uses that language in that context?
MR. HARRIS: Objection, foundation, speculation, lay opinion, argumentative.
Q. Okay, go ahead. You can answer.
A. Yes.
Q. So are there any other disabilities that offend you?
MR. HARRIS: Objection, argumentative. Instruct the witness not to answer. Harassing. Don't answer.
Q. Are there some disabilities that offend you?
MR. HARRIS: Same objection, same instruction. Irrelevant, harassing.
Q. Why were you offended at that time in November?
A. As a woman, any woman would be offended being called a C word.
Q. But did he actually say, you're a cunt, at that



time in November?
A. He addressed me as, eh, C. Can you help me return, C, this wheelbarrow, C?
Q. Let me ask you that question again.
MR. HARRIS: Objection, asked and answered, argumentative. Instruct the witness not to answer.
Q. What made you think that he was directing that to you personally at that time?
A. He was asking -- directing to me, asking me for help and looking at me straight in the eyes and saying the C word. He addressed me as, eh, C.
Q. He actually said a --
A. Eh, as in E-H, eh.
Q. Isn't it possible he was simply asking you for help in this transaction?
MR. HARRIS: Objection, foundation, speculation.
Q. You can answer that.
A. He was asking me for help, but he still addressed me as, eh, C.
Q. So that's -- that was your feeling at that time, that he was calling you a cunt; is that correct?
A. Yes.
Q. And is that still your feeling?
A. Yes.



Q. So did Mr. Muse at that time ask you for any kind of accommodation with respect to his condition?
MR. HARRIS: Objection, foundation, speculation, lay opinion, inadmissable.
Q. You can answer.
A. No.
Q. Do you know what an accommodation is?
MR. HARRIS: Objection, foundation, speculation, lay opinion.
Q. You can answer.
MR. HARRIS: Vague. And vague.
Q. You can answer that.
A. I don't know. I don't recall.
Q. Okay, did you -- if Mr. Muse had asked you for an accommodation at that time, what would you have done?
MR. HARRIS: Objection, foundation, speculation, vague, and lay opinion, assumes facts not in evidence.
Q. Go ahead.
A. Whether he asked me for an accommodation or not, I served him as I would a regular customer while he was still saying the C word. I was taught to do my job good and I did it as I was trained to.
Q. Can you describe where your -- the checkout stand was in Home Depot at the time of the November incident?

Page 46

A. My checkout stand, as you enter Home Depot, Ewa end, the Ewa end, it's right as you enter the door. My checkout stand was number 23.
Q. Could you have taken Mr. Muse to a separate checkout stand and done the transaction there?
MR. HARRIS: Objection, foundation, speculation, assumes facts --
Q. At the time of the incident.
MR. HARRIS: -- assumes facts not in evidence.
THE WITNESS: No.
Q. Why not?
A. There's three registers.
MR. HARRIS: Go ahead and answer.
THE WITNESS: I was helping Mr. Muse. The other girl, register 25, helping another customer, and we had a long line, so the available cashier take the next customer.
Q. Do you have any -- we talked about the manual for employees at Home Depot. You recall that?
A. Yes.
Q. Did the manual say anything about what you do if you have a difficult customer?
MR. HARRIS: Objection, foundation, speculation, best evidence, hearsay.
THE WITNESS: Yes.
Q. What does the manual say to do?

Page 47

A. We treat customers all the same, whether they're disgruntled, have a problem with us, or we call the manager over or the head cashiers, which I did.
Q. To your knowledge, do they have personal shoppers at Home Depot?
MR. HARRIS: Objection, foundation, speculation.
THE WITNESS: I don't -- yes, they do.
Q. Would that -- and how do you know this?
A. What do you mean by personal shoppers?
Q. Do you have employees there who would go with someone who had a difficulty shopping there --
MR. HARRIS: Objection --
Q. -- at Home Depot?
MR. HARRIS: -- foundation, speculation, vague.
Q. Do you have employees who were assigned to do that?
A. If a customer asks you for help, it's -- we don't have employees assigned, but anybody -- any employee can help a customer, and we do when they ask us for help. We did it on several occasions.
Q. And this includes customers with disabilities?
A. Yes.
Q. If someone in a wheelchair came into Home Depot and asked for a personal shopper when they first came in, would

Page 48

someone go around the store with them?
MR. HARRIS: Objection, foundation, vague, speculation, assumes facts.
THE WITNESS: Yes.
Q. And that's part of the -- your training that you know this?
MR. HARRIS: Same objection.
THE WITNESS: Yes.
Q. Okay, and is that in the manual as well?
MR. SHERMAN: Same objection, and best evidence, hearsay.
THE WITNESS: Yes.
Q. There's actually a portion of the manual that deals with people with disabilities?
A. Yes.
Q. Really? What does it say?
MR. HARRIS: Same -- objection, foundation, speculation, best evidence, hearsay.
THE WITNESS: Help customers with disabilities that need our help, returns, cashiers, or anybody who is on the floor. When a disabled -- disabled customer asks us for our help, we give them our full attention.
Q. And this is for every disability?
A. Every disability, yes.
Q. Even Tourette's?

Page 49

MR. HARRIS: Same objection, foundation, speculation, vague.
Q. You can answer.
A. Yes.
Q. Even Tourette's like Mr. Muse has?
MR. HARRIS: Same objection, foundation, speculation.
Q. You can answer.
A. I didn't know at the time Mr. Muse had Tourette's.
Q. But you know now; is that correct?
A. I don't know if he had Tourette's.
MR. HARRIS: Counsel, is this a good time for a bathroom break? I don't need to talk to the witness or anything.
MR. SHERMAN: Sure, we can take a break now. Let's go off the record.
VIDEOGRAPHER: Go off the record at 10:03 a.m.
(Recess taken.)
VIDEOGRAPHER: We're now back on the record at 10:13 a.m.
Q. Mrs. Peterson, you understand you're still under oath?
A. Yes.
Q. Now, in November, at the November incident, after Mr. Muse had left, did you speak with Mr. Dolan about it?

A. Yes.
Q. And what was the -- what did you say to him?
A. I had told him what had happened, when I saw Mr. Muse from when he was standing in line. There was about seven people in line and he kept saying the C word, and the people in line kept turning behind to see who was saying that, and when he finally came to my register, what had happened, and until I called Mr. Dolan over.
Q. Do you remember exactly what you said to Mr. Dolan?
A. Yes.
Q. And what was that?
A. He came towards the register and he asked me, what's going on? I said this guy just called me the C word. He said, what is the C word? And then I told him.
Q. Okay. Well, at the time did you actually help Mr. Muse when this was going on?
A. Yes.
Q. And what did you do for him?
A. I helped him exchange a broken wheelbarrow that he had.
Q. And you completed the transaction?
A. Yes.
Q. When you spoke to Mr. Dolan, did you ask him what you would do when Mr. Muse came back?
A. When I spoke to Mr. Dolan and I told him what had



happened, Mr. Dolan turned red, so red that he couldn't, you know, believe what was said. His face was flushed. Then he went and talked to Jon Muse himself.
Q. So Mr. Dolan was very angry?
A. He wasn't very angry. He was upset, you know, from what was said to his cashier. He wasn't angry at all.
Q. You mean his face turned red and he wasn't angry?
A. He was embarrassed, more embarrassed for us.
Q. Is that your interpretation of Mr. Dolan's state at that time?
A. Yes.
Q. He could have been angry, though; isn't that true?
MR. HARRIS: Objection, foundation, speculation.
THE WITNESS: He wasn't angry. He was upset, not angry.
Q. How do you know he wasn't angry?
MR. HARRIS: Same objection.
THE WITNESS: Mr. Dolan is a professional. He's a professional. He knows how to deal with people and the tone of voice to use, and he wasn't shouting or anything to Mr. Muse.
Q. And to your knowledge, Mr. Dolan has been trained by Home Depot to act that way?
MR. HARRIS: Objection, foundation,



speculation.
THE WITNESS: Yes.
Q. And you've been trained by Home Depot to act that way?
A. As a professional, yes.
Q. How long was your training?
A. Two weeks. You have cashier college for two weeks.
Q. And where is cashier college?
A. Upstairs in the building, upstairs in the back.
Q. What -- and tell me what you do at cashier college.
A. Cashier college, we have what was being hired, about five to six people at the time, and we have an instructor going over the rules, going over the policies, going over our job, our duties. We learn with the computers upstairs how to check in, check out people.
Q. What's the average time for a checkout at Home Depot?
A. Depending on how many items they have at the register.
Q. Is there a paradigm you follow, though, as to what the best checkout time is?
MR. HARRIS: Objection, foundation, speculation.
THE WITNESS: No.
Q. You mean at Home -- at cashier college they never



said you should be able to check someone out with five items within one minute?
A. No. You just do your job thoroughly, make sure you do it thoroughly and correct and get the customer on his way. There's no racing the clock here.
Q. Is there any policy for when a checkout stand gets backed up with a number of customers waiting, what would be done?
MR. HARRIS: Objection, foundation, speculation.
THE WITNESS: Sometimes the head cashiers will jump on, if they're not busy or, you know, some people on lunch, so you can't help it.
Q. What do you mean jump on?
A. Jump on the cashier register to check out people.
Q. You mean they'll go to an empty register and start checking people out?
A. Yes.
Q. And that will alleviate the backup; is that correct?
A. Yes.
Q. And they went over this with you at cashier college, did they?
A. Yes.
Q. At cashier college do they also give you the

employee manual?
A. Yes.
Q. Did they give you scenarios about what to do in certain situations at cashier college?
A. Act out scenarios?
Q. Yes.
A. We read out of the book and acted with each other.
Q. Is there any particular scenario where the customer uses swear words?
A. No.
Q. Okay. Is there any particular scenario about dealing with a customer who is disabled or is difficult to understand?
A. Yes.
Q. They actually acted that scenario out for you?
A. It's more just reading and talking to each other. It's not actually physical act out.
Q. Okay. Who -- did you have a main instructor at cashier college?
A. Yes.
Q. Who was that?
A. Sonia.
Q. Do you know what Sonia's last name is?
A. No, I don't.
Q. Would she be familiar with the policies at Home



Depot?
A. Yes.
MR. HARRIS: Objection, speculation.
Q. She certainly told you what the policies were; is that correct?
A. It was a whole class. We go over it. Everybody learns at the same time.
Q. Okay, but she was the person who taught you what the policies were; is that correct?
A. Yes.
Q. Did you have any other instructors as to what the policies were?
A. There was another girl there. She's no longer working at Home Depot.
Q. And this would have been in November or December of 2002; is that correct?
A. 2002.
Q. That's when you began --
A. Yes.
Q. -- at Home Depot; is that correct?
A. Yes.
Q. In your statement, did you -- it doesn't say -- did you ever ask Mr. Muse not to use the word cunt?
A. Don't recall.
Q. Well, if it's not written here, then you wouldn't



have asked him not to use the word; is that correct?
A. I don't recall.
Q. Didn't you write down exactly what happened in this account --
A. Yes.
Q. -- in November?
A. Yes.
Q. So if something's not there, then that most likely didn't happen; is that correct?
A. Yes.
Q. So you never asked Mr. Muse not to use the word cunt, did you?
A. Yes.
MR. SHERMAN: I'm sorry, can you read that question back to her again.
(Record read.)
THE WITNESS: Yes.
Q. Okay, let me rephrase it so we get this clear. Did you ever use -- did you ever ask Mr. Muse not to use the word cunt?
A. No.
Q. Did you ever ask Mr. Muse why are you using the word cunt?
A. No.
Q. Did you ever say to Mr. Muse, please don't use that



word in front of me?
A. No.
Q. Did Mr. Muse use that word in a loud fashion?
A. Yes.
Q. He screamed it out, did he?
A. No.
Q. He shouted it out, did he?
A. No.
MR. HARRIS: Objection, argumentative.
Q. Okay, that's fine. Here, can you look at the statement and see if there's any place here that you say that he said it in a loud voice, the word cunt, to you?
A. No.
Q. So it's probable that he didn't say the word in a loud voice to you, isn't it?
A. He did.
Q. Wouldn't you have written that down in this statement if he had said it in a loud voice?
A. I don't know.
Q. Well, you have stated on the record that you wrote down exactly what happened to you that day; is that correct?
A. Yes.
Q. And you didn't say in your statement that he shouted or said the word cunt to you in a loud voice, did you?

Page 58

A. It wasn't a shout. It was, can you help me? Can you help me return this, C. Little higher than normal, when the C word would come out. It wasn't a shout.
Q. But it wasn't louder. You said higher.
A. Yeah, higher and louder.
Q. Is it a higher pitch?
A. No.
Q. Could it be like he was trying not to say it?
MR. HARRIS: Objection, speculation.
Q. You can answer the question.
A. I don't know.
Q. You don't know. Isn't it possible he was trying not to say that word?
MR. HARRIS: Objection, asked and answered.
THE WITNESS: He said it several times.
Q. Isn't it possible that he was trying not to say that word?
A. No.
MR. HARRIS: Objection, asked and answered.
Q. So you believe that he was saying that word to you intentionally the whole time?
A. Yes.
Q. But you didn't put in -- and you believe he said it loudly to you; is that correct?
A. Yes.

Page 59

Q. But you didn't write that in your statement at the time, did you?
A. No.
Q. Okay. And the statement you destroyed, that you copied, didn't say that either, did it?
A. No, it was the same as this one.
Q. But you destroyed it; is that correct?
A. Well, yes.
Q. How did you destroy it?
A. Tear it up.
Q. Where were you when you tore it up?
A. In the lunchroom at Home Depot.
Q. Did Mr. -- I'm sorry, you tore up the statement when you were at the lunchroom in Home Depot; is that correct?
A. Yes.
Q. What date was that?
A. It was -- you know, I'm so nervous that this date probably -- I know this top date is November 3rd, 2003. Okay. That should be 2003, because I wasn't even hired on November 3rd, 2000 -- I'm confused with my date on the top, but this was November 2003. Because the second time I saw Mr. Muse in April 2004 it was -- he came around to my register. I was helping a Samoan lady with her little daughter. They were all dressed in white. Samoans have this

Page 60

white Sunday. They're either going to church or -- they're going to church or they're going home from church. It's white Sunday. I have a Samoan nephew. I know about white Sundays. It's a family day. The kids -- put out plays and stuff for the kids and they have baptisms.
I was helping the Samoan lady with her little daughter and Mr. Muse came around and started saying, C, can you help me return this, C, sprayer? And the Samoan lady, in embarrassment, put her head down and shaked her head. So I had to talk to her louder to not let the little girl hear what was going on. So I said, okay, Mr. Muse. Go to the garden center, look for the same sprayer, and come back. So during that time I rushed with the lady and got her and the little girl out of there.
(Exhibit No. 2 marked.)
Q. Now, I've given you what's been marked as Exhibit 2.
Yeah, write it on there.
But before we get to that, I just wanted to ask you, so you have been -- which date did this occur, to the best of your recollection, 2004, 2003?
A. The first one? The first time was 2003, Sunday -- no, excuse me, November 3rd, 2003.
Q. Okay, so you're changing your testimony from earlier today; is that correct?

Page 61

A. No, it's just the date.
Q. Okay. You testified earlier --
MR. HARRIS: I object. Instruct the witness not to answer. You're harassing.
MR. SHERMAN: I'm not harassing her. I'm pinning down as to her ability to recollect, and apparently it's not so good.
MR. HARRIS: I'm not going to argue.
MR. SHERMAN: Are you instructing her not to answer?
MR. HARRIS: Go ahead and ask the question.
MR. SHERMAN: Okay.
Q. Earlier today you testified that this occurred in 2004; is that correct?
MR. HARRIS: Objection, vague, argumentative, asked and answered.
Q. You can answer the question.
A. Yes.
Q. And what's written here in Exhibit 1 is 2002; is that correct?
A. Yes.
Q. And that's your handwriting?
A. Yes.
Q. And that's what you copied verbatim from the earlier written declaration that you destroyed; is that

correct?
A. Yes, but you have to know during this -- well, he called -- saying the C word and me doing this, I was still shaking, so, you know, the date just got me confused, you know, writing that date down. I just went...
Q. But when you copied this again about five months later, were you still upset and shaking?
A. No.
Q. So you made the same mistake again?
A. It wasn't a mistake. It was I was just copying it, not realizing it was the wrong date.
Q. And I just want to get this straight so that there's no confusion. You crumpled up the original written statement; is that correct?
A. No.
MR. HARRIS: Objection.
Q. No, you didn't? What did you do with it?
A. Tear it up.
Q. Into how many pieces?
A. Lots.
Q. Okay, did you use a paper shredder?
A. I tore it up into tiny bits of pieces.
Q. And then what did you do with it?
A. Threw it away.
Q. In a wastebasket?



A. Yes.
Q. So that original written statement that was written at or about the time of the incident is gone forever; is that correct?
A. Yes.
Q. Did you ever tell anyone else you had done this, torn this up -- this statement up?
A. No.
Q. Did anyone instruct you to tear it up?
A. No.
Q. Do you know if that's a policy of Home Depot, for you to destroy evidence like that?
MR. HARRIS: Objection, speculation, argumentative.
THE WITNESS: I already had the same thing written on another paper, so it was exact, the same wording.
Q. What do you mean another paper?
A. On this paper. I'd already rewritten it on the employee statement.
Q. Okay. So you can understand that we're a little confused about the dates, based on your testimony earlier today.
MR. HARRIS: Objection, argumentative. Instruct the witness not to answer.
Q. Which date --



MR. HARRIS: And hearsay.
Q. -- did this occur on?
A. November 3rd, 2003.
Q. So this statement is wrong; is that correct?
A. The statement is not wrong. It's the date is wrong, the year is wrong. I wasn't employed at Home Depot on November 3rd, 2002 yet. It was just a human error with the year.
Q. But it was an incorrect statement on your part; is that correct?
MR. HARRIS: Objection, harassment, instruct the witness not to answer.
MR. SHERMAN: If your witness wants to persist, and all you have to do is say I made a mistake, and it's obvious.
MR. HARRIS: It's asked and answered. I'm not going to argue.
MR. SHERMAN: But her --
MR. HARRIS: I'm not going to argue with you, Counsel. Don't address me. You state something for the record and then keep going.
MR. SHERMAN: Her ability to recollect is always at issue, any witness's is, and it's apparent here that her dates are all over the place. It also brings into question what else might have occurred and whether her



recollection is accurate.
MR. HARRIS: Objection, attorney testifying. Move to strike.
MR. SHERMAN: I'm just stating my basis for the reason.
Q. You understand that we may have to take your deposition again if we go to the judge and Mr. Harris is found not to be correct in the basis for some of his objections? You appreciate that?
MR. HARRIS: Objection. Objection, argumentative. Attorney testifying. Move to strike. Instruct the witness not to answer.
Q. Okay, are you going to follow Mr. Harris's instructions with regard to that particular question?
A. Yes.
Q. Okay, now, going down to Exhibit 1 at the bottom, I want you to read the last two sentences, starting with, I told Mike.
A. I told Mike C. Mike asked the young man, please stop saying that or I need you to leave. He told Mike Dolan, C, I have Tourette's, C.
Q. So Mike Dolan asked Jon Muse to leave; is that correct?
A. He asked him to leave if you're going to be -- from my recollection, would you please leave, if you're going to