OF COUNSEL:
DAVIS LEVIN LIVINGSTON GRANDE
STANLEY E. LEVIN     1152-0
851 Fort Street
400 Davis Levin Livingston Grande Place
Honolulu, Hawaii 96813
Telephone: (808) 524-7500/Fax: (808) 545-7802
E-Mail: slevin@davislevin.com

BRUCE F. SHERMAN    5996
E-mail: failey52@hawaii.rr.com
THOMAS F. FEENEY    5546
E-mail: feen@compuserve.com
1164 Bishop Street, Suite 124
Honolulu, Hawaii 96813
Tel:(808) 599-3955/Fax: (808) 599-3944

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JON MUSE, | CIVIL NO. 04-00154 DAE/BMK |
| | (Civil Rights Violation) |
| Plaintiff, | PLAINTIFF'S MEMORANDUM IN |
| | OPPOSITION TO DEFENDANT |
| vs. | HOME DEPOT USA, INC.'S FIRST |
| | (1ST) MOTION IN LIMINE |
| HOME DEPOT USA, INC., | (RESTRAINING PLAINTIFF JON |
| | MUSE FROM ATTEMPTING TO |
| Defendant. | INTRODUCE EVIDENCE, |
| | TESTIMONY, ARGUMENT, AND |
| | COMMENT CONCERNING THE |
| | OPINIONS OF WILLIAM P. |
| | SHEEHAN, M.D.) AND |
| | CERTIFICATE OF SERVICE |
| | |
| | TRIAL WEEK: January 17, 2007 |
| _____ | JUDGE: David A. Ezra |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT
HOME DEPOT USA, INC.'S FIRST (1ST) MOTION IN LIMINE
(RESTRAINING PLAINTIFF JON MUSE FROM ATTEMPTING TO
INTRODUCE EVIDENCE, TESTIMONY, ARGUMENT, AND COMMENT
CONCERNING THE OPINIONS OF WILLIAM P. SHEEHAN, M.D.)

## I.   INTRODUCTION

Defendant wrongly alleges that Plaintiff's treating physician's, William P. Sheehan, M.D. (Dr. Sheehan), testimony is "unreliable," "irrelevant" and "speculative." These are Defendant's characterizations of Dr. Sheehan's testimony. Defendant has tried in vain to keep Dr. Sheehan from testifying, and as the Court will see at the hearing on this Motion, Defendant's position is ill-conceived, incorrectly interprets the facts and the law, and clearly nonsensical.

## II.   DR. SHEEHAN'S TESTIMONY IS RELEVANT, RELIABLE, AND NOT SPECULATIVE.

Defendant refers to case law and decisions that hold that it is unfair to permit treating physicians like Dr. Sheehan a wide berth in relating his opinions about his patients' health. Defendant has completely mischaracterized Dr. Sheehan's testimony in a desperate effort to in some way exclude it. However, it is clear that Dr. Sheehan is a classic treating physician and should be treated as such. The law on treating physicians is that:

> **Treating physician** must be identified pursuant to Rule 26(a)(2)(A) but the report requirement of Rule 26(a)(2)(B) shall not apply to the extent that the **testimony** of such **treating physician** is limited to: (a) a description of the symptoms presented to the **physician**;

> (b) description of records or other information relied on to provide treatment; (c) any diagnosis made for purpose of treatment, and (d) a description of any treatment prescribed or provided. *Testimony by a **treating physician** as to causation or prognosis or future impact of the condition or injury is subject to the report requirement of Rule 26(a)(2)(B).*
>
> **Sowell v. Burlington Northern and Santa Fe Ry. Co.,** Not Reported in F.Supp.2d, 2004 WL 2812090 N.D.Ill., 2004. December 07, 2004. *This black letter law that as long as the treating physician does not plan to testify about causation, then his testimony is freely admitted without the requirement of Rule 26 that he prepare a report. See* **Gonzalez v. Executive Airlines, Inc.,** 236 F.R.D. 73 D.Puerto Rico, 20066*;* **Smith v. Wyeth-Ayerst Laboratories Co.,** 278 F.Supp.2d 684 W.D.N.C., 2003.

There is no question that if Dr. Sheehan is offering garden variety treating physician testimony, which he is, then it is not being offered under Rule 702 and there is no reporting requirement. Indeed, "If the individual is not providing testimony under Rule 702, he is not an expert witness for the purpose of Rule 26. *See Gómez v. Rivera Rodríquez,* 344 F.3d 103 at 113 (1st Cir.2003))." Therefore, there can be no question that Dr. Sheehan's testimony is relevant, since he was the Plaintiff's treating physician from 2001-2005. Moreover, there is no question that his testimony is not speculative, because it is based on his informed opinions about his patients' health supplemented by his observations and his testimony, which is undoubtedly reliable because he is being asked to make no expert opinions.

Defendant may be concerned about testimony it elicited at the deposition of Dr. Sheehan:

> Q. What is your opinion about Mr. Muse's condition?
>
> A. I believe that Mr. Muse has Tourette's disorder, severe, I would say pretty severe, and that was primarily why I saw him. He may have some related, if not conditions, then traits, certainly, of some other phenomenon, if you will, short attention span, hyperactivity. You know, it's that compulsive behavior, obsessive thinking. He had used substances in the past, not while I was working with him, but prior to that he had, in the past he had substance use.
>
> So the DSM-IV, that's a diagnostic criteria book that psychiatry uses, and if you went by criteria he probably had -- I treated him for, and I believe I considered it Tourette's disorder. And I don't think I gave a formal -- maybe nicotine dependence, but I don't think formally I label -- you know, put a bill in for another type of condition, although he had some traits of depression -- episodes of depression, anxiety, and those other things. that was my sort of my opinion, just in a nutshell, in working with him.

*See,* Deposition Transcript of Dr. Sheehan, Page 13, Line 18, to Page 14, Line 11.

Dr. Sheehan further opined:

> Q. Yes, Doctor, you've been designated to give your opinion in this lawsuit, and I want to know what your opinion about Mr. Muse is? And if you've given your full opinion, that's fine. If you have any other statement of your opinion about Mr. Muse's condition, I'd like to know it.
>
> A. I think that Mr. Muse has a very serious case of Tourette's disorder, and unfortunately, his symptoms never fully responded to treatment as I was able to provide it, for a variety

of reasons, but bottom line was it never got fully under control. So I'm aware -- and it's pretty debilitating.

I always appreciated Mr. Muse's ability to manage his life, and, I guess, adapt or accommodate to his own condition. He sort of developed a lifestyle that really allowed him to function sort of on the periphery of mainstream society, but he did function. He wasn't on public assistance, he was able to make some income, and I always admired that and appreciated that about him, that he was able to do that.

And his symptoms -- there's a few percentage points of folks who have this condition that symptoms don't get better with treatment. And under my care, and I think before me, too, with Dr. Zen and previous people who he had seen, those symptoms never got under control. So I think -- and he had a pretty unfortunate symptom, coprolalia, and he verbally sort of ejaculates inappropriate -- or what we would consider inappropriate or off-color or scatological words and sayings. And actually movements, too, he had the tic, motor tic as well.

And so along the time I've known him, it was sort of a series -- I mean these kinds of things would happen every so often, and he would try and harmonize himself with the environment so that it didn't cause too much disruption for -- because he was aware, he was aware that he has this thing. But also he would sort of not expect people to completely understand, he had a pretty high tolerance for people not sort of understanding his condition, and kind of raised eyes and avoidance and nonverbal kind of stuff. But my opinion is he managed pretty well.

And since we're talking about the lawsuit, when this thing happened, it was, even for him, he did react to this. He's kind of used to stuff happening. But I think this -- it was a coincidence that I actually happened to see him on November 3rd, 2003, which was either the day of or right around the time it happened because that's the way he started the meeting, and then the whole thing -- I became aware of it from there. And that was kind of an unusual thing. Most of the time he somehow

managed his life so that he didn't really have that kind of conflict or issue come up, I guess, I don't know what the right word is. And it was the first time it ever happened at this particular place, too, at Home Depot.

So in regards to the lawsuit, I think that I don't really know the other side of it, obviously. I just know from talking to him, right, because he was my patient and we talked, but I don't really know the whole rest of the story on this. So my opinion on him has been kind of he's done a pretty good job managing things despite having a pretty serious condition. And the whole time I knew him, until I left in October of 2005, it was still on his mind. Because I guess – I don't know where this thing started, but it was still on his mind, so that was something I know – it troubled him more than other things, you know, he'd had a few along the way, scrapes that he'd gotten into.

So my opinion, sort of partly me, sort of as a psychiatrist, realizing I couldn't for whatever reason, the medications didn't work well enough for him, and the problem it never went away, never went completely away. And that's sort of the goal you hope for, you hope that the medicine and the treatments you render will result in the symptoms going under control, and it just didn't happen. So that was one – and Jon tolerated that pretty well, I thought, because it doesn't feel good to have somebody you're working with who has this kind of debilitating sort of symptom or socially problematic symptom not go away, and he kind of tolerated that. And then -- so that was one opinion I have.

The other opinion, I think, is that he's had a lifetime of things that have been, you know, kind of rough on him, and he's handled them reasonably well, not perfectly, but reasonably well. And this thing that happened at Home Depot was a -- for whatever reason, it was more painful to him than other things that he'd had before. Got a whole -- if I had more ability -- I was working at Kaiser, a little different than private practice. It's sort of based on a triage function. People come in to see -- it's sort of like in a private practice, you see people very often,

> very frequent, so you have a lot of time with them. I never really had that with Mr. Muse because of the circumstances of an HMO. People pay a fee, a lot of people to see, so you sort of base it is on severity or how serious something is at the time. So things would flare up and calm down, so I didn't really ever feel like I had the chance to see him get into a full course of treatment for his condition, which I think would have been -- to my opinion on that, is that he's had to -- even after left I, I don't know how he is now, but I suspect live with a continuing amount of symptoms.

*See,* Deposition Transcript of Dr. Sheehan, Page 15, Line 5, to Page 18, Line 24.

Dr. Sheehan is an excellent witness who answered Mr. Harris' questions carefully and who would not agree with Mr. Harris' description of evidence. For example, Dr. Sheehan testified as follows:

> Q. Did you determine whether or not Mr. Muse could suppress his obscene gestures or obscene statements for periods of time?
>
> A. No.
>
> Q. Did you even consider that?
>
> A. Sure. Did I study it? I mean, there probably are ways I could have studied it, but I didn't. I asked him, I mean, you would always ask him, I would ask him if he could do it, but didn't really study an intervention and then you measure how long, no, I didn't do that.
>
> Q. Are you aware of literature that talks about people with TS being able to suppress it?
>
> A. Not suppressing, but trying to manage it. My take on the literature is that suppressing it doesn't work very well, but other things might help, relax, or, you know, kind of have the reversal, trying to relax around it. But actually my take on the literature and experience has been that the more you try and suppress it, the worse it gets. It either catches up or you can't do it, and it sort of blurts out a little bit more. But like a

>relaxation, deep breathing, meditation, yoga, things like that might relax it, I guess.

*See,* Deposition Transcript of Dr. Sheehan taken on August 3, 2006, Page 25, Line 5, to Page 26, Line 1.

## III.   CONCLUSION

Plaintiff does not believe that Defendant Home Depot's motion in limine pursuant to Daubert and Kumbo as to his treating physician, Dr. Sheehan, is well taken. Given the fact, however, that this is a bench trial, it may be best that any decision be reserved until the Plaintiff has had the opportunity to qualify Dr. Sheehan at trial.  Should the court have any concerns regarding Daubert and Kumbo, Plaintiff believes that such concerns can and will be addressed and alleviated by Dr. Sheehan's testimony in the form of an offer of proof and the record will be preserved as to both parties to this litigation.  Again, because this is a bench trial, such an approach will not result in an appreciably longer trial.

DATED: Honolulu, Hawaii, December 4, 2006.

/s/ STANLEY E. LEVIN
STANLEY E. LEVIN
BRUCE F. SHERMAN
THOMAS F. FEENEY

Attorneys for Plaintiff